IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN HODSON | ) | |
| | ) | Civil Action No.  03 - 0374e |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Maurice B. Cohill, Jr. |
| | ) | |
| | ) | |
| ALPINE MANOR, INC. d/b/a | ) | |
| INTEGRATED HEALTH SERVICES | ) | |
| OF ERIE AT BAYSIDE | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.    BACKGROUND

Plaintiff filed the Complaint on November 17, 2003.  Plaintiff, *pro se,* claims (1)

she was fired on May 17, 2002 due to her religion, Evangelical Christian, and harassed

in violation of Title VII; (2) she was discriminated against by management during her

employment because of her disability;  (3) she was harassed during her employment,

but does not state whether or not she is claiming sexual harassment, harassment due

to her disability, or harassment for some other reason; and (4)  that she was terminated

in retaliation for having been injured on the job.  Plaintiff does not specify whether she

is alleging such retaliation under Title VII or the ADA or under a common law wrongful

discharge theory.  As Plaintiff is *pro se*, Defendant will consider her allegation of

retaliation under all three theories.

1

## II.   **STATEMENT OF FACTS**[1]

IHS is a skilled nursing facility that believes that its patients should receive the highest quality of patient care.  This entails the facility meeting at all times all local, state and federal law and regulations, as well as established Company policies and procedures.  To the end, IHS insists that its staff strictly adhere to facility policies. See Affidavit of Sheila Rist, which includes copy of the Employee Handbook and other policies, as Exhibit "A."

Plaintiff, Kathleen Hodson, is a Licensed Practical Nurse.  Hodson[2] 7.  She became employed at IHS as an LPN on or about May 15, 1997.  Hodson 9-10; Affidavit of Sheila Rist.  Hodson's job required her to assess patients, pass out medications, perform treatments and document patient charts.  Hodson 12.  See Hodson's job description, Exhibit "C."  LPN's are supervised directly by the Director of Nursing and also can be supervised by the Assistant Director of Nursing and other RN supervisors.  Hodson generally worked the 3:00 p.m. to 11:00 p.m. shift.  However, when she was on light duty status she also worked the 7:00 a.m. to 3:00 p.m. shift.  Hodson 80; Affidavit of Sheila Rist.

### A.   **Plaintiff's Work Injury and Light Duty Status**

Hodson suffered a back injury at work on or about March 30, 2001.  Hodson 12, 41-

---

[1] For purposes of this MSJ only, Defendant will accept, as true, certain testimony of Plaintiff contained herein and in Defendant's Statement of Material Facts Not in Dispute. However, there are material issues of fact created by numerous self-contradictions within Plaintiff's testimony, as well as between her testimony and documents. It is submitted that Plaintiff's self-created material issues of fact cannot form a basis for denial of a Motion for Summary Judgment. See Martini V. Merrell Dow Pharmaceuticals, Inc., 851 F.2d 703, 706 (3d Cir. 1988)

[2] "Hodson" refers to the deposition transcript of Kathleen Hodson, which was conducted on March 28, 2005.  A true and correct copy of the transcript is attached hereto as Exhibit "B."

42; Affidavit of Sheila Rist. Hodson was initially off work for a short period of time after this incident (about 10 days), and returned to light duty status. She was eventually released to full duty by IHS' doctor about 90 days after the injury. Hodson claimed she had not recovered enough to go back to work full duty and requested a second opinion. Hodson 20. IHS made arrangements for her to see another doctor, who put her back on light duty status. Hodson 20-21. From July 6, 2001 through the end of 2001, she was on light duty status, while periodically taking time off work allegedly because of back pain. Hodson 17-19. During this period of light duty, she generally worked with a 20-30 pound lifting restriction. Affidavit of Sheila Rist. See Hodson's medical slips, Exhibit "D."

Hodson went on a medical leave of absence for about two months in the beginning of 2002, as her family doctor put her on work restrictions that prevented her from working during this time period. Hodson was not receiving worker's compensation or disability pay at this time. Hodson 37-39. When she returned in late February 2002, she returned to light duty status, with a weight limit of 20 pounds. See doctor's light duty slip, Exhibit "E." Hodson was sent correspondence from Carl Kovski, Administrator at IHS, advising her of the availability of light duty work and setting forth what her job duties would be. Hodson 33; Affidavit of Rist. See correspondence and job description, Exhibit "F."

### B. Hodson's Employment at IHS and Accommodations

Based on the recommendations of her doctor. IHS made accommodations for Ms. Hodson, such as having other employees push the medication cart down the hall and helping her open and close drawers and lift heavy equipment. Hodson 64, 76. Sometimes other nurses treated patients for her if she was unable. She was also permitted to go to the physical therapy room and put hot packs on her back and lie down on the therapy mats

3

during breaks. Hodson put this request in writing and Kovski approved it. Hodson 65-67. See Hodson's written request and approval by Kovski, Exhibit "G;" See also, Affidavit of Rist; Affidavit of Kovski, Exhibit "H;" Affidavit of Dave Dinges, Exhibit "I;" Affidavit of Kathy Mannion, Exhibit "J;" and Affidavit of Roger Watkins, Exhibit "K;" and Affidavit of Jennifer Heiser as Exhibit "L." Hodson also stated in her deposition that there were times when she asked to go home early and she was permitted to do so. Hodson 74.

Hodson believes that when she returned to work in late February 2002, she was not on light duty status because IHS assigned her other tasks besides filling out paperwork. Hodson 66, 75. She believed that performing any work on the patient halls was not light-duty work. Hodson 66. However, her only restriction set forth by her doctor was a 20 pound weight lifting limit. See Exhibit "E." Ms. Hodson allegedly complained about not wanting to perform work on the patient halls to Sheila Rist and Carl Kovski. Hodson claims that Rist told her she had to talk to Kovski and Hodson can not remember what Mr. Kovski said to her in response to her concerns. Hodson 27-28; 75-76.

Hodson made no requests for reasonable accommodations to be able to perform the essential duties of her LPN position that were denied by IHS. IHS did not believe Hodson was disabled in any way, nor did IHS perceive her as being disabled. While she worked at IHS she never claimed to be disabled. She simply was on light duty status with a twenty pound weight limitation from an injury, and occasionally took time off from work due to alleged pain. See Affidavits of Sheila Rist; Carl Kovski, Dave Dinges, Kathleen Mannion and Roger Watkins.

In addition, there were always nurses' aides assigned to every hall, and they were available to assist Hodson. Although she complained she did not want to perform certain

4

tasks, those tasks were within her light duty restrictions.  See Affidavits of Sheila Rist; Carl Kovski, Dave Dinges, Kathleen Mannion, Roger Watkins and Jennifer Heiser.

