IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON                        )
                                       )    Civil Action No.   03 - 0374
            Plaintiff,                 )
                                       )
      vs.                              )    Judge Maurice B. Cohill, Jr.
                                       )
                                       )
INTEGRATED HEALTH SERVICES             )
LONG TERM CARE, INC. d/b/a             )
IHS AT BAYSIDE,                        )
                                       )
            Defendant.                 )


APPENDIX FOR EXHIBITS TO BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT                          # 1

A.    Affidavit of Sheila Rist

B.    Deposition transcription Kathleen Hodson

C.    LPN job duty description

D.    Medical slips

E.    Light duty status slips

F.    Letter dated February 19, 2002, from Carol Kovski

G.    Memo regarding hot packs

H.    Affidavit of Carl Kovski

I.    Affidavit of Dave Dinges

J.    Affidavit of Kathleen Mannion

K.    Affidavit of Roger Watkins

L.    Affidavit of Jennifer Heiser

M.    Employee Counseling Forms for Kathleen Hodson

N.    Punch detail report

O.    Patient list for Northwest Mall and Ambassador Mall for May 17, 2005

P.    Affidavit of Ray Martinez

Q.    Disciplinary Action Form for Kathleen Hodson, May 17, 2005

R.    Affidavit of Maureen Magraw

S.    Affidavit of Carmen Callicott

T.    Affidavit of Donna Marsili

U.    Executed Employee Corporate Compliance Acknowledgments signed by Kathleen Hodson

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON )
)  Civil Action No.  03 - 0374e
Plaintiff, )
)
vs. )  Judge Maurice B. Cohill, Jr.
)
)
ALPINE MANOR, INC. d/b/a )
INTEGRATED HEALTH SERVICES )
OF ERIE AT BAYSIDE )
)
Defendant. )

## AFFIDAVIT OF SHEILA RIST

I, Sheila Rist, do hereby depose and voluntarily state:

1.     I have personal knowledge and I am competent to testify as to the matters

set forth herein.

2.     I am employed at Integrated Health Services of Bayside (hereinafter

"IHS") as the Human Resources Manager.  IHS of Erie at Bayside is a skilled nursing

facility that believes that its patients should receive the highest quality of patient care.

This entails the facility meeting at all times all local, state and federal laws and

regulations, as well as established Company policies and procedures.  To this end, IHS

insists that its staff strictly adhere to facility policies.

3.     Kathleen Hodson was employed at IHS as an LPN at IHS from on or

about May 15, 1997 until May 17, 2002.  Ms. Hodson was injured at work on or about

1



EXHIBIT
tabbies
"A"

March 30, 2001 and she filed a worker's compensation claim.  She was off work for a short period of time and returned to light-duty status.  Ms. Hodson was released to full-duty by the employer's doctor, however, Ms. Hodson complained that she was not well enough to return to full duty.  A true and correct copy of the release to full-duty is attached hereto as Exhibit "A."  Thereafter, IHS sent her to a different doctor and Ms. Hodson was returned to a light duty status.  She remained on light duty status from July 6, 2001 until her separation from the company, once in a while taking time off work because of alleged back pain.  During this period, she generally worked with a 20-30 pound lifting restriction.  A true and correct copy of Hodson's physician notes are attached hereto as Exhibit "B."

4.      Ms. Hodson went out on a temporary leave in the beginning of 2002. When she returned to light duty on March 28 2002, correspondence was sent to her from Carl Kovski, outlining her light duty assignments.  Attached hereto as Exhibit "C" is a copy of this correspondence, a copy of the light duty restriction and a copy of the light duty job description.

5.      IHS accommodated Ms. Hodson based on the recommendations of her doctor.  IHS made accommodations for Ms. Hodson such as having other employees push the medication cart down the hall and assist her when needed with patient care. She was also permitted to go to the physical therapy room and put hot packs on her back and lay down on the therapy mats during breaks.  Ms. Hodson put this request in writing and Mr. Kovski approved it.  A copy of Ms. Hodson's written request and approval by Mr. Kovski is attached hereto as Exhibit "D."    To my knowledge, Ms. Hodson was informed to follow her restrictions and she would not be asked to perform

2

duties outside of her light duty job description. I am not aware of any request for reasonable accommodations that was made by her and denied by IHS

6.      To my knowledge, Ms. Hodson was not disabled in any way, nor did I perceive her as being disabled. She never claimed to be disabled. She simply was on light duty status from an injury and occasionally took time off from work due to alleged pain.

7.      Ms. Hodson often was overly dramatic about her physical limitations and it was my impression that she did not want to work and would do just about anything to get out of performing an assigned task. She would complain that there was no one around to help her, but there were always nurses aides assigned to every hall and all she had to do was ask. She complained she did not want to perform certain tasks, even though those tasks were within her light duty restrictions.

8.      Ms. Hodson was reprimanded several times during the course of her employment for insubordination and failure to follow proper policy and procedures. Ms. Hodson's personnel file shows she was reprimanded as follows: (1) August 21, 1997, for failure to follow proper policy and procedure in re-capping a lancet, which caused a needle stick to herself; (2) August 22, 1997 for giving the wrong medication to a patient and failing to call physician and document file upon discovery of mistake; (3) December 1, 1997 failure to follow medication administration policy by giving a patient the wrong medication; (4) December 3, 1997 for failure to follow proper documentation procedure; (5) December 29, 1997, for failure to follow physician orders with a patient; (6) December 18, 1998, for failure to meet minimum standards are care of patients; (7) April 2, 1998, for failing to remove an IV from a patient in a timely manner; (8) February

3

25, 1999 for failing to properly document failure to provide treatment or explain why treatment was not provided; (9) June 6, 2001, verbal warning for improper documentation; (10) November 11, 2001, verbal warning for excessive absenteeism; (11) January 29, 2002 for failing to properly sign in and out for lunch and breaks; (12) May 14 2002, for failing to properly complete a narcotic count and document file  A true and correct copy of these documented verbal and written warnings are attached hereto as Exhibit "E."   Ms. Hodson could have been terminated for several of these infractions, however, IHS counseled Ms. Hodson and continued to employ her.

9.    On May 17, 2002, Ms. Hodson was  assigned to work on the Northwest Hall.  IHS was staffed challenged on this date and it was necessary  to adjust staff assignments to cover the care for all the patients.  When Ms. Hodson reported to work, she clocked in and saw her assignment to the Northwest Hall.  A true and correct copy of her punch card for May 17, 2002 is attached as Exhibit "F."

10.    I was present when Ms. Hodson spoke with Dave Dinges about her hall assigned, as was Kathy Mannion.  Ms. Hodson told Mr. Dinges that she could not work on Northwest Hall and claimed she was only permitted to work on Ambassador Hall. Mr. Dinges asked her why she could not work on Northwest Hall and she did not provide a reason.  Ms. Hodson's claim that she was unable to work that Hall was invalid because her restrictions would be considered in either Hall.  On May 17, 2002, the patient load in the Northwest Hall was similar to the Ambassador Hall Ms. Hodson wanted to work on.  A true and correct copy of the patient list is attach as Exhibit "G."

