IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN HODSON | ) | |
| | ) | Civil Action No.   03 - 0374 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Maurice B. Cohill, Jr. |
| | ) | |
| | ) | |
| INTEGRATED HEALTH SERVICES | ) | |
| LONG TERM CARE, INC. d/b/a | ) | |
| IHS AT BAYSIDE, | ) | |
| | ) | |
| Defendant. | ) | |

APPENDIX FOR EXHIBITS TO BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT     # 2

A.    Affidavit of Sheila Rist

B.    Deposition transcription Kathleen Hodson

C.    LPN job duty description

D.    Medical slips

E.    Light duty status slips

F.    Letter dated February 19, 2002, from Carol Kovski

G.    Memo regarding hot packs

H.    Affidavit of Carl Kovski

I.    Affidavit of Dave Dinges

J.    Affidavit of Kathleen Mannion

K.    Affidavit of Roger Watkins

L.    Affidavit of Jennifer Heiser

M.    Employee Counseling Forms for Kathleen Hodson

N.    Punch detail report

O.    Patient list for Northwest Mall and Ambassador Mall for May 17, 2005

P.    Affidavit of Ray Martinez

Q.    Disciplinary Action Form for Kathleen Hodson, May 17, 2005

R.    Affidavit of Maureen Magraw

S.    Affidavit of Carmen Callicott

T.    Affidavit of Donna Marsili

U.    Executed Employee Corporate Compliance Acknowledgments signed by Kathleen Hodson

GENERAL ORIENTATION PROGRAM MANUAL

# TYPES OF CARE PROVIDED

IHS is a highly diversified health services provider, offering a broad spectrum of post-acute medical services. More than just alternatives to traditional hospitalization, these high-quality, low-cost services support patients throughout the entire treatment period. IHS's nationwide post-acute networks include the following well-integrated services:

**Subacute Care** - For medically stable patients who require nursing, rehabilitative care, and sophisticated therapies more intensive than traditional skilled nursing care.

**Home Care** - When patients need skilled medical attention after they leave a healthcare center, or prior to institutional care, they receive the same consistently high level of care in the comfort of their homes.

**Rehabilitation** - Both inpatient and outpatient services for physical, speech, occupational and other therapies are an integral part of IHS post-acute care.

**Respiratory Care** - IHS respiratory therapists are available to provide care in a hospital, a subacute healthcare center, or at home.

**Diagnostics** - Monitoring a patient's physical condition with modern technology. IHS provides x-ray, blood-gas analysis, EKG, Holter monitors, video fluoroscopy, and other diagnostic services at medical healthcare centers or in the patient's home.

**Hospice Care** - Offering terminally ill patients a secure and supportive environment that's an effective alternative to routine home care and repeat hospitalization.

**Long Term Care** - IHS healthcare centers offer extended care to elderly and other patients not able to live independently.

Supporting the full continuum of healthcare needs, IHS treatment specialties include pulmonary care, wound management, rehabilitation, orthopedics, neurology, infectious disease, oncology, cardiovascular care, and nutritional care-offered through a well-coordinated network that supports patients from hospital discharge through recovery, and in some cases completely eliminating the need for traditional inpatient stays.

**BASIC MEDICAL SERVICES** - The Company provides a wide range of basic medical services at its geriatric care healthcare centers which are licensed as skilled care nursing homes. Services provided to all patients/residents include required nursing care, special diets, and other services which may be specified by a patient's/resident's physician who directs the admission, treatment and discharge of the patient/resident.

Please refer to the orientation video.

# WORKERS' COMPENSATION
## EMPLOYEE'S ACKNOWLEDGMENT
### UNDER SECTION 306(f)(1)(i)

1.  The employee has the duty to obtain treatment for work-related injuries and illnesses from one (1) or more of the designated health care providers for ninety (90) days from the date of the first visit to a designated provider.

2.  The employee has the right to have all reasonable medical supplies related to the injury paid for by Integrated Health Systems as long as treatment is obtained from a designated provided during the ninety (90) day period.

3.  The employee has the right, during this ninety (90) day period, to switch from one health care provider on the list to another provider on the list, and all treatment shall be paid for by Integrated Health Systems.

4.  The employee has the right to seek treatment from a referral provider if an employee is referred to him by a designated provided, and Integrated Health Systems shall pay for the treatment rendered by the referral provider.

5.  The employee has the right to seek emergency medical treatment from any provider, but subsequent non-emergency treatment shall be by a designated provider for the remainder of the ninety (90) day period.

6.  The employee has the right to seek treatment or medical consultation from a non-designated provider during the ninety (90) day period, but these services shall be at the employee's expense for the applicable ninety (90) days.

7.  The employee has the right to seek treatment from any health care provider after the ninety (90) day period has ended, and that treatment shall be paid for by Integrated Health Systems, if it is reasonable and necessary.

8.  The employee has the duty to notify Integrated Health Systems of treatment by a non-designated provider within five (5) days of the first visit to that provider, Integrated Health Systems may not be required to pay for treatment by a non-designated provided prior to receipt of this notification. However, Integrated Health Systems shall pay for these services once notified, unless the treatment is found to be unreasonable by a URO, under Subchapter C (relating to medical treatment review).

9.  The employee has the right to seek an additional opinion from any health care provider of the employee's choice when a designated provider prescribes invasive surgery for the employee. If the additional opinion differs from the opinion of the designated provider, and the additional opinion provides a specific and detailed course of treatment, the employee shall determine which course of treatment to follow. If the employee opts to follow the course of treatment out-lined by the additional opinion, the treatment shall be performed by one of the health care providers on Integrated Health Systems' designated list for ninety (90) days from the date of the first visit to the provider of the additional opinion.

DATE: _____

_____
Employee

DATE: _____

_____
Witness

# The Occupational Health Center

## Injury/Illness Information

-968700973

| Corporate Name: | Bayside Nursing and Rehabilitation | 4114 Schaper Avenue | | |
| Company Name: | **Bayside Nursing and Rehabilitation** | | | |
| | **2110883911** | Erie | PA | 16508 |

| Billing Information: | <u>Bill Attn:</u>  Shelia Rist | | | |
| | Same | Same | Same | PA |

| Lab:  ACL | MRO:  The Occupational Health Center |

## Panel Physicians

877-60D

| Specialty | Provider | Address | Phone | Fax |
|-----------|----------|---------|-------|-----|
| Occupational Medicine | The Occupational Health | 1602 Sassafras Street | (814) 452-7879 | |
| Opthamology | Howard Levin, MD | 2626 Sigsbee | (814) 455-7541 | |
| Opthamology | Michael Earick, MD | 2626 Sigsbee | (814) 455-7541 | |
| Orthopedic Surgery | Orthopedic Surgeons, Inc. | 204 West 26th Street | (814) 454-2401 | |
| Other | Fast Track, | West 24th and Mrytle | (814) 452-5353 | |
| Other | Immediate Care West, | . | (814) 877-7015 | |
| Other | Immediate Care East, | 810 East 38th Street | (814) 877-7016 | |
| Other | Hamot ER, | 201 State Street | (814) 877-6000 | |
| Other | Saint Vincent ER, | 232 West 25th Street | (814) 452-5353 | |
| Physical Therapy | TRAC Rehab Services, | 1527 Sassafras Street | (814) 452-5231 | (814) 452-7855 |

## Company Profile

Mod. Duty Available? ☑     Employer Type: Healthcare-nursing homes/home c    # Employees: 161

Modified Duty Information:   Call ASAP!

Post Accident Instructions:   Post accident instructions

WC Insurer: Gallgher Bassett          WC Agency:  None
Mgd Care Co: None                     TPA Name:  None

---

Patient Name:                          Patient SS#:

Edit Date:   2/25/98          *Copyright: The Occupational Health Center, 1997*          TOHC Rep:    JW

# PART 1
## NOTICE OF RIGHTS OF NURSING FACILITY RESIDENTS
### (Applies To Everyone)

---

**Dear Resident:**
This is your personal copy of the notice of rights given by the law to residents living in nursing facilities, as required by Title XIX of the Social Security Act. The applicable sections (Sec.) of the Social Security Act are provided for your information.

The nursing facility is committed to provide you with professional care and support services which will accommodate your medical and personal care services needs.

By law you have the following rights:

---

## ADVANCE DIRECTIVE - Sec. 1902(w)
You have the right to give advance written instructions to your doctor and others, that in the event you become incapacitated, your nursing facility and your physician will honor your wishes regarding your choice to accept, refuse, or discontinue medical care or surgical treatments.

## FREEDOM OF CHOICE - Sec. 1919(c)(1)
You have the right to choose a personal attending physician and to be fully informed in advance about the care and treatment you will receive; to participate in planning your care and treatment; and, to be fully informed in advance of any changes in your care plan or treatment.

## FREEDOM FROM RESTRAINTS - Sec. 1919(c)(1)
You have the right to be free from physical or mental abuse, corporal punishment, involuntary seclusion, and any physical or chemical restraints unless they are required to treat your medical symptoms and are not used for purposes of discipline or for the convenience of staff. Restraints may only be used to ensure your physical safety or the safety of other residents. These limitations must be based upon the written order of a physician which specifies the duration and circumstances which require such restraints.

## PRIVACY - Sec. 1919(c)(1)
You have the right to privacy with regard to accommodations, medical treatment, written and telephone communications, visits and meetings with family and other resident groups. Your right to privacy should not be interpreted as a right to a private room.

## CONFIDENTIALITY - Sec. 1919 (c)(1)
Neither your personal nor your clinical record may be released to anyone who is not involved in providing or monitoring the care provided to you under your plan of care, except with your consent. Exception - your records will be released when required by law, or when you are transferred to another health care institution.

MA401 (7-96)

## ACCOMMODATION OF NEEDS - Sec. 1919(c)(1)

You have the right to have your personal needs and preferences provided for to the extent that they do not interfere with the rights of other residents of the nursing facility. You must have advance notice of any intention to change either your room or your roommate in order that your personal preferences may be considered prior to any change being made.

## GRIEVANCES - Sec. 1919 (c) (1)

You have the right to object to any treatment or care which has been furnished as well as that which has not been furnished with the assurance that there will be no reprisals for voicing your grievances which must be resolved promptly and fairly. If the need should arise, you may choose to be represented by an attorney.

## PARTICIPATION IN RESIDENT AND FAMILY GROUPS - Sec. 1919(c)(1)

You have the right in your nursing facility to organize and participate in resident groups which may include families and friends.

## PARTICIPATION IN OTHER ACTIVITIES - Sec. 1919(c)(1)

You have the right to participate in social, religious, and community activities which do not interfere with the rights of other residents in the nursing facility.

## EXAMINATION OF SURVEY RESULTS - Sec. 1919(c)(1)

You have the right to examine the results of the most recent survey of the nursing facility as conducted by state or federal authorities and any plan of correction in effect with respect to your nursing facility. The survey results must be made available for your examination by the facility in a place readily accessible to you.

## NOTICE OF RIGHTS - Sec. 1919(c)(1)

Your nursing facility must inform you orally and in writing, at the time of your admission to the facility, of your legal rights while you are a resident of the facility. A written statement of your rights must also be provided to you by your nursing facility upon reasonable request.

## RIGHTS OF INCAPACITATED RESIDENTS - Sec. 1919(c)(1)

If you are judged incapacitated under the laws of the state, a person will be appointed under state law to act on your behalf.

## USE OF PSYCHOPHARMACOLOGIC DRUGS - Sec. 1919(c)(1)

These drugs may only be administered to you on the orders of a physician and only as part of your written plan of care. Your plan of care must describe the plan to eliminate or modify the symptoms for which the drugs are prescribed. At least annually an independent, external consultant must review the appropriateness of your receiving such drugs.

## TRANSFER AND DISCHARGE - Sec. 1919(c)(1) and (2)

You cannot be transferred or discharged from your nursing facility <u>except</u> in an emergency: the nursing facility ceases operations; you may endanger the health and safety of the other residents; nonpayment of your share, if any, of your cost of care; improvement in your health to the point where you no longer need nursing facility care: or an urgent need for medical services the nursing facility cannot provide. <u>Except</u> for an emergency or your <u>urgent</u> need for medical services the nursing facility cannot provide, the nursing facility must give you and a relative or other responsible person you have named, 30 days advance <u>written</u> notice of your transfer or discharge. The nursing facility must arrange for your safe and orderly transfer to a site where your needs can be adequately provided for, and the nursing facility must thoroughly prepare you for your upcoming transfer or discharge.

**Transfer or discharge does not mean movement of a resident to a bed within the same certified facility.**


## BED HOLD POLICIES - MEDICAL ASSISTANCE RESIDENTS  - Sec. 1919(c)(2)

The Medical Assistance Program will make payment to your nursing facility to hold (reserve) the bed for you when you are away from the nursing facility for a continuous 24 hour period because you are in the hospital or on therapeutic leave.  A bed must be available for you when you return to the nursing facility.  Pennsylvania's limits on Medical Assistance Program payments for reserved bed days are as follows:

1. Hospitalizations - A maximum of 15 consecutive days per hospitalization. During the 15 day period, the same bed shall be available to you upon your return to the nursing facility.
2. Therapeutic leave - A maximum of 30 days per calendar year (leave days must be included in your Plan of Care and must be ordered by your attending physician).


## ACCESS AND VISITATION RIGHTS - Sec. 1919(c)(3)

You have the right to say who may or may not have access to your nursing facility for the purpose of visiting with you.  This includes your family, relatives, or others. Also. you have the right to immediate access by your attending physician or any representative of the federal Department of Health and Human Services, the state Departments of Public Welfare and Health, and the Department of Aging Ombudsman Program.  Organizations or individuals providing health, social, legal, or other services may, with your consent, have reasonable visits with you.


## EQUAL ACCESS TO QUALITY CARE - Sec. 1919(c)(4)

Your nursing facility must establish and maintain the same policies and practices for <u>all</u> residents regardless of source of payment. regarding transfer, discharge and provision of nursing facility services required under the state plan.

MA401 (7-96)

## ADMISSION POLICY - Sec. 1919(c)(5)

Your nursing facility cannot prohibit or discourage you from applying for or receiving Medicare or medical assistance benefits. Your nursing facility must prominently display or provide you with individually written and oral information about how to apply for Medicare or medical assistance benefits, how to use these benefits and how to receive refunds for any prior payments made by you that are covered by these benefits.

If you are entitled to medical assistance for nursing facility services, neither you nor anyone on your behalf may be required by the nursing facility to make any payments to the nursing facility as a condition of your admission, to speed up your admission or to guarantee your continued stay in the nursing facility. This requirement does not stop the nursing facility from requesting, accepting, or receiving genuine charitable, religious or humanitarian contributions from organizations or people that are not related to you, if the contribution is not a condition of your admission, to speed up your admission or to guarantee your continued stay in the nursing facility.

The nursing facility must advise you in advance when payments for items or services to be delivered are not covered by the Medical Assistance Program. You must be advised of the costs of the noncovered items or services, and be given the option of accepting or rejecting the charges and the noncovered items or services. This requirement does not stop a nursing facility from charging you for items or services which you requested and received that are not covered by the Medical Assistance Program.

## PROTECTION OF PERSONAL FUNDS - Sec. 1919(c)(6)

You are not required to deposit your personal funds with your nursing facility.

If you choose, however, to deposit your personal funds with your nursing facility, your nursing facility must provide you with a written authorization form which you must sign, that requires the nursing facility to manage and account for your personal funds **OVER** $50.00 in an interest-bearing account. This account must be kept separate from any of your nursing facility's operating accounts. If your funds are kept in the same account (pooled accounts) as other residents, there must be an accounting of each resident's share of the funds and interest in the account.

Any of your personal funds **UNDER** $50.00 must be kept in a noninterest-bearing account, interest-bearing account, or petty cash fund. Your nursing facility must maintain a full and complete separate accounting of your personal funds; a written record of all financial transactions involving your personal funds; and permit you or your legal representative reasonable access to the records of your account.

If you are a resident receiving medical assistance benefits, your nursing facility must let you know when the balance in your account plus the value of your other nonexempt resources reaches $200.00 less than the amount that may cause you to lose your eligibility for medical assistance benefits.

MA401 (7-96)                                    -4-

Integrated Health Services Facility Operations

# PAID TIME OFF (PTO) PROGRAM
(All states except California and Colorado)

## PROGRAM SUMMARY AND EMPLOYEE ACKNOWLEDGMENT

Policy Statement
It is the policy of Integrated Health Services to provide Paid Time Off (PTO) to eligible employees. PTO is a comprehensive paid-leave program and combines traditional vacation, sick time and holidays into a single benefit award.

Application. This policy applies to facility staff, defined as Administrators, Directors of Nursing and all other employees of the facility. Note: If PTO is covered under a labor agreement, the labor agreement takes precedence for the bargaining unit members.

Eligibility. PTO is awarded to full-time employees working 30 or more hours per week and part-time employees working 20-29 hours per week.* New employees will be awarded PTO upon the successful completion of the 90-day introductory period.

* If the facility offers benefits to part-time employees as of the effective date of this policy, those part-time employees will be entitled to PTO benefits according to this policy. If not, the facility must obtain approval from the Senior Vice-President, Regional Vice-President and Division Vice-President of Human Resources.

Change in Status. If, after successful completion of the introductory period, an employee changes status (e.g., full-time, part-time, prn), the employee will transfer a prorated portion of their PTO award from his or her prior status and receive an additional prorated award based upon the new status. The prorated award will be calculated based upon the effective date of the change in status.

Transfer. If, after successful completion of the introductory period, the employee transfers to another facility, the employee will transfer a prorated portion of his or her PTO award at the former facility and receive an additional prorated award at the new facility. The prorated award will be calculated based upon the effective date of the transfer.

Benefit Year. The benefit year for the PTO program is January 1 through December 31 of each calendar year.

Calculation of PTO for New Employees. PTO is awarded to a new employee upon the successful completion of the introductory period. The amount of PTO awarded is calculated based upon the number of full months between the first of the month following the ninety-first day of active employment and December 31. For example, an employee completing the introductory period in May would be awarded 7/12ths (June through December) of the PTO award for a one-year employee in the relevant job classification.

Annual Award of PTO. Subsequent to the initial award of PTO, each employee will receive an award of PTO each January 1. Employees on inactive status, such as during a leave of absence, will receive prorated PTO for the remainder of any benefit year upon returning to active status.

Final 12/14/98

| 5 up to 10 years of service years completed prior to January 1 | Level Three |
| 10 or more years of service completed prior to January 1 | Level Four |

Unused PTO Options.    Because PTO may not be carried over from one benefit year to the next, there are three disbursement options at the end of a calendar year which allow the employee an alternative use for any unused portion of the annual award. Each January 1, employees must select one of these options. Selection of any of these options does not preclude the employee from using all of his or her PTO award as paid time off during the current calendar year. Unless an employee chooses otherwise, unused PTO will rollover into the Extended Illness Bank.

1.  Deposit unused PTO into an Extended Illness Bank.  Unused PTO will be credited to the employee's Extended Illness Bank for use in case of serious illness/recuperative time extending more than three days in duration. The maximum number of days which can be banked is 90. For purposes of the Extended Illness Bank, 'serious illness' will be defined and determined in accordance with the definitions provided under the Family and Medical Leave Act; however, an employee need not be employed for 1 year or 1250 hours as required under the Act to access the Extended Illness Bank. IHS reserves the right to require appropriate medical certification as a condition of payment from an Employee's Extended Illness Bank. Extended Illness Bank balances will not be paid out at separation of employment, regardless of the reason for such separation.

2.  401(k) Contribution and Extended Illness Bank.  The dollar amount of unused PTO up to 40 hours will be added to the employee's IHS 401(k) Plan account. Once so contributed, all such amounts will be vested as are other employee contributions and will be subject to the terms of the Plan. Any unused PTO remaining after this disbursement will revert to the Extended Illness Bank. This contribution will be based on the employee's base rate times the amount of unused PTO hours to be contributed. Any unused PTO remaining after this disbursement will revert to the Extended Illness Bank.

3.  Cash Payout and Extended Illness Bank.  Up to a maximum of 40 hours of unused PTO will be paid to the employee in the first full payroll period in December. This payout will be based on the employee's base rate times the amount of unused PTO hours to be cashed out. Any unused PTO remaining after this disbursement will revert to the Extended Illness Bank.

Premium Pay Days.  The following schedule identifies Premium Pay Days, in which employees will be paid time and one-half their base rate of pay for all hours worked. Regardless of status, employees must take a PTO day in order to be paid for taking time off on a holiday. These days are identified based upon the difficulties encountered in scheduling employees to work. They are the most requested days/shifts off in the year.

| Independence Day | 7-3 (day) shift through 11-7 (night) shift that day |
| Thanksgiving | 7-3 (day) shift through 11-7 (night) shift that day |
| Christmas | 3-11 (eve) shift Christmas eve through 3-11 (eve) shift Christmas Day |
| New Year's | 3-11 (eve) shift New Year's eve through 3-11 (eve) shift New Year's Day |

IHS OF ERIE AT BAYSIDE

TO:    ALL EMPLOYEES

FROM: PERSONNEL

DATE: MARCH 18, 1999

SUBJ: TIME SWIPES AND NURSING SKILLED SHEET

Submitting swipe slips timely and documenting hours on the
daily staffing sheet is mandatory as it is information that
affects financial statements.

In order to ensure accurate information in the payroll system
the following will be implemented immediately:

Effective next pay period, March 25, 1999, staff who have
failed to submit swipe slips and/or who have not completed the
daily staffing sheet will be required to go to the personnel
office to receive their pay checks on pay day.  The personnel
office will distribute the employee's pay check once
appropriate documentation is submitted.

Please note the disciplinary policy continues to be in effect
regarding swipe slips.

IHS OF ERIE AT BAYSIDE

MEMORANDUM

TO:      ALL EMPLOYEES

FROM     ADMINISTRATION

SUBJECT: EMPLOYEE'S TIME CARD SWIPES

DATE:    FEBRUARY 18, 1999

It is each employee's responsibility to make sure they punch in and out of the time clock. Each employee is responsible for swiping their time card at the beginning of their shift and end of their shift and lunch times. Failure to follow this procedure will result in disciplinary action as well as being short wages in your pay check.

The following progressive discipline process will be followed in regards to employees not swiping correctly:

First Offense -   No Warning
Second Offense -  Verbal Warning
Third Offense -   Written Warning
Fourth Offense -  2nd Written Warning
Fifth Offense -   Suspension one (1) day without pay
Sixth Offense -   Suspension one (1) day without pay and placed on a thirty day probation period for the employee to change the unacceptable behavior.

If the above listed steps of this disciplinary process do not result in identified changes in this behavior, termination will be necessary. This pertains to a twelve month period.

Each employee must clock in and out for meal periods: 30 minute lunch
Minimum of 5 consecutive hours worked = 1 meal break
14 or more consecutive hours worked = 2 meal breaks

Lost time cards are to be reported immediately to Human Resources and/or your direct supervisor. Lost time cards will follow the same disciplinary process as missed punches.

MEMORANDUM

TO:      ALL EMPLOYEES

FROM:    PERSONNEL

DATE:    DECEMBER 31, 1997

RE:      EXCESSIVE TARDINESS AND ABSENTEEISM

Repeated absences and tardiness places an unfair burden upon everyone and
interferes with providing quality care to our residents.

We all need to be aware of the problem and understand our policy.

Excessive Tardiness is defined as punching in and being available for work
after the scheduled start of your shift.  Being tardy 3 times or more in any
30 day period and/or more than 6 times in any 60 day period will result in
termination.

Excessive Absenteeism is defined as having more than 2 separate occurrences
of time off within any consecutive 30 day period and/or having more than 6
separate occurrences of time off within any 12 month period.  All absences
are cumulative for the year following the date of employment.

A) When an employee has 2 separate occurrences during any consecutive 30 day
period they will be placed on 30 day probation and can have no absences
during this 30 day probation.

B) When an employee is absent 5 separate occurrences during a 1 year period
from date of employment they will receive a written warning and possible 1
day suspension without pay.

C) When an employee is absent 6 separate occurrences during a 1 year period
from date of employment they will receive a final written warning stating
that any additional days missed will result in termination.  They will also
be suspended anywhere from 1 to 3 days without pay.

D) When the employee has missed their 7th separate occurrence they will be
terminated.

We will take into account occasional extenuating circumstances like bad
weather, during which we have the authority to allow some flexibility.
During bad weather, for example, we do not want to penalize staff who make
an effort, even if they are late.

## EMPLOYEE HANDBOOK

Welcome to Integrated Health Services of Erie at Bayside.  We hope that you will like working here and will be with us for a long time.  We at Bayside have tremendous responsibility to provide for the health care needs of many people.  In hiring new people, we strive to hire people who care, and care about other people.

We also want to hire people who care about themselves, their ability to perform well and who want to improve their abilities to do a good job.  We believe that you are that type of person and we are glad that you decided to join our company.  As you work here, we believe that you will soon discover that a basic reason for Bayside's success is the people who work here, people who enjoy working together as a team to provide the highest quality to our residents.  All of the jobs at Bayside are in some way related to the important purpose of providing quality care to our residents.  As a result, there is no such thing as an unimportant job.  This booklet has been prepared to acquaint you with our company, it's philosophy and the responsibility that we share in making Bayside a good place to work.  This booklet gives you a brief summary of the benefits and policies which will be administered according to the actual provisions of appropriate policies.  The details of these policies are contained in the procedures manual and you are welcome to read the manual, just contact your department head to do so.