Hodson was reprimanded numerous times for insubordination and/or failure to follow proper policy and procedures.  Her personnel file shows she was reprimanded as follows: (1) August 21, 1997, for failure to follow proper policy and procedure in re-capping a lancet, which caused a needle stick to herself; (2) August 22, 1997 for giving the wrong medication to a patient and failing to call physician and document file upon discovery of mistake; (3) December 1, 1997 failure to follow medication administration policy by giving a patient the wrong medication; (4) December 3, 1997 for failure to follow proper documentation procedure; (5) December 29, 1997, for failure to follow physician orders with a patient; (6) December 18, 1998, for failure to meet minimum standards are care of patients; (7) April 2, 1998, for failing to remove an IV from a patient in a timely manner; (8) February 25, 1999 for failing to properly document failure to provide treatment or explain why treatment was not provided; (9) June 6, 2001, verbal warning for improper documentation; (10) November 11, 2001, verbal warning for excessive absenteeism; (11) January 29, 2002 for failing to properly sign in and out for lunch and breaks; (12) May 14 2002, for failing to properly complete a narcotic count and document file.  See documented verbal and written warnings, attached hereto as Exhibit "M;"  See also Affidavits of Rist and Dinges.  Hodson could have been terminated for several of these infractions.  However, IHS counseled Hodson and continued to employ her.

### C.    May 17, 2002 Incident - Ms. Hodson's Separation from IHS

Hodson's last day of work was May 17, 2002.  Hodson 10.  When Ms. Hodson reported to work on this date, she punched in and looked at the Hall assignments.  See

punch in card, Exhibit "N." She saw that she was scheduled to work on Northwest Hall. This upset Hodson, because she claimed that Carl Kovski, then Administrator of IHS, previously told her she was only to be assigned Ambassador Hall. Hodson 29- 30. Hodson claimed in her deposition that nurses are assigned to a specific hall, but are relocated if IHS is short staffed[3]. Hodson 24. Hodson told the nurse who she was scheduled to relieve on Northwest Hall that she could not take over for her and she went to find Kovski. Kovski was not available, and, therefore, Hodson spoke to Dave Dinges, Director of Nursing and her supervisor. This was witnessed by Kathy Mannion, Assistant Director of Nursing and Sheila Rist, of Human Resources. Hodson 30-31.

Hodson told Dinges she would not work on Northwest Hall. Dinges told her that if she left her shift, she would be abandoning her job. Hodson 33-34. During this conversation with Dinges, Hodson did not discuss what accommodations could have been given to her to work on Northwest Hall, but instead simply refused to work on the hall, claiming she would not do it. Hodson 94. Hodson admits that she was aware that there was about the same number of patients on Northwest Hall and Ambassador on that particular day. Hodson 97. See redacted patient list, Exhibit "O."

Dinges asked her why she could not work on Northwest Hall and Hodson claimed she should not be assigned to work on any hall, as that is not light duty. Hodson claims that she heard another nurse state that Northwest Hall "was a bear" and she claims that the hall was very demanding. The medicine cart is organized differently, which required

---

[3] Concerning Hodson's allegation that Kovski told her she was only permitted to work on Ambassador Hall, this assertion is false. Kovski never assigned any employee, including Hodson, to a specific hall, as there are often instances when IHS would be staffed challenged and nurses would be relocated to different halls. While it may be true that Hodson generally worked on Ambassador Hall, her restrictions did not prevent her from performing the same job duties, on a different hall. Kovski can think of no instance where he ever assigned any employee to a specific hall and specifically, he never made this arrangement with Hodson. There is no valid reason why she could not have worked on any of the other halls, and still done so within her restrictions. See Affidavit of Carl Kovski, Sheila Rist and Dave Dinges.

a lot of bending.  She did acknowledge in her deposition that there were nurses' aides that could help her.  Hodson 31-33.  Hodson also claims that she requested to work on a different Hall and that request was denied.  Hodson 74.

Dinges told Hodson that she needed to work on Northwest Hall and if she did not, she would be abandoning her position.  Although he urged her to remain and warned of the consequences of refusing the assignment, Hodson disobeyed orders, punched out, and walked off the job.  Hodson 35.  See Exhibit "N;" Affidavit of Dinges, Rist and Mannion.

After Hodson left the facility, she went home and called Ray Martinez, who was the corporate Director of Human Resources.  See Martinez's Affidavit as Exhibit "P."  Before this call to Martinez, Hodson never called corporate headquarters to file a complaint.  According to Martinez, Hodson did not complain of any harassment or discrimination during this phone call.  See Exhibit "P."  According to Hodson, Martinez told her she was not terminated, but despite this she never went back to work at IHS.  She called Kovski the next day in an attempt to return to work and was told that she walked off the job, abandoned her patients and was terminated.  Nevertheless, Martinez processed her worker's compensation claim and she began receiving worker's compensation monies.  Hodson 36-37;  See Affidavit of Ray Martinez.

After Hodson walked out, Dinges filled out a disciplinary action form documenting what occurred.  See disciplinary action, Exhibit "Q."  Hodson voluntary quit her position when she refused to work on the Northwest Hall and abandoned her patients.  Because of this, she was thereafter terminated.   See Also Affidavits of Dinges and Rist.

## D. Hodson's Allegations of Religious Discrimination & Harassment

Hodson was open about her religious beliefs. She would openly give credit to God entering her life and claims that people would come to her asking if she would pray for them. Hodson 47; Affidavit of Rist; Kovski, Dinges, Mannion, Watkins, Maureen McGraw, as Exhibit "R," Carmen Callicott, as Exhibit "S," and Donna Marsili, Exhibit "T."

Hodson claims she was discriminated against, harassed and terminated because of her religious beliefs. To support this assertion, Hodson claims that Dinges put a note addressed to her on the bulletin Board that contained offensive comments about her religion. It was folded in half and everyone could see it. The note addressed an incident wherein Hodson forgot to put her initials on a treatment record. Dinges allegedly wrote something on the note, such as "What an amazing thing you have performed" or " Did you lay hands on them and heal them?" Hodson 49. Hodson 51. Hodson claims that she gave the note to Sharon DiLoreto, who was then the Director of Nursing, but according to Hodson, DiLoreto has no recollection of the note. This incident occurred before her alleged work related injury, so it occurred at least 1 year before her job abandonment.[4]

---

[4]Dinges admits that he did place a note for Hodson on the pin-up board, as he did for all staff, but the notes were always folded in half and/or placed in an envelope so other staff could not read the note. He never placed a note on the pin-up board disparaging Hodson about her religious beliefs. He questioned why she did not perform a treatment as ordered by a physician. Hodson claimed to Dinges at that time that the patient did not need treatment as per ordered by physician and she did not make proper notation in the file.