4

11.    Mr. Dinges told Ms. Hodson that her assignment to Northwest Hall would stand and that it did not violate her restrictions. He stated that she could either work Northwest Hall or if she left she would no longer be employed for refusing the job assignment.  Ms. Hodson said she was leaving and she punched out and left the facility. See Exhibit "F."  Also attached as Exhibit "H" are the notes I took documenting this incident.  When she walked off the job, she was in violation of IHS policy as she abandoned her patients without adequate notice or without finding a replacement. As a nurse at IHS, every employee is responsible for every patient in the building.

12.    While it may be true that Ms. Hodson generally worked on Ambassador Hall, her restrictions did not prevent her from performing the same job duties on a different hall. No nurse is permanently assigned to a specific hall at IHS, as staff are rotated around the various halls when necessary to ensure coverage of care for all the patients.  To my knowledge, Ms. Hodson was never specially assigned to Ambassador Hall by anyone at IHS, but she worked on Ambassador Hall on regular basis.

19.    After Ms. Hodson walked out, Mr. Dinges filled out a Disciplinary action form documenting what occurred, as explained above.  A copy of this disciplinary action form is attached as Exhibit "I."  Ms. Hodson was not fired.  She voluntary quit her position when she refused to work on the Northwest Hall and abandoned her patients.  I also filled out the appropriate paperwork, noting Ms. Hodson's separation from the company was due to job abandonment.

20.    With respect to Ms. Hodson's allegations of discrimination, harassment and retaliation by Dave Dinges and Roger Watkins, I believe her allegations to be

5

baseless and unfounded. I never witnessed Mr. Dinges or Mr. Watkins treating Ms. Hodson inappropriately. Any employment decisions made with respect to Ms. Hodson's employment at IHS were made for legitimate business reasons having nothing whatsoever to do with Ms. Hodson's allegations. Although she did make general venting type complaints to me about management of IHS in general, she never claimed that she was being discriminated against, harassed or retaliated against.

21.     If Ms. Hodson wished to file a complaint, about any manner, she could have done so through my office, through the Administrator, Carl Kovski, corporate headquarters and there was a 1-800 hot line that employees could call. These procedures were outlined in the employee handbook and employees were advised of these procedures upon hire. A copy of the employee handbook is attached hereto as Exhibit "J." Furthermore, the 1-800 hotline number was posted throughout the facility and employees had access to call this hotline at anytime. As far as I am aware, Ms. Hodson never filed any complaints against Mr. Dinges or Mr. Watkins, nor did she call the 1-800 hotline.

22.     Ms. Hodson had a problem with David Dinges because he held her to her job requirements and would not let her neglect her work. This is how Mr. Dinges treated all employees at IHS, as his main objective was quality care for the patients.

23.     Mr. Watkins is openly gay and Ms. Hodson is open about her religious convictions. Ms. Hodson had a problem with Mr. Watkin's sexual preference and they generally had personality conflicts because of this.

6

24.    I never heard Mr. Waktins or Mr. Dinges disparage Ms. Hodson based on her religious beliefs and Ms. Hodson never made any such complaints. She never complained about an incident involving statements allegedly made by Mr. Dinges questioning whether Ms Hodson "laid her hand on patients and healed them" or that he posted a note on the pin-up board that disparaged Ms. Hodson's religion.    Ms. Hodson never complained to me that Mr. Watkins threw a box of lancets to her and joked about her physical ability to catch the small box. She never complained that he made statements about wanting to give patients flu shots in their butts, or him joking about how Attends would not fit him because of his physical endowments. She never complained that he talked about wanting "to do it with a priest."   I never heard any complaints that Mr. Watkins pinched Ms. Callicott's nipples, nor did Ms. Callicott complain of such misconduct.  I never witnessed any of these incidents, and no other employee complained of such conduct. In fact, no other employee made any complaints against Mr. Dinges or Mr. Watkins based on  religious discrimination, sexual harassment or any type of discrimination or harassment.  These allegations only were made by Ms. Hodson after she quit her position.  In fact, I was shocked to hear of these complaints.

I have read and had an opportunity to correct this Affidavit consisting of __7__ pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 07-28-2005

_____
Sheila Rist

7

Patient's Name _Kathleen Hodson_____ Date _____

No work until next appointment _____

Return to work date _____

\* <u>Restrictions:</u>

    Lifting _____ Lbs. _____

    Squatting _____

    Standing _____

    Sitting _____

    Continue current restrictions ___✓_____ _for now, then_

Follow-up appointment _____ _full duty_
_9/1/01._

Physician _____

        Orthopaedic Surgeons, Inc.
        204 West 26th Street
        Erie, PA  16508

**EXHIBIT**

_"A"_

WORKERS

THIS FORM IS TO BE FILED WITH THE EMPLOYER OR INSURER ACCORDING TO INSTRUCTIONS PROVIDED ON THIS FORM.

Name of Employee  KATHLEEN HODSON.

Name of Employer  IHS AT BAYSIDE

Name of Insurer  IHS OF ERIE AT BAYSIDE

Claim Number (if known) C395C 525 7989  Date of Birth 11/26/46

Employee SS#  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  Date of Injury 3/30/01

Date of Report  3/5/02.

Provider Name  ORTHOPAEDIC & SPORTS MEDICINE

| 03/05/02 | KATHLEEN HODSON | REFERRING PHYSICIAN |
|---|---|---|
| DATE | NAME | |

The patient apparently has not returned to work because of her severe pain and her family physician kept her off work for some period of time. She states that the pain is worsening. It is in her back and now it is going to her left leg as well. She has been taking muscle relaxants and Darvocet. She tells me that she just knows she is not capable of working. She did see Dr. Falasca for initial evaluation and injections are going to be carried out on March 14th. At her request, I have given her a slip that she can be off work for two weeks to facilitate the injections. I gave her a prescription for Darvocet N 100-50 with two refills. I gave her the benefit of the doubt, however, I think that her complaints are out of proportion to the MRI findings that we have been able to ascertain up until this point in time.

John J. Euliano, Jr., M.D./cao

ORTHOPAEDIC & SPORTS MEDICINE OF ERIE, P.C.
300 STATE ST. • SUITE 400 A • ERIE, PA 16507
PHONE (814) 454-8287 • FAX (814) 454-8470

Providers may not charge for documentation supporting a claim for payment. Providers may charge their usual fee for special reports specifically requested by the Employer/Insurer. All patient information shall be submitted with the knowledge of the patient and must be maintained as confidential by the Employer/Insurer. The insurance plan or program shall not be liable to pay for treatment until the report/claim form has been filed.