## OUR MUTUAL OBLIGATIONS

As we work together, we believe that each of us has certain obligations to one another.  The success of our company is dependant upon the performance of our employees, likewise job security, personal advancement, improved benefits and pay become the overall success of the company.

We believe Integrated Health Services of Erie at Bayside has the following obligations:

1.  To treat employees fairly with dignity as individuals to avoid favoritism and to administer all policies, rules and benefits consistently among employees.

2. To provide safe and orderly working conditions in all areas.

3. To train, guide and regularly keep employees informed of their progress.

4. To invite constructive suggestions and criticism and guarantee the right to be heard without fear of reprisal.

5. To take all practical measures to solve problems effecting employees.

6. To give helpful considerations and guidance when an employee makes a mistake.

7. To terminate a regular employee only after exhausting every reasonable measure of retaining him in our organization, except when an employee violates a basic policy requiring immediate dismissal.

8. To respect and support federal and local laws safe-guarding the rights of employees.

9. To keep employees informed of rules, policies, activities and changes concerning their status.

10. To offer good pay and benefits in relationship to economic conditions, the effectiveness of our organization, and similar work being performed in other nursing centers in the community.

We believe that the other people who work at Bayside have these general obligations:

1. To be kind, considerate, respectful, and friendly to our residents, their families and friends and to provide residents with the quality care they require.

2. To do your work in a safe and orderly manner, promptly reporting injuries and unsafe conditions, being concerned for the safety of others, and working together to improve the safety of the nursing center.

3. To be dependable, punctual, and have a good attendance record.

4. To follow company rules and policies relating to yourself your job, your fellow employees and residents in the nursing center.

-3-

5. To promptly discuss your suggestions, criticisms and any phase of your job relations with your immediate supervisor.

6. Cooperate with your supervisor by carrying out instructions and procedures. Do not hesitate to ask your supervisor if you have any questions regarding your job.

7. To cooperate with your fellow employees by giving assistance as required.

8. To use materials and supplies with care to avoid waste from spoilage, over use, or careless handling, protect company property, equipment and materials from damage or loss.

9. To develope efficient and accurate work habits.

10. To give a full day of work for a full day of pay.

## FACTS ABOUT YOUR WORK

**EMPLOYEE STATUS:**

Bayside employs several types of employees. Regular full time employees, regular part time, and temporary employees. Regular full time employees are those who are employed with the understanding that they will be working for thirty hours a week or more on a regular basis and have completed their probationary period. Regular part time employees, who work on a regular basis, less than thirty hours per week and have completed their probationary period. Temporary employees are those employees who are employed for a specific period of time or for the duration of a specific need.

## PROBATIONARY PERIOD

The first ninety days is the introductory period. The introductory period is the time frame in which the new employee and employer evaluate each other to determine if continued employment is desirable.

-4-

## PAY PERIODS

There are twenty-six pay periods in a year.  Pay checks will
be distributed every other week and will compensate for hours worked
in a fourteen day period.  Your supervisor can tell you when you
will get your first pay check.

## PARKING FACILITIES

If you drive an automobile to work, you will find parking
facilities at the nursing center.  Correct parking will provide
maximum use of all available space.  The company cannot assume
responsibility for damage to cars or personal property left in the
automobile while in the parking area.  You are asked not to park
in the few spaces reserved for physicians and handicapped persons.
The nursing center may have special parking regulations such as
designated areas for night parking.  Please comply with any special
regulations your center may have.

## PERFORMANCE APPRAISAL

Your performance will be appraised on a regular basis by
your supervisor.  The purpose of the appraisal is to let you know
how you  are doing on the job, what you are doing well, and what
you may not be doing so well.  If there are some areas in which
improvement is needed, you and your supervisor can work out the necessary
steps for improvement.  Your performance will be evaluated on the
following factors:  consideration of patients; application of work
time; quality of work; cooperation with others; cooperation with
supervisors; self direction; communication; attendance and punctuality;
and an overall rating.  During the performance review you will also
have the opportunity to tell your supervisor about many problems that
you may have and obtain any additional information that you may require.

-5-

## UNIFORMS

Many employees at the nursing center are required to wear uniforms. Please make certain that your uniform is clean and neat. Your appearance is very important to continue the professional atmosphere here at the nursing center. For your safety, shoes should be comfortable with low heels, closed toes, and non-slip soles. Effective August 16, 1993 the following uniform/dress code policy took effect and is being enforced:

### NURSING ASSISTANTS

Shirts/tops           Peach, sapphire blue, white.        Scrub, polo
                                                          or uniform

Pants/Skirts          Includes uniform split skirts if no more than
                      1" above the knee. White uniform pants. No
                      tight pants are to be worn. (includes spandex).

Back device must be worn at all times when on the nursing unit. Gait belt to be worn around waist.

### REGISTERED NURSE/LICENSED PRACTICAL NURSE

Shirts/Tops           Pastel colors.                     Scrub, polo or
                                                          uniform.

### ALL NURSING STAFF

Hose/Nylons           white                              ankle socks may be
                                                          worn over nylons

Underclothes          white                              full covering
                                                          (no bikini, thong type
                                                          no prints

### DIETARY

Tops                  white                              No tee-shirts
Pants                 black
shoes                 clean leather white shoes          No canvas
Hairnets for all employees

### HOUSEKEEPING AND LAUNDRY

Slacks                Blue \ NAVY BLUE
Smocks \ UNIFORM TOPS Light Blue & OR PRINTED
Shoes                 Clean, white

ALL employees are required to wear their names tags at all times!

-6-

It is the employee's responsibility to inform the personnel office of any name changes or the loss of the name tag. Failure to comply will result in the following disciplinary measures:

FIRST OFFENSE - Verbal warning and request to change non-compliant clothing or jewelry.

SECOND OFFENSE - Written warning, placement in employee file. Sent home to correct deficiencies in dress code immediately with return to work expected to complete shift.

THIRD OFFENSE - Suspension without pay for 3 days.

FOURTH OFFENSE - Termination of employment for willful misconduct. (Failure to follow dress code)

Any questions about your department's dress code please contact your department supervisor.

## MEALS AND BREAKS

A thirty minute unpaid lunch period will be scheduled by your supervisor if you are a regular employee. Employees working an eight hour day will also receive two ten minute breaks each day unless emergencies or unusual work demands make it impractical.

## REPORTING LATE FOR WORK

Please notify the nursing center prior to the start of your shift if you are delayed for any reason or expect to be late reporting for work. If a delay occurs while you are in route to work, please call promptly and tell the designated person at the facility the reason for your delay and when you may reasonably expect to arrive.

## ABSENCE FROM WORK

When you have to be absent from work for any reason, please notify the nursing center as soon as you know that you will be absent so that arrangements can be made for someone to take your place. While you are asked to give as much notice as possible, the rules require that you give at least two hours notice. An absence of three days for reasons of illness will require a medical statement from a doctor, stating the nature of the illness, and that you are unable to return to work. Repeated absences or failure to obtain authorization for absence may subject you to disciplinary action. Our residents and co-workers depend on you to be available for work, repeating absences and tardiness places an unfair burden upon everyone and interferes with our belief of giving quality care to our residents.

## ATTENDANCE POLICY

The following attendance policy took effect on December 19, 1992 and is for all employees of Bayside. All employees must have the responsibility to provide continuous care and service for our residents. Inadequate staffing due to employee absences creates an unnecessary hardship on the other employees who report to work regularly and on time. Absences also create an interruption in the process of providing quality care to our residents.

A. Request for day off

If you would like to request a specific day(s) off for a given schedule, you must submit the request in writing to your department head a minimum of three (3) weeks in advance of the beginning of the schedule. While we cannot guarantee that such request will be honored, we will do everything possible to schedule you accordingly. In return, we ask you not to exceed (2) request off days per month.

B. Schedule trades

Employees are permitted to exchange days provided that a proper form is completed and signed by both employees involved. Additionally, the trade must be reviewed and approved by your department head or supervisor. Please note that such trades are not permitted if such a trade requires over-time on the part of either employee.

C. Call off reporting

Call the facility (814-868-0831) as far in advance of the scheduled shift as possible. This allows us to attempt to locate replacement staff. You must report the absence yourself. Spouses, relatives, friends and/or co-workers are not permitted to call on your behalf. Employees must make a repeat telephone call to their supervisor or department head for each day of absence if an employee's absence is to be excused.

D. Leaving early

No employee may leave early without the permission of his or her supervisor or department head. This approval must be documented in writing on the time card. Any employee leaving before the end of his or her shift without permission is subject to immediate termination for abandoning your job.

E. Absences

Excessive absenteeism is defined as having more than two (2) occurrences of time off within any consecutive 30 day period and/or having more than six(6) occurrences of time off within any twelve-month period. If this occurs, progressive disciplinary action will be taken as outlined below: ALL ABSENCES ARE CUMULATIVE FOR THE YEAR FOLLOWING THE DATE OF EMPLOYMENT. ANY CALL OFF ON A HOLIDAY OR WEEKEND NECESSITATES THE EMPLOYEE WORKING THE NEXT HOLIDAY OR WEEKEND.

1. When an employee misses 2 scheduled days during any consecutive 30 day period, they will receive a written warning stating that they are being placed on a 30 day probation period for the following 30 consecutive days. The employee is placed on a 30 day probationary period and can have NO ABSENCES.

2. When an employee is absent during the 30 day probationary period he/she will be terminated.

3. When an employee is absent a total of 5 days during a one year period from the date of employment, he/she will receive a written warning stating that only 1 more absence will be allowed without termination.

-9-

   4.  When an employee is absent 6 days during a one year
       period from the date of employment, he/she will receive
       a final written warning stating that any additional
       days missed will result in termination.
   5.  When the employee has missed their 7th day, he/she will
       be terminated.
G.  Excessive Tardiness
    Being tardy is defined as punching in and being available for
    after the scheduled start of your shift.  Being tardy 3 times
    or more in any 30 day period and/or more than 6 times in any
    sixty day period of time will result in termination.
H.  Personal Days
    Each FULL TIME employee will be granted three paid personal
    days (7.5 or 8 hours each for a total of 22.5 or 24 hours per
    year) after completing their 90 day probation period with
    administrator approval.  The personal days must be scheduled
    in advance and approved by your supervisor.  Personal days are
    not paid after employment has been discontinued.
I.  Probationary Employees
    All new employees will be placed on a 90 day probationary
    period from the date of employment.  During this period an
    employee can miss a maximum of two scheduled work days.  Any
    absences over 2 days will result in termination.
The following additions are in effect April 1, 1993:
   1.  All unused sick days will be paid to the employee
       at or around their annual evaluation date.
       Full time (60 hours or more per pay period)= maximum 48
       hours paid.  Part Time (less than 60 hrs per pay period)=
       maximum 24 hours paid.
   2.  A monthly report will be posted in the employee break room
       showing the total hours to be paid to the employee at
       their annual evaluation.
   3.  Example:  Suppose that a nursing assistant making $6.00
       per hour has missed zero days at the date of her evaluation.
       The bonus calculation would be:

              6 days x 8 hours per day = 48 hours
              48 hours x $6.00 = $288 Bonus

-10-

4. Any unused personal days may be paid with department head
   approval.
5. Any personal days used as sick days with department head
   approval will be deducted from the total hours paid for bonus.
6. The total estimated facility annual cost of this bonus is
   $46,000.

## BULLETIN BOARDS

Bulletin boards are placed in the nursing center for posting
information of general interest to everyone. It is a good idea to
refer to these bulletin boards frequently to avoid overlooking matters
of importance to you.

## PACKAGE INSPECTIONS

All packages taken in or out of the facility are subject to
inspection by supervisors.

## RUMORS

From time to time disturbing rumors will be circulated in most
organizations. Such rumors are rarely, if ever true. When they
are started, they can cause you serious concern about your personal
future or about your job security. When you hear a rumor, we
suggest that instead of passing it on you ask your supervisor about it.
If your supervisor does not have the answer, he or she will get it for
you.

## LENGTH OF SERVICE

It is the policy of IHS of Erie at Bayside to recognize the length
of service as a prime consideration for purposes of promotion, transfer
reduction in force, vacation preference, granting of holidays and
calculating certain company benefits. The continuous service of an
employee is calculated on the basis of the unbroken service from the
date the employee was hired. Continuous service shall be considered
broken by reasoning of the following:

1. Resignation
2. Termination or discharge
3. Absence due to layoff or a physical disability which continues
   for more than one year.
4. Failure to return to work at the expiration of a leave of
   absence, unless a written excuse, acceptable to the company
   is presented.

-11-

5. Failure to return to work for three days after being recalled from layoff unless other arrangements have been made with the company.

6. Retirement

### YOUR JOB SECURITY

Doing our work properly, providing excellent care for our residents, and the success of IHS of Erie at Bayside are our best guarantee of job security. Should it become necessary, however, to layoff employees due to lack of work, length of service is a prime consideration in determining who will be laid off.

### OVERTIME

When overtime is required, it must in each instance, be authorized by your supervisor. The supervisor will acquaint you with work requirements and extent of time involved as accurately as possible. We will give you advance notice of overtime to be worked whenever possible, and will try to divide the overtime as equally as possible among all employees in the unit who are available and qualified to perform satisfactorily the work being requested. It is very important that you do not punch a time card more than five minutes prior to the start of your normal shift. Likewise, when going off duty, do not punch out later than five minutes after your scheduled time unless you are requested to work overtime by your supervisor. It is the policy of Integrated Health Services of Erie at Bayside to pay overtime by the following method:

1. In a fourteen day work period. Under this method, an employee will be paid time and one-half hours over eight hours worked in any work day or over eighty hours in a fourteen day period. Your supervisor will discuss with you the overtime method under which you will be working.

-12-

## RECORD CHANGES

If there is a change in your name, address or telephone number you should notify the office so that your records may be kept current. This is important to avoid any confusion or delays should we need to contact you in case of emergency or schedule change or recall from layoff or other reasons. You should also contact the office should you wish to change the number of exemptions on your withholding tax or any other type of changes that you may feel necessary to keep your records current.

## EMPLOYEE BENEFITS

The details of an employee benefits plan should be obtained from the front office or your supervisor in your nursing center. Your supervisor will explain to you the benefits for vacation, holiday and sick pay. It should be noted that if it becomes necessary for you to call in due to illness, please make sure that you call in at least two hours prior to the start of the shift so a replacement can be sought.

## JURY DUTY

Integrated Health Services of Erie at Bayside believes that it is important to accept responsibility for jury services. If you are called please present the notice to your supervisor so that you may receive a leave of absence. During your jury service, you will receive the difference between your regular straight pay and what you will be receiving from the court for up to five days of jury duty service. Of course, it is understood that you will return to work on a day that you are excused from the court, which coincides with your regular scheduled day of work. Upon the termination of your jury duty service, you are to report back to work promptly.

## FUNERAL PAY

Regular full time employees may be paid funeral pay if there is a death in the employees immediate family. The immediate family is defined as spouse, parent, children, brother or sister. Funeral pay will be granted up to a maximum of three days at the time of the funeral. One day of pay will be granted to attend the funeral of the employees mother-in-law or father-in-law. All employees are entitled to funeral

leave.  However, if you are not a regular full time employee, the funeral leave will not be paid.

## LEAVE OF ABSENCE

Employees who have one year or more of service may apply for an unpaid leave of absence for illness, pregnancy, or compelling personal reasons.  If you find it necessary to take a leave of absence, see the administrator to complete the appropriate forms and for details of the leave of absence policy.

## RULES OF CONDUCT

When a group of people are working together, it is necessary to have common rules of conduct so that actions of one individual will not be detrimental to the other employees or the company.  The purpose of these rules is not to impose restrictions on the rights of anyone, but to define and protect the rights of all who work here and to insure that all employees work under the same conditions.  Most rules involve common sense and accepted standards of good conduct. Violations of any of the following rules is considered serious and will result in discharge without prior warning.

1. Abuse or inconsiderate treatment of patients, visitors, borrowing money or accepting tips from residents for taking  residents food.
2. Theft or unauthorized removal of property.
3. Unauthorized removal of records or unathorized divulging of proprietary information.
4. Punching someone elses time card or having someone punch yours.
5. Falsifieation of records.
6. Refusal to perform assigned work or following instructions.
7. Gross carelessness or negligence.
8. Intoxication, or possession of alcoholic beverages, use or possession of drugs, or under the influence of drugs while on company property.
9. Willful destruction of property.
10. Sleeping during working hours.
11. Disorderly conduct, biting, wrestling, using threatening insults or abusive language and similar conduct.
12. Carrying weapons on company property.
13. Threatening or cursing others to the limit work performance or engage in any practice in violation with company rules.

-14-

14.  Three days of unreported absence.

In addition to the basic rules listed above, there are other rules which require disciplanary action if violated.  These rules include the following:

1.  **Work Time:**  any conduct which interferes with the work of an employee will not be tolerated.  Also employees are not permitted to leave work areas during work time without permission of their supervisor.  Work time does not include lunch or coffee or other recognized breaks.

2.  **Work Performance:**  employees are expected to put in a fair days work.  Unsatisfactory work, poor performance, producing below standards, loafing or excessive time away from the job permitting avoidable waste in lack of co-operation raises cost and jeopordizes our business or residents.

3.  **Appearance:**  neatness, cleanliness, professional attire and good hygiene are required for all employees.

4.  **Patient care:**  all residents and visitors should be treated with kindness, friendliness, patience and respect.  Employees should refrane from gossip, loud talking and other unnecessary noise and forms of conduct which could be disturbing to the residents and detract from the professionalism of our center.

5.  **Information regarding residents:**  it is contrary to the best interest of this center and those we serve to give out informati regarding any resident, his condition, or his treatment.  Such information should be held in strict confidence and should not be discussed in or out of the home with the resident, his family or anyone else not directly concerned with the resident's care.  Refer any resident, family or visitor inquiries to the supervisor or the charge nurse.

6.  **Absenteeism or tardiness:**  an employee should notify their
    supervisor on duty at least two hours prior to the start
    of his shift if he is to be absent in order for a replacement
    to be arranged.  Reasons for the absence should be given.
    Employees are expected to have a positive regular attendance
    record.  Excessive habitual and unauthorized absence and
    tardiness is disruptive to schedules and creates a burden
    on other employees.  The act of calling does not itself
    constitute an excuse for absence.  The employee must be in their
    department and on their job ready to perform their assigned
    job at the starting of their assigned shift.

7.  **Safety rules:**  Every caution must be taken to guard against
    accidents to residents and employees.  It is the responsibility
    of every employee to correct unsafe conditions such as liquid
    food paper, extension cords, etc. on the floor or any other
    condition which could cause an accident.  Report unsafe
    conditions and fire hazard immediately.  Unsafe acts, such as
    horse play, throwing objects, and running are not permitted.

8.  **Fire rules:**  it is the responsibility of all employees to
    understand their role in an emergency.  This includes
    understanding and familiarization with location and operation
    of the fire alarm boxes, location and operation of fire
    extinguishers, reporting a fire to the fire department, and
    knowledgable off all fire exits.

9.  **Solicitation:**  There is to be no solicitation  of employees
    by other employees, while either the person being solicited
    or the person doing the solicitating is on work time.  In
    addition, all solicitations must be prohibited at all times
    in direct resident care areas, such as resident's rooms,
    hallways, physical therapy rooms and recreational areas.

10. **Distribution of printed material:**  in the interest of maintainin
    an attractive and litter-free center, and in the interest of
    resident's safety and well being, employees are not permitted
    to distribute advertising material, handbills, printed or
    written material of any kind in direct resident care areas
    and other work areas of the center.

11.  **Entering the facility during off duty hours:**  in the interest
     of avoiding  undue confusion with respect to the smooth
     functioning of the center, there will be no access to the
     interior of the facility during off duty hours.

12.  **Smoking:**  employees may smoke only during break or lunch
     period in designated smoking areas.

13.  **Bulletin boards:**  employees shall be responsible for reading
     all notices effecting them which are posted on the department
     bulletin boards.  No bulletins or printed matter may be posted
     on the premises without permission from the administrator.

14.  **Telephones:**  company telephones are for business purposes.
     In order that the company may be free to conduct business,
     the use of company telephones for personal reasons must
     be limited to emergency situations.  Please use pay phones
     for all outgoing personal calls during lunch or break time.

15.  **Time clocks and overtime:**  Employees should not punch in
     before five minutes prior to their starting time or
     five minutes after their quitting time.  All overtime must
     be authorized by the supervisor.

### GRIEVANCE PROCEDURE

In the operation of our business, problems may occasionally arise
from misunderstandings regarding the application of policies, rules
and procedures, dissatisfaction with treatment or with working
conditions.  We believe that most problems can be resolved to the
satisfaction of all concerned.  The procedure described below is a
method of solving problems.  It is not meant to replace the open door
policy or informal discussions with the supervisor, the administrator
or any member of management from the center or from the corporate office.

During any step of the following procedure you may want  a fellow
employee to appear with you.

STEP 1  When you have a question or a problem, you should bring it to
        the attention of your immediate supervisor.  Your supervisor
        may not be able to give you an immediate answer at that time,

-17-

however the supervisor will get an answer within two scheduled working days. To assure prompt attention and so that factual information can be obtained, the grievance should be submitted immediately.

STEP 2 Should your question or problem not be resolved by discussion with your supervisor, you may request a meeting with the department head. At this point, you may place your grievance in writing on the Grievance Form. The department head, with the question or problem will make every effort to reach a satisfactory solution.

STEP 3 If after discussion with the department head, if there is still a question or problem, the department head will arrange for such a meeting. The administrator will meet with you to discuss your grievance, review the question or problem.

STEP 4 If the matter is not resolved with the Administrator, you may request a meeting with the Regional Director. The Administrator will schedule a meeting with the Regional Director during his trip to the center. The Regional Director will review all the facts and make a final decision.

### FAMILY MEMBER EMPLOYEES

It is the policy of Integrated Health Services of Erie at Bayside to not hire family members of our employees.

### QUESTIONS

If you have any questions concerning the material in this booklet please ask your supervisor. If your supervisor doesn't know the answer he or she will be glad to get it for you. We believe that overall you will find them quite good when compared to other nursing centers in the area.

### RESIGNATIONS

We hope that you will enjoy working here and hope that you will be employed with us for a long time to come, however, if you do find it necessary to resign, please submit a signed resignation notice at least two weeks in advance. For department heads and supervisors, we request that a resignation notice be placed at least four weeks in advance. Also, there are some problems on the job that may need to

be corrected.  Please discuss these problems with your supervisor
and/or use the grievance procedure before you decide to resign.
We are sincerely interested in why employees leave Bayside.  Therefore,
all employees who leave are requested to have an exit interview, this
will be conducted in confidence.  During the interview, you will be
encouraged to make constructive comments and suggestions concerning
your work experience here.  We want to make Integrated Health Services
of Erie at Bayside a good place to work; the exit interview may help.

### HOLIDAYS

All regular full-time employees will be granted a normal day's
pay for the following holidays:

**NEW YEAR'S DAY**

**MEMORIAL DAY**

**INDEPENDANCE DAY**

**LABOR DAY**

**THANKSGIVING DAY**

**CHRISTMAS DAY**

In order to qualify and be eligible for paid holiday time the
employee must work the last regularly scheduled day before the holiday
and the first regularly scheduled day after the holiday.
All regular full-time employees will be paid for the hours worked and
their holiday pay, for working the holiday provided that all
eligibility requirements are fulfilled.
All regular part-time employees will be paid for the holiday only if
worked and at the one-half time rate.  All of the above eligibility
requirements must be fulfilled.  A normal day's pay will be granted
for one (1) Personal Day chosen by the employee.

### VACATION

All regular full-time and regular part-time employees will
receive paid annual vacation time according to the following
schedule:

a.)  After one (1) year of continuous employment two (2) day's
     vacation for each 390 hours of actual time worked of regular
     hours will be given.

b.)  After seven (7) years of continuous employment, three (3) days
     vacation for each 390 hours of actual time worked of regular
     hours will be given.

-19-

Each employee must fill out a "Request of Vacation" slip.  The time requested must be approved by the Department Head, or Administrator, thirty (30) days before the dates requested are granted.  Conflicts will be resolved on the basis of seniority and patient care needs. Employees will accrue vacation time on their anniversary date for the prior year worked.  No payment will be granted in lieu of vacation except upon termination of employment.  In order to receive payment for accrued vacation benefits, an employee must give proper notice (see "Resignations") and must be in good standing with the home. An employee who is discharged from the facility for just cause as the result of disciplinary action, will not be paid for vacation benefits upon termination from employment.

### LEAVE OF ABSENCE

A leave of absence, to a maximum of six (6) months, without pay may be granted to regular  employee who has a minimum of twelve (12) months of continuous service with Bayside for the following purposes:

1.  Education:  Leave may be granted for the improvement of the employees skill at Bayside through education, provided the request in writing is made at least one month in advance of the proposed leave and is approved by the Department Head and the Administrator.

2.  Sickness or injury:  Leave may be granted upon the presentation of a physician's certificate stating the length of time an employee should not be working.

3.  Family Illness:  Leave may be granted in the case of an illness in the family that requires the employees full-time attention.