Dinges admits that he may have made a comment one time to another employee questioning how Hodson treated patients. Hodson would make statements around the facility that if it were not for her, patients would die at IHS or that she had saved them. He may have commented once by questioning who she saved and what she did to them. He believes he questioned whether she performed CPR and said, "What did Kathy do, put her hands on them and heal them?" This was an isolated comment which was made in jest. It certainly was not meant to be discriminatory or mean in any way. Hodson is taking one isolated comment and blowing it out of proportion. She never complained to Dinges about this comment, and as far as he is aware, she never filed a written complaint about this comment. If she would have complained to Dinges, of if he was aware that the comments offended her, he would have apologized to her. See Affidavit of Dinges and Mannion.

8

Hodson 81.  This is the only incident Hodson has to support her claim for religious discrimination.  Hodson 49-52.  Hodson 81.

After her injury, she claims she was targeted by Roger Watkins, Assistant Director of Nursing, because he knew she was a Christian, although no specific incidents or support for this assertion have been made by Mr. Hodson.  Hodson 59.  Watkins is a Roman Catholic.  Affidavit of Watkins.

With no supporting justification, she also believes that Watkins made sexual innuendos in front of her because she is a Christian.  Hodson 52; 77.  Watkins is openly gay.  According to employees at IHS, Hodson had a problem with Watkins sexual preference, and they generally had personality conflicts because of this.  See Affidavits of MaGraw, Callicott, Marsili, Rist and Kovski.  Hodson was heard making derogatory comments while working at the nurses station, calling Mr. Watkins a "faggot" and she openly stated her opinion that "God does not approve of homosexuality."  See Affidavit of Mannion.  She made comments directly to Watkins, such as, "I can't understand your kind," and "Your people are wrong."  She also made a comment that "All his people should be put on an island."  When she would make these comments to Watkins, he would roll his eyes and walk away without saying anything back to her.  See Affidavit of Watkins.

Hodson claims that Watkins' sexual preference did not bother her and that she does not have a religious stance on this issue.  Hodson 61.

Hodson was repeatedly asked in her deposition if there were any other specific instances to support her claim of religious discrimination or harassment and she

_____

9

could not articulate any other incident.  Hodson 77.  There was nothing concrete that she could point to, she just believed this.  Hodson 77-78.

### E.    Hodson's Allegations of "Harassment"

To support her allegations that she was sexually harassed, harassed for being on light-duty, discriminated against because of her injury, was subjected to a hostile work environment and was retaliated against, Hodson claims as follows:

(1) Roger Watkins threw a box of lancets at her, (a box about three by four of five inches long) and said "If that's not too heavy for you, Hodson, could you take here or take it here or give it to."  Allegedly RN Donna Marseli witnessed this and Ms. Hodson said to her, "How long do I have to continue to take this treatment?"  Ms. Marcelli allegedly shrugged her shoulders and said she did not want to get involved[5].  Besides Marcelli, who is not Hodson's supervisor, she never complained to anyone else about this incident.  Hodson 45- 46.

(2)    Watkins put a lot of medications and files in front of her and asked her to send them back and make a record of them.  He threatened to write her up if she did this wrong[6].  Hodson 53; 64.  Hodson admits that Watkins never wrote her up for any misconduct.  Hodson 64.

(3)    Watkins would make sexual comments to Carman Callicott, LPN, and Hodson overheard these conversations. Watkins claimed that he could not put Attends (adult diapers) on because they would not fit due to his physical endowments.  Watkins

---

[5] Marseli has no recollection of this incident.  See Exhibit "T."

[6] Watkins alleges this never happened.  He never threatened her, nor did he ever write her up for any misconduct..  Affidavit of Watkins.

also talked about wanting to give patients "flu shots in the butt" because he wanted to see the male patients naked. He also made statements about wanting to "do it" with a priest. Hodson 53- 54. According to Hodson, Watkins did not make any of these statement directly to her, he just made them in her presence. She believes that Watkins made sexual statements in her presence because she was injured and he wanted to harass her. Hodson 55; 78. Callicott allegedly witnessed this conduct and Ms. Hodson complained to her about it[7]. Hodson 62.

(5)     Allegedly, Callicott told Hodson that Watkins pinched her nipples. Hodson did not witness this, but Callicott told her about it. She never complained to anyone about this incident. She only talked about it with Callicott[8]. Hodson 56-57.

(6)     Dave Dinges allegedly retaliated against her for being hurt and for being on workers' compensation Hodson 84-85.

(7)     She was reprimanded by Dinges for not properly signing off on narcotics. Another nurse also made this same mistake and she purportedly was not reprimanded[9]. Hodson 85-88.

(8)     Hodson requested to be employed in the MDS position (patient assessment and billing position) that was open. The position was given to Jeanette Brown,

---

[7] Callicott denies that Watkins ever made any of these statements. See Exhibit "S."

[8] Both Watkins and Callicott deny this ever happened. No complaint was ever made by Callicott or Hodson. See Affidavits of Watkins, Callicott, Rist and Kovski.

[9] Dinges alleges that this warning was warranted as a violation of IHS policy. The other nurse was reprimanded as well. See Affidavit of Dinges.

11

who had less seniority.[10]   Hodson 68-69.

Hodson can not recall whether she ever complained about these incidents or not. She claims she told Rist and Kovski about Watkins' behavior towards her, but in her deposition could not confirm specific incidents she complained about.  Hodson 55; 58-59.

Hodson was asked in her deposition if there were any other incidents of sexual harassment by Watkins and she said "Oh. I can't specifically remember right now, but, I mean, there was a lot more other harassment."   When asked again about other incidents of harassment or discrimination, she could not remember anything else. She admitted that Watkins never touched her inappropriately.  Hodson 83 - 84.