Listed on the reverse are guidelines for the completion of billing forms and submissions of records.

EXHIBIT

tabbies

"B"

# FUNCTIONAL CAPACITY EVALUATION
## SUMMARY PAGE

Patient name : Kathleen Hodson

Eval date: 12-18-01

Referral source: Dr. M. Ang

Dx: Lumbar Disc HNP

| LIFTING TOLERENCES: | Occasional | Frequent |
|---|---|---|
| *Floor to Knuckle:* | 20# | 10# |
| *Knuckle to Shoulder:* | 10# | *did not demonstrate* |
| *Carry:* | 17# | *did not demonstrate* |

| POSITIONAL TOLERENCES: | Occasional (0-33%) | Frequent (34-66%) | Constant (67-100%) |
|---|---|---|---|
| *Sit:* | | X | |
| *Stand:* | | X | |
| *Walk:* | X | | |
| *Squat:* | X | | |
| *Kneel:* | unable | | |
| *Climb Stairs:* | | X | |
| *Reach Forward:* | | X | |
| *Reach Overhead:* | | X | |
| *Use Foot Pedals:* | | X | |
| *Grip Firmly:* | | X | |
| *Fine Manipulation:* | | X | |
| *Static Head:* | | X | |
| *Trunk Bend:* | X | | |
| *(          ):* | | | |
| *(          ):* | | | |

**RESULT:** The client demonstrated the ability to work in the LIGHT classification category for an 8 hour day. ( According to the US Department of Labor Standards.)

Signed: Evaluator : *D Fultmeyer, PT* Date: 12-18-01
**PHYSICIAN** : *(I concur with the above, with changes as indicated)*
Physician signature here :_____ Date:_____

DEA #_____  868-3096- 11 Am

## ORTHOPAEDIC AND SPORTS MEDICINE OF ERIE, P.C.
300 State Street, Suite 400A • Erie, PA 16507 • (814) 454-8287

Nick Stefanovski, M.D.
PA Lic. No. MD-039774-E

Gary J. Cortina, M.D.
PA Lic. No. MD003260-E

John Euliano Jr., M.D.
PA Lic. MD-012162-E

David M. Babins, M.D.
PA Lic. MD-044724-L

Kathy M. Sullivan, PA-C
PA Lic. No. MA-002986-L

NAME  Kathleen Brown          DATE  12/7/01

ADDRESS _____

Patient may work sedentary duty only
pending results of MRI

Refill _____ times PRN NR

_____ M.D.

SUBSTITUTION PERMISSIBLE
IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED, THE PRESCRIBER MUST HANDWRITE
"BRAND NECESSARY" OR "BRAND MEDICALLY NECESSARY" IN THE SPACE BELOW.

DEA # _____

**BAYVIEW MEDICAL GROUP**
GEOFFREY BURBRIDGE, M.D.
ANNE-MARIE LISZKA, D.O.
MARY ANN ANDRIOLE-WENDEL, D.O.
LISA REMALEY-WALTERS, M.D.
140 WEST SECOND STREET, SUITE 203
ERIE, PA 16507
814-877-5040

PA LIC No. MD-023456-E          PA LIC No. OS-006569-L
PA LIC No. OS-007550-L          PA LIC No. MD-062655-L

NAME __Kathleen Hodson__

ADDRESS _____ DATE _9/11/01_

**Rx**  (Please Print)

excuse pt from
work x 1 week
due to leg pain

REFILL _____ TIMES     PRN     NR

SUBSTITUTION PERMISSIBLE ___O.D. (Liszka__

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED,
THE PRESCRIBER MUST HANDWRITE BRAND NECESSARY OR
BRAND MEDICALLY NECESSARY IN THE SPACE BELOW.

14-MAY-99                                    01-100572860-3-9155_0002

**MARY ANN ANDRIOLE-WENDEL, D.O.**
**ANNE-MARIE LISZKA, D.O.**
306 WEST 11TH STREET
ERIE, PA 16501
814-456-8105

PA LIC No. OS-007550-L                    PA LIC No. OS-006569-L

NAME _Kathleen Hodson_

ADDRESS _____ DATE 2-18-02

**R** (Please Print)

Excuse from work
till now till
April 1st
— pt ē medical
condition.

REFILL _____ TIMES     PRN     NR

SUBSTITUTION PERMISSIBLE _____ D.O.

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED,
THE PRESCRIBER MUST HANDWRITE BRAND NECESSARY OR
BRAND MEDICALLY NECESSARY IN THE SPACE BELOW.

04-SEP-01                              TRI010904_100173494-1_01_25993_0010

---

DEA # _____

**MARY ANN ANDRIOLE-WENDEL, D.O.**
**ANNE-MARIE LISZKA, D.O.**
306 WEST 11TH STREET
ERIE, PA 16501
814-456-8105

PA LIC No. OS-007550-L                    PA LIC No. OS-006569-L

NAME _Kathleen Hodson_

ADDRESS _____ DATE 2/14/02

**R** (Please Print)

excuse pt from work
2/14, 2/15, 4/16, 2/17
due to back strain

REFILL _____ TIMES     PRN     NR

SUBSTITUTION PERMISSIBLE _____ D.O.

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED,
THE PRESCRIBER MUST HANDWRITE BRAND NECESSARY OR
BRAND MEDICALLY NECESSARY IN THE SPACE BELOW.

04-SEP-01                              TRI010904_100173494-1_01_25993_0010

WORKERS' COMPENSATION MEDICAL REPORT FORM

THIS FORM IS TO BE FILED WITH THE EMPLOYER OR INSURER ACCORDING TO INSTRUCTIONS PROVIDED ON THIS FORM.

Name of Employee  _KATHLEEN   HODSON_

Name of Employer  _IHS   AT   BAYSIDE_

Name of Insurer  _IHS  OF  ERIE  AT  BAYSIDE_

Claim Number (if known) _C 395 C 525 7989_  Date of Birth  _11/26/46_

| 7/6/01 | KATHLEEN HODSON | |
|--------|-----------------|-----------------|
| DATE | NAME | REFERRING PHYSICIAN |

**CHIEF COMPLAINT:** This is a 54 y.o. white female who was seen with the chief complaint of back pain. The patient states that on March 30th, 2001 while at work at the IHS at Bayside, she was lifting a resident that began to fall and she twisted and noted pain in her back. She subsequently had x-rays at St. Vincent's of the thoracic and lumbosacral spines on April 4th, 2001. These were normal. She had an MRI of at the Imaging Center of the lumbar spine on 5/17/01, which showed a herniated disc L4-5 centrally. She had and MRI of her thoracic spine, which was negative. She has been treated by Dr. Ferris and was referred to Dr. Buseck and was told she can go back to work with no restrictions. She is currently on light duty with a 30-pound weight limit. Medications are Feldene and she takes extra-strength Tylenol and an occasional Flexeril. She has some radiation of the pain to her lower extremities but this was no a problem and feature of her disease.