4.  Family leave act:  In order to be eligible for benefits under the Act you must have been employed by Integrated Health Services, Inc. for 12 months and have worked at least 1,250 hours during that 12 month period.  If you are a professional or salaried employee, for whom time records are not kept, you need only have worked 12 months.

    1.  If you are eligible, you may take leave under the following circumstances:

A.   The birth or adoption of a child, or the placement
     of a child with you for foster care.  A Child includes
     a stepchild, a legal ward, or a child for whom you have
     day to day responsibility to care for and financially support.
     It can include a child over the age of 18 if the child is
     incapable of self-care because of a disability.

B.   You may take leave to care for your own servious health
     condition if it makes you unable to perform your job function.
     You may also take leave to care for the serious health
     condition  of a spouse, child, parent.  A serious health
     condition is an illness, injury, impairment, physical or
     mental condition that involves in-patient care at a hospital,
     physical or mental condition that involves in-patient care
     at a hospital, hospice or residential medical care
     facility  or continuing treatment by a health care provider.

C.   If you qualify for leave you may take up to 12 work weeks
     of leave during any 12 month period.  The 12 month period
     is calculated beginning on the anniversary date of your
     employment with IHS.  If you take leave for a new child,
     the leave must be concluded within 12 months after the
     birth, adoption or placement of the child.  If you are taking
     leave as a result of your own or a family member's medical
     condition you may take an intermittent leave or request a
     reduced schedule, if based upon a medical necessity.  You
     may not take an intermittent leave or reduced schedule
     for the birth, adoption or placement of a child.  If your
     request for leave is foreseeable based upon a planned medical
     treatment, IHS may require you to transfer temporarily to
     a position that better accommodates the leave, as long as
     it has equivalent pay and benefits.

D.   IHS will maintain your group health coverage during the period
     of leave.

-21-

    E.    When you return from leave you will be restored to your former position, or to an equivalent position with equal benefits, pay and other terms and other terms and conditions of employment.  However, you are not entitled to accrue seniority or employment benefits during the leave.  Furthermo) if you would not have otherwise been employed at the time reinstatement is requested.  IHS may deny reinstatement. For instance, if a lay-off would have eliminated your job during your period of leave, you are not entitled to reinstatement.

    F.    If you are entitled to accrued paid leave (such as vacation time or sick days) at the time you request leave under the Act, you are required to take your paid leave as part of the 12 week period.

The foregoing is a basic outline of your rights under the Act. Please contact Jan Zdanis if you wish additional information regarding the provisions of the Act.

IHS OF ERIE AT BAYSIDE 6/23/97

POLICY/PROCEDURE RE: WORKING WITH AGGRESSIVE RESIDENTS

PURPOSE:  To establish guidelines for caregivers who are required to work
with agressive residents.

PROCEDURE:

1. Address all residents in a quiet and respectful tone.
   a. Introduce yourself each time you enter a resident's room,
   especially those residents who are forgetful or prone to
   aggressive behavior.
   b, Explain to the resident your purpose for being in his/her
   room.

2. Speak to the resident calmly as you accomplish your tasks,
   explaining to her/him what you are doing and why.
   a. This is especially important when dealing with forgetful
   residents, and/or those prone to aggressive behavior, because
   it reassures them of your purpose.

3. Complete your tasks promptly and without interruptions.
   a. Have all necessary items preassembled to insure you will
   not need to leave the room.

4. Should the resident become combative, or display any type of
   aggressive behavior, i.e.; hitting, scratching, pinching,
   verbal abuse, etc., calmly excuse yourself from the situation,
   and explain to the resident your intent to return when he/she
   is better able to cooperate.
   a. Residents that are acting out are (usually) not accountable
   for their actions and cannot be held responsible for their
   words/actions.
   b. By removing yourself from the situation you allow the
   resident time to defuse and forget what upset him/her, thereby
   improving your chances of returning later and completing your
   tasks.

5. After assuring the resident's dignity, comfort and safety,
   apprise your charge nurse of your adverse encounter with the
   resident.
   a. This notifies the charge nurse of a possible change in a
   resident's condition and allows her/him an opportunity to
   intervene.

6. Should you be unfortunate and incur an injury as a result of
   aggressive behavior by a resident, you should report the
   injury to your supervisor immediately.
   a. Refer to policy and procedure re: filing an employee
   incident report.

# ABUSE PROHIBITION

**IHS** is committed to ensuring its facilities are free from *neglect, mental or physical abuse, including involuntary seclusion, and misappropriation of property* of the patient/resident entrusted to their care.

If you have concerns regarding these issues, we urge you to contact us immediately through one or more of the following resources:

- Your nursing home administrator
- Your nursing home social worker
- IHS In-Touch Line @ 1-800-255-4730

We pledge to investigate your concerns promptly and advise you of the outcome.

Matters that are reported shall be kept confidential, whenever possible.  Persons reporting concerns shall be free from retaliation.

We value your participation in helping us provide you and your loved one with a safe and pleasant living environment!

*Integrated Health Services*

# RESIDENT ABUSE: DOES IT REALLY EXIST?

Resident abuse and neglect is a form of violence and threatens the safety of many residents in Long Term Care Facilities and the elderly in the home. A report from the House Select Committee on Aging has suggested that between 1 million and 2 million older Americans are mistreated each year- that is definitely a significant number! It is up to the healthcare worker to protect our most valuable resource- our Residents. Remember some day it may be you!

Residents in Long Term Care Facilities are entitled by Law to the protection of life and property. For a caregiver to neglect or abuse a resident is a serious offense, and a violation of their rights. The following are some rights of our residents and are violated when abuse or neglect has been inflicted.

- The right to be free from mental and physical abuse, and free from from chemical and physical restraints (except when ordered by a Physician, and assessment reveals the need for restraint usage)

- The right to be treated fairly, without discrimination because of race, sex, age

- The right to use personal clothing and keep personal possessions

- The right to exercise his or her rights as a resident and as a citizen and to voice grievances, to be free from restraint, interference, coercion, discriminations, or reprisals.

Before we can begin to learn about abuse, we must first define the types of abuse. Definitions of neglect and abuse are essential in developing an understanding. The definitions following are offered as a guide for you to assist in identifying the various types of neglect and abuse.

# Definitions of Abuse

Before we can identify the various types of abuse, we must first define the word 'Abuse'. For the purpose of this Educational Release, the following definition will apply.

- **Abuse** - is *an act or omission, which results in harm or the threatened harm to the health or welfare of a Resident. Abuse includes intentional infliction of physical or mental injury; sexual abuse; or withholding of necessary food, clothing, and medical care to meet the physical and the mental health needs of a Resident.*

Abuse can be broken down into sub-categories of physical, sexual, and emotional. They are defined as...

- **Physical-** *is the physical use of force that may result in bodily injury, physical pain, or impairment. Physical abuse may include but is not limited to the following acts of violence such as, striking, hitting, beating, pushing, shoving, shaking, slapping, kicking, pinching, and burning. It also can include the unwarranted administration of drugs and physical restraints. Force feeding and physical punishment of any kind is examples of physical abuse. The most common acts include slapping, hitting and striking with an object.*

- **Sexual-** *is abuse of nonconsensual sexual contact of any kind with an elderly person. Sexual contact with any person incapable of giving consent also is considered sexual abuse; it includes but is not limited to unwanted touching, all types of sexual assault or battery such as rape, sodomy, coerced nudity and sexually explicit photographing.*

- **Emotional or Psychological-** *is the infliction of anguish, emotional pain, or distress. This includes but is not limited to verbal assaults, insults, threats, intimidation, humiliation, and harassment. Examples include habitual verbal aggression in the form of threats and insults, as well as statements that humiliate or infantilize the resident. The threat of abandonment is also a form of emotional abuse.*

When defining abuse, we can categorize "Neglect" here too. The following definition refers to neglect.

- **Neglect-** *is the refusal or failure to fulfill any part of a person's obligation or duties to a resident or failure of an assigned caregiver to meet the needs of dependent resident- is generally accepted as a form of maltreatment. Neglect may*

*be intentional, as when a caregiver deliberately fails to fulfill their responsibilities in order to harm or punish the resident. An example would be to deliberately withhold food or medication to get the resident to do what you want. Basically, it is failure to provide the basic life necessities such as food, water, safety, etc.*

## Two types of neglect are

- **Active-** *occurs when there is an intentional failure on the part of caregivers to fulfill their obligations. An example of active neglect is not answering a resident's call bell.*

- **Passive-** *occurs when a person fails to fulfill their obligation unintentionally or unconsciously inflicts distress. Lack of recognition of the necessity for intervention can lead to passive neglect.*

### Clinical Evaluation

The issue of when to evaluate for possible mistreatment is hard to resolve, everyone should be aware of the possible signs and symptoms of abuse and report to your supervisor when suspicions are present. The following signs and symptoms of abuse are summarized below. Please note that some signs and symptoms characterize several kinds of maltreatment. The most important of these are the following:

- Frequent unexplained crying; and

- Unexplained fear of or suspicion of a particular person

## Signs and Symptoms of Abuse and Neglect

### Physical

- Bruises, black eyes, welts, lacerations

- Bone fractures, broken bones, and skull fractures

- Stains, dislocations, and bleeding

3

- Laboratory findings of medication overdose or under utilization of prescribed drugs

- Resident's report of being slapped, hit, kicked or mistreated

- Resident's sudden change in behavior

- Resident stating they do not want a particular caregiver or to be alone with a certain person

## Sexual

- Bruises around the breasts or genital area

- Unexplained venereal disease or genital infection

- Unexplained vaginal or anal bleeding

- Torn, stained or bloody underclothing

- Resident's report of being sexually assaulted

## Emotional/Psychological

- Emotional upset or agitation

- Extreme withdrawal

- Resident's report of being verbally or emotionally mistreated

## Neglect

- Dehydration, malnutrition, untreated pressure ulcers

- Unattended health problems

- Soiled, fecal, urine smell

- Build up of matter between skin folds

PA DEPARTMENT OF HEALTH
BUREAU OF QUALITY ASSURANCE
DIVISION OF NURSING CARE FACILITIES

## DEFINITIONS

The following definitions should be applied when determining whether resident abuse, neglect, or misappropriation of resident property has occurred:

**ABUSE** means the willful infliction of injury, unreasonable confinement, intimidation, or punishment with resulting physical pain or mental anguish.

> **Interpretation:** This presumes that instances of abuse of any resident, whether cognizant or not, cause physical harm, pain or mental anguish.

Types of abuse include:

1.  Verbal abuse - refers to any use of oral, written, or gestured language that includes disparaging and derogatory terms to residents or their families, or within hearing distance to describe resident's, regardless of their age, ability to comprehend, or disability. Examples of verbal abuse include, but are not limited to: threats of harm; saying things to frighten a resident, such as telling a resident that she will never be able to see her family again.

2.  Sexual abuse - includes, but is not limited to: sexual harassment, sexual coercion, or sexual assault.

3.  Physical abuse - includes, but is not limited to: hitting, slapping, pinching, kicking, etc. It also includes control of resident's behavior through corporal punishment.

4.  Involuntary seclusion - means separation of a resident from other residents, from his or her room, or confinement to his or her room (with or without roommates) against the resident's will or the will of the resident's legal representative. Temporary monitored separation from others will not be considered involuntary seclusion and may be permitted if used for a limited period of time as a therapeutic measure until professional staff can develop a plan of care to meet the resident's needs.

5.  Mental abuse - includes, but is not limited to: resident humiliation, intimidation, threatening demeanor, harassment, threats of punishment or deprivation, or denial of food or privileges.

**NEGLECT** means failure to provide goods and services necessary to avoid physical harm, mental anguish, or mental illness. Neglect occurs on an individual basis when a resident receives a lack of care in one or more areas (e.g., absence of frequent monitoring for a resident known to be incontinent, resulting in being left to lie in urine or feces). [Neglect also occurs when a number of residents receive a lack of care in one or more regulatory groupings, a finding which reflects the facility's failure to have developed policies or implemented procedures to prohibit neglect.]

A finding of neglect must not be made if the accused individual demonstrates that such neglect was caused by factors beyond the control of the individual.

> **Interpretation** - Neglect refers to failure through inattentiveness, carelessness, or omission to provide timely, consistent, safe, adequate, and appropriate services, treatment and care, including but not limited to: nutrition, medication, therapies, and activities of daily living. The absence of reasonable accommodations of individual needs and preferences may result in resident neglect.

**MISAPPROPRIATION OF RESIDENT PROPERTY** means the deliberate misplacement, exploitation, or wrongful (temporary or permanent) use of a resident's belongings or funds without the resident's consent.

Source: CFR 488.301, 488.335
HCFA State Operations Manual Appendix P

**PENNSYLVANIA DEPARTMENT OF HEALTH**
**DIVISION OF NURSING CARE FACILITIES**
**GUIDELINES FOR INVESTIGATIONS**
**OF ABUSE, NEGLECT, AND MISAPPROPRIATION OF PROPERTY**

Information required from providers when reporting:

Provide chronology of the investigation: order of interviews or statements gathered, list of persons working who could reasonably have knowledge of the incident. Provide a brief employment history of all employees interviewed or who provided witness statements; include prior allegations or actions which resulted in discipline.

A.    Witness/Accused Statements - statement should be handwritten. If illegible, provide typed copy of exact words on statement and have the individual sign and date. Include both typed and handwritten copies with report.

Instruct the witness to describe the incident in full. Include the exact words if verbal abuse is suspected. Include a graphic description if physical abuse is suspected. Be sure to include a description of the scene, positioning of resident and staff, time, nature of injury, etc.

Note: If employees refuse to give a statement and management has reason to believe that the employee should have knowledge of an incident, require the employee to write a statement that he/she has no knowledge of the incident; sign, and date. Include with the report.

B.    Descriptors Needed:

1.    Verbal abuse - state exact words and describe circumstances surrounding the incident as well as responses from resident.

2.    Physical abuse - describe nature, location and size of injury i.e., pear-shaped bruise on left upper thigh, 5cm long, scratch on right upper cheek extending to ear, etc. Obtain Polaroid photograph of injuries when possible. Be sure to maintain the dignity of the resident and obtain permission for pictures. Use other objects in photo as well so as to show size relationships. Describe how resident manifested injury i.e., posturing of injured limb, grimacing, moaning, or actual voicing of pain.

Note: If an object or instrument was used to injure a resident be sure to impound such object as appropriate and be able to produce for the police or the department's inspection if requested. Photographs of objects are permissible in cases where the object is too large to move or permanently affixed.

Pictures should NOT be submitted with report, but should be available upon request, if taken as part of the investigation.

3.    Misappropriation of property - include physical description of property, amounts of money. Photographs of personal property, obtained upon admission, are invaluable as are itemized lists of all personal property. Include a list of staff who would have access, when article was last seen, where it is usually kept, and estimate of approximate value. Report should reflect that the "resident or residents' responsible party's permission was not given to use/remove said property.

# EMPLOYEE

## CORPORATE COMPLIANCE

*ACKNOWLEDGEMENT*

I, *Kathleen Hodson*                    *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*
  (PRINT employee name)                 (Social Security Number)

as an employee to the Company, acknowledge that:

*KH /5-7-98* have received, and have read, the Standards of Conduct, and
(initial) (date)

*KH /5-7-98* my continued employment with the Company depends on my
(initial) (date)   full Compliance with all Company rules and policies, and
           JCAHO Standards, and obedience to all local, state, and feder-
           al laws, rules, and regulations governing Medicare or other fed-
           erally funded health care programs, and

*KH /5-7-98* neither the Standards of Conduct nor this Form:
(initial) (date)   - create a contract for employment,
           - alter my status as an at-will employee, or
           - create a policy of progressive discipline.

*Kathleen Hodson LPN*                    *5-7-98*
  (Employee signature)                   (Date)

**EMPLOYEE**
**CORPORATE COMPLIANCE**
*ACKNOWLEDGMENT*

I, ~~Kathleen Hodson~~                    ~~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~~

(PRINT employee name)                    (Social Security number)

as an employee to the Company, acknowledge that:


~~KH 11-18-07~~ I have received, and have read, the Standards of Conduct, and
(initial) (date)


~~KH 11-18-07~~ my continued employment with the Company depends on my full
(initial) (date)    Compliance with all Company rules and policies, and JCAHO Standards,
                    and obedience to all local, state, and federal laws, rules, and regulations
                    governing Medicare or other federally-funded health care programs, and


~~KH 11-18-07~~ neither the Standards of Conduct nor this Form:
(initial) (date)    -create a contract for employment,
                    -alter my status as an at-will employee, or
                    -create a policy of progressive discipline.


~~Kathleen Hodson~~                    1-18-02

(Employee-signature)                    (Date)

*90%*

## COMPLIANCE 2001
### Post Test

*Name :* Kathleen Hodson          *Date:* 1-18-02

1.  Which is (are) the primary reason(s) that IHS has implemented a Compliance Program?

    a.  To define the policies, rules and standards to be followed by all employees.
    b.  To inform you of your obligation to report violations of policies, standards and laws.
    c.  To inform you of resources and communication tools available to you to express your concerns, including the IHS Compliance Hotline.
    d.  All of the above.

2.  When reviewing the therapy billing logs prior to Triple Check you noticed that the PRN therapist who treated Mrs. Blue last week did not document the number of units or minutes of physical therapy she provided on October 25th. You know she was with the resident for at least an hour that day. What should you do?

    a.  Document 4 units on the Billing Log because you are sure she at least provided that amount of therapy.
    b.  Call the therapist and request that she come back to the facility and document the services she provided.
    c.  Do nothing.
    d.  Call the therapist and tell her to add the units of therapy she provided on October 25th to the next time she treats the resident.

3.  It is your responsibility to call the Compliance Hot Line if:
    a.  You suspect fraud in the facility.
    b.  You feel uncomfortable discussing your concerns with your supervisor or Administrator.
    c.  You have brought the issues and concerns to the attention of the appropriate staff and you believe the issue has not been addressed or resolved.
    d.  All of the above.

4.  IHS cooperates fully with all government investigations. Should government investigators arrive at an IHS facility, you should:
    a.  Immediately notify your supervisor. If your supervisor is not on the premises, you should immediately contact the Corporate Legal/Compliance Department.
    b.  Be respectful and courteous.
    c.  Request identification of all government officials.
    d.  Request that the government officials identify the purpose of their visit to the facility.
    e.  All of the above.

5.  The False Claims Act prohibits billing for services not medically necessary.                    **True**          False

6.  During an internal audit, services are identified as non-covered. As a result, all payments received for these services are considered overpayments and must be refunded to the payor.          **True**          False

7.  IHS' policy prohibits retaliation against anyone reporting suspected violations of laws, regulations or IHS policies.          **True**          False

# HUMAN RESOURCES POLICY MANUAL
# OWNED & LEASED FACILITIES

# SECTION 2

# HUMAN RESOURCES FOUNDATIONS

2.1     Accomodating Disabilities
2.2     Equal Employment Opportunity
2.3     Employment at Will
2.4     Harassment
2.5     Sexual Harassment

# HUMAN RESOURCES STANDARDS OF PRACTICE

**SUBJECT:**   **ACCOMMODATIONS FOR DISABILITIES**
              **HR Policy 2.1**

**STANDARD:**

No employee of IHS will discriminate against any qualified individual with a disability on account of the disability with respect to any term, condition or privilege of employment. IHS will make reasonable accommodations to the known physical and mental limitations of otherwise qualified individuals with disabilities, unless such accommodations would impose an undue hardship on IHS business operations. Both job applicants and current employees are covered by the Americans with Disabilities Act and this policy.

**PRACTICE GUIDELINES:**

1.   *Definition of a Qualified Individual:*  A qualified individual with a disability is one who, with or without reasonable accommodations, can perform the essential functions of the employment position that such individual holds or desires.

2.   *Scope:*  The prohibition on discrimination applies to all terms, conditions and privileges of employment, including but not limited to:

   - Recruitment, selection and hiring
   - Job assignment, classification
   - Promotions, transfers, layoffs, reduction in force
   - Compensation
   - Leave and benefits
   - Education, training
   - Employer-sponsored activities

3.   *Job Openings:*  Information about job openings must be accessible to people with different disabilities and available in alternate formats upon request.

4.   *Interviewing:*  After reviewing job description, interviewers may ask applicants if they are able to perform the essential job functions with or without reasonable accommodations. Interviewers may not ask direct questions about whether an applicant has a disability or about the nature of a disability. Medical information cannot be discussed until after an offer has been extended. (SEE MEDICAL INFORMATION)

5.    ***Medical Examinations:***   Supervisors are prohibited from requiring a medical exam before making an employment offer. (SEE MEDICAL EXAMINATIONS)

6.    *Medical Information:*  Information on an employee's medical condition or history is kept in a separate file from other employee information.  Access to this information is limited to those who have a legitimate need to know.  (SEE MEDICAL INFORMATION)

7.    ***Confidentiality Regarding Disabilities:***  All employees with responsibilities which may require knowledge of disabilities are to treat this knowledge in a confidential manner.  All information regarding a disability or medical condition will be kept completely confidential except:

  A.    Supervisors who are responsible for assigning work responsibilities will be informed regarding restrictions on the work or duties of employees with disabilities and any accommodations that have been made.

  B.    First aid and safety personnel may be informed if the employee's condition may require emergency treatment.

  C.    Government officials investigating compliance with federal/state/local laws may be informed.

8.    Supervisors who have questions regarding the organization's ability to make reasonable accommodations are to contact the Division Human Resources Director for assistance.

Original: 02/97                    © Integrated Health Services, Inc. 1997        HR Policy 2.1
Revision:                                                                          Page 2 of 2

# HUMAN RESOURCES STANDARDS OF PRACTICE

<u>SUBJECT:</u>    EQUAL EMPLOYMENT OPPORTUNITY
HR Policy 2.2

## <u>STANDARD:</u>

IHS strongly supports equal employment and advancement opportunities for all persons, without regard to race, color, religion, sex, national origin, or veteran status or any other status protected by law. IHS provides promotion and transfer opportunities in a nondiscriminatory manner and based on job-related qualifications and abilities.

## <u>PRACTICE GUIDELINES:</u>

1.  *Scope:* This policy covers recruiting, hiring, placement, compensation, progressive discipline, termination, access to benefits and training, promotion or any other condition of employment.

2.  *Identification as EEO Employer:* IHS identifies itself as an Equal Employment Opportunity Employer on materials including but not limited to:

    _ Employment advertisements
    _ Job postings
    _ Recruiting materials
    _ Application forms
    _ Employee handbooks
    _ Offer letters

3.  *Posters regarding EEO:* All required federal and state posters on Equal Employment Opportunity will be posted on bulletin boards accessible to employees.

4.  *Employee Concerns about Discrimination:* An employee who feels he/she has been discriminated against should report the matter to the supervisor. If, for any reason, the employee feels uncomfortable going to the supervisor, or is not satisfied with the supervisor's response, the employee should contact the next level of management or the Division Human Resources Director. The manager receiving the complaint must promptly forward it to the Division Human Resources Director or be subject to disciplinary action up to and including termination.

5.      Complaints will be investigated promptly by the Division Human Resources Director, Corporate Human Resources and Legal Department. All allegations will be treated confidentially to the extent possible, consistent with the best interest of IHS and the employee. Employees will not be subject to retaliation or reprisals for reporting suspected discrimination under this policy or for taking part in any investigation of the allegation.

6.      *Formal Complaint of Discrimination:* Upon receipt of a formal complaint of discrimination filed with the Equal Employment Opportunity Commission and/or any state or local regulatory agency, the following procedures are to be followed:

A.      The Division Human Resources Director is immediately contacted and provided with all data relevant to the complaint.

B.      The Division Human Resources Director informs the Senior Vice President of Human Resources or designee of the complaint and progress on resolution.

C.      The Division Human Resources Director reviews the document with IHS Legal Department and informs the organization's management of the actions that will be taken.

D.      The organization does not to respond to any agency directly without the approval of the Division Human Resources Director and the legal department.

E.      Documentation of employee complaints is maintained in a file that is kept separate from personnel records.

# HUMAN RESOURCES STANDARDS OF PRACTICE

**SUBJECT:**     EMPLOYMENT AT WILL
                 HR Policy 2.3

**STANDARD:**

Employment at IHS is at will, meaning that either the employee or IHS has the right to terminate employment at any time, and for any reason, with or without cause and with or without notice.

**PRACTICE GUIDELINES:**

1. *Limitations:* No member of IHS management or an organization representative has the authority to make any agreement with an applicant or employee that alters this status in any way, except those designated in writing by the IHS Chief Executive Officer as having the authority to do so.

2. *Human Resources Materials:* No express or implied contract concerning any term or condition of employment will be communicated to employees or contained in any IHS materials, written correspondence or verbal conversations. A statement of the Employment at Will policy will be included in the following materials: *"Employment at IHS is at-will, meaning that either the employee or IHS has the right to terminate employment at any time, for any reason, with or without cause and with or without notice."*

   _ IHS Human Resources Standards of Practice (Policy Manual)
   _ Employee Handbooks
   _ Employment Applications
   _ Offer letters
   _ Written Correspondence
   _ Orientation Materials

3. *Introductory Period:* Completion of an introductory period or conferral of regular status will not change an employee's status as an employee at will.