### F.    IHS Grievance Policy

IHS has a grievance policy that is set forth in the employee handbook. See employee handbook attached to Affidavit of Rist, Exhibit "A." IHS has an open door policy for employee complaints.  In fact, Kovski told Hodson that she could come to him with any complaints she had and Hodson felt she could also make complaints to Rist.  Hodson 26-27.  Additionally, there was a 1-800 hot line number that employees could call to make complaints and this telephone number was posted around the facility.   Hodson 27. Employees could also file complaints with Ray Martinez, Corporate Director of Human Resources, and Hodson was aware of how to contact him. There was a procedure to file a written grievance, but Hodson never did so.  Hodson 28-29.   Hodson never called the hotline.  Hodson 27; See also Affidavits of Martinez, Rist, and Kovski, Callicott, Magraw

---

[10] Hodson interviewed for this position with Dave Dinges.  Kovski was not responsible for filling the position.  Dinges hired another person who was more qualified for the position.  Positions are not filled based on seniority.  See Affidavits of Dinges and Kovski.

and Marsili.

Employees are trained about issues related to sexual harassment and discrimination and the policy related thereto, and Hodson admittedly attended this training and was aware of how to make a complaint. Hodson 27. See Acknowledgment of IHS handbook and policies signed by Hodson as Exhibit "U."

### G. Hodson's Status Since Her Separation from IHS

Since Hodson's separation from IHS, she has not taken any action to seek additional employment. Hodson claims she never recovered from her work related injury in May 2001. She claims she can not walk far and has to take frequent rests. She, however, currently does not currently take any pain medication. Hodson 43-44.

Hodson believes she has a disability in walking. She has a herniated disc. She walks with a limp, but she can still walk. She does not use a leg brace, crutch or cane. She does not use a walker or a wheel chair. Hodson 70.

She claims that her family doctor states that she is not able to work at all. Hodson attempted to collect Social Security Disability benefits but her request was denied, as it was determined that Hodson could still work in less physical positions. Hodson 71-73.

### III.   ARGUMENT

#### A.   STANDARD OF REVIEW

The standard rules governing motions for summary judgment are applicable herein and for the sake of brevity are not set forth at length. Fed. R. Civ. P. 56 ( c) ; <u>U.S. v. Daum</u>, 968 F. Supp. 1037 (W.D. Pa. 1997, Judge Standish); <u>William Michelson v. Exxon Research and Engineering Company</u>, 808 F.2d 1005 (3d Cir. 1986).

## B.    LEGAL OVERVIEW

Title VII of the Civil Rights Act of 1964, 42 U.S.C.S. § 2000(e), prohibits employment discrimination based on religion and sex.  Under the McDonnell Douglas burden shifting test, a plaintiff in a Title VII case bears the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence.  McDonnell Douglas Corp. V. Green, 411 U.S. 792 (1973).   Although the *prima facie* elements of a discrimination claim can vary depending on the particular facts of the case, the plaintiff must present evidence that "raises an inference of discrimination."   Sarullo v. U.S. Postal Service, 352 F.3d 789 (3d Cir. 2003); Swierkiewicz v. Sorema N.A. Service, 534 U.S. 506, 510 (2002).   If the plaintiff is able to establish a *prima facie* case of discrimination, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory explanation for the adverse employment action. If the employer meets this burden, then plaintiff must prove by a preponderance of the evidence that the explanation offered by the employer is a pretext for discrimination.  Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

## C.    PLAINTIFF'S CLAIMS OF RELIGIOUS DISCRIMINATION/HARASSMENT UNDER TITLE VII SHOULD BE DISMISSED

In order to establish a *prima facie* case of discrimination under Title VII, Plaintiff must show: (1)  she is a member of a protected class; (2) she is qualified for the position; (3) she suffered an adverse employment action despite being qualified; and (4) the action occurred under circumstances giving rise to an inference of unlawful discrimination, such as when non-members of the protected class are treated more favorably than Plaintiff.  Sarullo v. United States Postal Serv., 352 F.3d 789 (3d Cir. 2003).

14

Plaintiff can not prove that she suffered an adverse employment action under circumstances giving rise to an inference of unlawful discrimination. Hodson's assertions of religious discrimination seem to stem from the fact that she, Dinges and Watkins simply did not get along. In her deposition she stated that Dinges and Watkins were mean people and they "ran the place." Hodson 34,45. Employees at IHS have stated that Hodson had personal problems with both Dinges and Watkins. She did not like Dinges because he held her to her job description and did not let her get out of performing work that was within her light duty restrictions. However, Dinges treated all employees in this manner. She did not like Watkins because he has openly gay. *See* Affidavits of Rist, Kovski, Watkins, Dinges, Mannion. The fact of the matter is that there was a personality conflict between Plaintiff and both Dinges and Watkins. The Fourth Circuit has held that:

> "Personality conflicts and questioning of job performance are unavoidable aspects of employment. They are an inevitable by-product of the rough edges and foibles that individuals bring to the table of their interactions. The Law does not blindly ascribe to race (or in the case at hand, religion) all personal conflicts between individuals of different races. To do so would turn the workplace into a litigious cauldron of racial suspicion. Instead , legally sufficient evidence is required to turn an ordinary conflict such as that between the plaintiff and the supervisors into an actionable claim of discrimination. Hakins v. Pepsico, 203 F.3d 274, 282 (4th Cir. 2000).

There is no legal cause of action for discrimination based upon Hodson's personality conflicts with Dinges and Watkins. Although she points to a few isolated remarks concerning her religion, these remarks were isolated, remote in time, and/or made in jest such that a reasonable person would not be offended. Even more significantly, there is simply no evidence to connect the remarks to her separation from employment. Therefore, Plaintiff cannot establish a *prima facie* case. *See* Curtis Blaine Storey, 390 F.3d 760 (3d Cir. 2004); Mullen v. Topper's Salon and Health Spa, 99 F.Supp.2d 553 (E.D. Pa. 2000) and Abdullah

v. Philadelphia Housing Authority, 2000 U.S. Dist. LEXIS 4814 (E.D.Pa. 2000)(wherein the Court dismissed plaintiff's religious discrimination claim against employer for failing to establish a *prima facie* case).

Even if, *assuming arguendo*, Hodson could establish evidence raising an inference of discrimination, the fact remains that Hodson was terminated when she refused to perform a work assignment and walked out at the start of her shift. Therefore, IHS had a legitimate, nondiscriminatory, business reason to terminate her position.

The burden then shifts to Plaintiff to prove that the reasons articulated by IHS for her termination were false or a pretext for discrimination. In *Kautz v. Met-Pro Corporation*, 2005 U.S. App. LEXIS 11559 (3d Cir. June 17, 2005), the Court analyzed a plaintiff's burden in creating an issue of fact as to whether an employer's proffered non-discriminatory reasons for its employment action are a pretext. Kautz alleged that he was laid off by his employer due to his age in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621-634.[11]

The Court noted that the standard for proving pretext "places a difficult burden on the plaintiff." Id. at *7, *citing Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994). It noted that in order to avoid summary judgment *Fuentes* requires a plaintiff to put forward "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could rationally find them unworthy of credence." Id.