**PHYSICAL EXAMINATION:** On physical examination today she is tender over the lumbar spine. She flexes to 80 degrees. Extension is 10 degrees. Straight leg raising is slightly positive on the left at about 60 degrees. It's negative on the right. Reflexes are 2+ at her knees and her ankles.

| IMPRESSION: | The impression is that of a herniated lumbar disc at L4-5. | |
|-------------|-----------------|-----------------|
| DATE | NAME | REFERRING PHYSICIAN |

**RECOMMENDATIONS:** I would recommend a light duty restriction with a 30-pound weight lifting limit. It more than likely will be permanent.

John J. Euliano, Jr., M.D./mk

cc: Dr. Mary Ann Wendel

*Side text (rotated, left margin):*
ORTHOPAEDIC & SPORTS MEDICINE OF ERIE, P.C.
300 STATE ST. • SUITE 400 A • ERIE, PA 16507
PHONE (814) 454-8287 • FAX (814) 454-8470

The following descriptions are provided as a clarification for the terms typically used to describe an injured employee's restricted work level. Use them to interpret the enclosed PATIENT STATUS REPORT that has been forwarded to you regarding your employee.

Please give detailed consideration to the defined classifications in conjunction with any other work limitations noted on the report.

*Please* feel free to call us if you have *any* questions! Thank you.

---

SEDENTARY WORK – Lifting 10 pounds maximum and occasionally lifting and/or carrying such articles as dockets, ledgers and small tools. Although a sedentary job is defined as one which involved sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.

LIGHT WORK – Lifting 20 pounds maximum with infrequent lifting and or carrying and/or carrying of objects weighing up to 10 pounds. Even though the lifted weight may be only a negligible amount, a job is in this category when it requires walking and standing to a significant degree or when it involves sitting most of the time with a degree of pushing and pulling or arm and/or leg controls.

LIGHT MEDIUM WORK – Lifting 30 pounds maximum with frequent lifting and/or carrying of objects weighing up to 20 pounds.

MEDIUM WORK – Lifting 50 pounds maximum with frequent lifting and/or carrying of objects weighing up to 25 pounds.

LIGHT HEAVY WORK – Lifting 75 pounds maximum with frequent lifting and/or carrying of objects weighing up to 40 pounds.

HEAVY WORK – Lifting 100 pounds maximum with frequent lifting and/or carrying of objects weighing up to 50 pounds.

OCCASIONAL – Activities that are performed up to ⅓ of the work day.

FREQUENT – Activities that are performed up to ⅔ of the work day.



February 19, 2002                    Certified 7000 1530 5531 5491


Ms. Kathy Hodson
2201 Keystone Drive
Erie, PA 16509

Ms. Hodson:

You will be receiving in the mail from Crawford, Slevin & Hicks,
your short term disability papers. When you receive these papers
there will be forms for you to fill out and for your physician to
fill out. The employer will also have forms to fill out. Please
return all completed forms to IHS Human Resources to be
overnighted to Crawford, Slevin & Hicks. (Do not let your
physician mail them; this delays the process.) Crawford, Slevin
& Hicks will then review all forms to ensure everything is filled
out.

At this time the facility still has light duty work available
within your 20lb. max of weight lifting. Enclosed is a copy of
your light duty job description, as well as the copy you gave us
of functional capacity evaluation signed and dated December 18,
2001. These light duty jobs are well within the functional
capacity range. Please review these with your physician. If
there is something that your physician feels you should not do
please have your physician specify.

Please contact the Administrator, Carl Kovski, by February 27,
2001 to set up a time to verify your return to work date, and to
go over the light duty job description.

Carl Kovski, NHA
Administrator

CC: Evan J. Jenkins, Esquire
    Lisa Williams of ESIS

Enclosure


EXHIBIT

"C"

# FUNCTIONAL CAPACITY EVALUATION
## SUMMARY PAGE

Patient name : Kathleen Hodson

Eval date: 12-18-01

Referral source: Dr. M. Ang

Dx: Lumbar Disc HNP

### LIFTING TOLERENCES:

| | Occasional | Frequent |
|---|---|---|
| *Floor to Knuckle:* | 20# | *10#* |
| *Knuckle to Shoulder:* | 10# | *did not demonstrate* |
| *Carry:* | 17# | *did not demonstrate* |

### POSITIONAL TOLERENCES:

| | Occasional (0-33%) | Frequent (34-66%) | Constant (67-100%) |
|---|---|---|---|
| *Sit:* | | X | |
| *Stand:* | | X | |
| *Walk:* | X | | |
| *Squat:* | X | | |
| *Kneel:* | unable | | |
| *Climb Stairs:* | | X | |
| *Reach Forward:* | | X | |
| *Reach Overhead:* | | X | |
| *Use Foot Pedals:* | | X | |
| *Grip Firmly:* | | X | |
| *Fine Manipulation:* | | X | |
| *Static Head:* | | X | |
| *Trunk Bend:* | X | | |
| ( | ): | | |
| ( | ): | | |

**RESULT:** The client demonstrated the ability to work in the LIGHT classification category for an 8 hour day. ( According to the US Department of Labor Standards.)

Signed: Evaluator : _D Futmeyer PT_ Date: _12-18-01_
PHYSICIAN : *( I concur with the above, with changes as indicated)*
*Physician signature here :* _____ Date: _____

- **CHECK IN WITH THE SUPERVISOR UPON ARRIVAL FOR ASSIGNMENTS**

**\*LIST ALL DUTIES THAT ARE COMPLETED DURING THE SHIFT AND GIVE TO THE SUPERVISOR BEFORE LEAVING**

-MA-51 FROM BUSINESS OFFICE

-IDDS COMPLETION

-THIN CHARTS (GET DIRECTION FROM C. COVERDALE AND <u>ALL</u> CHARTS NEED THINNED

-DINING ROOM - MONITOR AND FEED AT <u>ALL</u> MEALS DURING YOUR SHIFT-WEEKDAYS AND WEEKENDS

-NURSING ASSESSMENTS

-WARD CLERK DUTIES ON WEEKENDS AND WARD CLERKS DAYS OFF

-CHECK ALL DOOR NAME PLATES FOR ACCURACY AND REPLACE

-CHECK ALL RESIDENT NAME BANDS AND REPLACE

-SCHEDULING- CHECK WITH CAROL OTIS

-OTHER DUTIES AS ASSIGNED

-COPYING

SCHEDULED WORK HOURS WILL BE 7:00AM to 3:30PM.