4. *Termination:* Nothing contained in materials provided to employees in connection with their employment shall require the organization to have "just cause" to terminate an employee. Statements of specific grounds for termination set forth in this manual are not all-inclusive and are not intended to restrict the organization's employment at will status.

# HUMAN RESOURCES STANDARDS OF PRACTICE

**SUBJECT:    HARASSMENT**
**HR Policy 2.4**

## STANDARD:

IHS does not and will not tolerate harassment of employees, applicants, clients or customers in the work environment.  IHS will maintain a work environment where employees are treated with respect and are not subject to harassment, intimidation or exploitation.  In particular, IHS does not tolerate harassment of an employee because of race, sex, religion, color, age, national origin, disability or veteran status.

## PRACTICE GUIDELINES:

1.    *Scope:* Harassment may include verbal or physical conduct and/or the display of written or graphic materials which:

    A.    Denigrate or show hostility or aversion because of race, sex, religion, age, color, national origin, disability or veteran status

    B.    Create an intimidating, hostile or offensive work environment for an employee

    C.    Adversely effect an employee's employment opportunities

2.    *Sexual Harassment:* Sexual harassment is an illegal form of harassment based on an employee's gender although it may be of a sexual nature, whether physical or verbal. (SEE SEXUAL HARASSMENT)

3.    *Allegations of Harassment:* Allegations of harassment are to be reported to the immediate supervisor immediately and investigated promptly.  If, for any reason, the person reporting the alleged harassment is uncomfortable going to the supervisor, or is not satisfied with the supervisor's response, the person should contact the next level of management or the Division Human Resources Director.

4.    *Management Responsibility:* Managers who observe instances of harassment or learn that someone has been harassed, or receive an employee's report of alleged harassment must inform their immediate supervisor, the next level of management, and the Division Human Resources Director immediately or be subject to disciplinary action, up to and including termination.

5.    ***Complaints:*** Complaints under this policy will be investigated promptly by the Division Human Resources Director, Corporate Human Resources and legal counsel as necessary. All allegations will be treated confidentially to the extent possible, consistent with the best interest of IHS and the employee. Employees will not be subject to retaliation or reprisals for reporting suspected harassment under this policy or for taking part in any investigation of the allegation.

# HUMAN RESOURCES STANDARDS OF PRACTICE

**SUBJECT:**    **SEXUAL HARASSMENT**
**HR Policy 2.5**

## STANDARD:

IHS is committed to a work environment in which all individuals are treated with respect and dignity. Each individual has the right to work in a professional atmosphere that promotes equal opportunities and prohibits discriminatory practices, including sexual harassment. At IHS, sexual harassment, whether verbal, physical or environmental, and whether in the workplace itself or in outside work-sponsored activities, is unacceptable and will not be tolerated.

## PRACTICE GUIDELINES:

1.  *Definition:* Sexual harassment constitutes discrimination and is illegal under federal, state and local laws. For purposes of this policy, sexual harassment is defined as it is in the Equal Opportunity Commission Guideline promulgated in 1980 as unwelcome sexual advances, requests for sexual favors and other verbal or physical conduct of a sexual nature when:

    1.  Submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment.

    2.  Submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual.

    3.  Such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive working environment.

2.  *Examples of Potential Sexual Harassment:* Sexual harassment may include a range of subtle and not so subtle behaviors. Sexual harassment can include harassment between individuals of different sexes or individuals of the same sex. Depending on the circumstances, these behaviors may include, but are not limited to:

    - unwanted sexual advances
    - subtle or overt pressure for sexual favors
    - sexual jokes, flirtations, sexual innuendos, advances or propositions
    - verbal abuse of a sexual nature
    - graphic commentary about an individual's body

- comments on sexual prowess, sexual deficiencies, sexual preferences or sexual habits
- leering, whistling, touching, pinching, assaulting, coerced sexual acts
- suggestive, insulting or obscene comments or gestures
- display in the workplace of sexually suggestive objects or pictures
- intimidation, ridicule and insults based on the employee's gender
- display in the workplace of sexually suggestive objects or pictures

3. ***Individuals Covered Under the Policy:*** This policy applies to all employees of IHS, whether related to conduct engaged in by fellow employees, supervisors or someone not directly connected to IHS (e.g., an outside vendor, consultant, customer, etc.).

4. ***Reporting an Incident of Sexual Harassment:***

A.  IHS encourages reporting of all perceived incidents of sexual harassment, regardless of who the offender may be. IHS encourages individuals who believe they are being harassed to promptly advise the offender that his or her behavior is unwelcome. IHS also recognizes that it is not necessary for an individual to talk directly to an offender if it is uncomfortable.

B.  Individuals who believe they have been the victims of sexual harassment or believe they have witnessed sexual harassment may discuss their concerns with any of the following management staff:

- Supervisor/Department Head
- Top level of management in local organization
- Executive Director
- Regional Vice President
- Division Human Resources Director
- IHS Human Resources (1-800-454-5909)

C.  Contact information for these persons, (including names, work addresses and work phone numbers appropriate to each healthcare center/region/division) will be given to employees during their orientation session. The work phone number and work address for the Division Human Resources Director and IHS Human Resources will be posted on the employee bulletin board in the healthcare center.

D.  The names of appropriate state and federal employment discrimination enforcement agencies and telephone numbers for contacting them will also be included in the contact information provided to employees.

5. ***Management Responsibility:*** Management personnel who observe instances of sexual harassment or learn that someone has been harassed and/or receive an employee's report of alleged harassment are obligated to immediately inform their next level of management and their Division Human Resources Director. If the next level of management is the alleged harrasser, proceed to the next higher level of management and HR.

6. ***Investigations:*** Complaints under this policy will be investigated promptly by the Division Human Resources Director, Corporate Human Resources with Legal counsel as necessary. All allegations will be treated confidentially to the extent possible, consistent with the best interest of IHS and the employee.

7. ***Protection Against Retaliation:*** Employees will not be subject to retaliation or reprisals for reporting suspected harassment under this policy or for taking part in any investigation of the allegation. Acts of retaliation should be reported immediately to one of the following persons, and the Division Human Resources Director.

   - Supervisor/Department Head
   - Top level of management in local organization
   - Executive Director
   - Regional Vice President
   - IHS Human Resources (1-800-454-5909)

8. ***Responsive Action:*** Misconduct constituting sexual harassment will be dealt with appropriately. Responsive action may include but not be limited to the following examples: training and/or referral to counseling and/or disciplinary action such as warning, reprimands, withholding of a promotion, reassignment, temporary suspensions without pay, compensation adjustments or termination.

Original: 02/97          © Integrated Health Services, Inc. 1997          HR Policy 2.5
Revision:                                                                      Page 3 of 3

Page 1

1              IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3    KATHLEEN HODSON,                    :
                  Plaintiff             :
4                                        :
         v.                             :  Civil Action No. 03-0374
5                                        :          Erie
     INTEGRAGED HEALTH SERVICES          :
6    LONGTERM CARE, INC. d/b/a           :
     IHS AT BAYSIDE,                      :
7              Defendant                 :

8

9

10            Deposition of KATHLEEN HODSON, taken before

11       and by Janis L. Ferguson, Notary Public in and

12       for the Commonwealth of Pennsylvania, on Monday,

13       March 28, 2005, commencing at 10:30 a.m., at the

14       Erie County Courthouse, Room 209, 140 West Sixth

15       Street, Erie, PA 16501.

16

17

18   For the Defendant:

19       Liberty J. Weyandt, Esquire
         Margolis Edelstein
20       310 Grant Street
         The Grant Building, Suite 1500
21       Pittsburgh, PA 15219

22

23

24

                 Reported by Janis L. Ferguson, RPR
25             Ferguson & Holdnack Reporting, Inc.

EXHIBIT

"B"

174c7844-b997-4bbc-90a2-f861026969f1

Hodson v. IHS Bayside                 Kathleen Hodson                    March 28, 2005

---

Page 2

1                    I N D E X
2
3    TESTIMONY OF KATHLEEN HODSON
4        Direct examination by Ms. Weyandt . . . . . . . 3
5
6
7
8
9    EXHIBITS:
10       Hodson Deposition Exhibit 1 - Page 12
         Hodson Deposition Exhibit 2 - Page 39
11       Hodson Deposition Exhibit 3 - Page 65
         Hodson Deposition Exhibit 4 - Page 69
12       Hodson Deposition Exhibit 5 - Page 86
         Hodson Deposition Exhibit 6 - Page 90
13       Hodson Deposition Exhibit 7 - Page 90
         Hodson Deposition Exhibit 8 - Page 91
14       Hodson Deposition Exhibit 9 - Page 92
         Hodson Deposition Exhibit 10 - Page 102
15       Hodson Deposition Exhibit 11 - Page 104
         Hodson Deposition Exhibit 12 - Page 104
16
17
18
19
20
21
22
23
24
25

---

Page 3

1         K A T H L E E N   H O D S O N, first having
2    been duly sworn, testified as follows:
3
4              DIRECT EXAMINATION
5    BY MS. WEYANDT:
6
7        Q.   Okay, Miss Hodson, this is the time and the place
8    for the taking of your deposition today. I'm going to just
9    give you some basic instructions. Have you ever been
10   deposed before?
11       A.   Never.
12       Q.   Okay. Just so that you know, only one of us can
13   talk at a given time, because the court reporter is going to
14   be taking down everything we say today. So if we talk on
15   top of each other, it makes it difficult for her to be able
16   to record it down.
17            You also have to always give a verbal response.
18   Uh-huhs, you know, don't work, because it's difficult for
19   her to record. Shaking your head, nodding your head doesn't
20   work. You either have to say yes or no or give some type of
21   a verbal response. Okay?
22       A.   (Witness nods head.)
23       Q.   If you don't understand a question that I'm asking
24   you today, please ask me to rephrase the question or restate
25   the question. I'm not trying to trick you or stumble you up

---

Page 4

1    in any way. I'm just trying to gather facts in the case.
2            If you do answer a question, I'm going to assume
3    that you've understood what I said to you. So, please, if
4    you don't understand, ask me, and I'll be more than happy to
5    ask you the question again.
6            Are you taking any type of medications today that
7    would inhibit your ability to be able to give responses to
8    my questions today?
9        A.   No.
10       Q.   Also, if you need to take a break at any time, I'm
11   more than willing to do that. I would just ask that you
12   answer the question that I have asked you, and then we can
13   take a break if you need to. I think that's it.
14            Can you please state your full name for the
15   record.
16       A.   Kathleen Dianne Hodson.
17       Q.   And your address?
18       A.   2201 Keystone Drive, Erie, Pennsylvania 16509.
19       Q.   Social Security number?
20       A.   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.
21       Q.   And your marital status?
22       A.   Divorced for many years.
23       Q.   Do you have any children?
24       A.   Three. Four. I adopted my granddaughter.
25       Q.   Have you been involved in any other litigation

---

Page 5

1    besides this case?
2        A.   Years ago. A hot wire came down and hit my
3    trailer. I think it was like in 1981. And Penelec, I sued
4    Penelec. And Gus McGeorge was my lawyer, who has deceased.
5    And that's the only litigation that I can recall.
6        Q.   Did you actually file a Complaint in court?
7        A.   I don't remember.
8        Q.   Did you receive a settlement?
9        A.   Yes. Very small. Because Gus McGeorge wanted me
10   to settle.
11       Q.   And do you recall when you settled the case?
12       A.   '81. Probably not very long after -- after -- I
13   lost everything.
14       Q.   Any other lawsuits --
15       A.   No.
16       Q.   -- or litigation?
17       A.   Not that I can recall.
18       Q.   What about any other litigation against IHS?
19       A.   No.
20       Q.   Well, presumably before this, you filed with the
21   EEOC, correct?
22       A.   Yes.
23       Q.   And did you have a Workers' Compensation claim?
24       A.   Yes.
25       Q.   Did you also file a claim through the Labor and

---

2 (Pages 2 to 5)

Ferguson & Holdnack Reporting, Inc.

174c7844-b997-4bbc-90a2-f861026969f1

Hodson v. IHS Bayside                Kathleen Hodson                March 28, 2005

Page 6

1   Wage?
2       A.  Yes.  To see my personnel file, right?
3       Q.  Okay.  Your educational background, let's talk
4   about that a little bit.  Where did you go to high school?
5       A.  Meadville Area Senior High.  Meadville,
6   Pennsylvania.
7       Q.  What year did you graduate?
8       A.  I didn't graduate.  I quit in eleventh grade, and
9   then probably about 20 years later got my GED.
10      Q.  Then what education did you obtain after that?
11      A.  I went for practical nursing, and graduated in
12  1980 from Erie School District School of Practical Nursing.
13  And -- did I say in 1980?
14      Q.  Yes.  How many years did it take you to obtain
15  that?
16      A.  One year.
17      Q.  Now, is that how you obtained your license, or --
18      A.  I took State boards.
19      Q.  Okay.  You are licensed, correct?
20      A.  Yes.
21      Q.  Are you still licensed today?
22      A.  Yes.
23      Q.  Did you receive or obtain any other education?
24      A.  I have 30 credits, college credits, from Ann
25  Arbor -- or Spring Arbor University, for life experience.

Page 7

1       Q.  I'm sorry; what do you mean by that?
2       A.  It's a -- it's a religious college.  And life
3   experience credits, plus my LPN license, which counted.  I
4   think my LPN license counted for 30 credits.  And I was
5   going to go on, but I haven't yet.
6       Q.  When did you get your LPN license?
7       A.  1980.  I graduated in 1980.  I think we
8   probably -- that was in February of 1980, and I took the
9   State boards I think, that same year.
10      Q.  Any other training?
11      A.  No.
12      Q.  Now, as an LPN, are you required by the State to
13  take any additional updated courses, refresher --
14      A.  Yes.  Yes.
15      Q.  What types of courses have you taken?
16      A.  Anything that pertains to your -- what you do, in
17  any capacity as a licensed practical nurse.  I think that's
18  CPR or --
19      Q.  Have you taken any classes recently?
20      A.  No.
21      Q.  Did you take any classes while you were employed
22  by IHS?
23      A.  I'm sure I did.  I'm sure I did, because I signed
24  things saying that I did, that Sheila gave me.
25      Q.  Do you recall what any of those classes would be?

Page 8

1       A.  No.
2       Q.  Okay.  Let's talk a little bit about your work
3   history now.  We're going to talk about IHS specifically in
4   a little bit.  But let's talk about the job you had right
5   before IHS.  Do you recall where you worked?
6       A.  I'm trying to remember.  Presbyterian Lodge.
7       Q.  What was your position at Presbyterian Lodge?
8       A.  LPN.
9       Q.  Is that like a nursing care facility or --
10      A.  Yes.
11      Q.  And what year did you become employed at
12  Presbyterian Lodge?
13      A.  I should have brought papers.  Because I can't
14  recall.  I know right after I left there, it wasn't too long
15  before I started at IHS.  And that was 1997, I think.  So I
16  think about '94, '95.
17      Q.  And you said you left around 1997.
18      A.  (Witness nods head.)
19      Q.  And do you recall why you left or the reason for
20  your separation from --
21      A.  I was let go.  I had -- I had no write-ups, but
22  I -- I made a nursing judgment, and it was -- but eye drops
23  for a patient that had severe -- his eye was closed, and he
24  was in such pain, and these were his routine eye drops.  And
25  he had new eye drops for the condition, the very severe

Page 9

1   infection.  And so I chose not to give him the routine ones,
2   so.
3       Q.  And you were fired for that.
4       A.  Yeah.
5       Q.  Do you remember the job that you had before
6   Presbyterian Lodge?
7       A.  I think -- I think because I still -- worked --
8   moved where I am, I think it was Salvation Army.  Their
9   store up there on Peach Street.
10      Q.  What was your position there?
11      A.  Cashier and manager.
12      Q.  Do you recall from when to when you worked there?
13      A.  No.  That might have even been after Presbyterian
14  Lodge.  I can't remember.  I should have brought some
15  papers.  Was I allowed to bring some papers?
16      Q.  That's okay.  Just recall to the best of your
17  memory.
18      A.  Okay.
19      Q.  And before Salvation Army and/or Presbyterian
20  Lodge, where did you work?
21      A.  Okay.  All right.  I can't remember.  I'm probably
22  nervous.  And I wrote this all down, you know, for you.
23      Q.  You wrote a history down in your --
24      A.  Yes, I did.  Yes.
25      Q.  Now, you said you became employed at IHS in 1997?

3 (Pages 6 to 9)

174c7844-b997-4bbc-90a2-f861026969f1

Hodson v. IHS Bayside                Kathleen Hodson                March 28, 2005

Page 10

1    A.  '97, I think.
2    Q.  And what position were you hired for?
3    A.  LPN.
4    Q.  Were you given any specific assignments at that
5    time, as far as certain wings, certain floors?
6    A.  No.
7    Q.  And during the course of your employment with IHS,
8    were you always an LPN?
9    A.  Yes.
10   Q.  Your job title didn't change ever.
11   A.  No.
12   Q.  Do you recall when your last day of work was?
13   A.  May 17th.
14   Q.  200 --
15   A.  -- '02.
16   Q.  Have you had any employment since your separation
17   from IHS?
18   A.  No.
19   Q.  Have you applied for any jobs?
20   A.  No.
21   Q.  Do you have any sources of income since your
22   separation from IHS?
23   A.  Yeah, I get a little.  Adoption and Social
24   Security stipend for my granddaughter.  Nothing for me.
25   Q.  Your granddaughter still lives with you?

Page 11

1    A.  Yes.
2    Q.  How old is she?
3    A.  13.  She's been with me for over -- for two years.
4    Over two years.
5    Q.  Did she live with you while you worked at IHS?
6    A.  No.
7    Q.  So you haven't attempted to find another job since
8    you left IHS?
9    A.  No.
10   Q.  You haven't sent any resumes?
11   A.  No.
12   Q.  Do you have a current resume?
13   A.  No.
14   Q.  And besides the Social Security for your
15   granddaughter, you don't have any other source of income?
16   A.  I have that -- still have that settlement from the
17   Workman's Comp.  And I have been very frugal.  And it's -- I
18   have been very -- doing -- you know, as frugal as possible.
19   It will be two years next month.  Well -- yeah, two years
20   next month.
21   Q.  Okay.
22   A.  So I have used that, really, to --
23   Q.  Live off of.
24   A.  Yes.
25   Q.  Now, as an LPN at IHS, what were your job

Page 12

1    responsibilities?
2    A.  Assess patients -- do you want me to start from
3    the beginning, you go in, or do you just want me to put an
4    overall --
5    Q.  Just generally, what was your job?
6    A.  Assess patients --
7    Q.  What did your job entail?
8    A.  -- do treatments, pass medications, chart, care
9    plans.  If you're on the acute care hall, you do a lot more.
10   Q.  Did you work on the acute care hall?
11   A.  Yes.
12   Q.  When did you last work on that hall?
13   A.  Well, my last time of work was the night I got
14   hurt; was March 30th, 2001, I think.  That's the last time I
15   was on the acute care.  But I was on there all the time
16   before I got hurt.
17   Q.  I'm sorry; you said March 20th --
18   A.  I think it was March 30th.
19   Q.  I'm sorry.  What year?
20   A.  2001.  I hope I'm right with all these dates.
21   Q.  I'm going to show you what we're going to mark as
22   Exhibit No. 1.
23        (Hodson Deposition Exhibit 1
24        marked for identification.)
25   Q.  Do you recognize this?

Page 13

1    A.  What?
2    Q.  Do you recognize this document?
3    A.  (No response.)
4    Q.  Would it be fair to say that this is a description
5    of what your job was at IHS?
6    A.  That would be fair.
7    Q.  And on the last page, is that your signature?
8    A.  Yes, that's my signature.
9    Q.  And you signed it on 5/17/97?
10   A.  Right.
11   Q.  And is that probably around the time you began
12   working at IHS?
13   A.  Yes.  Same time -- almost the same date that I was
14   terminated.
15   Q.  Now, who were your supervisors or managers at IHS
16   during the course of your employment?
17   A.  Oh, my.  That would be almost impossible.  Because
18   we had such a high turnover.  But I would say -- okay.  I
19   would say Dave Venesky.
20   Q.  What was his position?
21   A.  Supervisor.
22   Q.  And do you recall from when to when he was your
23   supervisor?
24   A.  (Witness shakes head.)
25   Q.  No?  Okay.

Ferguson & Holdnack Reporting, Inc.

Page 14

1    A.  No.  I didn't say that out loud.
2    Q.  Okay.
3    A.  Cheryl Zimmerman.  These aren't in order.  Just as
4  I can remember.  Cathy Mannion.  Jean -- and I can't
5  remember her last name.  Jeannie.  Jen Hizer, Dave Dinges,
6  Roger Watkins.  Probably Flo Love; Florence Love.  There's
7  probably more.  If I could just remember all the RN's names
8  right now.  Because --
9    Q.  Were the RN's supervisors?
10    A.  Yes.
11    Q.  Were there people above them that also supervised
12  you?
13    A.  DON.  Director of nursing.
14    Q.  Were any of the persons that you named DON's?
15    A.  Did I say Dave Dinges?
16    Q.  You did.
17    A.  Then he was acting director of nursing.
18    Q.  Okay.
19    A.  Occasionally -- interim or whatever you call it.
20  And -- director of nursing.  Lori Gurdak, Sharon DiLoreto.
21    Q.  I'm sorry; what was Lori's last name?
22    A.  Gurdak.
23    Q.  Do you know how to spell that?
24    A.  G-U-R-D-A-K, I think.  I can't think of any more
25  right now.

Page 15

1    Q.  Do you remember what your starting pay was?
2    A.  I think around $9.
3    Q.  Had you received raises over the time of your
4  employment?
5    A.  Yes.
6    Q.  Do you recall what your ending pay was?
7    A.  $14.45.
8    Q.  And what benefits did you have at IHS?
9    A.  We had insurance.  We had different insurances
10  while I was there.  It changed.  And we had to contribute.
11    Q.  Are you talking health insurance?
12    A.  Health insurance.  I had life insurance, and I had
13  long-term and short-term disability.  And we had paid time
14  off.  I think we had personal days.  And vacation.  I guess.
15    Q.  Did you have any 401(k)'s or profit-sharing plans?
16    A.  I didn't.
17    Q.  Can you describe for me a little bit what the IHS
18  facility looks like on the inside; how it's laid out.
19    A.  Well, you come in the front door.  To your right
20  is Sheila's office; human resources.  Right beside hers is
21  the administrator's.  And then right beside that one -- it
22  used to be the director of nursing office.  Right in front
23  of the director of nursing office was the receptionist.
24    Q.  How were the patient areas laid out?
25    A.  Oh.  You go straight back the hallway when you get

Page 16

1  in the front door.  To the right, you go straight, and
2  that's North Hall.  That's the acute care hall.
3    Q.  When you say "acute care", what do you mean by
4  that?
5    A.  Ventilators.
6    Q.  Any other halls?
7    A.  You come back from that hall.  Right there is --
8  is north nurses' station.  In back of north nurses' station,
9  there's a short hall on the right.  That's Ambassador.  And
10  then there's a long hall on the left, and that's Northwest.
11  And then you go -- if you come in the front door and you go
12  left instead of right, you go down to South Hall -- or south
13  nurses' station.  And there's two halls that go off of south
14  nurses' station.  One is Southwest, and one is South.
15    Q.  So how many halls are there all together?
16    A.  One, two, three, four -- five.
17    Q.  Now, is there a difference in the types of
18  patients that are in these various halls?
19    A.  Like I said, North is ventilators and your most
20  seriously ill -- or they need more.  And it's mostly -- most
21  times you are doing the care yourself -- all the care.
22  Sometimes you have nurses' aides.  It might be better now.
23  But sometimes you get really short.
24    Q.  You mentioned nurses' aides.  Did IHS hire nurses'
25  aides to help the LPN's?

Page 17

1    A.  To help on all the halls, yes.  But sometimes
2  you're really short.  The night I got hurt, I don't think we
3  had any nurses' aides on North the night I got hurt.  I
4  can't remember if I -- if we did have any that night, I
5  didn't see them.
6    Q.  What about generally the number of patients per
7  hall?  Were they all generally the same?
8    A.  No.  From what I read on the reports, you know,
9  that I have received since -- I think there's like -- you
10  know, I don't remember.  I really don't remember the number
11  of patients.  I would say maybe 26 on all the halls
12  except -- maybe 25.  I don't know.  On all the halls except
13  Ambassador, which has about 21.  I am not sure of any of
14  those numbers.
15    Q.  Now, which halls did you work in during the course
16  of your employment at IHS?
17    A.  Before I got hurt, all of them.
18    Q.  What about after you were hurt?
19    A.  After I was hurt -- I worked light duty after I
20  was hurt.  I was never taken off light duty.  So there was
21  like a difference there of -- I guess you would call it
22  opinion, on what I was doing and whether I was still doing
23  light duty when I was put on Ambassador, when I came back
24  the last time when I was off.  To -- before I went off, I
25  was doing paperwork.  And I have a copy of all them

174c7844-b997-4bbc-90a2-f861026969f1

Hodson v. IHS Bayside                    Kathleen Hodson                    March 28, 2005

Page 18

1  positions that Sheila sent me in the mail. But when I come
2  back, I was never on any of those.
3      Q.  So I'm confused.  Did you work light duty --
4      A.  It is confusing.
5      Q.  Did you work a desk job at some point?
6      A.  Yes.
7      Q.  When was that; do you recall?
8      A.  Before the last time I was off.  Which I'm not
9  sure of the dates, but I think it was -- I was only back to
10  work, I think, five weeks when Dave Dinges fired me.  So I
11  was on Ambassador when I came back.
12      Q.  Let's go back a little bit and talk about --
13      A.  It is confusing when --
14      Q.  Let's talk about when you were off.
15      A.  Okay.
16      Q.  You said you got hurt March 30th, 2001.
17      A.  Yes.
18      Q.  So how long were you off after you were
19  injured?
20      A.  I don't know.  I don't think I was off more than
21  10 days.  Or maybe a week or 10 days.  I don't -- I'll have
22  to go back.
23      Q.  And so when you returned, you came back to light
24  duty.
25      A.  Yes.