---

[11]    Although *Kautz* is an AEDA case, whereas the instant case is an ADA case, both causes of action are analyzed under the burden shifting framework set forth in *McDonnell Douglas Co. v. Greene*, 411 U.S. 792 (1973).

16

The Court further explained that "to avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a fact finder reasonably to infer that each of the employer's proffered non-discriminatory reasons... was either a post hoc fabrication or otherwise did not actually motivate the employment action. Id. at *7-8, citing *Fuentes*, 32 F.3d at 764.

According to the Court, it is not enough to show that the employer's decision is wrong and mistaken inasmuch as the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is "wise, shrewd, prudent, or competent." Id., at *8. The Court then noted that it has interpreted *Fuentes* to require plaintiffs to present evidence contradicting the core facts put forward by the employer as legitimate reasons for its decision, *citing Stanziale v. Jargowsky*, 200 F.3d 101, 106 (3d Cir. 2000) and *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1110 (3d Cir. 1997).

Plaintiff cannot satisfy her burden of establishing that IHS' proffered reasons are pretextual. Indeed, she admits that she refused the work assignment and that she walked off the job. Although she may claim that the assignment was contrary to the alleged assurances by another supervisor that she would only be assigned to one specific hall, her supervisor for that shift gave her a specific instruction to work that shift on Northwest Hall and explained that they were short-staffed. No one demanded that she perform any work that was contrary to her light-duty restrictions. In fact, there were LPN's assigned to that Hall who could have assisted Hodson. Also, as she admitted, the number of patients in the Northwest Hall was the same or less than that from her normally assigned hall. Under these instances, Hodson was under a duty to obey the instructions of her supervisor and then, if she so chose, complain about the assignment to the Northwest Hall when he became

17

available. What she did **not** have the right to do is to disobey a direct order by her supervisor, walk out of the facility, and abandon the patients, her fellow workers, supervisors, and her job. IHS exercised its right to terminate Hodson under these circumstances, and there is no evidence to establish that this was not the reason for which Hodson was terminated.

Hodson also claims she was subjected to a hostile work environment due to her religion. A hostile work environment claim arises when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75 (1998). In order to establish a religiously hostile work environment claim a plaintiff must show that (1) she suffered intentional discrimination; (2) the discrimination was pervasive and regular; (3) it detrimentally affected her in the performance of her job; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Cardenas v. Massey, 269 F.3d 251 (3d Cir. 2001). The Supreme Court has emphasized that "whether an environment is 'hostile' or abusive; can be determined only by looking at the circumstances. This may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081 (3d Cir. 1996) (quoting Harris Forklift Sys., Inc., 510 U.S. 17 23 (1993)).

Based on the incidents and comments alleged by Hodson, she can not demonstrate a religiously hostile work environment. Dinges alleged jestful statement questioning whether

18

Hodson laid her hands on a patient and healed was an isolated statement and was sometime before her injury in March 2001. She claims that Watkins also harassed her based on religion, but in her deposition she could not specify one incident or comment by Watkins that can be attributed to Hodson's religion. Hodson has no evidence that the conduct by either Dinges or Watkins was severe or pervasive. This single isolated incident by Dinges is the only comment allegedly made about her religion and the comment cannot be viewed as offensive to the reasonable person. The comment was not physically threatening, nor does Hodson make any allegations that her claims of religious harassment prevented her from being able to perform his/her job. The purported comments would not detrimentally affect a reasonable person of the same protected class in the performance of his job. The record in this case is devoid of any facts that Dinges' comments or any conduct or comments by Watkins, Dinges, or any other IHS employee or supervisor, created a religiously hostile work environment. Therefore, this allegation should be dismissed. Curtis, *supra* ; Mullen, *supra*, and Abdullah, *supra*.

Finally, Hodson claims that she was not promoted to the position of MDS coordinator due to her religion, apparently under a disparate treatment theory. In order to establish a *prima facie* claim of disparate treatment under religious discrimination, Plaintiff must prove that (1) she is a member of a protected class; (2) she was qualified and rejected for the position sought; and (3) non-members of the protected class were treated more favorably than plaintiff. Bray v. Marriott Hotels, 110 F.3d 986, 990 (3d Cir. 1997). Plaintiff fails to establish a *prima facie* case for failure to promote because she does not show that similarly situated individuals from a non-protected class were promoted instead of her. She merely stated that she worked at IHS longer and had more LPN experience, which is different from

19

the experience required for the MDS position. Hodson never worked as an MSN. IHS does not hire or promote based on seniority, but instead selects the applicant who is more qualified for the position. *See* Affidavit of Dinges. Additionally, Plaintiff does not present any evidence that she was qualified for the job. Hodson's personnel file shows a history of written and verbal warning for failing to properly administer medication, document patient files and follow physical instruction. Considering that the MDS position requires a person to reliably assess patient acuity and properly bill for treatment, it is not surprising that Hodson was not hired for this position. *See* Martin v. Enterprise Rent-A-Car, 2003 U.S. Dist. LEXIS 1191 (E.D. Pa. 2003)(wherein summary judgment was granted to employer when plaintiff could not establish *prima facie* case of disparate treatment.)

Accordingly, Plaintiff's claims of religious discrimination and harassment/hostile environment should be dismissed.

### D. PLAINTIFF CAN NOT ESTABLISH A VIOLATION UNDER THE AMERICANS WITH DISABILITIES ACT

The ADA prohibits employers from discriminating "against a qualified individual with a disability because of the disability of such individual in regard to . . . terms and conditions of employment." 42 U.S.C. § 12112(a). A "qualified individual with a disability" is defined as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). "Disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

20

In order to establish a *prima facie* case of discrimination under the ADA, an employee must show: "(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Taylor v. Phoenixville School District*, 184 F.3d 296, 306 (3d Cir. 1999).

### 1.    Plaintiff Is Not a Disabled Person Within the Meaning of the Act

Plaintiff does not have a physical impairment that substantially limited one or more of her major life activities at the time of the alleged discrimination.  For an individual to be disabled because of an impairment that substantially limits the performance of manual tasks, an "individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives. Toyota Motor Mfg. v. Williams, 534 U.S. 184, 198 (2002).  EEOC interpretive guidelines indicate that "major life activities" are those basic activities that the average person in the general population can perform with little or no difficulty.    29 C.F.R. App. § 1630.2(l) (1999).  Examples of this include caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.  Id. § 1630.2(l).  In addition, the impairment must be permanent or long-term. Williams, *supra*.  Plaintiff must establish that the impairment substantially limits the ability to engage in the activity.