# Orthopaedic and Sports Medicine of Erie

Nick Stefanovski, M.D.
Gary J. Cortina, M.D.
John J. Euliano, Jr., M.D.
David M. Babins, M.D.
Kathy Sullivan, PA-C

300 State Street  •  Suite 400A  •  Erie, Pennsylvania 16507
(814) 454-8287  •  FAX (814) 454-8470

DATE: _2 - 11 - 02_

TO WHOM IT MAY CONCERN:

_Hodson, Kathleen_ _____ IS RELEASED TO

RETURN TO WORK ON _2-11 - 02_ _____

RETURN TO: _____ REGULAR DUTY _____ HOURS

X _____ LIGHT DUTY _____ HOURS

RESTRICTIONS: _20# Lifting Rotating_ _____

_____

_John Euliano, J. MD._

# WORKERS' COMPENSATION MEDICAL REPORT FORM

THIS FORM IS TO BE FILED WITH THE EMPLOYER OR INSURER ACCORDING TO INSTRUCTIONS PROVIDED ON THIS FORM.

Name of Employee  _KATHLEEN   HODSON._

Name of Employer  _IHS   AT   BAYSIDE_

Name of Insurer  _IHS  OF  ERIE  AT  BAYSIDE_

Claim Number (if known)  _C 3 9 5 C. 5 2 5 7 9 8 9_  Date of Birth  _11/26/46_

| 7/6/01 | KATHLEEN HODSON | | |
|--------|-----------------|---|---|

IMPRESSION: The impression is that of a herniated lumbar disc at L4-5.

| | | |
|---|---|---|
| DATE | NAME | REFERRING PHYSICIAN |

RECOMMENDATIONS: I would recommend a light duty restriction with a 30-pound weight lifting limit. It more than likely will be permanent.

John J. Euliano, Jr., M.D./nk

cc: Dr. Mary Ann Wendel

ORTHOPAEDIC & SPORTS MEDICINE OF ERIE, P.C.
300 STATE ST. • SUITE 400 A • ERIE, PA 16507
PHONE (814) 454-8287 • FAX (814) 454-8470

Carl,

Dorothy says I can
lie on a hot pack
on my 10 min break
if you give per-
mission. I really
need it ____ KH please call me
or ___

4-3-6? C. Kanski OK Rev

**EXHIBIT**

"D"

## EMPLOYEE COUNSELING FORM

DATE: 8/21/97

EMPLOYEE: Hodson K. LPN

PROBLEM: Failure To follow Correct Policies & Procedures.
LPN Hodson Re-Capped A "used" lancet which resulted
in a needle stick. It's Policy STATE NO
ReCapping of SHARPS for any reason.

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN:
SHARPS Are NOT to Be Recapped for any reason, @ any time.
You NEED to Review Policies In the Infection Control
MANUAL. Failure to comply c̄ Policies in the
future "will Result in Disciplinary Action OR TERMINATION!

Signature of Employee: Kathleen Hodson LPN  Date: 8-22-97

Signature of Staff Member: Darul W. Dinger RN  8/21/97

Dorothy Marsden  8/22/97

## EMPLOYEE COUNSELING FORM

Rev. 2/90

EXHIBIT

"E"

## EMPLOYEE COUNSELING FORM

DATE: 8/21/97

EMPLOYEE: Hodson K. LPN

PROBLEM: Failure To Follow Correct Policies & Procedures.
LPN Hodson re-capped a "used" lancet which resulted
in a needle stick. Itts Policy STATE NO
Recapping of SHARPS for any reason.

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN:
SHARPS Are Not to be recapped for any reason @ anytime.
You NEED to review Policies to the infection control
Manual. Failure to comply c Policies in the
future "will Result in Disciplinary Action or TERMINATION!

_David W. Dunger RN_                          _Kaulleen Hodson LPN_  8-22-97
Signature of Staff Member                     Signature of Employee       Date
_Darla Marshall_  8/21/97
                  8/22/97

## EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

DATE: 22 Aug 97

EMPLOYEE: Hodson K. LPN

PROBLEM: MEDICATION ERROR — ON 21 Aug 97 LPN Hodson
ADMINISTERED Valium 5mg to A Resident INSTEAD of Oxycontin 20,
AS PER Physician orders. The Resident Had NO Valium orders. The
ERROR WAS DISCOVERED During the Narcotic Count @ the end of the
Shift when the Count WAS FOUND INCORRECT. When the ERROR
WAS DISCOVERED the Physician WAS NEVER Notified and there WAS NO
Documentation that the Residents STATUS WAS EVALUATED!

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN:
This WAS A Serious ERROR which had great Potential to cause
harm to the Resident. Greet Care Must Be Given when ADMINISTERING
NARCOTICS and/or Any MEDICATION. You will Be Suspended NEXT Occurance
without Pay. Should AN INCIDENT of such NATURE occur
AGAIN Disciplinary Action and/or Termination will Result.

Signature of Staff Member ____ 8/22/97        Kathleen Hodson LPN 8-22-97
                                              Signature of Employee

Patricia Mannon RN 8/22/97

# EMPLOYEE COUNSELING FORM

*Verbal Warning*

DATE: 12/1/97

EMPLOYEE: Kathy Hodson

PROBLEM: failure to follow medication administration policy + procedures. On 11/25/97 @ 9pm you administered MS AR 30mg to ES instead of MS Contin 30mg.

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN: It is your responsibility as the nurse administering medications to verify you are administering the correct medication to the correct resident at the correct time. Further descrepencies of this nature will result in suspension +/or termination

_Housen RN_    12/1/97
Signature of Staff Member    Date

_Kathleen Hodson_ 12-1-97
Signature of Employee    Date

presented by ___

## EMPLOYEE COUNSELING FORM

Rev 2/90

# EMPLOYEE COUNSELING FORM

Verbal
warning

DATE: 12.3.97

EMPLOYEE: Kathlee Hoden LPN

PROBLEM: Incomplete Documentation I+O incomplete
For 12/2 for 4 assignment 45-47

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN:
It is your responsibility to complete /accurately/
I+O per Physician order assure that
those are complete before the end of
your shift. Further Discrepancies in this
area - will Result in Further disciplinary action

_____ PN   12-3-97          Kathleen Hoden LPN 12-8-97
Signature of Staff Member      Date        Signature of Employee    Date

EMPLOYEE COUNSELING FORM

Rev. 2/80

## EMPLOYEE COUNSELING FORM

DATE: 12-29-97

EMPLOYEE: Kathy Nodson (pn)

PROBLEM: Failure to Follow Documented Physician Orders- Resident 452 found on Floor 12-28-97 8:15 pm. Had only = siderail ↑ p̄ placed in bed - Has order for all (4) ½ rails to be ↑ when resident is in bed. Resident goofed employee as stating "well he's alert enough - he should have told the aide that all rails were supposed to be ↑

STATEMENT BY EMPLOYEE: Employee assisted CNA to transfer resonant to bed. I was not in room when resident was put into bed. I did not say "well he's alert enough". Lillian Bailey CNA was a witness to what I said

RESOLUTION OF PROBLEM OR ACTION TAKEN:

Joanne                              12-29-97        Kathleen Nodson
Signature of Staff Member    Date              Signature of Employee        Date

EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

*Verbal Warning*

DATE: 2-18-98

EMPLOYEE: Kathy Hodson LPN

**PROBLEM:** failure to meet minimum standards of care!! Resident
~~████ ████~~ ordered for daily wts on 3-11 shift. No weights
obtained on this resident since 2-5-98. This resident can fill ē
fluid and go into CHF very quickly and daily weights are
vital to monitoring for this. You failed to complete this
assigned duty X 1

**STATEMENT BY EMPLOYEE:**

**RESOLUTION OF PROBLEM OR ACTION TAKEN:** Further failure to complete assigned duties will result in
further disciplinary action and/or suspension/termination.
Read all MARS, TARs carefully to ensure all orders
are carried out.