Page 19

1      Q.  And then did you -- is that when you worked the
2  desk job?
3      A.  Yes.  Yes.
4      Q.  How long did you work the desk job?
5      A.  Yeah, I was -- except for a couple occasions, I
6  was told to go down and work on the hall.  I can remember
7  one specific occasion where I was -- it was Lori Gurdak and
8  Sheila; where I was made to go down on Southwest and work
9  full duty.  I remember that.  Because it didn't happen after
10  that.
11      Q.  Okay.  So when did you -- you mentioned that you
12  were off again.
13      A.  Yeah.
14      Q.  So --
15      A.  I was off many times.  I would say often.  For my
16  back.  But then it was two months prior to Ambassador.  Two
17  months when I came back, and then I was on Ambassador for
18  five weeks.  But prior to that, I was on paperwork.  And I
19  had a list of duties that I was supposed to do when I was on
20  that.  And --
21      Q.  What were your duties?
22      A.  Oh, I had a list.  And -- MA-51's, care plans.
23  I'm trying to remember.  A lot of paperwork.  And copying,
24  putting packets together, I think.
25      Q.  Do you recall how many times you were off work?

Page 20

1      A.  I'd say for -- okay.  So about a year.  It says in
2  one of those papers that the company accommodated my injury
3  for two years.  That was not true.  It was one year.
4      Q.  Okay.
5      A.  And --
6      Q.  I'm trying to get a time line for --
7      A.  I'm trying to remember.
8      Q.  So March 30th you were injured.
9      A.  Yes.
10      Q.  You were out for five to ten days, you said.
11      A.  Yes.
12      Q.  Then you came back.
13      A.  Right.
14      Q.  Now, how long did you work until you had to go
15  out -- had to leave work?
16      A.  Okay.  Well, 90 days -- for three months I was
17  doctoring, you know, with occupational health.  That might
18  be a better time line.  So that would be 90 days when I --
19  when I come back after my injury.  So that's three months
20  right there.
21      Q.  You were out -- you weren't working --
22      A.  No, I was working, but I was light duty, and I
23  was -- Dr. Ferris, 90 days.  He sent me to another doctor
24  who said that I could go back to work full duty.  That was a
25  company doctor too.  And I remember I had a conversation

Page 21

1  with Sheila, and I told her that I wasn't better, and I just
2  was in severe pain and that.  So she got permission for me
3  to go to Dr. Euliano then.  And I went to him, and he wrote
4  that -- something that he kind of like overturned what the
5  occupational health doctor, Dr. Ferris and Dr. Burak
6  (phonetic), I think was his name -- I'll know more later
7  when I get all these things in my head.  That I wasn't able
8  to go off of light duty.  And I would probably be on it
9  permanently.
10      Q.  And who was this doctor?  I'm sorry.
11      A.  Euliano.
12      Q.  Euliano.
13      A.  And Sheila says she would call and get permission
14  for me to go to him, and so I did.
15      Q.  So that still doesn't answer my question.  When
16  were you out of work again?  Was there another time that you
17  missed work totally, that you were unable to work?
18      A.  I would say in -- maybe a couple days at a time.
19  But I wouldn't say for two months like that last time.  I'm
20  not sure.
21      Q.  Did you ever have to have any surgery or any --
22      A.  No.  I had injections in my spine.
23      Q.  I've gone off track a little bit, but since we're
24  on the subject, who were the rest of the doctors that you
25  treated with?

Ferguson & Holdnack Reporting, Inc.

174c7844-b997-4bbc-90a2-f861026969f1

Page 22

1   A.   Well, let me start from the beginning. Ferris.
2   Q.   Where was Dr. Ferris --
3   A.   Occupational Health. I never really treated with
4   that one he sent me to; Durak or Burak at St. Vincent
5   Surgeons. I never really treated with him. He only looked
6   at me once and said go back to work. One day.
7       And then when Sheila got me permission to go to
8   Euliano, I went to him. And I think about that same time I
9   went to Dr. Ang, who is a chiropractor. And Dr. Euliano
10  says that that was all right.
11  Q.   Where was Dr. Euliano at?
12  A.   Dr. Euliano is down on State Street. He was -- he
13  was an orthopedic surgeon. He's since, I think, retired.
14  I'm not sure.
15  Q.   So then you went to Dr. Ang, who is a
16  chiropractor.
17  A.   Yes. At the same time. At the same time. I was
18  getting injections from Dr. Babins, Dr. Falasca, and going
19  to Dr. Ang, Dr. Euliano, then Dr. Gilman all at the same
20  time. The day I got fired by Dave Dinges, I was scheduled
21  for injections.
22  Q.   Where are Dr. Babins and Dr. Gilman?
23  A.   Dr. Babins, I don't think that -- I haven't
24  really -- he just -- you're referred to him to give
25  injections. He gives you injections at HealthSouth. And I

Page 23

1   also had a functional capacity test and MRI's and all that
2   too at the same time. And then Dr. Falasca, he's since went
3   out of practice, but he gave me injections also.
4   Q.   Any other doctors?
5   A.   Gilman.
6   Q.   Okay. And where is he at?
7   A.   He's a neurosurgeon. And he's in Modern Tool, I
8   think. He's on State Street.
9   Q.   So besides the 15 days that you were off when you
10  initially were hurt, you weren't off for any lengthy period
11  of time --
12  A.   A couple days at a time. Maybe a day or a couple
13  days. And I can -- I have those records. You know, I
14  can --
15  Q.   You can give those to me, if you have them.
16  A.   You have them. You sent them to me.
17  Q.   You mean the authorizations that I sent to you?
18  A.   Well, yeah. You sent all that stuff to me.
19  Q.   I requested your medical records --
20  A.   Yeah.
21  Q.   -- from all of these various --
22  A.   Oh, yeah, right. And then but you also sent me
23  stuff saying when I missed and everything else. And for
24  what and everything else.
25  Q.   Okay. Let's go back to where we were before we

Page 24

1   started getting into your injury. Because we're going to
2   talk about your injury a little bit later, but I want to go
3   back to where I was.
4   A.   Okay.
5   Q.   We were talking about the difference in the halls.
6   A.   Okay.
7   Q.   Now, is it typical for nurses to be assigned to
8   specific halls, or how does that work?
9   A.   Well, it -- it varies. You know, sometimes it's
10  like a -- it, like -- sometimes, it depends on who you are
11  too. You know, whether you get your own hall. Or the same
12  hall all the time. And because --
13  Q.   Well, are nurses assigned to a specific hall?
14  A.   Yes.
15  Q.   And do they always work that same hall?
16  A.   Some. I mean, some, unless they, you know, are
17  really short and they have to go to another hall. You know,
18  I mean, I'd say that's very seldom. There's only a couple
19  that I can think of that say, you know, this is my hall, you
20  know, and -- but they have been there for a long time too.
21  So it's kind of like a favor.
22  Q.   So if someone -- if they are short in one hall a
23  given night, they might assign a nurse who normally works in
24  South Hall to the Northwest Hall.
25  A.   Yeah, um-hum. You can -- you can see that -- I

Page 25

1   wonder if I could ask a question. Am I allowed to ask a
2   question?
3   Q.   No, not now.
4   A.   Oh.
5   Q.   Okay. What hours did you typically work?
6   A.   3:00 to 11:00.
7   Q.   Did you work five days a week?
8   A.   I think four. 32 hours.
9   Q.   Did you work 32 hours before your injury?
10  A.   Let me see. I think I asked for 32 hours before
11  my injury. I think I did. It was just -- I was down on
12  North Hall all the time, and it was a very heavy hall, and
13  we were really short, and I'm -- you know, it was hard.
14  Q.   So after your injury, did you keep working 32
15  hours?
16  A.   I think so.
17  Q.   Now, if there's a reason that you have to call off
18  from work, what is the policy on that?
19  A.   (No response.)
20  Q.   If you're sick and you need to call off or
21  something comes up that you need to call off, was there --
22  A.   Just call.
23  Q.   Who did you have to call?
24  A.   Well, probably the supervisor. I don't know. You
25  get -- like at night, there's not very many on, you know.

7 (Pages 22 to 25)

Page 26

1    Q.  Were you required to give so many hours notice?
2    A.  I would say.
3    Q.  Do you know how many hours notice?
4    A.  They weren't always -- they made, you know, things
5    as you went along.  There was like, you know -- if it was an
6    emergency or something, you know, or, you know, you had been
7    ready for work, and you just absolutely couldn't, you know,
8    they, you know, were pretty good about it, you know.  And,
9    you know, things come up and stuff too.
10   Q.  But generally was there a number of hours or an
11   amount of time?  Like did you have to give 24 hours' notice
12   or 12 hours' notice?
13   A.  I don't think you'd give 24.  Yeah.  We had people
14   calling in at the last minute all the time.
15   Q.  Okay.  Now, does IHS have a policy in place where
16   employees can make complaints or grievances about things
17   that are going on in the workplace?
18   A.  Yes.
19   Q.  Okay.  And what --
20   A.  I think they do.  At least Sheila used to tell us
21   that -- you know.
22   Q.  Okay.  And what was your understanding of what the
23   policy was?
24   A.  It is probably in the -- in the book.  But, I
25   mean, it was like an open-door policy.  And you could

Page 27

1    approach, you know, whoever to complain.  I do know when
2    Carl Kovski was there, he told me straight out, if I had any
3    complaints, to come to him.  And he -- he definitely told me
4    that.
5    Q.  Okay.  Anybody else you could report to?
6    A.  Sheila.  I could probably tell her.  And your
7    supervisor or -- or, you know.
8    Q.  Was there anyone in upper corporate management
9    that you could talk to?
10   A.  Yeah.  We were always told that there was a number
11   to complain to.  In fact, it was --
12   Q.  Was this -- I'm sorry.
13   A.  I'm trying to remember.  If I can remember.  I
14   don't know.  I never called it before that day.
15   Q.  Before what day?
16   A.  May 17th.  I never called it.  I feel -- I
17   don't -- I don't do that.
18   Q.  Are employees trained, or are there any kind of
19   training sessions about issues regarding sexual harassment
20   or discrimination or --
21   A.  Yes.  I think that Sheila -- I remember her giving
22   that.  Because we had to take those occasionally, you know.
23   And -- yeah.
24   Q.  So you took the classes.
25   A.  I'm pretty sure.  You know, I'm pretty sure.  And

Page 28

1    when I complained to Carl Kovski about the harassment, I
2    just, you know, told him, because he -- he said come to him
3    with any complaints.  And I complained to Sheila too about
4    being on Ambassador Hall, when nobody that was on light
5    duty -- and that letter I got at home, it was different, and
6    it was hard.  And I was in a lot of pain, and I complained
7    more than once.
8    Q.  Which hall was hard?
9    A.  Just being on the hall.  Just being on the hall
10   and being on -- passing meds and all that.  And I complained
11   to Sheila, and she said, you know, I wasn't to talk to her;
12   I was to talk to Carl.
13   Q.  Was there any written procedure?  Could you file
14   like a written grievance?  Are there any procedures for
15   that?
16   A.  You probably could, but when I -- really, you're
17   supposed to go and talk first.  You know, like an open-door
18   policy.  And all I got was, oh, well, you know, that's just
19   Roger.
20   Q.  So once you talked, what was the next step?
21   A.  Well, that was the administrator, so, you know, I
22   wasn't sure that he wasn't going to say something to Roger.
23   You know, I wasn't sure.  He didn't say he wasn't going to
24   talk to Roger.  He just said, oh, that's just Roger.  The
25   very same words that Carmen said; oh, that's just Roger.

Page 29

1    Q.  So you never filed any kind of written grievance.
2    A.  No.  It wasn't just that.  It -- you know, that --
3    dirty language and stuff, you know.
4    Q.  Now, the last day you worked at IHS was May 17th,
5    correct?
6    A.  Yes.
7    Q.  And on that day, it's my understanding that you
8    were assigned to work on the Northwest Hall.  Is that
9    correct?
10   A.  Yes.
11   Q.  And how did --
12   A.  Well, I was assigned Ambassador until I come in
13   that day.
14   Q.  That's what I was going to ask you.  How did you
15   find out that you were assigned --
16   A.  I looked on the -- on the daily that was hanging
17   on -- or it was around.  You had to go looking for it when
18   you get there.
19   Q.  "Daily", you mean a schedule that's posted on a
20   wall?
21   A.  Yeah.  A daily, yes.
22   Q.  And when you saw it posted on the wall that you
23   were to work on Northwest Hall, what did you do?
24   A.  Well, first of all, this had happened probably
25   about three weeks prior to that.  I was put on another hall;

Page 30

1  Southwest.
2      Q.  So --
3      A.  So I had called Carl from home before I came to
4  work, and I said, I cannot work any hall but Ambassador,
5  because I have the cart all fixed up, you know, with -- with
6  the meds up at the top of the cart, so I don't have so much
7  bending and everything.  And he said, don't worry, come to
8  work, you'll be on Ambassador Hall.  So, therefore --
9      Q.  Okay, wait.  Let me stop you one second.
10     A.  Okay.
11     Q.  This conversation happened three weeks before --
12     A.  Yeah, about three weeks.
13     Q.  -- May 17th.
14     A.  Yes.  Yes.  And I called Carl -- because, see, he
15  told me that he was in charge of my whole working life; you
16  know, employment.  And even Sheila told me I had to go to
17  Carl.  Any questions or complaints I had.  And he told me to
18  keep it right with him.  So that's what I did.  So he told
19  me, I would be on Ambassador when I came in.
20         So what I did was when I seen that I was on
21  Northwest, Nurse Curry from -- I think she's from MSN.  She
22  was on Northwest Hall.  And I says, well -- I went over to
23  her, and I said, well, I'm sorry, but, you know, I can't
24  relieve you, and I have to go up and talk to Carl.  And I
25  told her, you know, and I was sorry, because, you know, any

Page 31

1  nurse that's working or has that hall, all she wants is to
2  get out of there.  And I felt bad.  But I told her I wasn't
3  able.
4         And so I went and -- up to speak to Carl, and he
5  wasn't available.  I don't know if he was there or not.  He
6  wasn't available.  So I said, well, I need to speak to
7  whoever is in charge then.  And so Dave Dinges, Cathy
8  Mannion, and Sheila came up and went into the DON's office
9  with me.
10     Q.  Okay.
11     A.  So I gave notice, you know.  And it wasn't like I
12  walked and didn't -- it's just that, you know, this had
13  happened three weeks before.
14     Q.  Well, what is the difference between the halls
15  that you couldn't --
16     A.  Well, the difference is -- let me tell you.  That
17  cart on Northwest Hall -- and, of course, Dave says, you
18  know, that I didn't give any reason.  It says in there that
19  I wouldn't give any reason why.  I was not able.  That cart
20  on Northwest Hall -- and I heard Lori Haines, the one that
21  took Ambassador that day, I heard her the day before saying,
22  I'm not going on Northwest Hall because it's a bear.
23     Q.  Can you just try and answer the question that I
24  have asked you.
25     A.  Okay.

Page 32

1      Q.  The differences in the hall.
2      A.  Okay.  The differences in the hall.
3      Q.  Between Ambassador --
4      A.  Okay.
5      Q.  -- and Northwest.
6      A.  Okay.  Very demanding patient at the time.
7      Q.  Very demanding patient on Northwest?
8      A.  Yes.
9      Q.  Okay.
10     A.  The cart.  The cart was all done -- okay.
11  Narcotics are at the bottom of the cart, and there's a lot
12  of narcotics needed on that hall.  So it was constant
13  bending.  Demanding patient, as I said.  To where you're --
14  and the thing is -- the thing is, when you are put on in a
15  hall, and you -- first of all, you know, that's really like
16  full duty anyway.  Okay?  With restrictions.  When you are
17  put on that hall -- and I did the best I could.  I fixed the
18  cart on Ambassador so that I wouldn't have to be bending.
19  Here (indicating) is the narcotics on Ambassador Hall cart.
20  It's on the top.
21     Q.  Well, you testified earlier that you had nurses'
22  aides that could help you.  Were there people there that
23  could have helped you with the bending and the pushing of
24  the cart?
25     A.  Well, they could take the cart down the hall and

Page 33

1  park it.  But, still, you've got all that walking back and
2  forth to do.  I was only supposed to be walking one-third of
3  a shift, which is like, what -- one-third of a shift.
4      Q.  Why don't we stop a second and talk about what
5  your restrictions were.
6      A.  They were sent to me at home with a letter telling
7  me what my job -- job would be when I -- if I came back to
8  work, okay, with my functional capacity test saying that I
9  was only supposed to walk one-third of a shift.  It said
10  on that job description that I was sent at home by Carl
11  Kovski wasn't one bit of passing meds or anything.  It was
12  all paperwork.  You must have a copy of that.  And if not,
13  I'll make sure that you get one.
14     Q.  Did you have a weight limit?
15     A.  I think it was 20 pounds.
16     Q.  Okay.  Now, let's go back to when you said you met
17  with Dinges and Mannion and Sheila.
18     A.  Right.
19     Q.  And you claimed that you couldn't work on
20  Northwest Hall.  What did they say to you in response to
21  that?
22     A.  Why couldn't I?
23     Q.  And what did you say?
24     A.  I said I just wasn't able.  I said, you know, that
25  I was -- I was not doing well where I was, to begin with.

Ferguson & Holdnack Reporting, Inc.

174c7844-b997-4bbc-90a2-f861026969f1

Page 34

1  And Cathy Mannion -- oh, first of all, I could see -- you
2  know, it was like Cathy Mannion and Dave --
3      Q.  What was Cathy's position at the time?
4      A.  I think she was supposedly assistant director of
5  nursing.  Her and Dave Dinges -- and pardon me saying
6  this -- ran the place.  Write that down.  Cathy Mannion and
7  Dave Dinges ran the place.  And Cathy was screaming at me
8  that if I left, she was going to call the State, she was
9  going to have my license for abandonment.  And --
10     Q.  Can you lose your license for abandoning a
11 patient?
12     A.  Yeah.  A patient, yes.  That's what they --
13 everybody always -- that's your biggest fear at being a
14 nurse, is abandoning a patient.
15     Q.  But isn't it true that no matter which hall you
16 worked on, IHS was giving you the same accommodations?
17     A.  No.
18     Q.  Okay.  Why is it that you think not?
19     A.  Definitely not.  It shouldn't have happened to
20 begin with.  And Sheila knows it.  I went to her and
21 complained.  And I told her, why is this going on.
22     Q.  Well, I still don't quite understand.  Besides the
23 one difficult patient and the cart being different, if you
24 have --
25     A.  First of all, I shouldn't have been on Ambassador

Page 35

1  Hall to begin with.  That's full duty.  I shouldn't have
2  been on Ambassador Hall to begin with.  I was sent those job
3  descriptions to my home when I came.
4      You had to be there.  You had to be there.  Let me
5  tell you.
6      Q.  Well, did Dave Dinges say to you, if you don't do
7  your job as you're assigned on Northwest Hall, you're going
8  to be terminated?
9      A.  Yeah.  You no longer work here.
10     Q.  So he gave you a choice.  Either work the hall --
11     A.  Yes.  Yeah.
12     Q.  -- or be terminated.
13     A.  Should have never happened.  And Ray Martinez said
14 that on the phone that day.  Should have never happened.
15     Q.  And so you decided to walk out.
16     A.  Well, he told me if I didn't work Northwest Hall,
17 I no longer worked there.  What would you think?
18     Q.  I just want to know what happened.  You walk out
19 after that.
20     A.  I left.
21     Q.  You left.  Okay.
22     A.  I punched out.  I never said I didn't punch in.
23     Q.  And after you punched out, you were terminated by
24 Mr. Dinges?
25     A.  No.  I was in the office.  No, I was in the

Page 36

1  office.  He told me that if I didn't work Northwest Hall --
2      Q.  After you punched out --
3      A.  I went home.  I was highly upset.  I called that
4  number at corporate, which I had never called before.  And
5  I -- I just feel that it was God that answered my prayer
6  that it was Ray Martinez, the director of human resources at
7  corporate.  And I didn't make anything up.  I did not lie or
8  anything.  I told him exactly what happened.  And he says,
9  well, I will look into it and get back to you.
10     He called me several times.  He told me I was not
11 terminated.  I have several papers right now that I'm going
12 to put on file to say I was not terminated.  Even the day
13 that Dave Dinges testified at my Workman's Comp., he said
14 I was not terminated, because they told me to say that she
15 was still an employee of IHS, that day that he testified.
16     Q.  Did you ever work again for IHS after May 17th?
17     A.  No.
18     Q.  Okay.  If you didn't think you were terminated,
19 why didn't you ever report back to work?
20     A.  I wanted to.  I called.
21     Q.  Who did you call?
22     A.  Carl Kovski.
23     Q.  When did you call him?
24     A.  Probably like the next day.  I don't know.  But it
25 seems to me that was Friday, so I think I called -- I have

Page 37

1  called Sheila, I called Carl Kovski.  I asked, could I
2  come -- you know, could I work.  No.
3      Q.  And what did they say to you?  What did --
4      A.  No, you can't come to work.
5      Q.  Did he say you were terminated?
6      A.  He says, you walked off the job; you're terminated
7  or whatever.  I don't even remember the conversation.  But I
8  do know, I was told I was not allowed to come back to work.
9      Q.  And what did Sheila say to you?
10     A.  I was not allowed to come back to work.  Ray
11 Martinez was in charge --
12     Q.  Okay.  Now, you said Ray works in corporate.  What
13 was his title?
14     A.  He was director of human resources.  He lives down
15 in Collegeville now.  I haven't quite discovered what his
16 title is now.  But there was several conversations with him.
17 And he had my Workman's Comp. turned on and had me a check
18 in the mail via UPS, I think within two weeks.  So he
19 overturned everything.  And that two months that I was off,
20 Carl Kovski and Sheila put me on family leave.
21     Q.  What do you mean?  What two months were you off?
22     A.  That two months I was off.  This was ongoing.
23 This was totally --
24     Q.  For what two months?
25     A.  The two months previous to coming back with my

Page 38

1    back. The two months --
2        Q.  Okay. Now, we talked about a whole time line
3    before, and you never said two months. You said five --
4        A.  Yeah, I did.
5        Q.  You said five to 10 days, and then you said a
6    couple days here and there, give or take.
7        A.  Right. And there was two months. It was like
8    just prior to coming back to work that I got the letter at
9    home saying that I would -- light duty was available for me
10   and a list of the things -- of the job duties. And they put
11   me on family leave. I didn't ask for family leave. And
12   there -- I -- there was no money. I wasn't allowed to have
13   any Workman's Comp. I wasn't allowed to have any
14   disability, because I was injured at work.
15       Q.  Did your doctor put you on work restrictions that
16   you couldn't work during those two months?
17       A.  Yes.
18       Q.  And which doctor would that have been?
19       A.  Dr. Ang.
20       Q.  So he said you couldn't work.
21       A.  Yes. But they wouldn't recognize him at first.
22       Q.  Who is "they"?
23       A.  Sheila and, I guess, Carl. I'm not sure. Or
24   maybe corporate. Because then when I brought another -- I
25   have all these -- all these papers at home.

Page 39

1        Q.  Are these things that you have produced to me?
2        A.  Yes. I'm pretty sure -- no, they came from you.
3    I'm pretty sure.
4            But back to them turning on Workman's Comp., Ray
5    turned it on that day -- that -- I don't know if it was
6    exactly that day. But he took over. He says, well, you
7    just go back on Workman's Comp. And I says, well, you don't
8    seem to understand, I have never gotten any money on
9    Workman's Comp. And he said, oh. He didn't understand
10   either.
11       Q.  Okay. I'm going to change gears a little bit, and
12   I want to go through the allegations in a little bit more
13   detail, as you have alleged them in your Complaint.
14       A.  I'm sorry, but it just is upsetting.
15       Q.  That's okay. I'm trying to keep us on focus.
16       A.  Okay.
17       Q.  So this is what we're going to mark as Exhibit 2,
18   which is a copy of the Complaint that you filed in this
19   case. Is that correct?
20       A.  Yeah.
21           (Hodson Deposition Exhibit 2
22           marked for identification.)
23       Q.  Did you sign this document?
24       A.  Yes.
25       Q.  And would you agree that everything that you put

Page 40

1    in here is true and correct?
2        A.  Yes.
3        Q.  The first thing that you mentioned -- it's going
4    to be a little difficult because you didn't do numbered
5    paragraphs, so --
6        A.  I know. I'm amending it. Remember, I told you on
7    the phone.
8        Q.  So bear with us as we try and pinpoint where
9    things are. Okay. The first thing -- once you talk about
10   everybody's address, the first thing you talked about is
11   your injury at work. You say you were off for a few days,
12   and then you came back to work on light duty and was on
13   doctor's care and rehab. You can't exactly remember the
14   dates.
15           Now, we haven't yet talked about how the injury
16   happened. So why don't we talk about that.
17       A.  Okay.
18       Q.  What happened on March 30th, 2001?
19       A.  Well, I went on North Hall, and I had -- I think I
20   had all the -- all the vent patients. I'm not sure. I
21   might not have had all of them. But I was in the front of
22   the hall, so I had the majority of them. And I don't know
23   if we had six or seven, but five maybe. I don't want to
24   exaggerate. Let me tell you five or -- vent patients is a
25   lot.