The EEOC defines "substantially limits" as leaving the plaintiff (1) "unable to perform a major life activity that the average person in te general population can perform"; or (2) "significantly restricted as to the condition ,manner, or duration under which an individual can

perform a particular major life activity as compared to the condition manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1) (i)(ii) (1993). EEOC regulations also provide that "the following factors should be considered in determining whether an individual us substantially limited in a major life activity: (1) the nature and severity of the impairment; (ii) the duration or expected duration of the impairment; and (iii) the permeant or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2 (j)(2)(i)(iii).

In <u>Taylor v. Pathmark Stores, Inc.</u>, 177 F.3d 180 (3d Cir. 1999), the Court held that a cashier who underwent surgery in his ankle, walked with crutches, and could stand and walk for 50 minutes at a time without rest, was found not disabled under the ADA. The Court found that plaintiff was no different than an average person with respect to walking and could "carry out most regular activities that require walking and standing." <u>Id</u>. at 186.

In <u>Kelly v. Drexel University</u>, 94 F.3d 103 (3d Cir 1996), plaintiff suffered from a hip fracture and walked with a noticeable limp. He claimed he could not walk more than 1 mile without stopping. The Court granted summary judgment, holding that "comparatively moderate restrictions on the ability to walk are not disabilities" <u>Id</u>. at 106.

In <u>Marinelli v. City of Eire</u>, 216 F.3d 354 (3d Cir. 2000), Plaintiff claimed he was substantially limited in the major life activity of performing cleaning tasks, lifting objects, from walking and was in pain. The Court noted that other Courts have traditionally held that a 25 pounds weight restriction is not significantly limiting, and in <u>Marinelli</u>, even a 10 pound weight restriction was not found to be significantly limiting. <u>Id</u>. *See also*, <u>Williams v. Channel</u>

22

Master Satekkite Sys., Inc., 101 F.3d 346 (4th Cir. 1996); Ray v. Glidden Co., 85 F.3d 227,

229 (5th Cir. 1996); Aucutt v. Six Flags Over Mid-American, Inc., 85 F.3d 1311 (8th Cir. 1996);

Thompson v. Holy Family Hospital., 121 F.3d 537 (9th Cir 1997).    The Court in Marinelli

stated that only "extremely limiting disabilities . . . qualify for protected status under the ADA."

It therefore, dismissed the plaintiff's claim on the basis that Plaintiff did not have a disability.

Finally, the EEOC has stipulated that in order for a person to be properly

characterized as substantially limited from working under the ADA, an individual must be

unable "to perform either a class of jobs or a broad range of jobs in various classes as

compared o the average person having comparable training, skills and abilities." 29 C.F.R.

§ 1630.2 (j)(3)(I).  The mere "inability to perform a single particular job" will not suffice to

establish a substantial limitation with respect to working.  Id.  An individual who "is unable

to perform a particular job for one employer , or is . . . unable to perform a specialized job"

is not substantially limited in his ability to work."  Id. App. § 1630.2(j).  The Second Circuit

has held that where a plaintiff could only perform light or sedentary work it merely

established that the individual was disqualified from a "narrow range of jobs", and ,therefore,

the plaintiff was not disabled under the meaning of the ADA.  Colwell v. Suffolk County

Police Dep't, 158 F.3d 635 (2d Cir. 1998).

Hodson's bald assertion that she is disabled is insufficient to prove she is disabled as

defined under the Act.  Plaintiff admits that she was released to return to work in a light-duty

capacity by her doctor.  See Exhibit "E."  This fact alone is inconsistent with the requirement

that Plaintiff must be substantially limited in a major life activity to qualify for protection under

the ADA and shows she her doctor did not believe her to be so limited that she could not

23

return to work.  Additionally, Hodson's injury occurred in March of 2001 and she continued to work in a light duty capacity, after treatment, for well over a year, albeit with intermittent days off from work.

Moreover, following the rationale and holdings of Taylor, Kelly and Marinelli, *supra*, Plaintiff's back injury, back pain, and weight lifting restriction of 20 pounds, which allegedly makes it difficult for Plaintiff to walk and work, can not constitute a disability, as these types of impairments have been found to be not substantially limiting in a major life activity.  In addition to the reasons set forth above, Plaintiff admits that she takes no medication for her injury or pain and she does not need to use any assistive devices.  She only claims she has to take rests and can not walk long distances.  The fact that Plaintiff can walk and go about her day without the use of any assistive devices also weighs heavily to show that she is not so "extremely limited."    Therefore, Plaintiff complaint should be dismissed because she does have a disability as defined by the ADA.

At her deposition Hodson tried to emphasize the severity of her disability by claiming her doctor said she can not work at all and that she can not perform the job of LPN.  Hodson 71-73.  In order to state a cognizable cause of action under the ADA, a putative plaintiff must establish that he/she is a "qualified individual with a disability."  See 42 U.S.C. § 12112(a); Cleveland v. Policy Management Sys, Corp., 526 U.S. 796 (1999).  Assuming *arguendo*, that Plaintiff's back injury substantially limited Plaintiff in the life activity of working or walking, then Plaintiff is not a qualified individual with a disability, as she would then be unable perform the essential functions of the job, with or without accommodation, and she, therefore, is not entitled to the protections provided by the ADA.

24

Additionally, should this Court believe Ms. Hodson did have a disability, Defendant accommodated her disability, as admitted by Plaintiff.

### 2.    Plaintiff Was Terminated Because of Her Alleged Disability

In order to establish that Defendant discriminated against Plaintiff because of a disability as defined under the ADA, Plaintiff must establish that Defendant was aware that she had a disability as defined under the ADA.  Thus, the employer must have knowledge of the employee's substantial physical limitations.  Phoenixville, 184 F. 3d at 313; Taylor v. Principal Fin. Group, Inc., 94 F. 3d 155, 163 (5th Cir.), cert denied, 519 U.S. 1029 (1996).

Having back pain alone does not automatically establish that an individual has a disability as defined under the ADA.  Marinelli, supra.  The matter is a case by case issue. In the case at hand, Hodson's doctor released her to light duty status, from which IHS inferred that. Hodson was able to perform her job, with restrictions.  Plaintiff's mere reporting that she had back pain to Defendant does not establish that Defendant had sufficient knowledge to be aware of a disability as defined under the ADA.  IHS denies that it was aware that Hodson was disabled.  For over a year after the accident, Plaintiff came to work each day and performed her job, with accommodations.