Daniel Venesky RN    2-18-98
<small>Signature of Staff Member    Date</small>

Kathleen Hodson LPN
<small>Signature of Employee    Date</small>

## EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

DATE: 4-2-98

EMPLOYEE: Kathy Hodson LPN

**PROBLEM:** On 3-30-98 resident JV ▮▮▮▮ had IV ordered at 80cc/hour IVPB to run at 200cc/hour Ms. Hodson left IV infusing at 200cc/hour. Entire bag infused resulting in IV infiltration and fluid overload.

**STATEMENT BY EMPLOYEE:**

**RESOLUTION OF PROBLEM OR ACTION TAKEN:** April 2 1998 Suspension. Any further medication error will result in termination

Sharon DeReath _____ Date

Lee Wix RN 4/2/98

Kathleen Hodson LPN 4/2/98
Signature of Employee   Date

EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

DATE: 2/25/99

EMPLOYEE: Kathy Hodson

PROBLEM: On 2/15/99 you initialed, then circled ▬▬▬ treatment for OOB Bid as tolerated + cooperative, however, you did not document why you did not complete the treatment as prescribed by the physician

See attached.

STATEMENT BY EMPLOYEE:

I accept responsibility for not explaining why I circled tx. Resident did refuse to get OOB is what I should've written on the back of TAR.

RESOLUTION OF PROBLEM OR ACTION TAKEN: Review ihs policy regarding documentation requirements when treatments are not completed per the physician's orders

Houser RN        2/25/99        Kathleen Hodson LPN  3-1-99
Signature of Staff Member    Date        Signature of Employee        Date

## EMPLOYEE COUNSELING FORM

## EMPLOYEE COUNSELING FORM

DATE: 6-6-01

EMPLOYEE: Kathy Hodson, LPN

PROBLEM: On 6-6-01

[redacted] showed me (her) drug on [redacted]
w̄ = her initials from 6-5-01 even though
you had initialled it on 3-11 shift. Please
be more careful.

STATEMENT BY EMPLOYEE: As this is 6-21-01 when I received this,
I cannot remember. I probably forgot to circle
it. I will circle t/c. I don't get to, if
I am unable in the future.

RESOLUTION OF PROBLEM OR ACTION TAKEN:

D. Marsili LPN
Signature of Staff Member          Date

Kathleen Hodson LPN    6/21/0
Signature of Employee          Date

## EMPLOYEE COUNSELING FORM

## Disciplinary Action Form

### Disciplinary Action Form

Date  11-15-01

Name  Kathy Hodson

Dept.  1012502  Nsg

Disciplinary Action:

Verbal* ☒          Written ☐          Written & Suspension ☐          Discharge ☐

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: Absenteeism: Policy is 6 separate occurrence within Any 12 month period. Employee Absent on 1-22-01 1-23-01 ILL, 6-22-01 Back hurts, 7-17-01 walked off the Job (Back), 9-9-01 back pain, 11-10-01 Back hurts, & 5 absences* Any Further absences will Result in Disciplinary Action.

A copy of this warning was personally delivered to the above employee by:

_____ RN  11-15
Supervisor

_____ HK 11-30-01
Date

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

Reviewed c refusal to sign R/T "I'm on workman's comp & I miss b/c of my Back"
                Employee

11/15/01  Date

FORMS–67

**Disciplinary Action Form**

---

### Disciplinary Action Form

Date _1-29-02_

Name _Kathy Hoooa_

Dept. _Nursing_

Disciplinary Action:

Verbal* ☐          Written ☐          Written & Suspension ☐          Discharge ☐

To the employee:

    Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: _Notified of potential attendance problem_

_____

_____

_____

_____

A copy of this warning was personally delivered to the above employee by:

_____
Supervisor

_1-29-02_
Date

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

_Would not sign_

_____
Employee

_____
Date

*Completion of this form shall serve as documentation only and should not be filed in the employee's personnel file.

# Disciplinary Action Form

## Disciplinary Action Form

Date 1/29/00

Name Kathleen Hodson

Dept. NSG

**Disciplinary Action:**

Verbal* ☑    Written ☐    Written & Suspension ☐    Discharge ☐

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: On 1/18, 1/19, 1/20 employee failed to punch in and out for lunch despite prior reminders to punch in and out for a 30 min lunch per 8 hr shift. On 1/18, employee punched in 29 minutes early. On 1/19 employee punched in 14 minutes early. On 1/20 employee punched in 1 hr and 30 minutes early. Employees are not to punch in more than 5 minutes early.

A copy of this warning was personally delivered to the above employee by:

you must take your 1/2° lunch every day. you don't. we will schedule it along to your work schedule ea. day.

Supervisor _____ RN ADOW

Date 29 JAN 02

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

* Reported she has been to busy to take lunch.

Employee _____

Date _____

*Completion of this form shall serve as documentation only and should not be filed in the employee's personnel file.

**Disciplinary Action Form**

## Disciplinary Action Form

Date **14 May 02**

Name **K Hodson (RN)**

Dept. **NSG**

Disciplinary Action:

Verbal* ☑    Written ☐    Written & Suspension ☐    Discharge ☐

To the employee!