Page 41

1            So I went down there, and one of the patients --
2    and I can't remember her name -- was up in a chair. And
3    vent patients, she was a total. She was absolutely
4    dependent on the vent. And she was in a -- up in a chair
5    with no lift pad underneath her. So I surmised that
6    physical therapy, which have guys, men, get them up during
7    the day on first shift, and so they put her in a chair and
8    left her there. So it was really my duty to get her back
9    into bed. And she looked very uncomfortable and tired. And
10   who knows how long she was up.
11           So there was nobody to help me. I couldn't find
12   anybody to help me. And that's the truth. Everybody had
13   their own misery that day. You know, the other nurses.
14           And so I saw a nurse walking by, another LPN
15   walking by, and she was a friend of mine, and so I begged
16   her to come and help me. And that was Maureen McGraw,
17   another LPN. She was on another hall. And so I asked her
18   if she would help me get this patient back into bed.
19           And so we went in, and we tried to figure out how
20   we were going to do this. And, of course, the patient is
21   number one. And with all -- her all hooked up to the
22   ventilator and everything else, without a lift pad, we did
23   the best we could. And it looked like we were going to lose
24   her -- you know, like when you get her almost onto the bed.
25   It looked like we were going to lose her. So I bent over to

11 (Pages 38 to 41)

Page 42

1   save her -- you know, to save her from falling. And, oh,
2   man, when I did, I could just feel my back just crunch and
3   burn. And so continued and got her -- thank the Lord, you
4   know, we didn't drop her. And we put her into bed. And, of
5   course, you know, Maureen, that was really nice of her. But
6   she knew I hurt my back, because I said it right at the
7   moment. I said, oh, I really did something to my back, or
8   something like that. Anyway, you can really tell when you
9   hurt your back.
10      But then got her in there. And so I filled an
11  incident report that night. I finished my shift. You know,
12  I finished my shift. You know. That would be an awful
13  thing to do to anybody, you know; to leave.
14      Q.  And then you were off for five to 10 days after
15  that.
16      A.  Well, I went down to the emergency room the next
17  morning. Down to Hamot. Because I know I had really --
18  really hurt my back. And so give me some pain pills and
19  told me, you know, I had strained my back, and I think I was
20  off about a week. I'm not quite sure. And that I would be
21  on light duty. And he told me to go to Occupational Health.
22      I did everything, you know, like you said before;
23  I did everything that you're supposed to do, you know, that
24  Sheila put in your head, you know, to do; what you're
25  supposed to do in that circumstance.

Page 43

1       Q.  Now, so from March 30, 2001 forward, were you then
2   always on light duty or some form of light duty?
3       A.  Some form. Yeah, some form.
4       Q.  And what was your -- did you have a final
5   diagnosis as to what was wrong, or --
6       A.  Well, herniated lumbar 4 and 5 and possibly 6,
7   from what I read from that one MRI.
8       Q.  And have you healed from this injury?
9       A.  No.
10      Q.  What are your current limitations?
11      A.  I can't walk very far. I have to take frequent
12  rests, you know. Pain medication. I don't have any today.
13      Q.  Do you take pain medication?
14      A.  Yes.
15      Q.  But you haven't today.
16      A.  No.
17      Q.  What medication do you take?
18      A.  I continue on the Darvocet and the Flexeril and --
19  I haven't -- you know, like the Vicodin and all that other
20  stuff, you know; the injections, the spinal injections and
21  things. But the heavy drugs, you know, I have to function,
22  pain or no pain. And I have a history of -- of alcoholism,
23  so. And I'm sure that's in my thing. But I haven't had a
24  drink since May 20th, 1993. And I certainly don't want to
25  get addicted to having pain medication. So that's why I

Page 44

1   haven't -- I guess that's one reason why I haven't taken the
2   heavy drugs. And I have to function, because I adopted my
3   granddaughter a couple years ago, and she's 13, and --
4       Q.  Okay. The next thing you talk about -- you say
5   you believe you were discriminated against by management
6   during this whole time, because of my disability, religion,
7   Evangelical Christian, and I had to endure working in a
8   hostile work environment the whole time. So let's break
9   these up.
10      A.  Okay.
11      Q.  And I'm going to go into better detail about all
12  these areas when we get into your Answers to
13  Interrogatories.
14      A.  Okay.
15      Q.  But for now, when you say that you were
16  discriminated against based on your disability, what do you
17  mean by that?
18      A.  Well, it just seemed when I got hurt, when I, you
19  know -- I guess put on Workers' Comp., you know, not for
20  money, but -- and restrictions and medical and all that, it
21  just seemed like -- and it wasn't my imagination -- that
22  things just -- am I allowed to say anything personal?
23      Q.  Just answer the question how you want to answer
24  it.
25      A.  IHS was not a very pleasant place to work to begin

Page 45

1   with. And there was a lot of problems going on. And Dave
2   Dinges and Cathy Mannion, as I said before, seemed to just
3   run that place. And they weren't very nice people.
4       Now, I know you can't -- you know, you can't sue
5   somebody for not being a nice person, but after I got
6   injured, it's like, you know, I had restrictions, and it was
7   kind of like, you know, to -- the innuendos, the -- not
8   believing that you're injured, not pulling your weight
9   was -- and like, say, Roger -- for instance -- and this
10  escalated too. This was an ongoing thing. Throwing a box
11  of lancets at me this big (indicating), at the desk, the
12  nurses' station, throwing it at me.
13      Q.  Can you describe how big it is for the record,
14  because she cannot --
15      A.  Yeah. I'm sorry. It's about three by
16  four inches, or maybe five inches. And throwing that right
17  at the desk, right at the nurse' station, at me, in front of
18  me, on the desk, and saying for everybody to hear, if that's
19  not too heavy for you, Hodson, could you take it here or
20  give it to. Stuff like that, that was never -- and it was
21  known. It was known.
22      Donna Marcelli sat right behind me, and she's an
23  RN. And I turned around to her, and I says, how long do I
24  have to continue to take this treatment. And all she did
25  was shrug her shoulders and shake her head and say, I don't

Page 46

1   want to get involved.
2       Q.  Did she actually see it happen?
3       A.  Yes, she did.  Yes, she did.  She was sitting
4   right there.  She's one of my witnesses.
5       And, see, Dave Dinges -- Roger Watkins was a buddy
6   of Dave Dinges.  And it just escalated to the point of
7   ridiculous.  Because Roger, when I was on restriction or I
8   was at the desk and doing paperwork, he felt that I should
9   be doing things for him.  And like he would bring a whole
10  great big stack of drugs -- you know, pills in packets that
11  have to be returned to the pharmacy.  And he would say,
12  here, I want these written up; I want you to send these
13  back.  But, yet, see, I had to do what was on my thing and
14  what the supervisor told me to do.
15      Q.  Well, when Roger threw the box of lancets at you,
16  did you report it to anybody?
17      A.  Yeah.  I turned around and reported it to Donna
18  Marcelli.
19      Q.  Anybody besides Donna?
20      A.  No.
21      Q.  Was Donna your supervisor?
22      A.  No.  But she's an RN, and she's been in charge.
23      Q.  So you didn't report the lancet throwing to Carl.
24      A.  No.  I reported harassment to Carl.
25      Q.  Okay.  Well, we'll get to that.

Page 47

1       A.  Yeah.  By Roger.  And not just sexual either.
2   Every kind of harassment you want to --
3       Q.  We'll get to that.  Okay.  I want to move on to
4   the next issue that you put into the Complaint, and that's
5   being discriminated against based on your religion.  You say
6   your religion is -- am I saying this right, first of all?
7   Evangelical Christian.
8       A.  (Witness nods head.)
9       Q.  Can you describe to me what that is.  Is that like
10  Catholic, is it like Presbyterian?
11      A.  I'd say it's Protestant.  Just a personal
12  relationship with Jesus Christ.  It's a miracle.
13      Q.  Do you attend church on a weekly basis?
14      A.  Yes.
15      Q.  Did anybody at IHS know what your religion is?
16      A.  Yes.  Most of them.
17      Q.  How do those people know?
18      A.  Oh, because, you know, I give all the credit to
19  God, you know, for entering my life.  And if anybody, you
20  know, wanted to -- you know, a lot of people came to me just
21  to ask, you know, if I would pray for them.  Maybe not
22  there, you know, but just keep them in prayer.  And our
23  belief in God and that, you know.
24      Q.  So you were open about your religion.
25      A.  Yeah.  Yeah.  I didn't preach.  Sharon DiLoreto,

Page 48

1   she was the DON, and she used to come and get me and take me
2   to the DON's office and shut the door and say, I need
3   prayer.  So we would pray together.  And she's the one that
4   I took the note to.
5       Sheila was very nice too.  She was very nice.  You
6   know, because we had so many personal talks, you know,
7   where -- you know, you -- you know, how you would talk back
8   and forth about caring for somebody, and that -- and I'm
9   very sorry that this all had to happen.
10      Q.  Who discriminated against you based on your
11  religion at IHS?
12      A.  Well, I would say that the two most extreme people
13  is Dave Dinges and Roger Watkins.  I mean, I'm sure Cathy
14  Mannion behind my back, but not -- you know, not to my face.
15      Q.  And jumping back up to the topic we were at
16  before, who discriminated against you based on your
17  disability?
18      A.  Really?
19      Q.  Yes.
20      A.  I mean, I named Dave Dinges and that.  But I would
21  say -- and I can prove it.  I would say Carl Kovski, I would
22  say Sheila Rist, I would say Dave Dinges, I would say Roger
23  Watkins, I would say -- because they all knew.  They all
24  knew that I was doing a job that I shouldn't have been doing
25  to begin with, and I was told to come back to work and do

Page 49

1   one job, light duty, and told there's light duty available
2   for me.  But when I got back there -- and I even complained
3   to Sheila, and she said that I had to go to Carl.
4       Q.  Okay.  On the religious discrimination, can you
5   just describe to me how you were discriminated against based
6   on your religion.
7       A.  Well, I guess, you know, I was -- it's just
8   something that you -- that you take.  It's just something
9   that you expect, I guess, from others.  You know.  It
10  happens all the time.  Except when the treatment, the
11  harassment, the -- whatever it was, the hostile work
12  environment that continued, then it made me realize that,
13  you know, the religious discrimination must have been there
14  before.
15      Because Dave Dinges wrote a note and put it on the
16  bulletin board.  And when I came to work, I looked at it,
17  and it was quite big letters.  And it says -- because I
18  didn't circle -- or I put my initials or forgot to put my
19  initials on a treatment on a hall, he says, amazing -- what
20  an amazing thing that you have performed that you have -- or
21  that you have did that you laid hands -- what did you do;
22  lay hands on them and heal them?  And it was not nice.  And
23  it just really hurt me.
24      So -- I didn't -- I was kind of stunned, so I took
25  it up to Sharon DiLoreto, and I gave it to her.  And I just

13 (Pages 46 to 49)

Page 50

1  handed it to her, and she looked at it. And I guess she
2  said, well, it's a good thing he's not here today; I will
3  take care of it. So -- and I didn't do anything more about
4  it. I just read it.
5      Q. Do you still have the note?
6      A. No. Sharon took it. She said -- she says she
7  doesn't remember the note. She says that she would have
8  given it to Sheila or someone else if, you know --
9      Q. I don't quite understand --
10         (Attorney Weyandt asked for clarification by
11         reporter.)
12     Q. I said, I'm not sure what the note was in regards
13 to. Is there something that you didn't do in a chart
14 properly first?
15     A. Yes. I -- it was like, you know, probably -- it
16 was probably a treatment. And I probably signed that I did
17 it or -- I can't remember exactly. Because he didn't write
18 what it was. He just wrote that nasty note.
19         And then -- but the funny thing is, the EEOC guy
20 talked to Sharon DiLoreto, and she didn't remember it. But
21 the funny thing is, the very same words I have, that Dave
22 Dinges testified -- or wrote a statement on paper to Bridget
23 Miller, the EEOC person at corporate, he used those very
24 words. He says, oh, well maybe -- about a year ago. I
25 mean, I remember about a year ago. Cathy was saying that,

Page 51

1  you know, everybody would die down there or something if she
2  wasn't down there on that hall. And I jokingly said, well,
3  what did she do; lay hands on them and heal them. The very
4  same words.
5      Q. But you said he put it on a note.
6      A. He did.
7      Q. Was this a note that everybody could see that was
8  on the bulletin board, or how was it displayed?
9      A. It was folded in half, but everybody could --
10 everybody could see it, yeah. With my name on it.
11     Q. It was folded in half --
12     A. Yes.
13     Q. -- with your name on it, on the bulletin board.
14     A. Yeah. Believe me, if it wasn't, (indicating).
15     Q. Was it standard for supervisors to put notes for
16 nurses or other employees on the bulletin board?
17     A. It was usually to come and see them or something.
18     Q. But the reason that he wrote the note was that you
19 made a mistake in a patient chart?
20     A. Well, no. If I -- you know, on the treatment, if
21 I, you know, put my initials or -- or something and didn't
22 explain why I put my initials -- it wasn't because of that.
23 It wasn't because of that. It was deliberate. I mean this.
24 And it was a -- a cut, you know, towards --
25     Q. Is this the only incident, based on your religious

Page 52

1  claim, that you can --
2      A. Yes.
3      Q. -- point to, as to why you were discriminated
4  against?
5      A. Yes. But I really believe that Roger Watkins did
6  a lot of the sexual innuendos in taking about his sexual
7  exploits and stuff.
8      Q. Okay. We're going to go there next.
9      A. In front of me, because I am a Christian. That
10 happens a lot.
11     Q. So then your next claim is hostile work
12 environment, sexual harassment. And who were the persons
13 that you believed did this to you?
14     A. Well, I don't know exactly whether, you know,
15 sexual -- if you would call it sexual or not. Because Roger
16 Watkins did it all. And it was very well-known of how he
17 acted in that place. And Dave Dinges, it was very
18 well-known. And Cathy Mannion, it was very well-known.
19     Q. Well, what do you mean by that; how he acted in
20 that place?
21     A. All three of them, or just Roger?
22     Q. All three.
23     A. All three? Mean. Getting people. I would often
24 hear them; you know, well, they were going to, you know, get
25 them. And get them in the office the way they did me. You

Page 53

1  know. And just bombard the person. And I hope, you know --
2  I mean, it can be proven.
3      Q. What does that have --
4      A. But none of them worked there. I mean --
5      Q. What does that have to do with sexual harassment?
6      A. Okay. You want one word, sexual harassment. I'm
7  just saying harassment. Roger Watkins throwing the thing at
8  me. Putting all them meds in front of me, packages, and
9  telling me that I had to send them back and make a record of
10 them, when I'm doing something else, and you better do it,
11 and if you don't do it, I'm going to write you up. Okay.
12 Now, sexually explicit things?
13     Q. Um-hum.
14     A. I hope -- you know, but I'm willing to court to
15 say all these things.
16     Q. Okay.
17     A. Okay. So -- and it is embarrassing. You can
18 imagine, too, being right there. And these were done at the
19 nurses' station. And all Carl Kovski said, oh, that's just
20 Roger.
21         Okay. Talking about putting an Attends on, but it
22 wouldn't fit because Roger -- he said, oh, but that wouldn't
23 fit because, you know -- in speaking about his genitals, his
24 endowment. And usually the person that he was always
25 talking to is Carmen Callicot about those things. And I was

14 (Pages 50 to 53)

Hodson v. IHS Bayside                 Kathleen Hodson                          March 28, 2005

---

Page 54

1  right there. And Carmen, I will say that most of the time
2  she would be embarrassed and kind of like -- because I was
3  there. And Carmen and I used to talk about church and stuff
4  and everything. Okay.
5      And another thing is he would joke to her, yeah,
6  well, we're going to give the flu shots, so, you know, you
7  do the women, and I'll do the men. And making a joke about
8  it. And then --
9      Q.  Let me stop you a second. How is that sexual?
10     A.  Because he wanted to see the men naked.
11     Q.  Don't you give a flu shot in the arm?
12     A.  He was talking about giving it to them in their
13  buttocks. And he wanted to see the men naked.
14         And, okay, about a Priest. This was at the
15  nurses' station -- all these occurred at the nurses'
16  station.
17     Q.  Did you personally hear all these things?
18     A.  Yes. Definitely. And about him doing it with a
19  Priest. And I kind of forget that -- the Priest's name.
20  But Carmen was there also for that discussion. I was
21  sitting at the nurses' station doing paperwork, trying to
22  ignore the whole thing, but it goes on and on and on. It's
23  just -- not just one little thing.
24         And then he said, well, Carmen, you know, things
25  like, you know, well swinging both ways.

---

Page 55

1          And then when I went to Carl Kovski, and I asked
2  him when I -- what -- here is exactly what I said to Carl
3  Kovski: What do I have to do to stop Roger Watkins from
4  harassing me.
5      Q.  Well, how is he harassing you?
6      A.  He's doing it all the time around me. It was
7  not -- it was not random. Okay?
8      Q.  Is he making any of the statements to you? Does
9  he ever have any of these conversations with you?
10     A.  Oh, no. He knew that it just absolutely made me
11  sick. That's what it did. So I went to Carl. Because this
12  went on all the time. And not just these few incidents. I
13  have -- like, I kept notes. You know why? Because it was
14  so horrendous.
15     Q.  Do you have copies of those notes?
16     A.  At home.
17     Q.  Can you provide those to me, please.
18     A.  Yeah. Oh, yeah. Do you know why I kept notes?
19  Because it was so ongoing. It was all the time. And it was
20  just -- Roger acted like he hated me, for one thing. Okay?
21  And he loved making me miserable. And he certainly didn't
22  want me to be on restricted duty. And so, therefore, I had
23  to listen to this stuff.
24         And then when I went to Carl -- the thing that
25  happened next was when Roger came right in front of me,

---

Page 56

1  right in front of me where I sat -- Carmen was standing here
2  (indicating). I was sitting at the desk. Carmen was
3  standing on the other side. And he came over. Carmen
4  grabbed her chest. And I says, what is the matter? And she
5  says, he just pinched my nipple. And this was right in
6  front of me.
7      Q.  Did you see him pinch her nipple?
8      A.  He pinched her -- well --
9      Q.  Did you see that?
10     A.  No. She said, he just pinched my nipple.
11     Q.  So you didn't see him do it. She told you what
12  happened.
13     A.  She was standing right there. She grabbed her
14  chest (indicating) as he went by. Carmen won't lie. She
15  won't lie, because that was -- she was appalled that day.
16  She was shocked. And I said, what? She said, he just
17  pinched my nipple. And I said -- and I was shocked.
18     Q.  Yes, but just to be clear, you did not see him --
19     A.  No, but it was done right in my face. Right in
20  front of me. He was allowed to get away with this. This
21  was constant.
22         Guess what -- guess what Carmen said when I said,
23  what are you going to do? Oh, she didn't say anything. She
24  didn't say anything at that time. I think later on -- I
25  can't say that, no. It was probably, oh, that's just Roger.

---

Page 57

1  She was appalled. She really was appalled. She never would
2  report that. But this was always in front of me.
3      Q.  Did you report it?
4      A.  No. That was right after I reported to Carl
5  Kovski about Roger's behavior.
6      Q.  So you never specifically went to Carl and said
7  Roger just pinched Carmen's --
8      A.  No.
9      Q.  Did you tell anybody?
10     A.  Carmen and I talked.
11     Q.  No one else?
12     A.  No.
13     Q.  I'm going to go back to a couple of the
14  incidents --
15     A.  I think I was fired right -- I think I was fired
16  right after that. I think -- and, you know, when I --
17     Q.  So when do you think that happened?
18     A.  Yeah, that was right before I was fired. I'm
19  going to look on those notes you want. Because I kept notes
20  because it was so horrendous. I mean, it was awful.
21     Q.  Did you keep those notes --
22     A.  I hated to go to work.
23     Q.  Did you keep those notes after it happened, or did
24  you make those notes after the fact?
25     A.  As it happened. Even at the desk.

---

Ferguson & Holdnack Reporting, Inc.

174c7844-b997-4bbc-90a2-f861026969f1

Hodson v. IHS Bayside                  Kathleen Hodson                        March 28, 2005

Page 58

1    Q.  Okay.  Now, you talked about the Attends, putting
2    on the Attends.  Do you recall when that happened?
3        A.  That happened before.  That was probably one of
4    the first incidents in -- that was like probably a couple
5    days prior to the flu shot deal.
6        Q.  Okay.  When did the flu shot --
7        A.  And I can -- I can almost pin that down,
8    because -- when we give flu shots.
9        Q.  Okay.  So when did the flu shot happen?
10       A.  I might have a date on that note.  I might have a
11   date on that note.
12       Q.  Did you complain to anybody about the flu shot
13   incident?
14       A.  Yeah.  When I went to Carl and I asked him what I
15   had to do to, you know --
16       Q.  So you specifically told him about the flu shot
17   incident when you complained.
18       A.  I may have.  I don't remember.  Yeah, I may have.
19   I may have.
20       Q.  Did you tell him about the Attends incident?
21       A.  I may have.  I don't remember.  He knows how upset
22   I was.  And Carl hopefully won't lie either.
23       Q.  What about doing it with the Priest?  Did you tell
24   him about that?
25       A.  I may have told him that same day that I went and

Page 59

1    complained.
2        Q.  Did you complain to anybody else besides Carl?
3        A.  No.  Oh, Roger, many times.  Many times, you know,
4    I would say please.
5        Q.  Okay.  Well, what did you say to Roger?
6        A.  Please don't.  You know, I mean -- and just be
7    so -- you know, trying to, you know, get across to him.  But
8    he knew.  He knew.  He knew exactly what he was doing.  He's
9    probably doing it where he is right now.
10       Q.  What was Carmen's position?
11       A.  LPN.
12       Q.  Was she ever one of your supervisors?
13       A.  No.  I'd like to think she was a friend.  It was
14   hard.  It was hard.  It was very hard with Dave Dinges and
15   what was going on after I got hurt.  It was hard.
16       Q.  Okay.  Now, you stated in -- that you believe that
17   Roger hated you.
18       A.  Well, I believe that he just loved to -- you know,
19   because he knew I was a Christian.  Now, that's just --
20   that's just, you know, my personal opinion.  But after I got
21   hurt and I was on restrictions, it's like, you know, I was
22   his target.  Definitely his target.  It's like when somebody
23   is wounded and --
24       Q.  Did he ever tell you that he hated you or say
25   anything to you that --

Page 60

1        A.  No, but I'm sure he did a lot of other people.
2        Q.  What do you mean?  He said things to other people?
3        A.  Oh, I'm sure.  I mean, I can't prove it.  I can't
4    prove it.  But I'm sure he did.
5        Q.  Do you know what Roger's religion is?
6        A.  No.
7        Q.  Are you aware that he's a Roman Catholic?
8        A.  No.  Oh, well -- no.  No.  I don't know.  I have
9    no idea.
10       Q.  Did he ever talk about religion?
11       A.  No.  But I was going to joke that if he called
12   doing it with a Priest -- but that's not a very nice joke.
13   I don't mean to be light on it, because it was sickening.
14       Q.  Did you have your own personal opinions with
15   respect to Roger?
16       A.  You know what, that's the funny thing.  You know.
17   Because I thought Roger was a very miserable, unhappy
18   person.  And he was always, you know, like -- you know,
19   flitting around from one place to another, you know, and
20   stuff.  And I kind of felt -- sometimes I even felt sorry
21   for him, you know, because --
22       Q.  Did you have any animosity towards Roger?
23       A.  I tried to avoid Roger.  I'm sorry.  I tried to
24   avoid Roger.
25       Q.  Did you have any knowledge about Roger's sexual

Page 61

1    preference?
2        A.  I think -- well, he was very open about he was a
3    homosexual.  He was very open about being gay to everyone.
4        Q.  Did this bother you?
5        A.  No.  No.  Not any more than, you know, like a
6    person that was heterosexual that talked about those things
7    right in your face all the time.  And that's the truth.
8        Q.  Does your religion -- in your religion, do you
9    believe in homosexuality?
10       A.  I don't know.  I don't -- I don't know, you
11   know -- I don't know what you mean by that.
12       Q.  Well, do you have a religious stance on
13   homosexuality?
14       A.  No.  I would say no, I don't, except I think
15   everybody needs Jesus, you know, as their personal savior.
16   And then after you accept Jesus as your personal savior,
17   then he, you know -- the Holy Spirit leads you in the way
18   you should go.  You know, like you quit doing things that --
19   like -- that you did before.  It changes you completely.
20   It's amazing.
21       Q.  Well, do you disagree with his lifestyle?
22       A.  I don't know his lifestyle.
23       Q.  Now, you mentioned that Roger was your supervisor.
24   Do you know from when to when he was your supervisor?
25       A.  Oh, he was on and off all the time.  On and off.