Furthermore, there is insufficient evidence to show Defendant regarded Plaintiff as having a disability.  In order to establish a claim under the "regarded as" prong of the ADA disability definition, Plaintiff must show that IHS regarded her as having a disability as defined under the ADA.  Helfrich v. Lehigh Valley Hospital, 2005 U.S. Dist. LEXIS 4420, *54 (E.D. Pa. March 22, 2005).  Further, the Third Circuit has held that the mere fact that an employer is aware of an employee's impairment is insufficient to demonstrate either that the

employer regarded the employee as disabled or that the perception caused the adverse employment action. <u>Kelly v. Drexel Univ.</u>, 94 F.3d 102, 109 (3d Cir. 1996); *see also*, <u>Gallagher v. Sunrise Assisted Living</u>, 268 F. Supp. 2d 436, 441 (E.D. Pa. 2003). There is simply no evidence in this matter to establish that IHS regarded Plaintiff as having a physical impairment that substantially limited a major life activity of Plaintiff, and, therefore, Plaintiff can not establish a *prima facie* case, and Plaintiff's ADA claim should be dismissed on this basis, as well.

> **3.     Defendant Has Articulated a Legitimate Business Reason For Plaintiff's Termination & Plaintiff Can Not Establish by a Preponderance of the Evidence That Defendant's Articulated Reason for Termination Was Pretextual.**

Even assuming, *arguendo*, that Plaintiff has met her burden of establishing a *prima facie* case, IHS has articulated a legitimate, non-discriminatory business reason for her termination. Hodson was terminated after she was assigned to work on Northwest Hall and refused to do so. She admits she walked out on the job and abandoned her patients. Hodson 35. Since IHS has satisfied the second prong of <u>McDonnell Douglas</u>, by setting forth a legitimate, non-discriminatory business reason for Hodson's termination, it becomes Plaintiff's burden to establish that the reason advanced by IHS is pretextual and/or to show a causal link between the disability and the adverse employment action.

As discussed above, there is no evidence in the record to suggest that IHS advanced reason for Hodson's termination is pretextual. Plaintiff has not presented evidence of such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action," such that a reasonable fact finder

could rationally find IHS' reason unworthy of credence.   The fact that IHS permitted Hodson to work on light duty status for well over a year and provided accommodations to her within her light duty restrictions supports IHS' position that its legitimate business reason was not a pretext.   Hodson herself admits that she was not denied any requested accommodation. On the day she walked off the job, she demanded that she not be given this hall assignment. However, even if this insubordination could somehow be construed as a request for an accommodation, such request was not reasonable based on the needs of the facility, and because Hodson's light duty restriction of not lifting 20 pounds would have applied to any hall she was assigned to work.   Furthermore, Hodson's employment was only terminated after she refused to work on her assigned hall and abandoned her patients.   It was ultimately Hodson's conduct, which was well within her control, that caused her termination.   Plaintiff has no evidence to show that Defendant's advanced reason for his alleged termination is unworthy of credence or pretextual, nor can he show that IHS's motivation was more likely than not discriminatory or retaliatory.   Therefore, Plaintiff's ADA claim should be dismissed on this basis as well.   Kautz, supra.

### 4.    Plaintiff Was Not Subjected to a Hostile Work Environment Based On Her Alleged Disability

Hodson also claims she was subjected to a hostile work environment due to her disability.   Even if this Court finds that Hodson was disabled as defined under the ADA, Plaintiff can not sustain a cause of action for hostile work environment based on her disability.     As set forth at length above, a hostile work environment claim arises when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Oncale, *supra*.

The only incident of harassment that Hodson alleges related to her alleged disability is when Watkins allegedly threw a box of lancets at her and asked her if they were too heavy for her. This single isolated incident does not rise to the level of "severe and pervasive" and a reasonable person would not have been detrimentally affected by this sole comment.

Hodson makes bald assertions that Dinges harassed her based on her disability, but does not provide specific instances. The only example of harassment she can muster against Dinges is that he allegedly wrote her up without justification and another nurse was not reprimanded. However, Hodson has no direct knowledge of whether the employee received any reprimand, and Dinges testified that he in fact reprimanded that employee. Also, each written and verbal reprimand issued to Hodson was set forth in great detail and all reprimands show that Hodson violated various IHS policies, in addition to various laws. See Exhibit "M." Hodson could have been terminated for some of these infractions. However, IHS continued to employ her. Furthermore, Hodson herself signed off on the written warnings.

Even, assuming the reprimands were unjustified, there is no causal connection between the reprimands and Hodons' alleged disability. None of the reprimands show a scintilla of discriminatory intent. Furthermore, any alleged conduct by either Watkins or Dinges was not severe or pervasive, so as to create a hostile work environment.

Therefore, Plaintiff's Hodson's hostile work environment claim based on her alleged disability should also be dismissed.

28

## E.   PLAINTIFF'S CLAIMS OF SEXUAL HARASSMENT, HOSTILE WORK ENVIRONMENT OR SEXUAL DISCRIMINATION SHOULD BE DISMISSED

### 1.   Plaintiff's Allegations of Sexual Harassment

There are two ways an employee can establish a sexual harassment claim: (1) the employee proves that her supervisor subjected her to adverse tangible employment action for the purpose of harassing her, and (2) the employee can prove that there was a hostile work environment created by a co-employee. Burlington Industries, Inc., v. Ellerth, 524 U.S. 742 (1998); Faragher v, City of Boca Raton, 524 U.S. 775 (1998); Andrews v. City of Philadelphia, 895 F.2d 1469 (3d Cir. 1990). The Third Circuit has held that a tangible adverse employment action is an act that substantially affects an employee's earning potential or disrupts working conditions. Durham Life Ins. Co. v. Evans, 166 F.3d 139 (3d Cir. 1999).  There must be causation between the tangible employment action and the harassment.

There is no evidence to suggest that IHS terminated, or took any other tangible employment action against, Hodson for the purpose of sexually harassing her.   All of Hodson's claims of sexual harassment are associated with the alleged actions of Watkins. Although Watkins was a supervisor of Hodson in limited capacities, Watkins never took any adverse employments actions based on sex, or for any other reason, against Hodson for the purpose of harassment.  In fact, he never took any adverse employment actions against Hodson at all.  Watkins had nothing to do with the incident which resulted in Hodson's termination. See Affidavit of Watkins; also Hodson 30-31.   Further, there is no evidence that any other employee of IHS took  any adverse employment actions against Hodson,

29

based on her sex and for the purpose of harassing her. Hodson may have reprimanded her regarding her work performance, but reprimands do not constitute "tangible employment actions." Weston v. Pennsylvania, 251 F.3d 420 (3d Cir. 2001). There are no allegations that any employee at IHS requested sexual favors that were rejected, which caused her termination, nor is there any allegation that she was threatened that she would be terminated if she refused to engage in sexual conduct. Therefore, Hodson cannot establish a quid pro quo claim of sexual harassment.