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: _Failed to Complete Narcotic Count, Count Found Incorrect, Failed to Document Narcotic Given to resident, on 13 May 02._

_# Employee was provided "Eduction Materials" "Maintaining Control over Controlled Drugs," Its Handout_

A copy of this warning was personally delivered to the above employee by:

_[signature] RN, D.O.N._
Supervisor

Date

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

_Kathleen Hodson RN_
Employee

_5/14/02_
Date

_Happy Nurses' Week_

_Usually, the supervisor, "pencils in" your name and the next day, asks you to sign in the space, in the thie book provided. I very seldom, in get to sign off, that's why I can't understand, being written up for this. I see, several blank spaces, in the narc book & I ask about them, He said I wasn't to worry about anyone else, this was, about me, only! K. Hodson RN 5/14/02_

FORMS 6

```
IES - BAYSIDE                                      05/20/02 11:37a  Page 1
PUNCH DETAIL REPORT
Current pay period
```

------------------------------------------------------------------------

```
HODSON, KATHLEEN D.200347211   1012502   88---F-
   ID       IN  DEPT        OUT    ID IN  DEPT          OUT      TOTALS
Fri 05/17  248p*U          322p                              0.50    0.50

  Dept:1012502 LTC NON-CERTIFIED LPN
                     REG:        0.50
```

**EXHIBIT**

"F"



| NORTHWEST | | AMBASSADOR | |
|---|---|---|---|
| 50-1 | S█████ P█████ | 66-1 | M█████ █████ T |
| 50-2 | C██, B████ S | 66-2 | F████ F████ |
| █████ | K█ M██ MOD | 67-1 | J█████ C█████ S |
| 52-1 | S█████ H███ T | 67-2 | B██ M█████ |
| 52-2 | S█████ C█████ MOD | 68-1 | V█████ A█████ |
| | | 68-2 | C████ R████ |
| █████ | G█████, R███ ~MED | 69-1 | G█████ C█████ S |
| 54-1 | L███, M█████ ~S | 69-2 | K█████ R███ MOD |
| 54-2 | | 70-1 | M█████ █████ S |
| █████ | M███, F█████ MOD | 70-2 | D█████ D█████ T |
| | C██, G█████ S | 71-1 | P█████ T |
| 58-1 | M█████, D█████ MAX | 71-2 | S█████ M█████ T |
| 58-2 | L████ S████ ~S | 72-1 | C█████ █████ T |
| █████ | W█████, A██ MOD | 72-2 | R█████ H███ S |
| 60-1 | B███, M███ J███ MIN | 73-1 | S█████ T |
| 60-2 | V█████, E█████ T | 73-2 | M█████ █████ T |
| 61-1 | V█████, F████ T | 74-1 | G█████ A██ T |
| 61-2 | L█████, B█████ MOD | 74-2 | A█████, O█████ MAX |
| 62-1 | | 75-1 | B█████ J█████ MED |
| 62-2 | | 75-2 | N████ B█████ MOD |
| 63-1 | H█████, T█████ MAX | | |
| 63-2 | R█████, L█████ MAX | | |
| 64-1 | A███ L███ Ⓢ | | |
| 64-2 | | | |
| 65-1 | F█████ R█████ Ⓢ | | |
| 65-2 | S█████, A█████ (namot) | | |

TOTAL = 20

Total CALE = 9

A = 3.5 (4)    TOTAL = 20    Total Cale = 3    SUPERVISION = 7    CNA = 2
SUPERVISION = 6                    MOD = 2
MOD = 4    MIN = 1              MED = 1
MED = 2                          MAX = 1

EXHIBIT

tabbies

"G"

May. 17, 2002

Meeting 17 May 2002 ō Kathy Hodson LPN, David Dinges DON, Shield Rist (Human Resource) any myself Cathy Marrow RN – unit manager.

David "what is your issue"

Kathy Hodson – "I can't work that Hall" (referring to N.W. Hall)

David – "why?"

Kathy Hodson "I can't"

David "why"

Kathy H "I can't"

David: "you have to give me a Reason"

Kathy H: I don't have to tell you

David: what are your restrictions --- 20# lift ō No pushing no pulling

Kathy H: I was told that N.W Hall is the hardest Hall in the Building

David: All you need to do is Follow Your restrictions and Get help When you need it.

Kathy H: That's it I'm Leaving

Cathy M: Cathy if you leave you will Be terminated for abandone abandonement

Kathy H: NO I won't because I - ndlor Dinges oB in

EXHIBIT "H"

Cathy M: — Kathy, when was the last time you worked that ha (NW)

Kathy H — I haven't worked that Nac/

Cathy M. — Kathy your restriction List Nothing N regard to the # g residents on a hall or the Oacuity — so how can you say your not working that Hall

Kathy H: "Thats it I'm Leaving"

Cathy M: If you leave your & DAve position will be terminated

Katty H: Well I'm Leaving

5.17.02

# Disciplinary Action Form

## Disciplinary Action Form

Date 17 May 02

Name Cathy Hodson LPN

Dept. ONS6

Disciplinary Action:

Verbal* ☐   ☐   ☐ Written   ☐ Discharge   ☐ Written & Suspension ☐     Discharge ☒

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: LPN was assigned NW Hall on 17 May 3-11 shift. LPN came to DON c/n "She could not walk that Hall & was not in her restriction." I told her, her restrictions were 20 wt restriction, no pulling or lifting/lifting no matter what hall you are on. She stated "Then I'm leaving." I told her if you leave you are done, you will no longer be employed here. LPN said Then I'm leaving.

A copy of this warning was personally delivered to the above employee by:

_____ RN DON
Supervisor

17 May 02
Date

17 May 02

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

_____
Employee

_____
Date

EXHIBIT

"I"

GENERAL ORIENTATION PROGRAM MANUAL

# MISSION AND QUALITY STATEMENTS

## The IHS Mission

To provide our patients/residents with the
highest quality of cost-effective medical care,
while continually recognizing:

■

The human dignity of patients/residents.

■

The personal investment of employees.

■

The healthcare needs of the communities in which we operate.

■

The financial expectations of investors.

## IHS Quality Statement

Quality means meeting the needs and surpassing the expectations of our patients/residents, physicians, payors, employees, stockholders, and the communities we serve through teamwork and commitment to a process of continuous improvement. Achieving quality is a process of regular measurement, systematic feedback, continuous improvement, and innovation.

## IHS Purpose Statement

Our purpose is to be the employer and provider of choice, delivering value added services; exceeding customer and financial expectations.

Original:   01/94
Revision:   09/96



**EXHIBIT**

tabbies

*"J"*

GENERAL ORIENTATION PROGRAM MANUAL

# WELCOME TO
# INTEGRATED HEALTH SERVICES, INC. (IHS)

We at Integrated Health Systems, Inc. (IHS) welcome you to our team. We sincerely hope that this will be the beginning of a mutually rewarding relationship. At IHS, we believe that we have a responsibility to provide the highest quality health care to our patients/residents. Each employee is to work toward this standard.

The growth and progress of any company depends on its people...people with initiative, creativity, and enthusiasm, working in an atmosphere of respect and harmony. We have such people at IHS.

We are a growth oriented company and we invite you to grow along with us by taking advantage of the many opportunities open to you. We believe that you will share the pride and satisfaction we have in being able to participate in the future and progress of IHS.

In your position, you have become a part of a company which is building a reputation in our industry for the highest quality service, courtesy, and professionalism. You were selected because we believe you have the potential and desire to meet these high standards and will help us maintain our position of leadership.

IHS promotes an atmosphere of open two-way communication and cooperation by keeping our employees informed of goals, procedures, and other activities which may be of interest to them. This orientation program reflects that thinking.

All departments within Corporate IHS are here to serve you and we ask that you use us as a resource and a support system.