Ferguson & Holdnack Reporting, Inc.

Hodson v. IHS Bayside                Kathleen Hodson                    March 28, 2005

Page 62

1    Q.  Okay.  Now, did he ever make any of these sexual
2  comments or innuendos or jokes directly to you?
3    A.  No.
4    Q.  You just happened to overhear them?
5    A.  Not happened.  He did it in my face.  Right in my
6  presence.  Like not quietly.
7    Q.  Well, who else was around when this happened?
8    A.  Mostly Carmen.  Mostly Carmen.  I think Carmen
9  tried to -- I think she was a little embarrassed, because
10  she would try to, you know -- it -- I think it kind of
11  embarrassed her a little bit in front of me.
12    Q.  Was Roger just joking around when he said these
13  things, or --
14    A.  What do you mean?
15    Q.  Well, when he made these various comments about
16  doing it with the Priest and --
17    A.  I don't know.  I don't think so.  I'm sorry.  I
18  don't think so.  You know, I mean, it was very -- how do you
19  put it when you're -- he was very descriptive.  He didn't
20  just say things and leave them there.  It was an ongoing --
21    Q.  Well, give me an example of what he said that was
22  descriptive.
23    A.  The Priest?  He continued on.  It wasn't just --
24    Q.  Well, what did he say?
25    A.  Okay.  It was like have you ever done it with a

Page 63

1  Priest and stuff like this, and -- you know.  And who was
2  there?  Carmen.  And also Colleen Fulton.  She was there.
3  And --
4    Q.  Who is Colleen Fulton?
5    A.  She was the supervisor, because she was at the
6  nurses' station when Roger was going on about the Priest.
7  And then, you know -- and she says, oh, yeah, I -- you know,
8  he was asking if she knew a certain Priest and stuff and
9  about how his -- what he did.  Some ongoing -- I mean,
10  ongoing conversation.  And then, you know, Roger would say
11  to Carmen, well, have you ever thought of doing it with a
12  Priest and this and that and swinging both ways, and just
13  ongoing, totally, totally -- right on top of me, right as
14  I'm sitting there doing orders.
15    Q.  Okay.  Now, in your Complaint here, you state that
16  there's so much more, but you don't go into the detail in
17  your Complaint.  What else more was there?
18    A.  (No response.)
19    Q.  I think I --
20    A.  I have the note.  You can't put everything in a
21  Complaint.
22    Q.  Well, that's why I'm asking you now.  Is this --
23    A.  Yeah.  I have those notes.  But as far as the
24  harassment goes, I mean --
25    Q.  It's right here.  You say, "There is so much

Page 64

1  more --"
2    A.  Yeah, Roger.  Constantly, you know -- Roger was
3  constantly going up front and complaining about me to the --
4  whoever was up there.  I don't know who it was.  The
5  administrator, the DON.  Constantly saying, you know, if you
6  don't do this, I'm going to write you up and --
7    Q.  Did he ever write you up?
8    A.  No.  Because he went up front, and he'd come back,
9  and he was mad probably because -- he was probably told --
10  you know, Roger was like that.  He was constantly running
11  from one place to another, you know, and -- and -- the
12  behavior was kind of, you know, outrageous.  His -- his --
13  his behavior was outrageous.  But it was well-known.  It was
14  well-known.  By the administration and everybody.  For he
15  got -- he was allowed to be like that for whatever reason.
16  I don't know.
17    Q.  And the other things that you address in your
18  Complaint are the accommodations that IHS --
19    A.  Yes.
20    Q.  -- did or didn't give you.  Can you describe what
21  accommodations were given to you.
22    A.  Well -- like I asked if I could go on my break and
23  put a hot pack on my back.  I would call that an
24  accommodation.
25    Q.  Did they allow you to do that?

Page 65

1    A.  Yeah.  I asked them -- I had, you know --
2        MS. WEYANDT:  Mark this as 3.
3        (Hodson Deposition Exhibit 3
4        marked for identification.)
5    Q.  Is this your handwriting?  Whose handwriting is
6  this?
7    A.  Yeah, I think.
8    Q.  It looks like it was a note on 4/3/02.
9    A.  Um-hum.
10    Q.  It says, "Carl, Dorothy says I can lie on a hot
11  pack on my 10-minute break if you give permission.  I really
12  need it."  And then is that your name at the bottom there?
13    A.  Yeah.
14    Q.  You wrote "KH", Kathy Hodson.
15    A.  Yeah.
16    Q.  "Please call me.  I'm on --"
17    A.  Ambassador.
18    Q.  "-- Ambassador."  And then up at the top, it says,
19  "Okay per Carl."  Up at the top, up here (indicating).  Is
20  that --
21    A.  Yeah.
22    Q.  So you asked, and they allowed you to do that.
23    A.  That's you, isn't it, Sheila?  Per Carl Kovski?
24  Looks like you.
25    Q.  But you didn't write that part.

17 (Pages 62 to 65)

Ferguson & Holdnack Reporting, Inc.

Page 66

1    A.   No.
2    Q.   Somebody else okayed it from IHS.
3    A.   Yes.
4    Q.   Okay.  So how often did you use the hot pack on
5  your --
6    A.   On my breaks.
7    Q.   Is this every time?
8    A.   Just about.  I was -- I was suffering.  I was in
9  agony.  I wasn't even supposed to be on, on full duty, to
10  begin with.  I wasn't on one of them --
11    Q.   Well, you weren't on full duty.
12    A.   Yes, I was.  Yes, I was.  There is none of this
13  that's saying that I was on light duty.  Yes, I was.  This
14  was all brought out in the testimony by Dave Dinges at my
15  Workman's Comp. hearing.
16    Q.   What other accommodations were you given?
17    A.   I was told -- first of all, when I got that letter
18  at home and I came back to work, it was all changed.  Before
19  I left, I was on paperwork.  When I come back -- I was sent
20  that letter at home.  I came back, I was never on paperwork.
21    Q.   After the two-month break.
22    A.   Right.
23    Q.   When you came back, you --
24    A.   I was put on Ambassador Hall.  And, you know, that
25  was it.  And anybody can blame me for doing it, but the same

Page 67

1  thing would have happened that ended up -- what did happen,
2  if I were to refuse.
3    Q.   But you did work Ambassador Hall for about five
4  weeks.
5    A.   Yes.
6    Q.   And did IHS provide you with nurses' aides to help
7  you if you needed help?
8    A.   Push my cart in the middle of the hall.  I would
9  ask anybody to do that.  Push my cart in the middle of the
10  hall.  But that would just cause total walking the whole
11  shift, going back.  And, you know, that was it.  Don't lift.
12    Q.   So you didn't have to lift.  What else?  Any other
13  accommodations?
14    A.   Going -- hot pack on my breaks.
15    Q.   Is that it?
16    A.   Yeah.
17    Q.   Now, in your Complaint, you stated that you asked
18  for a less physically demanding position, but that you
19  didn't get the job.
20    A.   I just told you that; what I -- oh, you mean the
21  MDS job.  Oh, yeah, the MDS job came up at that time.  When
22  I was -- Carl was in charge of everything about me.  I was
23  supposed to go to him with everything.  And I mentioned
24  that.
25         It came up, see, because Dave Dinges, he was

Page 68

1  acting DON, and -- let me see how that was.  The MDS job, I
2  don't think it was the main -- like the coordinator.  It was
3  just somebody to do the MDS's.  Which they fill out on the
4  patient to get the funding.  It was up.  In fact, it was
5  going to be posted, I think, within a couple days.  And it
6  was just common knowledge.
7         And so I went and asked Carl Kovski.  And I wrote
8  him a note, which I don't have, and I asked him if I could
9  have it.  Because it was like a less demanding job.  You
10  know, it was like something that I thought I could do.  But
11  I kind of, you know -- he said he would look into it.
12  That's what he said.  But then it was given to another LPN
13  that had lesser time -- lesser seniority than me.  I think
14  her -- Jeanette Brown.
15    Q.   Do you know what the job responsibilities were?
16    A.   Yeah.  It's -- he -- they -- we used to do them.
17  We used to do them.  They used to bring them down on the
18  hall and lay them on the -- on the cart, you know, for us to
19  do.  And what you have to do is you have to see what they
20  can do, you know, and stuff and -- and fill them out and --
21  I think on a regular basis.  I don't know how often.  But
22  they are not anything I couldn't do.  You know.
23    Q.   Did you need to be an LPN to do the job?
24    A.   I don't think so.  I don't know, but I don't think
25  so.  It helps.  I would say it would help a lot, because you

Page 69

1  would, you know, be able to assess and know what certain
2  meds are for, so that you can find that diagnosis and stuff
3  like that.
4    Q.   And you said Jeanette who was given the job?
5    A.   Jeanette Brown.  She's another LPN.  I don't know
6  if she still has it or not.  I mean, I don't hold it against
7  her.  I just know that it was due to be posted in a couple
8  days, and I asked for it.
9    Q.   I'm going to show you 4.
10         (Hodson Deposition Exhibit 4
11         marked for identification.)
12    Q.   You hand-wrote the answers out, correct?
13    A.   Yes.
14    Q.   And would you agree that everything that you wrote
15  in here is true and correct?
16    A.   Yes.  Except I have a written amendment to my
17  Complaint, which is different from some -- a couple of the
18  answers I put.
19    Q.   Okay.  But you haven't filed an Amended Complaint,
20  have you?
21    A.   No, but.
22    Q.   Did anybody help you prepare these answers?
23    A.   No.
24    Q.   I want to talk about what you put for your answer
25  for Question No. 7.  "Please state all facts upon which

18 (Pages 66 to 69)

Page 70

1  Plaintiff relies in stating that she was disabled, as
2  alleged in the Complaint." You state, "Pain, loss of
3  function, and herniated disc." Do you believe you have an
4  actual disability?
5      A. Yes.
6      Q. And what is your disability?
7      A. Walking, difficulty walking. Pain. Back spasms.
8      Q. When you say "difficulty walking", can you
9  describe what you mean by that.
10     A. Most of the time, I walk with a limp now, because
11 of my back. It's hard to explain, but it just seems like
12 it's down my legs. And it -- I -- most of the time now I
13 walk with a limp.
14     Q. But you can still walk.
15     A. Yes.
16     Q. Do you use a brace or a crutch or a cane?
17     A. No.
18     Q. A walker?
19     A. No.
20     Q. Have you ever needed a wheelchair?
21     A. When I flew.
22     Q. What do you mean? Like in the airport?
23     A. Yes.
24     Q. They wheeled you from place to place?
25     A. Yes.

Page 71

1      Q. Have any of your doctors told you that you are
2  physically unable to work?
3      A. My family doctor says that I'm not able to work.
4      Q. You're not able to work at all?
5      A. No. Because I have to change my position. I have
6  to, you know, sit down and lie down or -- I think she said a
7  limit of -- I'm not quite sure. She says I probably could,
8  you know, for part-time, maybe four hours, you know, with
9  frequent change in position.
10     Q. Which doctor is this?
11     A. Dr. Wendel.
12     Q. And she's your family doctor?
13     A. Yes. I'm down to her now, because I don't have
14 any insurance.
15     Q. So she's the only doctor you currently treat with.
16     A. Yes.
17     Q. How many times do you see her?
18     A. I don't see her often, because of money.
19     Q. And you had testified earlier that you get
20 injections in your back. Are you still --
21     A. I don't anymore. I can't afford it. I would love
22 to.
23     Q. Now, when you say "loss of function" in your
24 interrogatories, what do you mean by that?
25     A. Sometimes it's very difficult to continue, and I

Page 72

1  have to sit down.
2      Q. I'm sorry; continue what?
3      A. Continue walking or functioning or whatever I'm
4  doing. So I lie down. Or sometimes I just put a hot pack
5  on or --
6      Q. When was the last time you saw your family doctor?
7      A. Probably not for six months. I get my medicine.
8      Q. Are there any other activities that you're not
9  able to do?
10     A. I can't garden anymore. I can't drive very far.
11     Q. Why can't you drive?
12     A. Oh, because it very -- is very painful. Just
13 driving is one of the worst things. It's -- I can't explain
14 it, except, you know, you can't really change your position,
15 and you can't change the -- the foot you use or the leg you
16 use to drive.
17     Q. Now, you said that you get Social Security money
18 for your granddaughter.
19     A. Well, it's not for me. It's from her biological
20 father, because he's disabled. He's an amputee.
21     Q. Now, you don't collect Social Security Disability.
22     A. No.
23     Q. Have you tried to apply for it already?
24     A. Yes, um-hum.
25     Q. Were you denied?

Page 73

1      A. Yes.
2      Q. Why were you denied? Do you know?
3      A. Well, I was like approved on -- I think they have
4  five or six points, but -- and I was approved on most of
5  them, but they say I can still work as blind aide.
6      Q. I'm sorry, as a what?
7      A. Blind aide was one of their --
8      Q. What does that mean?
9      A. Well, I kind of -- I guess you help blind people.
10 I don't know. I mean, I thought it was off the wall. But
11 they said I was able to care for small children. Now, that
12 is ridiculous, because my granddaughter is 13, and she is an
13 absolute big help to me. But that's how they put it down.
14 I was able to care for small children in the home, and I can
15 work as a blind aide and a medical assistant, which is not
16 true. Because I just got -- in fact, a medical assistant is
17 about the same thing as an LPN in Pennsylvania. Except, you
18 know, maybe not, if you're just doing paperwork. So I don't
19 know.
20     Q. And when did you try to apply for SSI?
21     A. I think -- my last appeal was February 11th.
22     Q. This year?
23     A. Yes. So I have the option to appeal. I haven't
24 decided what to do. I don't know what to do.
25     Q. Now, we talked about some of these issues before

19 (Pages 70 to 73)

**Page 74**

1  when we talked about your Complaint, and I'm sorry some of
2  it is repetitive. I want to go through some of the things
3  in your Answers to Interrogatories.
4        So Question No. 8 deals with accommodations. Now,
5  did you ever ask for an accommodation that IHS didn't give
6  you?
7        A. Oh, yeah. I -- when I came back, I questioned why
8  I was put on the hall. I questioned where is the list, you
9  know, that I was sent at home. They decided -- I don't know
10  who decided, but they decided that it was within my
11  restrictions to work as the nurse on the hall.
12        (Discussion held off the record.)
13        Q. Were there any other requests that you made that
14  weren't accommodated?
15        A. To go home early sometimes. I usually asked the
16  supervisor and, you know, was like -- if I got my work all
17  done.
18        Q. Did they let you go home early?
19        A. Sometimes. It depends who it was.
20        Q. Who let you go home early?
21        A. I don't know. I think -- oh, I think Karen
22  Roberts. Now, that's a name. I think she let me go home
23  early.
24        Q. What was her position?
25        A. Supervisor. I forgot her too.

**Page 75**

1        Q. Do you know approximately how many times they
2  allowed you to go home early?
3        A. Oh, she might have a couple times.
4        Q. Anyone else?
5        A. I can't remember. Maybe Dave Dinges. I don't
6  think so. I doubt it very much. In fact, I think he
7  refused to let me go home early. But I'm not sure about
8  that. Jen Hizer may have.
9        Q. What was her position?
10        A. Supervisor. She may have.
11        Q. All these people that you named as supervisors,
12  are they also LPN's?
13        A. No, RN's.
14        Q. They are RN's.
15        A. Um-hum.
16        Q. Anything else you can think of?
17        A. About what?
18        Q. Any other accommodations that you asked for that
19  weren't granted?
20        A. I'm trying to think. Well, I think the main one
21  was, you know, I shouldn't have been on the hall to begin
22  with. And I complained about that --
23        Q. Who did you complain about that to?
24        A. To Sheila, to Carl.
25        Q. What did Sheila tell you?

**Page 76**

1        A. She wasn't allowed to talk to me, due to Carl.
2        Q. And what did Carl tell you?
3        A. I don't know. I can't remember.
4        Q. But IHS did give you some accommodations. I
5  thought the ice pack or the hot pack during your breaks, you
6  had help from the nurses' aides ---
7        A. Doing what?
8        Q. If you needed help from a nurses' aide, could you
9  go to an aide and ask for help?
10        A. For what? What help?
11        Q. Whatever you needed help with.
12        A. Yeah.
13        Q. They pushed your cart?
14        A. Well, that one time they pushed it. Maybe once.
15        Q. Well, did you ask them --
16        A. Twice.
17        Q. -- to do it more times and they didn't?
18        A. Well, down the hall, and that's it.
19        (Discussion held off the record.)
20        (Brief recess held.)
21        Q. I'm now going to Question No. 10, which deals with
22  religious issues. You talked about -- earlier today you
23  talked about that Dave Dinges posted a note on the bulletin
24  board that had your name on it at some point in time
25  about -- he made a comment in there that said, did you lay

**Page 77**

1  your hands on them to heal them.
2        Now, did you ever make statements to anybody at
3  IHS that if it weren't for you, patients would be dying --
4        A. No.
5        Q. -- or if it weren't for you, "X" would happen?
6        A. No.
7        Q. You never made such a statement?
8        A. Absolutely not.
9        Q. And is this the only incident that you have to
10  prove your claim for racial discrimination?
11        A. For what?
12        Q. The incident with Mr. --
13        A. Not racial.
14        Q. Religious. I'm sorry.
15        A. No. Dave Dinges wrote a statement --
16        Q. Besides.
17        A. -- later on.
18        Q. Besides.
19        A. That's not besides. Because he said the very same
20  words that was on that note.
21        Q. Okay. But besides that particular incident and
22  that allegation of him making that statement, was there
23  anything else?
24        A. Like I said, I really believe that that had a lot
25  to do with the way that Roger and Dave treated me.

20 (Pages 74 to 77)

Page 78

1    Q.   But you don't have anything --
2    A.   No. No.
3    Q.   -- concrete.
4    A.   No. No.
5    Q.   It's just what you think.
6    A.   (Witness nods head.)
7    Q.   Correct?
8    A.   About that that's why Roger was always telling,
9 you know, about his sexual exploits and stuff like that,
10 yeah. I believe that. But that's my personal --
11    Q.   You think he did that in front of you because of
12 your religious beliefs?
13    A.   That, or just to harass me or something. Because
14 I wasn't pulling my weight or something. Because I was hurt
15 at work.
16    Q.   Now, who was the person that you gave the note to?
17    A.   Sharon DiLoreto.
18    Q.   Did you give the note to her immediately after it
19 happened?
20    A.   Yes. I went right from the nurses' station up
21 there. I was kind of shocked. I just handed it to her. I
22 wish I would have kept it.
23    Q.   Did anybody else see the note?
24    A.   Probably not. Oh, wait a minute. I don't know
25 for sure. I have to --

Page 79

1    Q.   Where do you go to church, by the way?
2    A.   Free Methodist.
3    Q.   Are you aware if any members of Dave Dinges'
4 family go to your church?
5    A.   I -- I don't know. I never asked. That one
6 time -- at one time there was a Dinges that came to our
7 church a couple times. From Girard. And I don't think I
8 ever got to ask him whether --
9    Q.   Well, didn't you once tell Dave that there was a
10 Dinges family there that was having a child baptized?
11    A.   I might have. I can't really remember. But I
12 don't know for sure if they are related or not. I don't
13 think Dave ever told me that. I think I was always meaning
14 to ask.
15    Q.   What were Dave's work hours?
16    A.   Well, they varied because -- mostly days. Mostly
17 7:00 to 3:00. But they varied. Because if you were short a
18 supervisor or something, then he would stay.
19    Q.   And what about Roger's?
20    A.   The same.
21    Q.   And you testified earlier that you started -- what
22 time did you start?
23    A.   Well, 3:00 till 11:00. Yeah.
24    Q.   So how many times did you actually, in a given
25 workweek, work with either Dave or Roger, if they didn't

Page 80

1 start -- they left at 3:00 and you started at 3:00?
2    A.   Well, see, when I was -- this is ongoing. This
3 goes clear back to when I was first hurt and when I was at
4 the desk a lot. Of course, if I was down the hall, you
5 know, it would be different. But when I was at the desk a
6 lot being a unit clerk or doing paperwork, which was a lot
7 in the beginning, after I was hurt.
8    Q.   But my question is, you didn't work the same
9 shifts. They worked from --
10    A.   Oh, I was 7:00 to 3:00. I was 7:00 to 3:00 then.
11 It says so right on that MA -- that thing -- letter that was
12 sent home to me.
13    Q.   How long did you work from 7:00 to 3:00? From
14 when to when?
15    A.   I don't know. I can't tell you.
16    Q.   Can you approximate?
17    A.   After I was hurt, I would say, more so. A lot.
18 Because I was unit clerk and on the weekends and did
19 paperwork and --
20    Q.   So how many hours on a given shift would you see
21 Roger? How much time in a given shift?
22    A.   When I was on the same shift?
23    Q.   Yes.
24    A.   Okay. A lot. I sat -- he was always -- he was
25 always, you know -- even when he was supposed to be on a

Page 81

1 hall, he was never on his hall. He was always at the
2 nurses' station. Not always. That's a little exaggeration.
3 But he was always --
4    Q.   What about Dave? How many hours in a given shift
5 would you be around Dave?
6    A.   Well, Dave was a lot -- around a lot too. Because
7 he kind of would go back and forth. He never stayed in one
8 place either. You know, you have to keep an eye -- that
9 probably was why I would say Dave would leave the nurses'
10 station and, you know, go back and forth, because -- keep an
11 eye on things.
12    Q.   Timewise, did any of the things that you are
13 alleging in your Complaint happen before you were injured?
14    A.   Yes. That note.
15    Q.   Dave's note happened before.
16    A.   Yes. But he admitted in -- okay.
17    Q.   Do you know around when that happened?
18    A.   No.
19    Q.   Was it many months before you were injured? A
20 couple of months before you were injured?
21    A.   Yeah, I would say it was probably -- could be
22 anywhere up to six months.
23    Q.   Is this something that you would have noted down
24 on your notes?
25    A.   No. I made a very big mistake there. And, no, I

21 (Pages 78 to 81)

Page 82

1  didn't even take notes then. Huh-uh. No.
2      Q.  When did you begin taking your notes?
3      A.  When I was hurt, when it really started to
4  escalate.
5      Q.  Okay. Anything else that we have talked about
6  today, did anything else happen before you were injured?
7      A.  No.
8      Q.  So everything happened after you were injured.
9      A.  (Witness nods head.)
10     Q.  Except the note.
11     A.  And then --
12     Q.  I'm sorry, you need to answer yes or no.
13     A.  Yes. What did you ask me?
14     Q.  Everything we have talked about today, except for
15  the note, happened after --
16     A.  Yes. Yes.
17     Q.  Going back to the hostile environment, sexual
18  harassment claim, one of the things you put in your Answers
19  to Interrogatories was that Roger talked about his sexual
20  fantasies. Can you describe what those were, what you heard
21  him say.
22     A.  Probably about giving the shots in the buttocks of
23  the patients, the flu shots. I don't think I listed that
24  separately on a -- doing it with a Priest. I don't know. I
25  didn't mean that he specifically said he did it with a

Page 83

1  Priest. He was talking about doing it with a Priest. So
2  that's kind of like the word I came up with.
3      Q.  Besides the things that we have previously talked
4  about with respect to your Complaint, the Attends, the doing
5  it with the Priest, pinching Carmen's nipples, the shots --
6      A.  Disgusting.
7      Q.  -- were there any other incidences?
8      A.  Of sexual?
9      Q.  Yes.
10     A.  Oh. I can't specifically remember right now, but,
11  I mean, there was a lot more other harassment.
12     Q.  How else did he harass you?
13     A.  Throwing things at me at the nurses' station. I
14  would call that harassment.
15     Q.  We talked about that. What else besides that?
16     A.  Oh, you don't want me to talk about anything we
17  have already talked about?
18     Q.  Well, you can mention it, but I'm trying -- is
19  there anything else that he did that you didn't put in your
20  Answers to Interrogatories or your Complaint?
21     A.  Where is my interrogatory to that one? I can't
22  remember.
23     Q.  Can't remember anything else?
24     A.  No.
25     Q.  And is Roger the only person who you're claiming

Page 84

1  sexually harassed you?
2      A.  Well, like I said, you know, I'm including that in
3  harassment. You know.
4      Q.  Did Roger ever physically touch you?
5      A.  No.
6      Q.  So he never touched you inappropriately?
7      A.  No. This isn't about that kind of harassment.
8  You're just talking about sexual stuff, huh? Well, I think
9  that's enough anyway.
10     Q.  So there is nothing else.
11     A.  I think that's enough. Let me look at those notes
12  that I was telling you about that I took.
13     Q.  And you're going to send those to me.
14     A.  Yes, I am.
15         (Discussion held off the record.)
16     Q.  Now, on Question No. 13, you write about why you
17  believe you were terminated, and you stated that you think
18  Dave terminated you because you were on light duty.
19     A.  It believe it was just --
20     Q.  Why is that?
21     A.  No, I believe that day it was just ongoing
22  harassment and retaliation from the disability. You know,
23  from being disabled. You know, from being injured at work.
24     Q.  This is the first time you used the word
25  "retaliation", though. How was Dave retaliating against

Page 85

1  you?
2      A.  Just for being injured at work. Just for being on
3  Workman's Comp.
4      Q.  When did you file for Workers' Comp., by the way?
5      A.  Probably when I got hurt. I think it's kind of
6  like automatic. I think Sheila filed.
7      Q.  And you had said that that day Dave, Cathy
8  Mannion, and Sheila was with you. Did anybody else witness
9  what happened?
10     A.  In the room?
11     Q.  Yes.
12     A.  No.
13     Q.  Do you recall how long Dave was your supervisor?
14     A.  No.
15     Q.  Can you give me an estimate?
16     A.  No. He was on and off.
17     Q.  Do you know how many times that Dave disciplined
18  you?
19     A.  Well, he did just -- I think it was a couple days
20  before the day that -- before May 17th.
21     Q.  How did he discipline you?
22     A.  What was her name? Marcia Bongiorno was the nurse
23  on Ambassador, and she was coming on for nights. We counted
24  the narcotics. We both signed off. And, you know, like the
25  count was right. Because the nurse coming on doesn't sign

22 (Pages 82 to 85)

Page 86

1  off unless the count is right.
2      Well, I came -- came to work -- I don't know if I
3  was off the next day, but the next -- I came to work the
4  next time I worked, and she says, oh, it was terrible; you
5  should have been here; Dave just had a fit. Because the
6  next morning her count was off. And I says, well, that's
7  funny, because, you know, our -- we signed. But stuff like
8  that happens.
9      And so he wrote me up and said something about,
10 you know, where was that pill, or, you know -- and I
11 think -- I think -- I'm not even sure what really happened,
12 except most of the times, you know, they pencil in your name
13 (indicating) -- you know, they pencil in your name, and when
14 you come back, you sign it. Sign off. Yeah. I don't even
15 know. Yeah, Happy Nurses' Week.
16     Q.  Is this (indicating) a copy of your --
17     A.  Yeah, this was short.
18     Q.  -- warning that you received?
19     A.  Yeah. Verbal.
20         (Hodson Deposition Exhibit 5
21         marked for identification.)
22     Q.  It looks like it was on May 14th, 2002?
23     A.  Yeah, okay.
24     Q.  And it says, "Failed to complete narcotic count.
25 Count found incorrect. Failed to document narcotic given to

Page 87

1  resident on May 13th, 2002. Employee was provided education
2  materials, "Maintaining Control over Controlled Drugs" in
3  the IHS handout.
4      A.  Right.
5      Q.  And you signed this, correct?
6      A.  Yes. And I wrote that note, yeah.
7      Q.  Why did you write "Happy Nurses' Week" on this?
8      A.  Because it was Happy -- it was Nurses' Week. I
9  guess I was being sarcastic.
10     Q.  So you were mad you were being disciplined.
11     A.  I just thought -- you know, most of the time what
12 he does is he -- you know, they pencil in your name, wait
13 till you come to work, give you a chance to sign it off --
14     Q.  Well, there's another issue here that says,
15 "Failed to document narcotics given to a resident."
16     A.  That was it. That was really the main thing.
17 That's what I did. When I gave it, I forgot to put it on
18 the Medex.
19     Q.  Okay.
20     A.  That's what happened. That's where it was. And
21 so, therefore -- you know, it's not like, you know --
22     Q.  So this warning was legitimate, in that you did do
23 something wrong.
24     A.  You know, it's hard for me to -- hard for me to
25 understand, because I couldn't understand. We signed off.