Hodson did not make any complaints about any allegations of sexual harassment while she was employed at IHS. Although she may have complained generally to Rist and Kovski, no claims of sexual harassment, or quid pro quo allegations, were made by Hodson. As such, the employment decisions made by the IHS could not have been in retaliation for her complaints of sexual harassment. There is also no evidence that she was retaliated against for making complaints of sexual harassment, that she was constructively discharged caused by a sexually hostile work environment or that the decision to terminate Plaintiff was due to her gender. Therefore, Hodson's allegations of unlawful retaliation should be dismissed.

### 2.    Plaintiff's Claims of Hostile Work Environment

In order for Hodson to establish a hostile work environment based on her sex she must show that (1) she suffered intentional discrimination based on her sex; (2) the discrimination was severe and pervasive; (3) it detrimentally affected her in the performance of her job; (4) it would have detrimentally affected a reasonable person of the same protected class in her position; and (5) there is a basis for vicarious liability. Cardenas, supra.

30

Hodson's claims of a sexually hostile work environment are directed to Watkins. Hodson claims that Watkins created a sexually hostile work environment by making comments such as him "wanting to do it with a priest," him wanting to give male patients flu shots in their butts, and his comments related to his physical endowments. Hodson also claims that Watkins pinched another nurse's nipples. Hodson 56-57.

Hodson admits that none of these comments or actions were directed towards her and that she was never physically touched by Watkins. She was not involved in any of these alleged conversation with Watkins, but she merely overheard them. For most of the incidents, she admitted she never complained to the appropriate persons at IHS and for some of the incidents, she could not remember if she complained at all. Hodson also admittedly never filed any written complaints, nor did she ever call the 1-800 number to report a hostile work environment. Hodson 27, *See* Affidavits of Rist Kovski, Martinez.

Even if Hodson's assertions are true[12], there is no evidence to prove that she suffered intentional discrimination based on her sex, that the discrimination was severe and pervasive or that  the comments would have detrimentally affected a reasonable person of the same protected class in the performance of her job. Therefore, she can not establish a hostile work environment claim, and this allegation should be dismissed. Cardenas, supra.

### 3. Plaintiff's Claim's of Sexual Discrimination

The McDonnell-Douglas framework applies to Hodson's sexual discrimination claim.

There is no evidence to suggest Hodson was terminated or discriminated against in any manner because of her sex. Even assuming, *arguendo*, that Plaintiff can establish a

---

[12] The witnesses Hodson claims were aware of this sexual conduct do not support or corroborate her contentions. *See* Affidavits of Callicott, Marsili and Magraw.

31

*prima facie* case, IHS has asserted a legitimate non-discriminatory reason for Hodson's termination, and, as discussed above, Hodson has not shown by a preponderance of the evidence that Defendant's asserted reason for her termination was pretextual. *Kautz, supra.*

Therefore, Plaintiff's claims for sexual discrimination should be dismissed.

## F.   PLAINTIFF CAN NOT PROVE A CAUSE OF ACTION FOR RETALIATION UNDER TITLE VII OR THE ADA OR A CLAIM FOR WRONGFUL DISCHARGE

In order for Hodson to establish a *prima facie* case of retaliation with respect to her termination, she has to show a causal connection between her protected activity and her termination. Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001).

Plaintiff can not establish a causal connection between any protected activity and her termination.    She never complained of any religious, sexual or any other discrimination/harassment during her employment with IHS.  Furthermore, there is no evidence that she was retaliated against for making any such complaints.  She was terminated after she voluntarily made a choice to refuse her job assignment to Northwest Hall and walked out on her shift.  Even if she had made complaints, there is no connection between the reason why she was terminated and her complaints.  No issues of discrimination or harassment were even remotely involved in Hodson's termination, and therefore, Plaintiff's retaliation claim should be dismissed.

Finally, Plaintiff is not entitled to any relief under a wrongful discharge theory. Pennsylvania law permits a cause of action for wrongful discharge where the employment termination abridges a significant and recognized public policy.  Public policy exceptions apply where no statutory remedies are available.  Novosel v. Nationwide Insurance Co., 721

32

F.2d 894 (3d Cir. 1983); <u>Bruffrett v. Warner Communications, Inc.</u>, 692 F.2d 910 (3d Cir. 1982).  In <u>Wolk v. Saks Fifth Ave., Inc.</u>, 728 F.2d 221 (3d Cir. 1984), the Court held that a common law action for wrongful discharge can not be maintained when there are other remedies available under state or federal statutory law.

Plaintiff had other remedies available to her to seek redress from her claims of harassment and discrimination under federal and state law, and, therefore, any wrongful discharge theories should be rejected.

Furthermore, Plaintiff made no allegations in her Complaint of wrongful discharge based on her filing a worker's compensation complaint.  In fact, she claims that after she was discharged, Ray Martinez promptly processed her worker's compensation claim and she receive benefits.  Even if Hodson had alleged wrongful discharge based on her filing for worker's compensation, she has no evidence to suggest the reason for her termination was based on her filing for worker's compensation benefits.  Furthermore, she filed for worker's compensation in March 2001, and was not terminated until more than a year later.  As such, there is no causal connection between her filing for worker's compensation and her termination.

Therefore, Plaintiff's claims for wrongful discharge should be dismissed.

## V.    CONCLUSION

For the above stated reasons, Plaintiff's Complaint should be dismissed in its entirety.

Respectfully submitted,

_____
Charles H. Saul, Esquire
PA I.D.  19938

_____
Liberty J. Weyandt, Esquire
PA I.D.  87654

Margolis Edelstein, 1500 Grant Building, 310 Grant Street, Pittsburgh, PA 15219
(412) 281-4256

## CERTIFICATE OF SERVICE

I certify that on the 29th day of July, 2005, I served upon Plaintiff via U. S. First Class

Mail, a copy of the within Brief in Support of Motion for Summary Judgment at the

following address:

Kathleen Hodson
2201 Keystone Drive
Erie, PA 16509


Charles H. Saul, Esquire