Original:     01/94
Revision:     09/96

© Integrated Health Services, Inc. 1996

GENERAL ORIENTATION PROGRAM MANUAL

# IHS: THE COMPANY, PHILOSOPHY, MISSION, GOVERNANCE AND CULTURE

When you join IHS, you become part of a leading national health care organization committed to serving the public with care and compassion. From your first day at work, we'll be counting on you to do your best to help us maintain the standards of clinical excellence our customers expect. You'll join thousands of others throughout the nation whose daily efforts make IHS the Provider of Choice.

We try to maintain a work atmosphere that will enable you to achieve your fullest potential. Our approach to work has always been results-oriented, quality-based, customer-focused, and founded on shared values of teamwork, trust, integrity, compassion, and respect for the individual. We strive to deliver only the best for our high-caliber team of employees and for all those who depend on our care. In an industry where change is perhaps the only thing that's constant, those high standards will never be altered.

IHS has been a pioneer and leader in innovative health care delivery for nearly a decade. Founded by a practicing physician in 1986. IHS offers alternatives to traditional medical care models which can substantially lower costs, help maintain reasonable hospital levels, and provide even greater quality of care.

Integrated Health Services, Inc. ("IHS" or the "Company") is a medical services company focused on providing post-acute care to a wide variety of patients/residents. The Company's strategy is to use geriatric care healthcare centers as an alternative site to provide a wide range of medical and rehabilitative services which traditionally have been provided in the acute care hospital, but at a significantly lower cost than hospital based care. The Company provides subacute care through medical specialty units ("MSUs") located within its healthcare centers.

IHS is a highly diversified health services provider, offering a broad spectrum of subacute and post-acute medical rehabilitative services through its post-acute healthcare system. IHS's post-acute services include subacute care, inpatient and outpatient rehabilitation, respiratory therapy, home healthcare, hospice care, and diagnostic services, supporting the full continuum of healthcare needs.

Original:    01/94
Revision:    09/96

GENERAL ORIENTATION PROGRAM MANUAL

# IHS PRODUCTS

*Catastrophic Injury Rehabilitation*

*Dysphagia Management*

*General Rehabilitation*

*Infectious Disease Management*

*Nutritional Support/Management*

*Pain Management*

*Renal Management*

*Post Surgical Recovery*

*Pulmonary Rehabilitation*

*Deep Vein Thrombosis*

*Diabetes Management*

*COPD Management*

Original:    01/94
Revision:    09/96

© Integrated Health Services, Inc. 1996

GENERAL ORIENTATION PROGRAM MANUAL

# CORPORATE ORGANIZATIONAL STRUCTURE

## CORPORATE OFFICE DEPARTMENTS

Accounting
Accounts Payable
Acquisitions
Administration
Clinical Services
Communications/Marketing
Development
Environmental Services
Facility Financial Services
Finance
Health Benefits
Human Resources
Information Services

Internal Audit
Investor Relations
Legal
Managed Care
Operations (Field and Corporate)
Outcomes Management and Research
Payroll
Purchasing/Materials Management
Reimbursement
Risk Management
Treasury

## CORPORATE ORGANIZATIONAL STRUCTURE

The Company is organized as follows: Chief Executive Officer, Chief Operating Officer, Executive Vice Presidents, Senior Vice Presidents, Vice Presidents, Directors, Managers, and remaining corporate staff.

## KEY CORPORATE PERSONNEL

Robert N. Elkins, M.D. has been Chairman of the Board and Chief Executive Officer of the Company since March 1986 and also served as President from March 1986 to July 1994. From 1980 until founding IHS in 1986, Dr. Elkins was a co-founder and Vice President of Continental Care Centers, Inc., an owner and operator of long term healthcare centers. From 1976 through 1980, Dr. Elkins was a practicing physician. Dr. Elkins is a graduate of the University of Pennsylvania, received his M.D. degree from Upstate Medical Center, State University of New York, and completed his residency at Harvard Medical Center.

Lawrence P. Cirka, has been President and Chief Operating Officer and a director of the Company since July 1994, and served as Senior Vice President and Chief Operating Officer of the Company from October 1987 to July 1994. Prior to joining IHS, Mr. Cirka served in various operational capacities with Unicare Healthcare Corporation, a long-term health care company, for 15 years, most recently as Vice President - Western Division, where he had operational and financial responsibility for 46 long-term healthcare centers exceeding 5,000 beds. Mr. Cirka is a graduate of Clarion University and Licensed Nursing Home Administrator in Pennsylvania, Florida, and Washington.

Original:    01/94
Revision:    09/96

GENERAL ORIENTATION PROGRAM MANUAL

# DEFINITION OF SUBACUTE CARE AND MEDICAL SPECIALTY UNIT (MSU)

Advances in medical technology, coupled with increasing pressures to reduce the soaring cost of hospital acute care, have recently altered long-held assumptions about the types of healthcare centers in which patients/residents should be treated. As a result, **subacute care** centers are viewed as a preferable care alternative for many seriously ill, but medically stable patients/residents. These patients/residents no longer need acute care hospital services, yet still require highly skilled nursing, rehabilitative care, and technologically advanced therapies.

Pioneered and perfected by IHS, subacute care is practical in the **Medical Specialty Unit (MSU)** - a "mini-hospital" center offering advanced technologies and medical care - all in a comforting high-tech environment conductive to recovery.

The Company's MSU's are 10 to 50 bed subacute specialty care units located within discrete areas of IHS' healthcare centers, with physical identities, specialized medical technology and medical staffs separate from the geriatric care healthcare centers in which they are located. An acute care nurse, or a nurse with similar qualifications, serves as Unit Manager of each unit, which is staffed with nurses having experience in the acute care setting. The operations of each MSU are generally overseen by a board certified specialist in that unit's areas of treatment. The patients/residents in each MSU are provided with a high degree of monitoring and specialized care similar to that provided by acute care hospitals. The physiological monitoring equipment required by the MSU is often equivalent to that found in the acute care hospital. The company opened its first MSU program during the fourth quarter of its 1988 fiscal year and approximately one-third of all MSU patients/residents are under the age of 70.

Although each MSU has the treatment capabilities of an acute care hospital in the MSU's area of specialization, the Company believes the per diem treatment costs are generally 30% to 60% less than in acute care hospitals, also a cost effective alternative for risk contracts, and the MSU is less "institutional" in nature than the acute care hospital. Also, unlike in an acute care hospital where visiting hours are fixed, families may visit MSU patients/residents whenever they wish and family counseling is provided. In marketing its MSU programs to insurers and healthcare providers, IHS emphasize the cost savings of its treatment as compared to acute care hospitals. The Company emphasizes the improved "quality of life" compared to acute care and long-term care hospitals in marketing its MSU programs to hospital patients/residents and their families.

Original:     01/94
Revision:     09/96

© Integrated Health Services, Inc. 1996