Page 88

1  See, that's what I was going to ask for. I was going to ask
2  for that -- that sign-off sheet is there. It is -- it
3  exists. And when Marcia and I signed -- when we counted,
4  she wouldn't sign that if it wasn't right. So do you have
5  it? But she wouldn't sign it if it wasn't right. Then she
6  found it short the next morning. And she says, oh, yeah, he
7  wanted me to call you at home and everything else, and he
8  was really upset and yelling and screaming and all of this.
9  But you know what? She didn't get written up.
10     Q.  How do you know that?
11     A.  I know that.
12     Q.  How?
13     A.  Because I talk to her. I asked her, did you get
14 written up too? And that's probably why I wrote "Happy
15 Nurses' Week." You know, I mean, because it didn't seem
16 fair, you know, that I would get written up and she wasn't.
17 Because hers was the one that was short.
18     So I guess, you know, what I did was just not make
19 a big deal out of it at the time. I didn't know that -- you
20 know, that I was just going to get told I was fired a few
21 days later.
22     Q.  If you miscount a narcotic or you don't properly
23 document a narcotic, is that something you can lose your
24 license for, if the State finds out about it?
25     A.  You wouldn't have any nurses there.

Page 89

1      Q.  That's not my question. Could you lose your
2  license for not following proper policy on narcotic
3  distribution and documentation?
4      A.  I would say no, because I would say that there
5  was -- there was -- there would be human people to take
6  human error into consideration. Yeah, I would say no. I
7  would say that. That's a verbal. I hadn't been written up
8  for -- like I was written up probably the first couple
9  years. I think I counted on there, you know, and I wrote
10 that on -- on the Interrogatories. In fact, it's here. I
11 hadn't been written up for a long time.
12     Q.  Well, do you know how many times Dave wrote you
13 up? Let's get back to that. You mentioned this most recent
14 one. How many other times did he write you up?
15     A.  This one -- well, are you going to count the
16 termination?
17     Q.  You can count that.
18     A.  Okay. One, two. I wrote them. Because I went
19 through them. I know he wrote me up probably the first six
20 months I worked there for -- we had these -- they don't --
21 they don't have them anymore. It's those little things
22 where you take the blood sugar. And so I put -- I went like
23 this (indicating) on the side of the plastic, and I pricked
24 myself. So that was it. So --
25     Q.  Here is one that looks like it was from Dave.

23 (Pages 86 to 89)

Page 90

1   August 1997.
2       A.   Um-hum.
3           (Hodson Deposition Exhibit 6
4           marked for identification.)
5       Q.   Is this an incident where you were written up by
6   Mr. Dinges?
7       A.   Well, it must be.  Because I signed it.
8       Q.   This is giving -- looks like Valium to a
9   resident --
10      A.   Yeah.
11      Q.   -- instead of Oxycontin.
12      A.   Right.
13      Q.   And that is your signature at the bottom.
14  Correct?
15      A.   Yeah.  That was Cathy Mannion too.  Huh.  But you
16  know what, that was in 1997.  Okay?  And my evaluations
17  steadily got better.  I didn't get any three's.  You know.
18      Q.   Here is another one.  This will be 7.
19          (Hodson Deposition Exhibit 7
20          marked for identification.)
21      Q.   Also August 1997.
22      A.   Yeah.  That's when I --
23      Q.   Failure to follow direct policies.  You used --
24  you retapped a lancet and used --
25      A.   Wow.  Look at that.  I mean, I'm telling you, you

Page 91

1   know, you really call attention to this.  You know, this is
2   awful.  This is awful.  I remember this write-up.  You know?
3   And I was sitting in the room with Cathy Mannion and Dave
4   Dinges.  And, see, I had to go to Occupational Health
5   because I had a stick.  And that's the only one I had in the
6   whole years that I worked there.  But, you know, I remember
7   Cathy Mannion turning her head and laughing when I was
8   getting written up.
9       Q.   Is this the writing up that you were talking about
10  during your Interrogatories?
11      A.   Yeah, this is it.  Yeah.  Laughing.  She enjoyed
12  it, and so did Dave.
13      Q.   This was back in 1997, right?
14      A.   Right.
15      Q.   This is before your injury.
16      A.   Oh, yeah, definitely.  And if you get
17  progressively better, you know, in your evaluations, and no
18  write-ups for two years, I mean, that should mean something.
19  And never written up for insubordination or not doing the
20  work that I was asked to.
21          (Hodson Deposition Exhibit 8
22          marked for identification.)
23      Q.   Here is another one, 8, dated 1/29/02.
24      A.   Oh, yeah, this is another one.  That was totally
25  me.  Yeah.  This was after I got hurt.  And he told me that

Page 92

1   if I didn't punch out for lunch, that -- yeah.  That's after
2   I got hurt.  And it took me so long to do my -- my work.
3       Q.   But had you been told that you needed to punch out
4   for lunch?
5       A.   No.  Not really.  But, I mean, he wrote that down.
6   I was surprised when he called me in.  I mean, it's a known
7   fact that you have to, except I didn't think possibly, you
8   know -- I guess you forget, you know, when you do forget
9   [sic].
10      Q.   So you weren't punching in for lunch -- punching
11  in and out for lunch.
12      A.   Early.  I punched in early.  And, you know, I
13  would -- I wouldn't even stay for lunch, you know.  I would
14  punch in early so I could get my work done.  You're not
15  supposed to do that.  I know that.  But -- he wouldn't even
16  let me work -- I think that was when he wouldn't even let me
17  work eight hours.  Almost --
18      Q.   I thought you said you normally didn't work eight
19  hours.  Did you work eight hours a shift?
20      A.   Oh, yeah.
21      Q.   But you only worked four days.  Because you worked
22  32 hours.
23      A.   Yeah.
24          (Hodson Deposition Exhibit 9
25          marked for identification.)

Page 93

1       Q.   Here is the next one, 9.  And this is the date of
2   your termination, May 17, '02.  "LPN was assigned to
3   Northwest Hall on May 17th shift.  She came to the DON.  She
4   could not work that hall.  It was not in her restriction.  I
5   told her, her restrictions were a 20-weight-pound
6   restriction, no pulling or lifting, no matter what hall
7   you're on.  She stated 'I'm leaving'."
8       A.   Yeah, right.
9       Q.   "I told her, if you leave, you're done; you will
10  no longer be employed here.  LPN said that 'I'm leaving'."
11  Is that what happened that day?
12      A.   No.  But nobody will -- you know -- Sheila was
13  there.
14      Q.   What is your version?
15      A.   Sheila knows that I wouldn't just say -- and give
16  no reason and say that I'm leaving.  And when -- finally I
17  saw how it was going to be with Cathy Mannion and Dave
18  Dinges and Cathy screaming at me that she's going to notify
19  the State and have my license and everything else, you know,
20      Q.   And your reason that you testified to earlier
21  today was that you just couldn't do it.
22      A.   I wasn't able.
23      Q.   You weren't able to do it.
24      A.   It should have -- I know that "should have been"
25  is not done.  But it should have been that I should have

Page 94

1  been able to at least contact my doctor or something.
2      Q.  Well, did you ask to be able to do that?
3      A.  You should have been there. Screaming at me
4  and -- oh, no. No. There was no -- he was not going to
5  change his mind. Not with Cathy Mannion right there beside
6  him. Hum-um.
7      Q.  Well, when they assigned you to the Northwest
8  Hall, did you ask them, you know, will your same
9  restrictions apply to that hall?
10     A.  I couldn't do it. I wasn't able. I'm sorry, but
11 I wasn't able.
12     Q.  Well, I --
13     A.  I can't believe -- I must have said something
14 about the cart. I must have said something about the med.
15 cart.
16     Q.  Well, what I don't understand is if you have a
17 nurses' aide available to help you, the cart --
18     A.  I couldn't do the cart to begin with. I could not
19 do the cart to begin with.
20     Q.  But you had an aide to help you, correct?
21     A.  She can't help me do the cart. She can push it
22 down the middle of the hall --
23     Q.  Well, weren't you told --
24     A.  -- but she can't pass the medicine.
25     Q.  Well, she can hand it to you, and then you can

Page 95

1  take the medication --
2      A.  Oh, no, she can't. No, she can't. They are not
3  allowed to do any of that. And I hadn't been on there in
4  the whole five weeks that I had been back.
5      Q.  Now, also in your answer to No. 13, you state that
6  Dave was fired, then he was brought back, and then he had
7  Carl fired. When did all this allegedly happen?
8      A.  I don't know exactly. But I do know he was fired
9  after I was.
10     Q.  So sometime after you stopped -- after your
11 termination.
12     A.  Yeah. Right after I was.
13     Q.  How do you know about these events if you weren't
14 there?
15     A.  Through the grapevine.
16     Q.  Well, how?
17     A.  I don't know exactly. But I do know that if you
18 run into anybody on the street, you know, that you know --
19     Q.  Well, who told you?
20     A.  I can't remember. I'm trying to remember exactly.
21 I don't know exactly who I heard it from. But I said, what?
22 You know, I was absolutely flabbergasted. And I also heard
23 why.
24     Q.  Well, what did you hear?
25     A.  The story that I heard was that he was collecting

Page 96

1  two or three paychecks for two or three different -- you
2  know, like MDS coordinator, acting DON, all this other
3  stuff. And I said, well, that sounds really suspect.
4  Because everything goes through Sheila. I remember, I said
5  that. Everything goes through Sheila. So Sheila wouldn't
6  do that. Or whatever.
7           So then -- and I don't know whether that's the
8  time I heard that -- some falsifying of records or what.
9  But you hear all kinds of wild things. And so then I heard
10 that he was back and that Carl was gone.
11     Q.  Do you know why?
12     A.  I just heard that since Carl okayed all this, that
13 that's probably why Carl was gone. But I don't know for
14 sure. But, I mean, I don't know --
15     Q.  So this is just what you heard through the
16 grapevine.
17     A.  Yeah. But I think some of it is correct. Because
18 Dave Dinges -- which I'm sending you a transcript that I
19 don't think you have from the Workman's Comp. So he
20 admitted a lot of stuff under oath. And so that's the story
21 I heard.
22     Q.  But you don't have any firsthand knowledge of
23 this.
24     A.  No.
25     Q.  And you can't recall who told you these things.

Page 97

1      A.  No. And then Dave Dinges come back, and then I
2  heard that he got fired for the way he talked to and treated
3  the DON at that time. That was the stuff that you hear, you
4  know. And --
5      Q.  And this incident, you mean, is after he came
6  back.
7      A.  Yeah. He came back. Yeah. Then he was fired
8  again. Everybody is fired -- I mean, I was -- when I was
9  going through the thing, just about everybody, you know,
10 that you -- that I put in here was fired.
11     Q.  On the day that you were assigned to Northwest
12 Hall, are you aware that there were actually less patients
13 on that hall that particular day?
14     A.  Yeah, um-hum.
15     Q.  There were less patients that were on --
16     A.  Well, I don't think there was less. There might
17 have been the same or one more or one less. I mean, I'm not
18 making that up. I --
19     Q.  Are you aware that there were more aides assigned
20 to the Northwest Hall that could have helped you?
21     A.  No. No. They can't help me anyway. All they do
22 is put the cart down the middle of the hall. Which makes
23 you walk more and more and more. They can't get the
24 narcotics from the bottom drawer --
25     Q.  Well, isn't it true that the aides were supposed

25 (Pages 94 to 97)

Page 98

1  to help you push the cart, and they were supposed to, you
2  know, move it every couple rooms so that you didn't have to
3  come back and forth --
4      A.  They don't have time to do that.  They don't have
5  time to do that.  They're not going to do that.
6      Q.  Well, did you ever complain that they weren't
7  helping you?
8      A.  I complained a lot.  I complained to Sheila, I
9  complained to Carl Kovski.  I complained a lot.
10      Q.  Specifically about the aides not helping you?
11      A.  Everybody complained about the aides not helping
12  you.  I don't even know who the aides were down there.  That
13  wasn't the point.
14      Q.  Let's talk about who some of your witnesses are.
15  Who --
16      A.  Okay.  I want to add a few more too.
17      Q.  Okay.  Who is Ray Balsinger?
18      A.  He is a person that felt that he was treated badly
19  after he got hurt.
20      Q.  What was his position?
21      A.  I'm not even sure.  I haven't even talked to him
22  lately.  I think maintenance.  I'm not sure.
23      Q.  When did he work there, at IHS?
24      A.  I'm not sure.  I have got to get his information.
25  But he's just willing to --

Page 99

1      Q.  Do you know what his injury was?
2      A.  No.  Not exactly.  I wouldn't be a bit surprised
3  if it was back.
4      Q.  Do you know his address and telephone number?
5      A.  I'd give it to you.
6      Q.  Did she witness any of the allegations that you
7  have raised?
8      A.  Oh, no.  It was -- all it was, was to substantiate
9  how people were treated there when they are hurt.  That's
10  all that was for.
11          And the other person was --
12      Q.  Lisa DeRose.
13      A.  Yes.
14      Q.  She also was injured?
15      A.  Yes.
16      Q.  What was her position?
17      A.  LPN.  It doesn't matter how they turned out.  It's
18  just that they know how --
19      Q.  Do you know what her injury was?
20      A.  Neck, I think.  I can get more.
21      Q.  If you can provide me the address and current
22  telephone number.
23      A.  I did.
24      Q.  I don't think I have an address.
25      A.  School Street, McKean.

Page 100

1      Q.  There is no address here.
2      A.  Oh, okay.  Hum.
3      Q.  If you can get it and just give it to me.
4      A.  Sure.
5      Q.  Did she witness any of the allegations that you
6  have raised?
7      A.  Not for me, no.  She just west through the same --
8  some of the same.  Not very long.
9      Q.  Was she a supervisor or a manager?
10      A.  No.  She was working on North too.
11      Q.  Earlier you mentioned Sharon DiLoreto.  She was an
12  LPN at some point in time?
13      A.  Yeah.  Earlier when the note -- when the note.
14      Q.  Now, you listed her in your EEOC documentation,
15  but she's not listed in the Answers to Interrogatories.  Is
16  there a reason why?
17      A.  Yeah.  Because she denied the note.  There's no --
18  I'm not going to -- I'm not going to --
19      Q.  So she can't substantiate the things --
20      A.  No.  No.  The only thing she could probably
21  substantiate, that, you know -- I don't know.  That, you
22  know -- that, I guess, you know, she -- I don't know.  She
23  can't substantiate anything.
24      Q.  Do you know her address and telephone number?
25      A.  No.  But it's listed in the EEOC stuff.  In her

Page 101

1  statement, it's listed there.  But Dave Dinges, you know, he
2  testified himself that he said the very same thing that's in
3  the note.
4      Q.  Steve Jankowski.  This is another person you
5  listed in your EEOC Complaint, but he's not listed in your
6  Answers to Interrogatories.
7      A.  Oh, okay.
8      Q.  Is there a reason why?
9      A.  Well -- okay.  For one thing, you know --
10      Q.  Who is he, first of all?
11      A.  Yeah, he's another LPN.  But the thing is -- oh,
12  yeah.  That complained.  Now I remember.  He complained
13  about Roger and some of his remarks.  And he -- I complained
14  to him.  I complained to Maureen McGraw too.  I complained
15  to Karen Ang too about Roger.
16      Q.  So why wasn't he listed in your Answers to
17  Interrogatories?
18      A.  Well, because -- okay, why.  Well, I'm pro se, and
19  I'm learning as I go along.  And I noticed with just with
20  the latest Answers to Interrogatories that you gave me, you
21  listed a lot of possible witnesses.
22      Q.  Um-hum.
23      A.  Okay, but no -- you didn't say this is definitely
24  going to be a witness.  So he was like -- and could be a
25  possible.

26 (Pages 98 to 101)

174c7844-b997-4bbc-90a2-f861026969f1

Hodson v. IHS Bayside              Kathleen Hodson                    March 28, 2005

Page 102

1    Q.   Okay.  And did he witness any of the things that
2    you have alleged?
3    A.   Not specifically.
4    Q.   But you complained to him?
5    A.   Oh, yeah.  And then he complained to me.
6    Q.   Do you know his address and telephone number?
7    A.   No.  I still got a lot of work to do.  I got to
8    find him, probably.
9    Q.   Who is Sue Kelly?
10   A.   She is the first investigator at the EEOC that I
11   spoke to on the phone.  She is the very first one.  And she
12   is the one that I told the sexual stuff to.  But then John
13   Wozniak took it over.  And so he kind of -- you know.
14   Q.   I just want to identify a couple of documents to
15   make sure that these are documents that you actually wrote.
16   A.   You're taking these all back, huh?  These aren't
17   mine?
18   Q.   You can have all these.
19   A.   Oh, okay.
20         (Hodson Deposition Exhibit 10
21          marked for identification.)
22   Q.   This looks like a document that's handwritten.  Is
23   this your handwriting?
24   A.   Yes.
25   Q.   It's dated May 19, 2002?

Page 103

1    A.   Yes.
2    Q.   Was this notes that you submitted to the EEOC?
3    A.   Is it?
4    Q.   I don't know.  I'm asking you.
5    A.   Oh.  I think so.
6    Q.   What is this --
7    A.   I think I filled out -- I think I complained
8    verbally, and she wrote it up.  She's the one that wrote
9    those up.  So, therefore -- on my Complaint.  And so then
10   there was a questionnaire that I got.  So they might have
11   been on the questionnaire.
12   Q.   Well, it looks like on the top here you wrote,
13   "Given to Carl --"
14   A.   Oh, yeah, okay.  That's after --
15         (Proceedings interrupted by reporter.)
16   Q.   One at a time.  "Put under his door.  Also one
17   sent to Corporate."  Does that refresh your memory as to
18   what this is?
19   A.   Yes.  This wasn't to the EEOC.  This -- I put this
20   under his door probably the very same weekend.  And this is
21   when I asked Carl, I think -- okay, yeah --
22   Q.   This happened after the time that you claim --
23   A.   Yeah.  I think that happened on a Friday.  So here
24   I am, I'm trying to come back to work.  That's all that is.
25   I'm trying to come back to work.

Page 104

1         (Hodson Deposition Exhibit 11
2          marked for identification.)
3    Q.   This will be 11.  It looks like it's a letter
4    dated May 9, 2003 to John Wozniak.  Is this a letter that
5    you wrote to him?
6    A.   Yes.
7    Q.   And your signature appears on the second page,
8    correct?
9    A.   Yes.
10        (Hodson Deposition Exhibit 12
11         marked for identification.)
12   Q.   This appears to be a letter dated May 15, 2002,
13   again to John Wozniak at the EEOC.  And it appears to be
14   signed by you.  Is this a letter from you?
15   A.   Yes.
16   Q.   And did you sign this?
17   A.   Yes.
18   Q.   While you were employed at IHS, did you ever tell
19   anyone there that you didn't want to be a nurse anymore?
20   A.   No.  Hum-um.  Oh, you mean after I got hurt?
21   Q.   Either before or after --
22   A.   I may have said that after I got hurt.  I mean --
23   Q.   Why would you have said that?
24   A.   Because I couldn't do the work.
25   Q.   Do you recall who you might have said that to?

Page 105

1    A.   No.  I may have said it to anyone.  I might have
2    said it to Sheila.  I mean, I might have said it to anyone.
3    You know, because I was suffering.  I mean, I was in -- and
4    Sheila knows I was in a lot of pain.
5    Q.   Now, earlier, you said that you were taking
6    classes at a religious school.  I don't remember the name --
7    A.   I never did.  I never did.
8    Q.   You never did?
9    A.   No.
10   Q.   Was that something you were thinking about doing
11   at the time?
12   A.   Well, I'm just -- no.  Well, yeah, I probably was
13   at the time, you know, because I -- I just kind of like felt
14   that I couldn't do this.  You know, I couldn't do this.
15   Q.   Did you tell anyone at IHS that this was your
16   plan?
17   A.   I don't know.  I can't remember.
18   Q.   Did you actually want to become a minister?
19   A.   I already am a minister.
20   Q.   Oh, okay.  I didn't know that.
21   A.   Yeah.  I told that to Dr. Euliano.  I remember
22   talking to him.
23   Q.   When did you become a minister?
24   A.   I'm a minister ordained by God.  Yeah.  I'm not --
25   I don't have any credential.  Yeah.

27 (Pages 102 to 105)

Ferguson & Holdnack Reporting, Inc.

Hodson v. IHS Bayside                Kathleen Hodson                    March 28, 2005

                                                              Page 106
1       Q.  What damages are you seeking?
2       A.  Compensatory.  A hundred thousand.  And that's for
3   loss of income, pain and suffering.  And -- and I also want
4   punitive damages for intentional mistreatment or misconduct.
5       Q.  Have you ever sought any psychiatric or mental
6   healthcare since your employment at IHS?
7       A.  At IHS?
8       Q.  Since IHS.
9       A.  No.  No.
10      Q.  What about before?
11      A.  Probably, I'd say before I quit drinking, you
12  know.  That was like in 1993.
13      Q.  Besides that, in 1993, you haven't seen any
14  therapists, psychiatrists, psychologists?
15      A.  I mean, I can't remember any.  Unfortunately, I'm
16  not impaired mentally.
17          (Discussion held off the record.)
18          MS. WEYANDT:  We're done.  I think that's all that
19          I have today.
20              You do have the right to read the deposition
21          transcript before it's made official, or you can
22          waive that and just trust that she has recorded
23          everything down.  You can't change what you have
24          said to me, but if there's like a typo or she
25          misunderstood something you said, you could make

                                                              Page 107
1           those kind of changes.  Or you can just trust that
2           she got it down.  That's your choice.
3           THE WITNESS:  I waive.
4
5           (Deposition concluded at 1:34 p.m.)
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

28 (Pages 106 to 107)

174c7844-b997-4bbc-90a2-f861026969f1