IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KATHLEEN HODSON | ) | |
| | ) | Civil Action No.   03 - 0374 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Judge Maurice B. Cohill, Jr. |
| | ) | |
| | ) | |
| INTEGRATED HEALTH SERVICES | ) | |
| LONG TERM CARE, INC. d/b/a | ) | |
| IHS AT BAYSIDE, | ) | |
| | ) | |
| Defendant. | ) | |

APPENDIX FOR EXHIBITS TO BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT

\# 3

A.    Affidavit of Sheila Rist

B.    Deposition transcription Kathleen Hodson

C.    LPN job duty description

D.    Medical slips

E.    Light duty status slips

F.    Letter dated February 19, 2002, from Carol Kovski

G.    Memo regarding hot packs

H.    Affidavit of Carl Kovski

I.    Affidavit of Dave Dinges

J.    Affidavit of Kathleen Mannion

K.    Affidavit of Roger Watkins

L.    Affidavit of Jennifer Heiser

M.    Employee Counseling Forms for Kathleen Hodson

N.    Punch detail report

O.    Patient list for Northwest Mall and Ambassador Mall for May 17, 2005

P.    Affidavit of Ray Martinez

Q.    Disciplinary Action Form for Kathleen Hodson, May 17, 2005

R.    Affidavit of Maureen Magraw

S.    Affidavit of Carmen Callicott

T.    Affidavit of Donna Marsili

U.    Executed Employee Corporate Compliance Acknowledgments signed by Kathleen Hodson

INTEGRATED HEALTH SERVICES, INC.
SKILLED CARE PROGRAM
POSITION DESCRIPTION

LICENSED PRACTICAL (VOCATIONAL) NURSE
D.O.T. Code 079.374-014

BASIC FUNCTION

To deliver nursing care to patients/residents requiring skilled care.

CHARACTERISTIC DUTIES AND RESPONSIBILITIES

ESSENTIAL FUNCTIONS
1.  Works under direct supervision using the Nurse Practice Act, IHS Standards, Policies and Procedures and nursing judgement.
2.  Delivers nursing care to patients/residents requiring subacute care.
3.  Assesses patients/residents and makes observations and reports pertinent information related to the care of the patient/resident.
4.  Implements the patient/resident plan of care and evaluates the patient/resident response.
5.  Directs and supervises care given by other nursing personnel in selected situations.
6.  Maintains knowledge of necessary documentation requirements.
7.  Maintains knowledge of equipment set-up, maintenance and use, i.e. monitors, infusion devices, drain devices, etc.
8.  Maintains confidentiality and patient/resident rights regarding all patient/personnel information.
9.  Provides patient/resident/family/caregiver education as directed.
10. Conducts self in a professional manner in compliance with unit and facility policies.
11. Works rotating shifts, holidays and weekends as scheduled.
12. Initiates emergency support measures (i.e. CPR, protects patients/residents from injury).

MARGINAL FUNCTIONS
1.  Participates in the identification of staff educational needs.
2.  Serves as a preceptor, as delegated, for new staff.
3.  Maintains patient/resident care supplies, equipment and environment.
4.  Participates in the development of unit objectives.
5.  Provides input in the formulation and evaluation of standards of care.

EXPOSURE RISK
The Licensed Practical (Vocational) Nurse is at high risk for exposure to blood and body fluids or other potentially infectious materials.

EXHIBIT

"C"

2. Care Plans:
   a. Evaluation of care plan is noted weekly or as indicated.
   b. Contributions to care plan revision are made as indicated by the patient's/residents status.

## GENERAL PATIENT/RESIDENT CARE

1. Patient/resident is approached in a kind, gentle and friendly manner. Respect for the patient's/resident's dignity and privacy is consistently provided.
2. Interventions are performed in a timely manner. Explanations for delays in answers/responses are provided.
3. Independence by the patient/resident in activities of daily living is encouraged to the fullest extent possible.
4. Treatments are completed as indicated.
5. Safety concerns are identified and appropriate actions are taken to maintain a safe environment.
   a. Siderails and height of bed are adjusted.
   b. Patient/resident call light and equipment is within reach.
   c. Restraints when used are maintained properly.
   d. Rooms are neat and orderly.
6. Patient/resident identification bands and allergy bands (if applicable) are present.
7. Functional assignments are completed.
8. Emergency situations are recognized and appropriate action is instituted.
9. All emergency equipment can be readily located and operated (emergency oxygen supply, drug box, fire extinguisher, etc.).

## PATIENT/RESIDENT EDUCATION/DISCHARGE PLANNING

1. Patient/resident/family teaching is conducted according to the nursing care plan.
2. Explanations are given to the patient/resident prior to interventions.
3. Discharge/death summaries are complete and accurate.
4. Transfer forms are complete and accurate.
5. Active participation in patient/resident care management is evident.

## ADHERENCE TO FACILITY PROCEDURES

1. Facility procedure manuals or reference materials are utilized as needed.
2. Procedures are performed according to method outlined in procedure manual.
3. Body substance precautions and other appropriate infection control practices are utilized with all nursing interventions.
4. Safety guidelines established by the facility (i.e., proper needle disposal), are followed.

## DOCUMENTATION

1. The patient's/resident's full name and room number are present on all chart forms. Allergies are noted on chart cover.
2. Only approved abbreviations are utilized.

## WORKING CONDITIONS

1.   Works inside the facility throughout the Nursing Service area, including the medication rooms, nurses stations and the patient/resident rooms.

2.   Sits, stands, bends, lifts, reaches, walks, and moves intermittently during the working hours.

3.   Is subject to frequent interruptions.

4.   Is subject to a quiet to moderate noise level due to phones, mechanical alarms and occasional construction work.

5.   Is involved with patients/residents, personnel, visitors, government agencies/personnel, etc., under all conditions and circumstances.

6.   Is subject to hostile and emotionally upset patients/residents, family members, personnel, and visitors.

7.   Communicates with the medical staff, nursing personnel, and other department supervisors.

8.   Works beyond normal working hours, and in other positions temporarily, when necessary.

9.   Is subject to hazards in the work area including, burns from equipment, odors, exposure to sharp instruments, falls, chemical cleansers etc., throughout the working hours.

10.  Is subject to exposure to infectious waste, diseases or conditions.

11.  Maintains a liaison with the patients/residents, their families, support departments, etc., to adequately plan for the patient's/resident's needs.

12.  May be required to wear a face mask, gown, or gloves.

## SPECIFIC REQUIREMENTS

1.   Must possess a current, unencumbered license to practice as a LPN/LVN in this state.

2.   Must be able to read, write, speak and understand the English language.

3.   Must possess the ability to make independent decisions when necessary.

4.   Must be able to relate information concerning a patient/resident condition.

## PHYSICAL AND SENSORY REQUIREMENTS
(With or without the aid of mechanical devices)

1.   Must be able to move intermittently throughout the work day.

2.   Must be able to speak the English language in an understandable manner.

3.   Must be able to cope with the mental and emotional stress of the position.

4.   Must be able to see and hear or use prosthetics that will enable the senses to function adequately to assure that the requirements of this position can be fully met (i.e. accurately read measurements on patient/resident related equipment such as thermometers, monitors, gauges).

5.   Must be able to function independently, have personal integrity, flexibility, and the ability to work effectively with patients/residents, personnel and support agencies.

6.   Must be in good general health and demonstrate emotional stability.

7. Must be able to relate and work with the disabled, ill, elderly, emotionally upset, and at times, hostile people within the facility.

8. Must be able to lift, push, pull, and move a minimum of 50 pounds.

9. Must be able to assist with the evacuation of patients/residents.

I HAVE READ THE ABOVE POSITION DESCRIPTION AND FULLY UNDERSTAND THE REQUIREMENTS SET FORTH THEREIN. I HEREBY ACCEPT THE POSITION OF LICENSED PRACTICAL/VOCATIONAL NURSE AND AGREE TO ABIDE BY THE REQUIREMENTS SET FORTH AND WILL PERFORM ALL DUTIES AND RESPONSIBILITIES TO THE BEST OF MY ABILITY.

_Kathleen D. Hudson LPN_     _5-15-97_

Signature of Licensed Practical/     Date
Vocational Nurse

_X M (R)_     _5-15-97_

Signature of Director of Nursing     Date

INTEGRATED HEALTH SERVICES, INC.
POSITION DESCRIPTION

## LICENSED PRACTICAL (VOCATIONAL) NURSE
### Job Code 02

BASIC FUNCTION

To deliver nursing care to patients/residents requiring long-term or rehabilitative care.

CHARACTERISTIC DUTIES AND RESPONSIBILITIES

ESSENTIAL FUNCTIONS

1. Works under direct supervision using the state-specific Nurse Practice Act, IHS Standards, Policies and Procedures, and nursing judgment.
2. Delivers nursing care to patients/residents requiring long-term or rehabilitative care.
3. Collects patient/resident data, makes observations, and reports pertinent information related to the care of the patient/resident.
4. According to state-specific regulations, implements the patient/resident plan of care and evaluates the patient/resident response.
5. In accordance with state-specific regulations, directs and supervises care given by other nursing personnel in selected situations.
6. Maintains knowledge of necessary documentation requirements.
7. Maintains knowledge of equipment set-up, maintenance and use, i.e., monitors, infusion devices, drain devices, etc.
8. Maintains confidentiality and patient/resident rights, regarding all patient/resident/ personnel information.
9. Provides patient/resident/family/caregiver education as directed.
10. Conducts self in a professional manner in compliance with unit and facility policies.
11. Works rotating shifts, holidays and weekends as scheduled.
12. Initiates emergency support measures (i.e., CPR, protects patients/residents from injury).

MARGINAL FUNCTIONS

1. Participates in the identification of staff educational needs.
2. Serves as a preceptor, as delegated, for new staff.
3. Maintains patient/resident care supplies, equipment and environment.
4. Participates in the development of unit objectives.
5. Provides input in the formulation and evaluation of standards of care.

EXPOSURE RISK

The Licensed Practical (Vocational) Nurse is at high risk for exposure to blood and body fluids or other potentially infectious materials.

## SUPERVISION RECEIVED

Receives administrative supervision from the Director of Nursing. May receive functional supervision from registered nurses working on the unit, the Nursing Supervisor or the Assistant Director of Nursing.

## SUPERVISION EXERCISED

According to state-specific regulations, exercises functional supervision in specific situations over unit personnel.

## MINIMUM QUALIFICATIONS

1. Graduation from a basic educational program in practical (vocational) nursing.
2. Current license to practice profession in state.
3. A minimum of one (1) year nursing experience in a long-term or acute care setting preferred.

## MINIMUM PERFORMANCE STANDARDS

Performance in the following areas is acceptable when:

## DATA COLLECTION

1. Admission and routine patient/resident observations/transfer notes are complete and accurately reflect the patient's/resident's status.
2. Documentation of observations is complete and reflects knowledge of unit documentation policies and procedures.
3. Nursing history is present in the medical record for all patients/residents.
4. Changes in patient's/resident's physical/psychological condition (i.e., changes in lab data, vital signs, mental status), are reported appropriately.

## PLANNING OF CARE

Contributions to the formulation/review of nursing care plans are made as needed.

1. Pertinent nursing problems are identified.
2. Goals are stated.
3. Appropriate nursing orders are suggested.

## EVALUATION OF CARE

1. Observations related to the effectiveness of nursing interventions, medications, etc. are reported as appropriate and documented in the progress notes.

2.    Care Plans:
    a.    Evaluation of care plan is noted monthly or as indicated.
    b.    Contributions to care plan revision are made as indicated by the patient's/resident's status.

## GENERAL PATIENT/RESIDENT CARE

1.    Patient/Resident is approached in a kind, gentle and friendly manner.  Respect for the patient's/resident's dignity and privacy is consistently provided.
2.    Interventions are performed in a timely manner.  Explanations for delays in answers/ responses are provided.
3.    Independence by the patient/resident in activities of daily living is encouraged to the fullest extent possible.
4.    Treatments are completed as indicated.
5.    Safety concerns are identified and appropriate actions are taken to maintain a safe environ-ment.
    a.    Siderails and height of bed are adjusted.
    b.    Patient/Resident call light and equipment is within reach.
    c.    Restraints, when used, are maintained properly.
    d.    Rooms are neat and orderly.
6.    Patient/Resident identification bands and allergy bands (if applicable) are present.
7.    Functional assignments are completed.
8.    Emergency situations are recognized and appropriate action is instituted.
9.    All emergency equipment can be readily located and operated (emergency oxygen supply, drug box, fire extinguisher, etc.).

## PATIENT/RESIDENT EDUCATION/DISCHARGE PLANNING

1.    Patient/Resident/Family teaching is conducted according to the nursing care plan.
2.    Explanations are given to the patient/resident prior to interventions.
3.    Discharge/death summaries are complete and accurate.
4.    Transfer forms are complete and accurate.
5.    Active participation in patient/resident care management is evident.

## ADHERENCE TO FACILITY PROCEDURES

1.    Facility Standards of Practice Manual or reference materials are utilized as needed.
2.    Procedures are performed according to method outlined in procedure manual.
3.    Body substance precautions and other appropriate infection control practices are utilized with all nursing interventions.
4.    Safety guidelines established by the facility (i.e., proper needle disposal) are followed.

## DOCUMENTATION

1.    The patient's/resident's full name and room number are present on all chart forms.  Allergies are noted on chart cover.
2.    Only approved abbreviations are utilized.
3.    Vital signs are properly and timely recorded
4.    I&O summaries are recorded and added correctly.
4.    Progress notes are timed, dated and signed with full signature and title.

Revised: 5/17/01
Reviewed:

©Integrated Health Services, Inc. 1994

5.    Unit flowsheets are completed properly (i.e., wound care records, treatment records, weight sheets, etc.).

## MEDICATION ADMINISTRATIONS/PARENTERAL THERAPY RECORD

1.    Adheres to state-specific Nurse Practice Act for administration of medication and parenteral therapy.
2.    Dates that medications are started or discontinued are documented.
3.    Medications are charted correctly with name, dose, route, site, time, and initials of nurse administering.
4.    Pulse and blood pressure are obtained and recorded when appropriate.
5.    Medications not given are circled, reason noted and physician notified if applicable.
6.    Appropriate notes are written for medications not given and actions taken.
7.    Name and title of nurse administering medication are documented.
8.    Patient's/Resident's medication record is labeled with full name, room number, date, and allergies.
9.    The procedure for administration and counting of narcotics is followed.
10.   All parenteral fluids, including additives, are charted with time and date started, time infusion completed, site of infusion and signature of nurse.
11.   All parenteral fluids are administered according to the ordered infusion rate.
12.   Parenteral intake is accurately recorded on the unit flowsheet or I&O record.
13.   Appropriate actions are taken related to identified IV infusion problems (infiltration, phlebitis, poor infusion, etc.).
14.   IV sites are monitored and catheters changed according to unit policy.
15.   IV bags and tubings are changed according to unit policy.

## COORDINATION OF CARE

1.    Tests are scheduled and preps are completed as indicated.
2.    Co-workers are informed of changes in patient/resident conditions or of any other changes occurring on the unit.
3.    Information is relayed to other members of the health care team (i.e., physicians, respiratory therapy, physical therapy, social services, etc.) and family/responsible party.
4.    Unit activities are coordinated (i.e., changing patients/residents rooms for admissions, coordinating transfer/discharge forms, etc.).

## LEADERSHIP

1.    Equitable care assignments that are appropriate to patient/resident needs are made prior to the beginning of the shift.
2.    Staffing needs are communicated to the nursing supervisor.

3.   Assistance, direction, and education are provided to unit personnel and families.
4.   Problems are identified, data are gathered, solutions are suggested, and communication regarding the problem is appropriate.
5.   Transcription of all orders is checked.
6.   All work areas are neat and clean.

## COMMUNICATION

1.   Change of shift report is complete, accurate and concise.
2.   Incident Reports are completed accurately and in a timely manner.
3.   Staff meetings are attended, if on duty, or minutes read and initialed if not on duty.

## PROFESSIONALISM

1.   Decisions are made that reflect knowledge and good judgment and demonstrate an awareness of patient/resident/family/physician needs.
2.   Awareness of own limitations is evident and assistance is sought when necessary.
3.   Dress code is adhered to.
4.   Committee meetings (if assigned) are attended.  Reports related to the committee are given during staff meetings.
5.   Responsibility is taken for own professional growth.  All mandatory and other inservices are attended annually.
6.   Organizational ability and time management is demonstrated.
7.   Confidentiality of patient/resident is respected at all times (i.e., when answering telephone and/or speaking to co-workers).
8.   Professional behavior is demonstrated.

## HUMAN RELATIONS

1.   A positive working relationship with patients/residents, visitors and facility staff is demonstrated.
2.   Authority is acknowledged and response to the direction of supervisors is appropriate.
3.   Time is spent with patients/residents rather than other personnel.
4.   Co-workers are readily assisted as needed.

## COST AWARENESS

1.   Supplies are used appropriately.
2.   Charge stickers (or charge system) are utilized appropriately.
3.   Minimal supplies are stored in the patient's/resident's room.
4.   Discharge medications are returned to the pharmacy or destroyed in a timely manner.
5.   Floor-stock medications are charged and re-stocked.

## WORKING CONDITIONS

1.   Works inside the facility throughout the nursing service area, including the medication rooms, nurses stations, and the patient/resident rooms.
2.   Sits, stands, bends, lifts, reaches, walks, and moves intermittently during the working hours.
3.   Is subject to frequent interruptions.

Revised: 5/17/01
Reviewed:

©Integrated Health Services, Inc. 1994

4.  Is subject to a quiet-to-moderate noise level due to phones, mechanical alarms, and occasional construction work.

5.  Is involved with patients/residents, personnel, visitors, government agencies/personnel, etc., under all conditions and circumstances.

6.  Is subject to hostile and emotionally upset patients/residents, family members, personnel, and visitors.

7.  Communicates with the medical staff, nursing personnel, and other department supervisors.

8.  Works beyond normal working hours, and in other positions temporarily, when necessary.

9.  Is subject to hazards in the work area including, burns from equipment, odors, exposure to sharp instruments, falls, chemical cleansers etc., throughout the working hours.

10. Is subject to exposure to infectious waste, diseases or conditions.

11. Maintains a liaison with the patients/residents, their families, support departments, etc., to adequately plan for the patient's/resident's needs.

12. May be required to wear a facemask, gown, or gloves.

## SPECIFIC REQUIREMENTS

1.  Must possess a current, unencumbered lcense to practice as a LPN/LVN in the state where practicing.

2.  Must be able to read, write, speak and understand the English language.

3.  Must possess the ability to make independent decisions when necessary.

4.  Must be able to relate information concerning a patient/resident condition.

5.  Must be CPR certified.

## PHYSICAL AND SENSORY REQUIREMENTS
(With or Without the Aid of Mechanical Devices)

1.  Must be able to move intermittently throughout the workday.

2.  Must be able to speak the English language in an understandable manner.

3.  Must be able to cope with the mental and emotional stress of the position.

4.  Must be able to see and hear or use prosthetics that will enable the senses to function adequately, to ensure that the requirements of this position can be fully met (i.e., accurately read measurements on patient/resident related equipment such as thermometers, monitors, gauges).

5.  Must be able to function independently, have personal integrity, flexibility, and the ability to work effectively with patients/residents, personnel and support agencies.

6.  Must be in good general health and demonstrate emotional stability.

7.  Must be able to relate and work with the disabled, ill, elderly, emotionally upset, and at times hostile people within the facility.

8.  Must be able to lift, push, pull, and move a minimum of 50 pounds.

9.  Must be able to assist with the evacuation of patients/residents.

I HAVE READ THE ABOVE POSITION DESCRIPTION AND FULLY UNDERSTAND THE REQUIREMENTS SET FORTH THEREIN. I HEREBY ACCEPT THE POSITION OF LICENSED PRACTICAL/VOCATIONAL NURSE AND AGREE TO ABIDE BY THE REQUIREMENTS SET FORTH AND WILL PERFORM ALL DUTIES AND RESPONSIBILITIES TO THE BEST OF MY ABILITY.


_____          _____
Signature of Licensed Practical/Vocational Nurse          Date


_____          _____
Signature of Director of Nursing                          Date

Revised: 5/17/01
Reviewed:                    ©Integrated Health Services, Inc. 1994

Patient's Name _Kathleen Hodson_ _____ Date _____

No work until next appointment _____

Return to work date _____

* <u>Restrictions:</u>

    Lifting _____ Lbs. _____

    Squatting _____

    Standing _____

    Sitting _____

    Continue current restrictions ____✓____ _for now, then_

Follow-up appointment _____ _full duty_
_9/1/01._

Physician _____

        Orthopaedic Surgeons, Inc.
        204 West 26th Street
        Erie, PA  16508

EXHIBIT

"D"

WORKERS' COMPENSATION MEDICAL

THIS FORM IS TO BE FILED WITH THE EMPLOYER OR INSURER ACCORDING TO
INSTRUCTIONS PROVIDED ON THIS FORM.

Name of Employee _KATHLEEN  H @DSUN._

Name of Employer _IHS  AT  BAYSIDE_

Name of Insurer _IHS  OF  ERIE  AT  BAYSIDE_

Claim Number (if known) _C395C 5257989_  Date of Birth _11/26/46_

Employee SS# _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_  Date of Injury _3/30/01_

Date of Report _3/5/02._

Provider Name _ORTHOPAEDIC & SPORTS MEDICINE_

| 03/05/02 | KATHLEEN HODSON | |
|---|---|---|
| DATE | NAME | REFERRING PHYSICIAN |

The patient apparently has not returned to work because of her severe pain and her family
physician kept her off work for some period of time. She states that the pain is worsening. It
is in her back and now it is going to her left leg as well. She has been taking muscle relaxants
and Darvocet. She tells me that she just knows she is not capable of working. She did see Dr.
Falasca for initial evaluation and injections are going to be carried out on March 14th. At her
request, I have given her a slip that she can be off work for two weeks to facilitate the
injections. I gave her a prescription for Darvocet N 100-30 with two refills. I gave her the
benefit of the doubt, however, I think that her complaints are out of proportion to the MRI
findings that we have been able to ascertain up until this point in time.

John J. Euliano, Jr., M.D./cao

ORTHOPAEDIC & SPORTS MEDICINE OF ERIE, P.C.
300 STATE ST. • SUITE 400 A • ERIE, PA 16507
PHONE (814) 454-8287 • FAX (814) 454-3470

Providers may not charge for documentation supporting a claim for payment. Providers may charge
their usual fee for special reports specifically requested by the Employer/Insurer. All patient information
shall be submitted with the knowledge of the patient and must be maintained as confidential by the Employer/
Insurer. The insurance plan or program shall not be liable to pay for treatment until the report/claim form has
been filed.

Listed on the reverse are guidelines for the completion of billing forms and submission of records.

Patient name : Kathleen Hodson

Eval date: 12-18-01

Referral source: Dr. M. Ang

Dx: Lumbar Disc HNP

| LIFTING TOLERENCES: | Occasional | Frequent |
|---|---|---|
| *Floor to Knuckle:* | *20#* | *10#* |
| *Knuckle to Shoulder:* | *10#* | *did not demonstrate* |
| *Carry:* | *17#* | *did not demonstrate* |

| POSITIONAL TOLERENCES: | Occasional (0-33%) | Frequent (34-66%) | Constant (67-100%) |
|---|---|---|---|
| *Sit:* | | *X* | |
| *Stand:* | | *X* | |
| *Walk:* | *X* | | |
| *Squat:* | *X* | | |
| *Kneel:* | *unable* | | |
| *Climb Stairs:* | | *X* | |
| *Reach Forward:* | | *X* | |
| *Reach Overhead:* | | *X* | |
| *Use Foot Pedals:* | | *X* | |
| *Grip Firmly:* | | *X* | |
| *Fine Manipulation:* | | *X* | |
| *Static Head:* | | *X* | |
| *Trunk Bend:* | *X* | | |
| *(          ):* | | | |
| *(          ):* | | | |

**RESULT:** The client demonstrated the ability to work in the LIGHT classification category for an 8 hour day. ( According to the US Department of Labor Standards.)

Signed: Evaluator : _DFutmuiuPT_ Date: _12-18-01_
PHYSICIAN ; *( I concur with the above, with changes as indicated)*
*Physician signature here :_____ Date:_____*

DEA # _____    868-3096- 11 AM

**ORTHOPAEDIC AND SPORTS MEDICINE OF ERIE, P.C.**
300 State Street, Suite 400A • Erie, PA 16507 • (814) 454-8287

Nick Stefanovski, M.D.
Gary J. Cortina, M.D.
PA Lic. No. MD-035774-E        PA Lic. No MD003260-E

John Eullano Jr., M.D.    David M. Babins, M.D.    Kathy M. Sullivan, PA-C
PA Lic. No. MD-012162-E    PA Lic. No. MD-044724-L    PA Lic. No. MA-002986-L

NAME  Kathleen Nolan                    DATE  12/7/01

ADDRESS _____

Patient may work sedentary duty only
pending results of MRI

Refill _____  times PRN NR

SUBSTITUTION PERMISSIBLE                    _____ M.D.
IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED, THE PRESCRIBER MUST HANDWRITE
"BRAND NECESSARY" OR "BRAND MEDICALLY NECESSARY" IN THE SPACE BELOW.

DEA # _____

**BAYVIEW MEDICAL GROUP**
**GEOFFREY BURBRIDGE, M.D.**
**ANNE-MARIE LISZKA, D.O.**
**MARY ANN ANDRIOLE-WENDEL, D.O.**
**LISA REMALEY-WALTERS, M.D.**
140 WEST SECOND STREET, SUITE 203
ERIE, PA 16507
814-877-5040

PA LIC No. MD-023456-E          PA LIC No. OS-006569-L
PA LIC No. OS-007550-L          PA LIC No. MD-062655-L

NAME     Kathleen Hodson

ADDRESS _____ DATE 9/11/01

**R** (Please Print)

excuse pt from
work x 1 week
due to leg pain

REFILL _____ TIMES     PRN     NR

SUBSTITUTION PERMISSIBLE     ____ (Liszka

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED,
THE PRESCRIBER MUST HANDWRITE BRAND NECESSARY OR
BRAND MEDICALLY NECESSARY IN THE SPACE BELOW.

14-MAY-99                                    01-100572860-3-9155_0002

DEA # _____

**MARY ANN ANDRIOLE-WENDEL, D.O.**
**ANNE-MARIE LISZKA, D.O.**
306 WEST 11TH STREET
ERIE, PA 16501
814-456-8105

PA LIC No. OS-007550-L                PA LIC No. OS-006569-L

NAME  Kathleen Hodson

ADDRESS _____ DATE 2-18-02

℞ (Please Print)

Excuse from work
till now till
April 1st
— pt c medical
condition.

REFILL _____ TIMES    PRN    NR

SUBSTITUTION PERMISSIBLE _____ D.O.

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED,
THE PRESCRIBER MUST HANDWRITE BRAND NECESSARY OR
BRAND MEDICALLY NECESSARY IN THE SPACE BELOW.

04-SEP-01                    TRI010904_100173494-1_01_25993_0010

---

DEA # _____

**MARY ANN ANDRIOLE-WENDEL, D.O.**
**ANNE-MARIE LISZKA, D.O.**
306 WEST 11TH STREET
ERIE, PA 16501
814-456-8105

PA LIC No. OS-007550-L                PA LIC No. OS-006569-L

NAME  Kathleen Hodson

ADDRESS _____ DATE 2/14/02

℞ (Please Print)

excuse pt from work
2/14, 2/15, 4/16, 2/17
due to back strain

REFILL _____ TIMES    PRN    NR

SUBSTITUTION PERMISSIBLE _____ D.O.

IN ORDER FOR A BRAND NAME PRODUCT TO BE DISPENSED,
THE PRESCRIBER MUST HANDWRITE BRAND NECESSARY OR
BRAND MEDICALLY NECESSARY IN THE SPACE BELOW.

04-SEP-01                    TRI010904_100173494-1_01_25993_0010

WORKERS' COMPENSATION MEDICAL REPORT FORM

THIS FORM IS TO BE FILED WITH THE EMPLOYER OR INSURER ACCORDING TO INSTRUCTIONS PROVIDED ON THIS FORM.

Name of Employee  _KATHLEEN  HODSON._

Name of Employer  _IHS  AT  BAYSIDE_

Name of Insurer  _IHS OF ERIE  AT BAYSIDE_

Claim Number (if known) _C395C 5257989_  Date of Birth _11/26/46_

| DATE | NAME | REFERRING PHYSICIAN |
|------|------|---------------------|
| 7/6/01 | KATHLEEN HODSON | |

**ORTHOPAEDIC & SPORTS MEDICINE OF ERIE, P.C.**
300 STATE ST. • SUITE 400 A • ERIE, PA 16507
PHONE (814) 454-8287 • FAX (814) 454-8470

**CHIEF COMPLAINT:** This is a 54 y.o. white female who was seen with the chief complaint of back pain. The patient states that on March 30th, 2001 while at work at the IHS at Bayside, she was lifting a resident that began to fall and she twisted and noted pain in her back. She subsequently had x-rays at St. Vincent's of the thoracic and lumbosacral spines on April 4th, 2001. These were normal. And she had an MRI of at the Imaging Center of the lumbar spine on 5/17/01, which showed a herniated disc L4-5 centrally. She had and MRI of her thoracic spine, which was negative. She has been treated by Dr. Ferris and was referred to Dr. Buseck and was told she can go back to work with no restrictions. She is currently on light duty with a 30-pound weight limit. Medications are Feldene and she takes extra-strength Tylenol and an occasional Flexeril. She has some radiation of the pain to her lower extremities but this was no a problem and feature of her disease.

**PHYSICAL EXAMINATION:** On physical examination today she is tender over the lumbar spine. She flexes to 80 degrees. Extension is 10 degrees. Straight leg raising is slightly positive on the left at about 60 degrees. It's negative on the right. Reflexes are 2+ at her knees and her ankles.

| IMPRESSION: The impression is that of a herniated lumbar disc at L4-5. | | |
|------|------|---------------------|
| DATE | NAME | REFERRING PHYSICIAN |

**ORTHOPAEDIC & SPORTS MEDICINE OF ERIE, P.C.**
300 STATE ST. • SUITE 400 A • ERIE, PA 16507
PHONE (814) 454-8287 • FAX (814) 454-8470

**RECOMMENDATIONS:** I would recommend a light duty restriction with a 30-pound weight lifting limit. It more than likely will be permanent.

John J. Euliano, Jr., M.D./mk

cc:  Dr. Mary Ann Wendel

The following descriptions are provided as a clarification for the terms typically used to describe an injured employee's restricted work level. Use them to interpret the enclosed PATIENT STATUS REPORT that has been forwarded to you regarding your employee.

Please give detailed consideration to the defined classifications in conjunction with any other work limitations noted on the report.

*Please* feel free to call us if you have *any* questions! Thank you.

---

SEDENTARY WORK – Lifting 10 pounds maximum and occasionally lifting and/or carrying such articles as dockets, ledgers and small tools. Although a sedentary job is defined as one which involved sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required only occasionally and other sedentary criteria are met.

LIGHT WORK – Lifting 20 pounds maximum with infrequent lifting and or carrying and/or carrying of objects weighing up to 10 pounds. Even though the lifted weight may be only a negligible amount, a job is in this category when it requires walking and standing to a significant degree or when it involves sitting most of the time with a degree of pushing and pulling or arm and/or leg controls.

LIGHT MEDIUM WORK – Lifting 30 pounds maximum with frequent lifting and/or carrying of objects weighing up to 20 pounds.

MEDIUM WORK – Lifting 50 pounds maximum with frequent lifting and/or carrying of objects weighing up to 25 pounds.

LIGHT HEAVY WORK – Lifting 75 pounds maximum with frequent lifting and/or carrying of objects weighing up to 40 pounds.

HEAVY WORK – Lifting 100 pounds maximum with frequent lifting and/or carrying of objects weighing up to 50 pounds.

OCCASIONAL – Activities that are performed up to 1/3 of the work day.

FREQUENT – Activities that are performed up to 2/3 of the work day.



# Orthopaedic and Sports Medicine of Erie

Nick Stefanovski, M.D.
Gary J. Cortina, M.D.
John J. Euliano, Jr., M.D.
David M. Babins, M.D.
Kathy Sullivan, PA-C

300 State Street  •  Suite 400A  •  Erie, Pennsylvania 16507
(814) 454-8287  •  FAX (814) 454-8470

DATE: _2 - 11 - 02_

TO WHOM IT MAY CONCERN:

_Hodson, Kathleen_ IS RELEASED TO

RETURN TO WORK ON _2-11 - 02_

RETURN TO:  _____ REGULAR DUTY _____ HOURS

~~LIGHT DUTY~~ _____ HOURS

RESTRICTIONS: _20# Lfts Rotatin_

_John J Euliano, M.D._

**EXHIBIT**

tabbies®

"E"



**INTEGRATED HEALTH SERVICES**

February 19, 2002

Certified 7000 1530 5531 5491

Ms. Kathy Hodson
2201 Keystone Drive
Erie, PA 16509

Ms. Hodson:

You will be receiving in the mail from Crawford, Slevin & Hicks,
your short term disability papers. When you receive these papers
there will be forms for you to fill out and for your physician to
fill out. The employer will also have forms to fill out. Please
return all completed forms to IHS Human Resources to be
overnighted to Crawford, Slevin & Hicks. (Do not let your
physician mail them; this delays the process.) Crawford, Slevin
& Hicks will then review all forms to ensure everything is filled
out.

At this time the facility still has light duty work available
within your 20lb. max of weight lifting. Enclosed is a copy of
your light duty job description, as well as the copy you gave us
of functional capacity evaluation signed and dated December 18,
2001. These light duty jobs are well within the functional
capacity range. Please review these with your physician. If
there is something that your physician feels you should not do
please have your physician specify.

Please contact the Administrator, Carl Kovski, by February 27,
2001 to set up a time to verify your return to work date, and to
go over the light duty job description.

Carl Kovski, NHA
Administrator

CC: Evan J. Jenkins, Esquire
    Lisa Williams of ESIS

Enclosure



EXHIBIT

"F"

FUNCTIONAL CAPACITY EVALUATION
## SUMMARY PAGE

Patient name : Kathleen Hodson

Eval date: 12-18-01

Referral source: Dr. M. Ang

Dx: Lumbar Disc HNP

### LIFTING TOLERENCES:

| | Occasional | Frequent |
|---|---|---|
| Floor to Knuckle: | 20# | 10# |
| Knuckle to Shoulder: | 10# | did not demonstrate |
| Carry: | 17# | did not demonstrate |

### POSITIONAL TOLERENCES:

| | Occasional (0-33%) | Frequent (34-66%) | Constant (67-100%) |
|---|---|---|---|
| Sit: | | X | |
| Stand: | | X | |
| Walk: | X | | |
| Squat: | X | | |
| Kneel: | unable | | |
| Climb Stairs: | | X | |
| Reach Forward: | | X | |
| Reach Overhead: | | X | |
| Use Foot Pedals: | | X | |
| Grip Firmly: | | X | |
| Fine Manipulation: | | X | |
| Static Head: | | X | |
| Trunk Bend: | X | | |
| ( ): | | | |
| ( ): | | | |

**RESULT:** The client demonstrated the ability to work in the LIGHT classification category for an 8 hour day. ( According to the US Department of Labor Standards.)

Signed: Evaluator : _DFutmeyer_ Date: _12-18-01_
**PHYSICIAN :** *( I concur with the above, with changes as indicated)*
*Physician signature here :* _____ Date: _____

- ## CHECK IN WITH THE SUPERVISOR UPON ARRIVAL FOR ASSIGNMENTS

## *LIST ALL DUTIES THAT ARE COMPLETED DURING THE SHIFT AND GIVE TO THE SUPERVISOR BEFORE LEAVING

-MA-51 FROM BUSINESS OFFICE

-IDDS COMPLETION

-THIN CHARTS (GET DIRECTION FROM C. COVERDALE AND ALL CHARTS NEED THINNED

-DINING ROOM - MONITOR AND FEED AT ALL MEALS DURING YOUR SHIFT-WEEKDAYS AND WEEKENDS

-NURSING ASSESSMENTS

-WARD CLERK DUTIES ON WEEKENDS AND WARD CLERKS DAYS OFF

-CHECK ALL DOOR NAME PLATES FOR ACCURACY AND REPLACE

-CHECK ALL RESIDENT NAME BANDS AND REPLACE

-SCHEDULING- CHECK WITH CAROL OTIS

-OTHER DUTIES AS ASSIGNED

-COPYING

SCHEDULED WORK HOURS WILL BE 7:00AM to 3:30PM.



# Orthopaedic and Sports Medicine of Erie

Nick Stefanovski, M.D.
Gary J. Cortina, M.D.
John J. Euliano, Jr., M.D.
David M. Babins, M.D.
Kathy Sullivan, PA-C

300 State Street  •  Suite 400A  •  Erie, Pennsylvania 16507
(814) 454-8287  •  FAX (814) 454-8470

DATE: 2 - 11 - 02

TO WHOM IT MAY CONCERN:

Hsssns Kutlees _____ IS RELEASED TO

RETURN TO WORK ON 2-11-02 _____.

RETURN TO:  _____ REGULAR DUTY _____ HOURS

☒  LIGHT DUTY _____ HOURS

RESTRICTIONS: 20# Lft; Rotatin

John J Euliano, J. MD.

# WORKERS' COMPENSATION MEDICAL REPORT FORM

THIS FORM IS TO BE FILED WITH THE EMPLOYER OR INSURER ACCORDING TO INSTRUCTIONS PROVIDED ON THIS FORM.

Name of Employee _KATHLEEN  HODSON._

Name of Employer _IHS  AT  BAYSIDE_

Name of Insurer _IHS  OF  ERIE  AT  BAYSIDE_

Claim Number (if known) _C 395 C. 525 7989_  Date of Birth _11/26/46_

| 7/6/01 | KATHLEEN HODSON | |

IMPRESSION: The impression is that of a herniated lumbar disc at L4-5.

| DATE | NAME | REFERRING PHYSICIAN |

RECOMMENDATIONS: I would recommend a light duty restriction with a 30-pound weight lifting limit. It more than likely will be permanent.

John J. Euliano, Jr., M.D./mk

cc: Dr. Mary Ann Wendel

ORTHOPAEDIC & SPORTS MEDICINE OF ERIE, P.C.
300 STATE ST. • SUITE 400 A • ERIE, PA 16507
PHONE (814) 454-8287 • FAX (814) 454-8470

Cal,

Dorothy says I can
lie on a hot pack
on my 10 min break
if you give per-
mission. I really
need it ~~KH~~ please
~~RATHY HANSON~~ call me or ~~amb.~~

4-3-6 C OK Per
Kanski

**EXHIBIT**

*gabbies*  "6"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON          )
                               )    Civil Action No.  03 - 0374e
       Plaintiff,       )
                               )
   vs.                    )    Judge Maurice B. Cohill, Jr.
                               )
                               )
ALPINE MANOR, INC. d/b/a       )
INTEGRATED HEALTH SERVICES   )
OF ERIE AT BAYSIDE          )
                               )
       Defendant.      )

## AFFIDAVIT OF CARL KOVSKI

I, Carl Kovski, do hereby depose and voluntarily state:

1.     I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.     I was formerly employed at Integrated Health Services of Bayside (hereinafter "IHS") as the Administrator from approximately July 2001 through July 2002. Kathleen Hodson was employed as an RN during the time I was employed by IHS.

3.     I am aware that Kathleen was on light duty during much of the time I worked at IHS. I am aware that she had a worker's comp claim pending. I do not recall the details of her injury, expect that she had a weight restriction of not being able to lift more than 20 pounds. There was a period of time when she did not work at all, as she was on medical leave.



EXHIBIT

"H"

4.    IHS accommodated Ms. Hodson based on the recommendations of her doctor. I would not have permitted her to perform work outside of her restrictions, and had I ever been informed she was performing work outside of her restrictions or was being asked to perform work outside of her restrictions I would have rectified this problem. To my knowledge, Ms. Hodson was never assigned or asked to perform work outside of her job light duty description. She never complained to me that she was being assigned tasks that were outside of her job restrictions, nor am I aware of any request for reasonable accommodations that was made by her and denied by IHS.

5.    IHS made accommodations for Ms. Hodson such as having other employees push the medication cart down the hall and helping her open and close drawers and lift heavy equipment. Sometimes other nurses treated patients for her if she was unable. She was also permitted to go to the physical therapy room and put hot packs on her back during breaks. This was an accommodation she requested from me and I freely granted.

6.    Ms. Hodson never complained to me that she needed further accommodations to perform her job or that she had asked for a certain accommodation and it was denied to her.

7.    Concerning Ms. Hodson's allegation that I told her she was only permitted to work on Ambassador Hall, this assertion is false. I never would have assigned any employee, including Ms. Hodson, to a specific hall, as there are often instances when IHS would be short staffed and nurses would be relocated to different halls. While it may be true that Ms. Hodson generally worked on Ambassador Hall, her restrictions did not prevent her from performing the same job duties, on a different hall.

Additionally, had I made a decision to assign her to a specific hall, which I deny, I would have indicated same in her personnell file and made others aware of my decision. I never did this. I can think of no instance where I ever assigned any employee to a specific hall and specifically, I never made this arrangement with Ms. Hodson. There is no valid reason why she could not have worked on any of the other halls, and still done so within her restrictions.

8.    With respect to Ms. Hodson's assertion that she verbally applied for an MDS position ( a medical billing position), I do not recall her ever making such a request. Dave Dinges or Director of Nursing at the time would have made that hiring decision and not myself. I have no knowledge if Ms. Hodson was even qualified for this position.

9.    Ms. Hodson did complain almost daily about something. She complained about the staff she had to work with and she always claimed that other staff did not like her. She complained she did not want to perform certain tasks, even though those tasks were within her light duty restrictions.

10.    Ms. Hodson had a problem with David Dinges because he held her to her job requirements and would not let her neglect her work. She was always trying to get out of doing something. She complained that Mr. Dinges made her do tasks that she did not want to do, however, these tasks were within her light duty restrictions.

11.    If Ms. Hodson wished to file a complaint, about any manner, she could have done so through my office, through corporate headquarters and there was a 1-800 hot line that employees could call. These procedures were outlined in the employee handbook and employees were advised of these procedures upon hire. Furthermore,

the 1-800 hotline number was posted throughout the facility and employees had access to call this hotline at anytime. They could even make complaints about me to this hotline. Any written complaint that came through my office would be forwarded to Human Resources for further investigation. I never dismissed any employee who came to me with a complaint.

12.     I do not recall Ms. Hodson ever asking me how to file a written complaint about any employee, but she certainly was aware of how to file a complaint, as do all employees at IHS.

13.     Ms. Hodson did complain to me once about Mr. Watkin's behavior towards her. Mr. Watkins is openly gay and Ms. Hodson is open about her religious convictions. Ms. Hodson had a problem with Mr. Watkin's sexual preference and they generally had personality conflicts because of this. Ms. Hodson asked me to talk to Mr. Watkin's about his conduct towards her, as she thought his conduct was offensive. I can not recall any specific incident alleged by Ms. Hodson, simply that she did not like his attitude towards her. I told Ms. Hodson I would meet with Mr. Watkins to discuss her concerns. I never made the comment, "That's just Roger," to Ms. Hodson.

14.     I thereafter met with Mr. Watkins and discussed Ms. Hodson's feelings. Mr. Watkins responded that any personal problems between he and Ms. Hodson stemmed from the fact that Ms. Hodson did not like him because he is gay. Mr. Watkins stated that he has never treated her inappropriately. I found no evidence of any inappropriate conduct, and at the time Ms. Hodson made this complaint, she made no specific allegations of misconduct. After this one complaint made by Ms. Hodson, she never complained to me again, and, as far as I am aware, she made no complaints

to corporate or to the 1-800 hotline.

15.    Although Ms. Hodson did make various complaints about Mr. Dinges and Mr. Watkins, none of these complaints were complaints of discrimination or harassment. I never heard Mr. Waktins or Mr. Dinges disparage Ms. Hodson based on her religious beliefs and Ms. Hodson never made any such complaints. Ms. Hodson never complained to me that Mr. Watkins threw a box of lancets to her and joked about her physical ability to catch the small box. She never complained that he made statements about wanting to give patients flu shots in their butts, or him joking about how Attends would not fit him because of his physical endowments. She never complained that he talked about wanting "to do it with a priest." I never heard any complaints that Mr. Watkins pinched Ms. Callicott's nipples, nor did Ms. Callicott complain of such misconduct. I never witnessed any of these incidents, and no other employee complained of such conduct. In fact, no other employee made any complaints against Mr. Dinges or Mr. Watkins based on sexual harassment or any type of discrimination.

16.    I was not at working at the time Ms. Hodson quit her position. I was advised that Ms. Hodson was assigned to work on a given hall and that she refused to do so, claiming I told her she only could work on Ambassador Hall, which is not true. IHS was short staffed that particular shift and Mr. Dinges acted within his Supervisory duties to staff the halls as he saw fit. Ms. Hodson apparently decided she was not working on the assigned hall and she quit. When she walked off the job, she was in violation of IHS policy and with the state Board of Nursing , as she abandoned her patients without adequate notice or without finding a replacement. Frankly, she is lucky

no charges were filed against her nursing license for abandoning her patients.

17.   Ms. Hodson called me the next day requesting her job back. I told her she quit her position, abruptly walked off the job without finding a replacement and abandoned her patients. According to IHS policy, employees are not eligible for rehire under these circumstances and I told her she would not be hired back. My refusal to permit her to return was solely based upon the abandonment of her job and the patients. My decision was not based in any way upon Ms. Hodson's religious belief, for any discriminatory reasons, for harassment or because she was on light duty status. To my knowledge, Ms. Hodson was not disabled in any way, nor did I perceive her as being disabled. She never claimed to be disabled. She simply was on light duty status from an injury.

I have read and had an opportunity to correct this Affidavit consisting of __6__ pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: _1-25-2005_                    _____

                                       Carl Kovski

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON               )
                              )    Civil Action No.   03 - 0374e
         Plaintiff,           )
                              )
    vs.                       )    Judge Maurice B. Cohill, Jr.
                              )
                              )
ALPINE MANOR, INC. d/b/a      )
INTEGRATED HEALTH SERVICES    )
OF ERIE AT BAYSIDE            )
                              )
         Defendant.           )

## **AFFIDAVIT OF DAVE DINGES**

I, Dave Dinges, do hereby depose and voluntarily state:

1.      I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.      I was formerly employed at Integrated Health Services of Bayside (hereinafter "IHS") from 1993 through 2003.  I was employed in several positions including as a staff nurse, MDS coordinator, Nursing Supervisor and Acting Director of Nursing.  Kathleen Hodson was employed as an LPN during the time I was employed by IHS and at times, I was her direct supervisor.

3.      I am aware that Kathleen was on medical leave and/or light duty from approximately 2001 until the day she quit her position, on or about May 17, 2002.  I do not recall the details of her injury, expect that she had a weight restriction of not being

1

EXHIBIT

"I"

able to lift more than 20 pounds. There was a period of time when she did not work at all, as she was on medical leave.

4.    IHS accommodated Ms. Hodson based on the recommendations of her doctor. IHS made accommodations for Ms. Hodson such as having other employees push the medication cart down the hall and helping her open and close drawers, lift heavy equipment or move patients. However, often times, Ms. Hodson chose to push medication cart herself. Sometimes other nurses treated patients for her if she was unable. She was also permitted to go to the physical therapy room and put hot packs on her back and lay down on the therapy mats during breaks. In my opinion, IHS accommodated Ms. Hodson more than any other employee had been accommodated and  there were never any problems doing so.

5.    I never asked Ms. Hodson to perform work outside of her job restrictions. Ms. Hodson never complained to me that she needed further accommodations to perform her job or that she had asked for a certain accommodation and it was denied to her. She never complained to me about being in pain and she was able to work a full 8 hour shift. To my knowledge, Ms. Hodson was not disabled in any way, nor did I perceive her as being disabled. She never claimed to be disabled. She simply was on light duty status from an injury.

6.    When Ms. Hodson returned to work after being on leave in March 2002, I made a notation on her schedule documenting her restrictions and confirming accommodations for her. A true and correct copy of this schedule is attached as Exhibit "A." I reminder her not to life anything over 20 pounds or move patients and to have the other staff push her medicine cart.

2

7.    Ms. Hodson often was over dramatic about her physical limitations and it was my impression that she did not want to work and would do just about anything to get out of performing an assigned task.   There were times when she would wheel herself around in an office chair with wheels around the nurses station and other moments where she would have no trouble pushing a medication cart down the hall. She would ask other nurses to carry a patient chart for her that weighed no more than 1 or 2 pounds.   She would complain that there was no one around to help her, but there were always nurses aids assigned to every hall and all she had to do was ask.   There were times I would see her bending down to pick something up off the floor with no difficulty.   She complained she did not want to perform certain tasks, even though those tasks were within her light duty restrictions.   Ms. Hodson had a problem with me because I held her to her job requirements and I would not let her neglect her work.

8.    To my knowledge, Ms. Hodson never filed any complaints against me while she worked at IHS for discrimination or harassment.   If Ms. Hodson wished to file a complaint against me she could have done so through the Administrator at IHS, through corporate headquarters and there was a 1-800 hot line that employees could call.   These procedures were outlined in the employee handbook and employees were advised of these procedures upon hire and at training sessions. Furthermore, the 1-800 hotline number was posted throughout the facility and employees had access to call this hotline at anytime.

9.    I deny that I ever discriminated against Ms. Hodson based on her religion or because she was on light duty status.   Any decision I made with respect to Ms. Hodson's employment was done for legitimate reasons having nothing whatsoever to do with her religious beliefs, for harassment purposes, or because of her physical

3

restrictions. IHS has a zero tolerance policy with respect to discrimination and harassment. There was training provided at IHS regarding discrimination and harassment and there was also a yearly refresher course. Additionally, I am in the Navy Reserves and every year I am trained on discrimination and harassment issues. I have never had any other allegations of discrimination or harassment filed against me.

10.    Ms. Hodson was very open about her religious beliefs and she talked about it freely, although I did not know the exact religion she practiced. I thought she might practice the same religion as my family, as she once asked me if my brother went to her church because she thought she witnessed my brother's child being baptized. If Ms. Hodson does share the same religion as my family, it makes no sense that I would discriminate against her because of her religion.

11.    I am aware that Ms. Hodson claims I discriminated against her based on her religion because of some note I allegedly posted on the bulletin board. I did place notes on the pin-up board for staff, but the notes were always folded in half and/or placed in an envelope so other staff could not read the note. I never placed a note on the pin-up board disparaging Ms. Hodson about her religious beliefs. As I recall, the note I placed on the pin-up board for Ms. Hodson questioned why she did not perform a treatment as ordered by a physician. She claimed the patient did not need treatment as per ordered by physician and she did not make proper notation in the file.

12.    I may have made a comment one time to another employee questioning how Ms. Hodson treated patients. Ms. Hodson would make statements around the facility that if it were not for her, patients would die at IHS or that she had saved them. Unfortunately, death is part of reality when you work at a nursing/rehabilitative facility and as far as I was aware, Ms. Hodson was not ever in a position at IHS were she

4

personally saved a person's life. I may have commented once by questioning who she saved and what she did to them. I believe I questioned whether she performed CPR and said, "What did Kathy do, put her hands on them and heal them." This was an isolated comment which was made in jest. It certainly was not meant to be discriminatory or mean in any way. Ms. Hodson is taking one isolated comment and blowing it out of proportion. She never complained to me that this comment offended her or upset her, and as far as I am aware, she never filed a written complaint about this comment. If she would have complained to me, of if I was aware that the comments offended her, I would have apologized to her.

13.     Ms. Hodson did apply for a MDS position ( a patient assessment/ medical billing documentation position) that became open and I interviewed her for the position. I ultimately hired another employee for the position. Although Ms. Hodson may have worked at IHS for a longer period of time, her assessment skills and documentation skills were lacking from what the position required and she was not as qualified for the position as the person I hired. Promotions are based on nursing skills and not seniority. Ms. Hodson was not denied this position because of any discriminatory or harassment reasons. There simply was another applicant who was more qualified.

14.     During the course of Ms. Hodson's employment I verbally reprimanded or wrote her up on occasions for not following proper policy and procedure.

- On August 21, 1997, Ms. Hodson was written up for recapping a used lancet, which resulted in her sticking herself with a needle. It was a high risk behavior which resulted in her exposing herself to the patient's blood. Training on this procedure is provided at IHS. Ms. Hodson signed off on this warning and it was witnessed by Cathy

5

Manion. Ms. Hodson was told if this happened again, she could be terminated for following safety procedures.

- On August 22, 1997, Ms. Hodson was written up for administering medication to the wrong patient. When the error was discovered, she failed to contact the physician and there was no documentation made in the patient's chart by Ms. Hodson. This was a serious infraction that could have caused serious harm to the patient. Ms. Hodson signed off on this written warning. She was told if this happened again, she would be terminated.

- On May 14, 2002, I verbally warned Ms. Hodson for failing to properly complete a narcotics count and failing to properly note that a patient was given a narcotic. Another nurse, Young Bongatu was also verbally warned for this same incident. Ms. Hodson signed off on the verbal warning, but claimed she was being unfairly treated and that the other nurse was not reprimanded. The other nurse was reprimanded, but I did not discuss my dealings with the other nurse, as I do not share this type of personal information with other employees. I am aware Ms. Hodson claims that I laughed at her about this incident. I did no such thing and the reprimand was witnessed by another supervisor, Cathy Mannion.

All of these reprimands were justified and were not for any discriminatory reasons or for harassment purposes. A copy of these written warning are attached as Exhibit "B."

15.    On May 17, 2002, I assigned Ms. Hodson to work on the Northwest Hall. IHS was short staffed on this date and it was necessary for me to adjust staff assignments to cover the care for all the patients. When Ms. Hodson reported to work, she clocked in and was made aware of her assignment to the Northwest Hall. She did

6

not want to work in the Northwest Hall and claimed that she was only permitted to work in Ambassador Hall, which made no sense to me. I was never advised by anyone at IHS that Ms. Hodson was assigned solely to Ambassador Hall. In fact, no nurse is assigned to a specific hall. Although someone may generally work on one hall, nurses are rotated around the various halls when necessary to ensure coverage of care for all the patients. I asked her why she did not want to work in the Northwest Hall and she did not provide me with a reason. Attached as Exhibit "C," are my hand written notes and disciplinary action form documenting the events of this incident.

16.     I acted within my supervisory duties to assign Ms. Hodson to a hall that needed nursing coverage. At no time did she request any accommodations to work at Northwest Hall. If she had obeyed my direct instructions to work Northwest Hall, she would still have been accommodated by doing only light duty work and the nurses' aides and other employees would have assisted her by performing the heavier work. Her same light duty restrictions applied to any hall she may have been assigned to work. Northwest Hall at the time had less patient acuity and it had more nurses' aides assigned to it. Ms. Hodson had the support staff she needed to perform her job in the Northwest Hall and her job responsibilities would have been no different than those on the Ambassador Hall.

17.     Ms. Hodson told me she was not working on Northwest Hall and she demanded to be assigned to Ambassador Hall. By the time Ms. Hodson reported to me that she was not going to work on Northwest Hall, we were already behind in passing out medications due to being short staffed. I told Ms. Hodson that she was needed in Northwest Hall, that if she refused to work on the Northwest Hall she was abandoning the patients, and that there was no one else available in that hall. I told her

7

she could either work Northwest Hall or quit her position. She decided to quit and she walked out. When she walked off the job, she was in violation of IHS policy as she abandoned her patients without adequate notice or without finding a replacement. As a nurse at IHS, every employee is responsible for every patient in the building.

18.    After Ms. Hodson walked out, I filled out a Disciplinary action form documenting what occurred, as explained above. A copy of this disciplinary action form is attached as Exhibit "C." I did not fire Ms. Hodson, she voluntary quit her position when she refused to work on the Northwest Hall and abandoned her patients.

19.    Ms. Hodson never complained to me about any sexual harassment or other misconduct by Roger Watkins or any other employee for that matter. I never witnessed Mr. Watkins treating Ms. Hodson improperly.

20.    I was never fired from my position at IHS as Ms. Hodson claims. I was suspended for a one week period of time and after investigation, I was asked to return to work as was paid my full salary. I left IHS in the summer of 2003, I was laid off and received a severance package from the company.


I have read and had an opportunity to correct this Affidavit consisting of __8__ pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7/26/05                          Dave Dinges

8



BAYSIDE SCHEDULE.

AMB

Lt. Dotey

RN

Hodson

| MAR | 30 | 31 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| | S | M | T | W | Th | F | Sa | S | M | Tu | W | Th | F | Sa | S | M | Tu | W |
| | 7 | 7 | — | — | 7 | — | 7 | 3 | — | 3 | 3 | / | 3 | / | 3 | 3 | 3 | / |

Wickey,

we this sheet you on chng for 4
weeks to get back on the svhng of
things. Remember that 90% responsibility
No lifting have chngs/ other nurse help
have chng of supervisors/nurses push cluor chngs
2 down in the am. No repositioning by following
Yes/devils

EXHIBIT

"A"



BAYSIDE SCHEDULE

# EMPLOYEE COUNSELING FORM

DATE: 8/21/97

EMPLOYEE: Hodson K. LPN

PROBLEM: Failure To follow Correct Policies & Procedures.
LPN Hodson Re-capped a "used" Lancet which resulted
in a Needle stick. IHS Policy STATE NO
Recapping of SHARPS for any reason.

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN:
SHARPS Are Not to Be Recapped for any reason, @ any time.
You NEED to Review Policies in the infection control
Manual. Failure to comply c Policies in the
future "will Result in Disciplinary Action or TERMINATION!

Signature of Staff Member          Date 8/21/97
                                   8/22/97

Signature of Employee    8-22-9
Date



EXHIBIT

"B"

**EMPLOYEE COUNSELING FORM**

# EMPLOYEE COUNSELING FORM

DATE: _22 Aug 97_

EMPLOYEE: _Hodson K. LPN_

PROBLEM: _MEDICATION ERROR — ON 21 Aug 97 LPN Hodson Administered Valium 5mg to a Resident INSTEAD of Oxycontin 20, as per Physician orders. The Resident HAD NO VALIUM ORDERS. The ERROR WAS DISCOVERED During the Narcotic Count @ the end of the shift when the Count WAS FOUND INCORRECT. When the ERROR WAS DISCOVERED the Physician WAS NEVER NOTIFIED and there WAS NO Documentation that the Residents STATUS WAS EVALUATED!_

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN: _This WAS A SERIOUS ERROR which had great Potential to cause harm to the RESIDENT. GREAT Care Must Be Given when ADMINISTERING NARCOTICS and/or ANY MEDICATION. You will Be Suspended NEXT occurance with out Pay. Should AN INCIDENT of such NATURE occur AGAIN Disciplinary Action and/or Termination will Result._

_Kathleen Hodson LPN 8-22-97_
Signature of Employee    Date

_Darrell W. Dingee RN_ 8/22/97
Signature of Staff Member    Date

_Catalen Manson RN_ 8/22/97

# EMPLOYEE COUNSELING FORM

**Disciplinary Action Form**

<div style="border: 1px solid black;">

## Disciplinary Action Form

Date 14 May 02

Name K Hodson (PN)

Dept. NSG

Disciplinary Action:

Verbal* ☒     Written ☐     Written & Suspension ☐     Discharge ☐

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: Failed to Complete Narcotic Count, Count Found Incorrect, Failed to Document Narcotic Given to Resident. on 13 May 02.

※ Employee was provided Eduction Materials "Maintaining Control over Controlled Drugs," Iths Handout.

A copy of this warning was personally delivered to the above employee by:

_____ RN, D.O.N

Supervisor

_____

Date

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

Kathleen Hodson LPN

Employee

5/14/02

Date

You all sign the super visor pencils in your name and the next day asks you to sign in the space on the nurse book provided. I very seldom ever get to sign off that's why I can't understand being written up for this. I see several blank spaces in the narc book + I ask have about them. Here I wasn't to worry about anyone else. this was about me, only K. Hodson LPN 5/14/02

Happy Nurses Week
</div>

FORMS-6

ON 17 May '02 Cathy Hodson CNA came to me @ approx 3:20pm to discuss her Hall Assignment. I took her in the office c̄ Cathy Mannion RN ADON & Shiker ḓīsT. CNA Hodson stated "I can not work that hall" referring to NW Hall. I asked her why she stated I can't. I asked her why she said people say it hard. I told her there was only 21 residents on that hall and it is much easier than it was 2wks ago with 29 residents. She said I can't work it, I just can't. I asked LPN Hodson why can't you work it if you haven't tried it since you've been Back? Cathy stated It's not in my restrictions Restriction to work down there. I told her Your restriction are a 20# wt lift limit, no Pushing, no Pulling, regaurd less of which hall you work on. Cath stated well I I can't Do it. I asked why, give me a reason? Cathy stated I don't have to, I'm leaving. I told her if you leave you will no longer be employed here for refusing your Assignment Cathy stated I'm leaving, & left.

Donil Wilkinson RN Dor
5/17/02

EXHIBIT

"C"

# Disciplinary Action Form

## Disciplinary Action Form

Date 17 May 02

Name _Cathy Hodson LPN_

Dept. _NSG_

**Disciplinary Action:**

Verbal* ☐    Written ☐    Written & Suspension ☐    Discharge ☒

To the employee:

    Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: _LPN was assigned NW Hall on 17 May 3-11 shift. LPN came to DON c/o "She could not watch that hall + was not in her restriction." I told her, her restrictions were 20" wt restriction, no pulling or lifting/lifting no matter what hall you are on. She stated then "I'm leaving." I told her if you leave you are done, you will no longer be employed here. LPN said then "I'm leaving."_

A copy of this warning was personally delivered to the above employee by:

_[signature]_ RN DON

Supervisor

17 May 02

Date

17 May 02

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

_[signature]_

Employee

Date

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON           )

        Plaintiff,        )

vs.                       )

ALPINE MANOR, INC. d/b/a    )
INTEGRATED HEALTH SERVICES   )
OF ERIE AT BAYSIDE        )

        Defendant.     )

Civil Action No.   03 - 0374e

Judge Maurice B. Cohill, Jr.

## AFFIDAVIT OF KATHLEEN MANNION

I, Kathleen Mannion, do hereby depose and voluntarily state:

1.     I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.     I was formerly employed at Integrated Health Services of Bayside (hereinafter "IHS") as the unit manager and Assistant Director of Nursing. Kathleen Hodson was employed as an LPN during the time I was employed at IHS, and I was her direct Supervisor.

3.     I am aware that Kathleen was on light duty during the time before her separation from the company. She had a weight restriction of not being able to lift more than 20 pounds and limited pushing, pulling and lifting. IHS accommodated Ms. Hodson based on the recommendations of her doctor and IHS permitted  other employees to push the medication cart down the hall and help her open and close



EXHIBIT

"J"

drawers and lift heavy equipment.   To my knowledge, Ms. Hodson was never assigned or asked to perform work outside of her job light duty description.  Ms. Hodson never complained to me that she needed further accommodations to perform her job.  I am not aware of any request for reasonable accommodations that was made by her and denied by IHS.   Except for the day she quit her position, as discussed below, she never complained that she was being assigned tasks that were outside of her job restrictions.

4.     Ms. Hodson had a problem with David Dinges, Director of Nursing, because he held her to her job requirements and would not let her neglect her work. She was always trying to get out of doing something.  She complained that Mr. Dinges made her do tasks that she did not want to do, however, these tasks were within her light duty restrictions.

5.     I am not aware of Mr. Dinges ever placing a note on the bulletin board disparaging Ms. Hodson because of her religious beliefs.  She never complained to me about this. Ms. Hodson openly claimed that without her, patients would die at IHS.  I do not recall Mr. Dinges making a comment such as "What did Kathy do, put her hands on them and heal them."  If he did make such a comment, and knowing Mr. Dinges, it was likely in jest and was not meant to be mean or discriminatory in any way.

6.     Ms. Hodson had a problem with Mr. Watkin's because of his sexual preference and they generally had personality conflicts because of this.  She would make comments while working at the nurses station such as calling Mr. Watkin's a "faggot" and she openly stated her opinion that "God does not approve of homosexuality."

7.      She never complained, nor did I ever hear Mr. Watkins disparage Ms. Hodson based on her religious beliefs or sexually harass her.  Ms. Hodson never complained to me that Mr. Watkins threw a box of lancets to her and joked about her physical ability to catch the small box.  She never complained or said that he made statements about wanting to give patients flu shots in their butts, or him joking about how Attends would not fit him because of his physical endowments.  She never complained or said that he talked about wanting "to do it with a priest."  I never heard any complaints or statements that Mr. Watkins pinched Ms. Callicott's nipples, nor did Ms. Callicott complain of such misconduct.  I never witnessed any of these incidents, and no other employee complained or made allegations of such conduct.  In fact, no other employee made any complaints against Mr. Dinges or Mr. Watkins based on sexual harassment or any type of discrimination.

8.      If Ms. Hodson wished to file a complaint, about any matter, she could have done so through me, through Shelia Rist, through corporate headquarters and there was a 1-800 hot line that employees could call.  These procedures were outlined in the employee handbook and employees were advised of these procedures upon hire.  Furthermore, the 1-800 hotline number was posted throughout the facility and employees had access to call this hotline at anytime.

9.      Ms. Hodson never complained to me that she was discriminated against or harassed by either Mr. Dinges or Mr. Watkins.  She complained to me about other general matters and I believe if she had a complaint, she would have said something to me.

10.    I personally have never discriminated or harassed Ms. Hodson in any manner. As far as I am aware, she never complained to any one about any of my conduct towards her and she never complained directly to me.

11.    I was working the day Ms. Hodson quit and witnessed the incident. IHS was short staffed that particular day and Mr. Dinges assigned Ms. Hodson to work on Northwest Hall. Northwest Hall was perceived by some as a "heavier" work load hall simply because there were more patients on that hall. However, the type of work that needed to be performed was generally comparable to other halls.

12.    Ms. Hodson did not want to work on Northwest Hall and she claimed that she was only permitted to work in Ambassador Hall. This was not true and her restrictions did not state that she could only work on a certain hall, nor did her restrictions limit the number of patients she could see in a given shift.    No nurse is assigned to a specific hall at IHS, as nurses are scheduled to halls based on need. Although someone may generally work on one hall, nurses are rotated around the various halls when necessary to ensure coverage of care for all the patients.

13.    Ms. Hodson's same light duty restrictions applied to any hall she may have been assigned to work. Although Northwest Hall generally had more patients than the other halls, during this particular time, there was less occupancy in the Northwest Hall and it had more nurses' aides assigned to it. Ms. Hodson had the support staff she needed to perform her job in the Northwest Hall and her job responsibilities would have been no different than those on the Ambassador Hall. The nurses' aides would have been able to perform, or assist in the duties that were beyond Ms. Hodson's work restrictions. Ms. Hodson was advised of this.

14.    By the time Ms. Hodson reported to work, we were already behind in passing out medications on the Northwest Hall due to being short staffed. Mr. Dinges told Ms. Hodson that she was needed in Northwest Hall, that if she refused to work on the Northwest Hall she was abandoning the patients, and that there was no one else available in that hall. He told her she could either work Northwest Hall or quit her position. She said "then I quit" and she walked out.    When she walked off the job, she was in violation of IHS policy as she abandoned her patients without adequate notice or without finding a replacement. As a nurse at IHS, every employee is responsible for every patient in the building. At no time did Ms. Hodson claim that she could not physically perform the work the work at Northwest Hall and at no time did she request any accommodations to work at Northwest Hall. If she had obeyed her supervisor's direct instructions to work at Northwest Hall, she would still have been accommodated by doing only light duty work and the nurses' aides and other employees would have assisted her by performing the heavier work.

I have read and had an opportunity to correct this Affidavit consisting of __5__ pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7/28/01

Kathleen Mannion

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON                          )
                                         )      Civil Action No.  03 - 0374e
            Plaintiff,                   )
                                         )
    vs.                                  )      Judge Maurice B. Cohill, Jr.
                                         )
                                         )
ALPINE MANOR, INC. d/b/a                 )
INTEGRATED HEALTH SERVICES               )
OF ERIE AT BAYSIDE                       )
                                         )
            Defendant.                   )

## AFFIDAVIT OF ROGER WATKINS

I, Roger Watkins, do hereby depose and voluntarily state:

1.      I have personal knowledge and I am competent to testify as to the matters
set forth herein.

2.      I was formerly employed at Integrated Health Services of Bayside
(hereinafter "IHS").  I was employed in several positions including as Infection Control
Nurse, Supervisor RN and Assistant Director of Nursing.  Kathleen Hodson was
employed as an LPN during the time I was employed at IHS, and on a limited basis, I
was her supervisor.

3.      Ms. Hodson had problems with me because she does not respect my
lifestyle.  I am openly gay.  She would make comments to me like "She can't
understand my kind," and "Your people are wrong."  She also made a comment that "All
his people should be put on an island."  When she would make these comments to me,



EXHIBIT

"K"

I would roll my eyes and walk away without saying anything back to her. Fortunately, Ms. Hodson and often worked different shifts, and our schedules usually only overlapped for 1 hour. Ms. Hodson worked from 3:00 p.m. to 11:00 p.m. and I worked from 7:00 a.m. to 3:00 p.m. There were times when Ms. Hodson was on light duty that she worked from 7:00 a.m. to 3:00 p.m. Most days I would not see Ms. Hodson.

4.    My religious affiliation is Roman Catholic. Ms. Hodson was very open about her religious beliefs, although I did not know what her religious affiliation was. I never discriminated against or harassed Ms. Hodson because of her religious beliefs. If anything, she was the person who discriminated against me because of my sexual preference.

5.    I am aware that Kathleen was on light duty during much of the time I worked at IHS. I do not recall the details of her injury. IHS accommodated Ms. Hodson based on the recommendations of her doctor. IHS made accommodations for Ms. Hodson such as having other employees push the medication cart down the hall and helping her open and close drawers and lift heavy equipment. Sometimes other nurses treated patients for her if she was unable. She was also permitted to go to the physical therapy room and put hot packs on her back during breaks.

6.    Ms. Hodson never complained to me that she needed further accommodations to perform her job or that she had asked for a certain accommodation and it was denied to her.

7.    I deny that I ever discriminated or harassed Ms. Hodson. IHS has a zero tolerance policy with respect to discrimination and harassment. There was training provided at IHS regarding discrimination and harassment and there was also a yearly refresher course.

8.    I am aware that since Ms. Hodson's separation of employment from IHS, she is now claiming that I sexually harassed her because of her physical abilities and created a hostile work environment. She claims that I once threw a box of lancets at her and made a statement "Here Hodson, take this, if it isn't too heavy for you." This never happened and I never made this statement. She also claims I threw files in front of her and threatened that if she did not perform various filings correctly, I would write her up. This is not true and I never wrote Ms. Hodson up for any misconduct.  I never made any statements about wanting to give patients "flu shots in their butts" or joking about how Attends would not fit me because of my physical endowments. I never stated that I wanted "to do it with a priest." I never made a statement about my sexual fantasies. I never pinched Carmen Callicott's nipples in front of Ms. Hodson, or ever at all. Ms. Callicott and I are friends and we lived with one another. We have traveled on vacations with one another. I would never disrespect a woman in this manner and honestly, I am not attracted to women, so there is no logical reason why I would do such a thing.

9.    Ms. Hodson never complained directly to me about any of my conduct towards her.  If she would have complained to me, or if I was aware that anything I did or said to her was offensive to her, I would have apologized to her.

10.    If Ms. Hodson wished to file a complaint against me, about any matter, she could have done so through Shelia Rist, through corporate headquarters and there was a 1-800 hot line that employees could call.  These procedures were outlined in the employee handbook and employees were advised of these procedures upon hire. Furthermore, the 1-800 hotline number was posted throughout the facility and employees had access to call this hotline at anytime.  As far as I am aware, no written complaint was ever filled by any employee against me.

11.    I am aware of one occasion when Ms. Hodson complained about me to Carl Kovski, who was the Administrator at IHS.  Apparently Ms. Hodson complained that she did not like my conduct towards her.  Mr. Kovski did speak to me about Ms. Hodson's complaint and I explained to Mr. Kovski that Ms. Hodson's problems with me stemmed from the fact she did not like persons who are gay and she did not like me personally.  I never mistreated Ms. Hodson in any manner, and, in fact, I rarely saw her.

12.    I am also aware that she went to Shelia Rist and complained that she "was not treated right" by me.  I do not know what she meant by this.  I am not aware of any specific things she complained about and I never mistreated her in any manner.  As far as I am aware, she never complained that I harassed her or discriminated against her.

13.    I was working the day Ms. Hodson quit, but I did not witness any of the occurrences.  IHS was short staffed that particular day.  I am aware she was assigned to Northwest Hall and that she did not want to work that hall.

14.    Ms. Hodson never complained to me about any harassment, discrimination or other misconduct by Dave Dinges.  I never witnessed Mr. Dinges treating Ms. Hodson improperly.

I have read and had an opportunity to correct this Affidavit consisting of __5__ pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7/28/05

Roger Watkins

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON )
)       Civil Action No.   03 - 0374e
        Plaintiff, )
)
vs. )       Judge Maurice B. Cohill, Jr.
)
)
ALPINE MANOR, INC. d/b/a )
INTEGRATED HEALTH SERVICES )
OF ERIE AT BAYSIDE )
)
        Defendant. )

## AFFIDAVIT OF JENNIFER HEISER

I, Jennifer Heiser, do hereby depose and voluntarily state:

1.      I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.      I am currently employed at IHS at Bayside as the Assistant Director of Nursing.  I worked with Kathleen Hodson, who was employed as an LPN, and from 2001 through 2003 and I was her Supervisor.  Both David Dinges and Roger Watkins, who are both RNs and at different times were Director of Nursing and Assistant Director of Nursing respectively , and were at varying times also Ms. Hodson's Supervisor.

3.      I am aware that Ms. Hodson was on light duty from an injury she claimed occurred at work.  IHS made accommodations for Ms. Hodson such as having other employees push the medication cart down the hall and helping her open and close drawers

1



and lift heavy equipment. She was also permitted to go to the physical therapy room and put hot packs on her back during breaks. She usually did this once a shift and she was usually was able to complete an 8 hour shift. Ms. Hodson never complained to me that she needed further accommodations or that she had asked for a certain accommodation and it was denied to her. Her work restrictions were posted on a clip board and as far as I am aware, Ms. Hodson was never asked to do something that was prohibited under her work restrictions.

4.    Ms. Hodson never complained to me that Mr. Dinges was discriminating against or harassing her in anyway. As her supervisor, Ms. Hodson certainly could have come to me about any complaints she had about any other employee. I never witnessed Mr. Dinges treating her inappropriately. There is also policy in the employee handbook advising employees on IHS procedure for making complaints. Additionally, during the time that Ms. Hodson worked at IHS, there was a 1-800 hotline number that was posted around the facility that employees could use to call in complaints.

5.    Ms. Hodson did complain about Mr. Dinges giving her assignments she did not want to do. She preferred to sit and fill out paperwork. Her job requirements as an LPN involved more tasks than filling out paperwork. She would get upset when Mr. Dinges assigned her tasks she did not wish to perform, even though the tasks were well within her work restrictions.

6.    Ms. Hodson was very openly religious and I am aware that she was training to be a preacher. She told me that nursing was too hard for her and she needed to find work that was less stressful to her. During my conversations with her, it is my understanding that Ms. Hodson did not want to be a nurse anymore.

2

7.      Ms. Hodson never complained to me about Mr. Watkins. Mr. Watkins was thought to be openly gay. Ms. Hodson had a personal problem with this and clearly she objected to his personal life style.

8.      I never heard Mr. Watkins talk about his sexual fantasies or exploits at work, I never heard him talk about his physical attributes. I never heard Mr. Watkins making statements about wanting to give patients flu shots in their butts, or him joking about how Attends would not fit him because of his physical endowments. I never heard him talking about wanting "to do it with a priest." I never heard any complaints that Mr. Watkins pinched Ms. Callicott's nipples, nor did Ms. Callicott complain of such misconduct. I never heard Mr. Watkins or Mr. Dinges disparage Ms. Hodson because of her religious beliefs. Ms. Hodson never complained to me of any of these incidents.


I have read and had an opportunity to correct this Affidavit consisting of 3 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7/26/05

Jennifer Heiser

3

# EMPLOYEE COUNSELING FORM

DATE: _8/21/97_

EMPLOYEE: _Hodson K. LPN_

PROBLEM: _Failure To Follow Correct Policies & Procedures._
_LPN Hodson ed-capped a "used" lancet which resulted_
_in a needle stick. Its Policy STATE NO_
_RE-capping of SHARPS for any reason._

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN: _SHARPS Are Not to be Recapped for any reason, @ anytime._
_You NEED to review Policies in the infection control_
_Manual. Failure to comply c Policies in the_
_future "will Result in Disciplinary action or TERMINATION!_

_David W. Designer RN_
Signature of Staff Member    8/21/97

_Debrah Marxen_ 8/22/97

_Kaitleen Hodson LPN_ 8-22-97
Signature of Employee    Date

## EMPLOYEE COUNSELING FORM

EXHIBIT

"M"

# EMPLOYEE COUNSELING FORM

DATE: 22 Aug 97

EMPLOYEE: Hodson K. LPN

PROBLEM: MEDICATION ERROR — ON 21 Aug 97 LPN Hodson Administered Valium 5mg to a Resident Instead of Oxycontin 20, as per Physician orders. The Resident had no valium orders. The Error was Discovered During the Narcotic Count @ the end of the Shift when the count was found incorrect. When the Error was Discovered the Physician was never notified and there was no Documentation that the Residents status was evaluated.

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN: This was a serious Error which had great Potential to cause harm to the Resident. Great Care Must Be Given when Administering Narcotics and/or Any medication. You will Be suspended NEXT occurrence without Pay. Should An Incident of such Nature occur Again Disciplinary Actions and/or Termination will Result.

Kathleen Hodson LPN 8-22-97
Signature of Employee    Date

_____ W. Unger RN    8/22/97
Signature of Staff Member    Date

_____ Mannon RN 8/22/97

# EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

*Verbal Warning*

DATE: 12/1/97

EMPLOYEE: Kathy Hodson

**PROBLEM:** Failure to follow medication administration policy & procedures. On 11/25/97 @ 9ᵖᵐ you administered MS AR 30mg to ES instead of MS Contin 30mg.

**STATEMENT BY EMPLOYEE:**

**RESOLUTION OF PROBLEM OR ACTION TAKEN:** It is your responsibility as the nurse administering medications to verify you are administering the correct medication to the correct resident at the correct time. Further occurrences of this nature will result in suspension +/or termination.

_____ Hansen RN 12/1/97          Kathleen Hodson 12-1-97
Signature of Staff Member   Date        Signature of Employee   Date

Presented by D Wiseofler

## EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

Verbal
warning

DATE: 12.3.97

EMPLOYEE: Kathlge Hodson LPN

PROBLEM: Incomplete Documentation I+O incomplete
for 12/2 for 4 assignment 45-47.

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN:
It is your responsibility to complete accurately
No per Physician order. assure that
those are complete before the end of
your shift. Further Discrepencies in this
area will Result in Further disciplinary action

_____ PN  12.3.97        Kathleen Hodson LPN 12-8-97
Signature of Staff Member  Date        Signature of Employee  Date

# EMPLOYEE COUNSELING FORM

Rev. 2/95

## EMPLOYEE COUNSELING FORM

DATE: 12-29-97

EMPLOYEE: Kathey Nodson (LPN)

PROBLEM: Failure to Follow Documented Physician ORders - Resident 492 found on floor 12-28-97 815pm. HAD oNly 1 siderail ↑ + placed in Bed - HAS ORDER for All (4)½ rails to be ↑ when resident is in bed. Resident gooted employee as stating " Well he's alert enough - he should have told the Aide that all rails were supposed to be ↑

STATEMENT BY EMPLOYEE: Employee assisted CNA to transfer resident to bed. I was not in room when resident was put into bed. *I did not say "well he's alert enough". Lillian Bailey CNA was a witness to what I said.

RESOLUTION OF PROBLEM OR ACTION TAKEN:

Ivonne 12-29-97    Kathleen Nodson LPN

# EMPLOYEE COUNSELING FORM

*Verbal Warning*

DATE: 2-18-98

EMPLOYEE: Kathy Hodson LPN

**PROBLEM** Failure to meet minimum standards of care. Resident
████ C███████ ordered for daily wts on 3-11 shift. No weights
obtained on this resident since 2-5-98. This resident can fill c̄
fluid and go into CHF very quickly and daily weights are
vital to monitoring for this. You failed to complete this
assigned duty X_1

**STATEMENT BY EMPLOYEE:**




**RESOLUTION OF PROBLEM OR ACTION TAKEN:** Further failure to complete assigned duties will result in
further disciplinary action and/or suspension/termination.
Read all MARS, TARS carefully to ensure all orders
are carried out.

_Daniel Venesky RN_ 2-18-98
Signature of Staff Member          Date

_Kathleen Hodson LPN_
Signature of Employee          Date

**EMPLOYEE COUNSELING FORM**

# EMPLOYEE COUNSELING FORM

DATE: 4-2-98

EMPLOYEE: Kathy Hodson LPN

PROBLEM: On 3-30-98 resident JK___ had IV ordered at 80cc/hour IVPB to run at 200cc/hour Ms. Hodson left IV infusing at 200cc/hour Entire bag infused resulting in IV infiltration and fluid overload.

STATEMENT BY EMPLOYEE:

RESOLUTION OF PROBLEM OR ACTION TAKEN: April 2 1998 Suspension. Any further medication error will result in termination

Signature of Staff Member: Sharon Di___       Date:

Signature of Employee: Kathleen Hodson       Date: 4-2-98

Lee Mix RN    4/2/98

# EMPLOYEE COUNSELING FORM

DATE: 2/25/99

EMPLOYEE: Kathy Hodson

PROBLEM: On 2/15/99 you initialed, then circled a 7
treatment for OOB Bid as tolerated + cooperative, however,
you did not document why you did not complete
the treatment as prescribed by the physician.

See attached.

STATEMENT BY EMPLOYEE:
I accept responsibility for not
explaining why I circled it. Res-
ident did refuse to get OOB is
what I should've written on the back of
TAR.

RESOLUTION OF PROBLEM OR ACTION TAKEN:
Review ihs policy regarding documentation requirements
when treatments are not completed per the physician's
orders

_Houser RN_          2/25/99      _Kathleen Hodson_    3-1-99
Signature of Staff Member        Date      Signature of Employee      Date

# EMPLOYEE COUNSELING FORM

# EMPLOYEE COUNSELING FORM

DATE: 6-6-01

EMPLOYEE: Kathy Hodson, LPN

PROBLEM:

On 6-6-01 ▊▊▊▊ showed me (her) drug on ▊▊▊ ▊▊▊▊ Tx = her initials from 6-5-01 even though you had initialled it on 3-11 shift. Please be more careful.

STATEMENT BY EMPLOYEE:

As this is 6-21-01 when I received this, I cannot remember. I probably forgot to circle it. I will circle it if I don't get to, if I am unable in the future.

RESOLUTION OF PROBLEM OR ACTION TAKEN:

D. Marsili R.N.
_Signature of Staff Member_                    Date

Kathleen Hodson LPN   6/21/0
_Signature of Employee_                    Date

# EMPLOYEE COUNSELING FORM

**Disciplinary Action Form**

<div style="border:1px solid black; padding:1em;">

### Disciplinary Action Form

Date __11-15-01__

Name __Kathy Hodson__

Dept. __1012502  Nsg__

Disciplinary Action:

Verbal* ☒          Written ☐          Written & Suspension ☐          Discharge ☐

To the employee:

    Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: Absenteeism: Policy is 6 separate occurrence within Any 12 month period. Employee Absent on 1-22-01  1-23-01 ill, 6-22-01 Back hurts, 7-17-01 walked off the job (back), 9-9-01 Back pain, 11-10-01 Back hurts, = 5 Absences. Any further absences will Result in Disciplinary Action.

A copy of this warning was personally delivered to the above employee by:

__K. ____ RN__ 11-15
Supervisor

__Sara K. R___ HK 11-30-01__
Date

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

Reviewed = refusal to sign
R/T "I'm on workman's comp + I miss b/c of my Back"
11/15/01      Employee          Date

</div>

**Disciplinary Action Form**

## Disciplinary Action Form

Date 1-29-02.

Name _Kathy Hoova_

Dept. _Nursing_

Disciplinary Action:

Verbal* ☐          Written ☐          Written & Suspension ☐          Discharge ☐

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: _Notified of potential Attendance problem_

A copy of this warning was personally delivered to the above employee by:

_Bobi Dli Q_

Supervisor

_1-29-02_

Date

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

_Would not sign_

Employee

Date

*Completion of this form shall serve as documentation only and should not be filed in the employee's personnel file.

# Disciplinary Action Form

## Disciplinary Action Form

Date 1/29/00

Name Kathleen Hodson

Dept. NSG

Disciplinary Action:

Verbal* ☒    Written ☐    Written & Suspension ☐    Discharge ☐

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: On 1/18, 1/19, 1/20 employee failed to punch in and out for lunch despite prior reminders to punch in and out for a 30 min lunch per 8hr shift. On 1/18, employee punched in 29 minutes early. On 1/19 employee punched in 14 minutes early. On 1/20 employee punched in 1hr and 3 minutes early. employees are not to punch in more than 5 minutes early.

A copy of this warning was personally delivered to the above employee by:

You must take your 1/2" lunch every Day you clock. We will schedule it along to your work schedule ea. Day.

Supervisor _____ RN ADON

Date 29 JAN 02

- - - - I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

✱ Reported She has been to Busy to take Lunch.

Employee _____

Date _____

*Completion of this form shall serve as documentation only and should not be filed in the employee's personnel file.

FORMS-67

**Disciplinary Action Form**

## Disciplinary Action Form

Date _14 May 02_

Name _K Hodson (RN)_

Dept. _NSG_

Disciplinary Action:

Verbal* ☒        Written ☐        Written & Suspension ☐        Discharge ☐

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: _Failed to Complete Narcotic Count, Count_
_found Incorrect, Failed to Document Narcotic_
_Given to Resident, on 13 May 02._

_* Employee was provided Education Materials " Maintaining_
_Control over Controlled Drugs," Its Handout_

A copy of this warning was personally delivered to the above employee by:

_Olula Murry_ RN, D.O.N.
Supervisor

_____
Date

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

_Kathleen Hodson RN_
Employee

_5/14/02_
Date

_Happy Nurses' Week_

_Usually, the supervisor "pencils in" your_
_name and the next day asks you to sign_
_in the space, in the this book provided. I_
_very seldom, forget to sign & thats why_
_I can't understand, being written up for this._
_I see many all blank spaces in the narc_
_book & I asked Olula about them. He said_
_I wasn't to worry about anyone else this was_
_about me, only K Hodson RN 5/14/02_

FORMS-6

IES - BAYSIDE
PUNCH DETAIL REPORT                                    05/20/02 11:37a   Page 1
Current pay period

------------------------------------------------------------------------

HODSON, KATHLEEN D.200347211    1012502   88---F-
   ID      IN DEPT            OUT   ID IN DEPT           OUT      TOTALS
Fri 05/17  248p*U            322p                              0.50    0.50

  Dept:1012502 LTC NON-CERTIFIED LPN
                      REG:      0.50

EXHIBIT

"N"



**NORTHWEST**

| | |
|---|---|
| 50-1 | S███████ P█████ |
| 50-2 | C███, B████ S |
| 51 | K███ M███ MOD |
| 52-1 | S███████ H███ T |
| 52-2 | S███████ O█████ MED |
| 53 | G██████, R██H~MED |
| 54-1 | L███, M██████ ~S |
| 54-2 | |
| 56 | M███, F██████ MOD |
| 57 | C███, G█████ S |
| 58-1 | M██████, D██████ MAX |
| 58-2 | L████ S████ S |
| 59 | W████████, A██ MOD |
| 60-1 | B███, M███ J███ MIN |
| 60-2 | V████████, E████ T |
| 61-1 | V████, F█████ T |
| 61-2 | L██████, B██████ MOD |
| 62-1 | |
| 62-2 | |
| 63-1 | H██████, T██████ MAX |
| 63-2 | R██████, L████ MAX |
| 64-1 | A███ L██ S |
| 64-2 | |
| 65-1 | F██████ R████ S |
| 65-2 | S██████, A█████ namo! |

**AMBASSADOR**

| | |
|---|---|
| 66-1 | M███████ J█████ T |
| 66-2 | F████ F████ S |
| 67-1 | J██████ C███████ ~S |
| 67-2 | B██ M███████ |
| 68-1 | V███████ H███ S |
| 68-2 | C████ R█████ |
| 69-1 | G██████ G██████ S |
| 69-2 | K██████ R██ MOD |
| 70-1 | M█████ A█ |
| 70-2 | D███████ T |
| 71-1 | P██████ L███ T |
| 71-2 | S████ M█████ T |
| 72-1 | C██████ G████ |
| 72-2 | R██████ B█████ |
| 73-1 | S████ A█████ |
| 73-2 | M██████ E█ T |
| 74-1 | C███ A█ |
| 74-2 | A█████ O███ MAX |
| 75-1 | B██ J███ MED |
| 75-2 | ███ B████ MOD |

TOTAL = 20

Total CALE = 9

SUPERVISION = 7
MOD = 2
MED = 1
MAX 1

CNA = 2

HA=
3.5(4)

TOTAL = 28   TotalCale=3
SUPERVISION = 6
MOD = 4    MIN = 1
MED = 3

EXHIBIT

"O"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON                )
                               )    Civil Action No.  03 - 0374e
            Plaintiff,         )
                               )
vs.                            )    Judge Maurice B. Cohill, Jr.
                               )
                               )
ALPINE MANOR, INC. d/b/a       )
INTEGRATED HEALTH SERVICES     )
OF ERIE AT BAYSIDE             )
                               )
            Defendant.         )

## AFFIDAVIT OF RAY MARTINEZ

I, Ray Martinez, do hereby depose and voluntarily state:

1.      I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.      I was formerly employed at Integrated Health Services (hereinafter "IHS") as the Vice President of Human Resources.  Kathleen Hodson was employed as an LPN at IHS.  Ms. Hodson was on light duty from a work related injury.  At the time of Ms. Hodson's employment at IHS, I oversaw 134 different facilities.

3.      On or about May 17, 2002, or shortly thereafter, Ms. Hodson called me claiming she had been terminated from her position by Dave Dinges.  She claimed that she was assigned to work on a hall that was too physically difficult for her and she walked out on her shift because she did not want to work on Northwest Hall.  At no time

1

EXHIBIT

"P"

during this conversation did she claim that she was being discriminated against because of her religion or a disability. At no time during this conversation did she claim she was being harassed.

4.    Before May 17, 2002, Ms. Hodson never complained that she was being harassed or discriminated in any way by either Dave Dinges or Roger Watkins. She never made any claims of violations under the ADA, religious discrimination, sexual discrimination or harassment or hostile work environment. These allegations only surfaced when Ms. Hodson litigated her worker's comp claim.

5.    I was physically present in the facility enough that employees knew they could and should contact me with any problems or complaints. Ms. Hodson was aware of who I was, what my position was and how to contact me directly with any complaints she may have had. She also could have called the 1-800 hotline number and filed a complaint. Any complaints made through the hotline would be forwarded to my attention for investigation. I do not recall ever receiving any complaints from Ms. Hodson through the 1-800 hotline.

I have read and had an opportunity to correct this Affidavit consisting of _2_ pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7/26/05

Ray Martinez

2

# Disciplinary Action Form

### Disciplinary Action Form

Date 17 May 02

Name Cathy Hodson LPN

Dept. _NSG_

Disciplinary Action:

Verbal* ☐   Written ☐   Written & Suspension ☐   Discharge ☒

To the employee:

Your performance has been found unsatisfactory for the reasons set forth below. Your failure to improve or avoid a recurrence will be cause for further disciplinary action.

Details: LPN was assigned New Hall on 17 May 3-11 shift. LPN Came to DON Ch "She could not work that Hall it was not in her restriction." I told her her restrictions well 20" wt restriction, no pulling or lifting/lifting no matter what hall you are on. She stated "then I'm leaving." I told her if you leave you are done, you will no longer be employed here. LPN said then I'm leaving.

A copy of this warning was personally delivered to the above employee by:

_____  RN DON

Supervisor

17 May 02
Date

17 May 02

I have received and read this warning notice. I have been informed that a copy of this notice will be placed in my personnel file.

_____

Employee

_____

Date



EXHIBIT

"Q"

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON                    )
                                   )     Civil Action No.  03 - 0374e
        Plaintiff,                 )
                                   )
    vs.                            )     Judge Maurice B. Cohill, Jr.
                                   )
                                   )
ALPINE MANOR, INC. d/b/a           )
INTEGRATED HEALTH SERVICES         )
OF ERIE AT BAYSIDE                 )
                                   )
        Defendant.                 )

### AFFIDAVIT OF MAUREEN MAGRAW

I, Maureen Magraw, do hereby depose and voluntarily state:

1.     I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.     I am currently employed at IHS at Bayside as an LPN.  I worked with Kathleen Hodson, who was employed as an LPN.  Both David Dinges and Roger Watkins, were also employed at IHS and were at varying times Ms. Hodson's supervisor.

3.     I do not have much  knowledge with respect to Ms. Hodson's physical limitations. I am aware that she had back problems and that she was assigned to light duty tasks.  In general, Ms. Hodson was not happy working at IHS or being a nurse.  She believed nursing was too stressful on her body.  She mentioned to me that she received a worker's comp lump sum settlement.

1



EXHIBIT

"R"

4.     Ms. Hodson vented generally to me about Mr. Dinges and Mr. Watkins and she was put off by them. She complained Mr. Dinges assigned her to halls that she allegedly could not physically perform tasks on, but I did not witness Mr. Dinges treating her inappropriately. I had no knowledge of what her physical restrictions were, but she said IHS accommodated her by having other staff push her medicine cart. She never complained that Mr. Dinges discriminated against or harassed her in any way. She mostly complained of the assignments Mr. Dinges asked her to perform.

5.     Ms. Hodson is open about her religious beliefs. I never heard Mr. Dinges making any comments to Ms. Hodson about her religion, nor did she complain about this to me.

6.     Mr. Watkins is openly gay. Ms. Hodson had a problem with this and clearly she objected to his personal life style. The way he acted offended her. I heard Mr. Watkins make sexual jokes on a couple of occasions, but these jokes were not directed to any employee in particular and were generally about his own sexual preference. It was just his sense of humor and his personality. I can not recall specifically what he said, but Ms. Hodson personally did not like Mr. Watkin's sense of humor. I am not aware that Ms. Hodson ever complained to any Supervisor about this, nor did I ever complain . She never claimed that any of his comments were directed to her. I am not aware of any employee complaining about Mr. Watkins jokes. I never took offense to Mr. Watkins' sexual preference, nor do I believe he is discriminatory against women.

7.     I do not believe IHS has a hostile work environment. I have complained about procedural and managerial type matters in the past, however, I have never experienced any type of discrimination or harassment at IHS by any other employee or any

2

supervisor or manager, nor have I witnessed any discrimination or harassment against any other employee. No employee has ever complained to me about being harassed or discriminated against.

8.    If I ever needed to make a complaint of harassment or discrimination at IHS, I am aware of how to do so. This policy is provided in the employee handbook and during the time Ms. Hodson was employed at IHS, there was a 1-800 number posted around the facility that employees could call to make complaints.

I have read and had an opportunity to correct this Affidavit consisting of 3 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7/25/05                    _Maureen Magraw_
                                  Maureen Magraw

3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON )
)    Civil Action No.   03 - 0374e
Plaintiff, )
)
vs. )    Judge Maurice B. Cohill, Jr.
)
)
ALPINE MANOR, INC. d/b/a )
INTEGRATED HEALTH SERVICES )
OF ERIE AT BAYSIDE )
)
Defendant. )

## AFFIDAVIT OF CARMEN CALLICOTT

I, Carmen Callicott, do hereby depose and voluntarily state:

1.      I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.      I am currently employed at IHS at Bayside as an LPN.   I worked with Kathleen Hodson, who was employed as an LPN. Both David Dinges, RN, BSN and Roger Watkins, RN, were also employed at IHS and were at varying times Ms. Hodson's supervisor.   I was roommates with Mr. Watkins and he and I were friends.

3.      I do not have any knowledge with respect to Ms. Hodson's physical limitations, nor am I aware of how she became injured. I am aware that she was assigned to light duty tasks.  She complained generally about not wanting to perform simple non-physical tasks and that she was not being accommodated.   She never specifically verbalized to me what accommodations she asked for that she was not granted. It

1



EXHIBIT
"S"

appeared to me that she was being treated fairly, but she just did not want to work and made excuses. I do know that she was provided with a different medication cart and that someone else was to push the cart down the hall for her when she was passing out medications.

4.    Ms. Hodson never complained to me about Mr. Dinges, besides her constant general complaints that she did not want to perform the tasks she was assigned. She never complained that he discriminated against or harassed her in anyway. I never witnessed him treating her inappropriately.

5.    Ms. Hodson never complained to me about Mr. Watkins. Mr. Watkins is openly gay. Ms. Hodson had a problem with this and clearly she objected to his personal life style.

6.    I never heard Mr. Watkins talk about his sexual fantasies or exploits at work, nor did I ever hear him use this kind of language when we lived together. I never heard him talk about his physical attributes.

7.    I am aware that Ms. Hodson claims that I was witness to her allegations of discrimination and sexual harassment and that she complained to me about these issues. This simply is not true. I never heard Mr. Watkins making statements about wanting to give patients flu shots in their butts, or him joking about how Attends would not fit him because of his physical endowments. I never heard him talking about wanting "to do it with a priest." I never heard Mr. Waktins or Mr. Dinges disparage Mr. Hodson because of her religious beliefs.

8.    Ms. Hodson's allegations that she saw Mr. Watkins pinch my nipples is false. Had Mr. Watkins touched me in any improper manner, I certainly would have

2

complained about it. I never made any such complaint against Mr. Watkins because nothing inappropriate ever happened.

9.    I do not know why Mr. Hodson is involving me in her allegations against IHS. Frankly, I do not believe any of her assertions. I think she is simply looking for free money.

10.    I do not believe IHS has a hostile work environment. Most of the employees at IHS get along and it is a pleasant place to work. I have never experienced any type of discrimination or harassment at IHS by any other employee or any supervisor or manager, nor have I witnessed any discrimination or harassment against any other employee. Besides Ms. Hodson's unjustified accusations, no employee has ever complained to me about being harassed or discriminated against.

11.    If I ever needed to make a complaint of harassment or discrimination at IHS, I am aware of how to do so. This policy is provided in the employee handbook and during the time Ms. Hodson was employed at IHS, there was a 1-800 number posted around the facility that employees could call to make complaints.

I have read and had an opportunity to correct this Affidavit consisting of 3 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7/25/05

Carmen Callicott
Carmen Callicott

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON          )

        Plaintiff,         )

vs.                  )

ALPINE MANOR, INC. d/b/a     )
INTEGRATED HEALTH SERVICES    )
OF ERIE AT BAYSIDE        )

        Defendant.       )

Civil Action No.  03 - 0374e

Judge Maurice B. Cohill, Jr.

### AFFIDAVIT OF DONNA MARSILI

I, Donna Marsili, do hereby depose and voluntarily state:

1.    I have personal knowledge and I am competent to testify as to the matters set forth herein.

2.    I am currently employed at IHS at Bayside as an RN.  I worked with Kathleen Hodson, who was employed as an LPN. Both David Dinges and Roger Watkins were also employed at IHS and were at varying times Ms. Hodson's supervisor.

3.    Ms. Hodson never complained to me about Mr. Dinges. She never complained that he discriminated against or harassed her in anyway. I never witnessed him treating her inappropriately.

4.    Ms. Hodson never complained to me about Mr. Watkins.  Mr. Watkins is openly gay.  Ms. Hodson is a very religious person who is also very open about her

1



EXHIBIT

"T"

convictions, and at times her commitment to her religion seemed over the top. Ms. Hodson clearly had a problem with Mr. Watkins lifestyle.

5.      I am aware that Ms. Hodson claims that I was witness to her allegations of discrimination and sexual harassment and that she complained to me about these issues. I do not recall her ever complaining to me about Mr. Watkins throwing a box a lancets (a small box of injection needles) at her and asking Ms. Hodson if they were too heavy, nor did I ever witness this.

6.      I do not recall ever having a conversation with Ms. Hodson wherein she was complaining to me about being mistreated and I told her I did not want to get involved. I can not deny that this happened, but I can not recall any such incident.

7.      I never heard Mr. Watkins talk about his sexual fantasies or exploits at work. I never heard him talk about his physical attributes. I never heard Mr. Watkins making statements about wanting to give patients flu shots in their butts, or him joking about how Attends would not fit him because of his physical endowments. I never heard him talking about wanting "to do it with a priest." I never heard Mr. Watkins or Mr. Dinges disparage Mr. Hodson because of her religious beliefs.

8.      Ms. Hodson's never complained to me that she saw Mr. Watkins pinch Carman Callicott's nipple. Ms. Callicott certainly never complained of such an incident to me. I have never witnessed Mr. Watkins acting in an inappropriate manner and I personally have never felt uncomfortable around him.

9.      I do not believe IHS has a hostile work environment. Most of the employees at IHS get along and it is a pleasant place to work. I have never experienced any type of discrimination or harassment at IHS by any other employee or any supervisor or manager,

2

nor have I witnessed any discrimination or harassment against any other employee. Besides Ms. Hodson's unjustified accusations, no employee has ever complained to me about being harassed or discriminated against.

      10.    If I ever needed to make a complaint of harassment or discrimination at IHS, I am aware of how to do so. This policy is provided in the employee handbook and during the time Ms. Hodson was employed at IHS, there was a 1-800 number posted around the facility that employees could call to make complaints.

      I have read and had an opportunity to correct this Affidavit consisting of 3 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7-26-05

Donna Marsili

3

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

KATHLEEN HODSON )
) Civil Action No.   03 - 0374e
Plaintiff, )
)
vs. ) Judge Maurice B. Cohill, Jr.
)
)
ALPINE MANOR, INC. d/b/a )
INTEGRATED HEALTH SERVICES )
OF ERIE AT BAYSIDE )
)
Defendant. )

### AFFIDAVIT OF DONNA MARSILI

I, Donna Marsili, do hereby depose and voluntarily state:

1.      I have personal knowledge and I am competent to testify as to the matters
set forth herein.

2.      I am currently employed at IHS at Bayside as an RN.   I worked with
Kathleen Hodson, who was employed as an LPN.  Both David Dinges and Roger Watkins
were also employed at IHS and were at varying times Ms. Hodson's supervisor.

3.      Ms. Hodson never complained to me about Mr. Dinges. She never
complained that he discriminated against or harassed her in anyway. I never witnessed him
treating her inappropriately.

4.      Ms. Hodson never complained to me about Mr. Watkins.  Mr. Watkins  is
openly gay.  Ms. Hodson is a very religious person who is also very open about her

1

convictions, and at times her commitment to her religion seemed over the top. Ms. Hodson clearly had a problem with Mr. Watkins lifestyle.

5.    I am aware that Ms. Hodson claims that I was witness to her allegations of discrimination and sexual harassment and that she complained to me about these issues. I do not recall her ever complaining to me about Mr. Watkins throwing a box a lancets (a small box of injection needles) at her and asking Ms. Hodson if they were too heavy, nor did I ever witness this.

6.    I do not recall ever having a conversation with Ms. Hodson wherein she was complaining to me about being mistreated and I told her I did not want to get involved. I can not deny that this happened, but I can not recall any such incident.

7.    I never heard Mr. Watkins talk about his sexual fantasies or exploits at work. I never heard him talk about his physical attributes. I never heard Mr. Watkins making statements about wanting to give patients flu shots in their butts, or him joking about how Attends would not fit him because of his physical endowments. I never heard him talking about wanting "to do it with a priest." I never heard Mr. Watkins or Mr. Dinges disparage Mr. Hodson because of her religious beliefs.

8.    Ms. Hodson's never complained to me that she saw Mr. Watkins pinch Carman Callicott's nipple. Ms. Callicott certainly never complained of such an incident to me. I have never witnessed Mr. Watkins acting in an inappropriate manner and I personally have never felt uncomfortable around him.

9.    I do not believe IHS has a hostile work environment. Most of the employees at IHS get along and it is a pleasant place to work. I have never experienced any type of discrimination or harassment at IHS by any other employee or any supervisor or manager,

2

nor have I witnessed any discrimination or harassment against any other employee. Besides Ms. Hodson's unjustified accusations, no employee has ever complained to me about being harassed or discriminated against.

10. If I ever needed to make a complaint of harassment or discrimination at IHS, I am aware of how to do so. This policy is provided in the employee handbook and during the time Ms. Hodson was employed at IHS, there was a 1-800 number posted around the facility that employees could call to make complaints.

I have read and had an opportunity to correct this Affidavit consisting of 3 pages and I hereby verify under penalty of perjury that the statements contained in this Affidavit are true and correct to the best of my knowledge and belief.

Dated: 7-26-05

Donna Marsili

3

# EMPLOYEE
# CORPORATE COMPLIANCE

### ACKNOWLEDGEMENT

I, *Kathleen Hodson*                    *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*
    (PRINT employee name)                    (Social Security Number)

as an employee to the Company, acknowledge that:

*KH* / *5-7-98* have received, and have read, the Standards of Conduct, and
(initial) (date)

*KH* / *5-7-98* my continued employment with the Company depends on my
(initial) (date)  full Compliance with all Company rules and policies, and
         JCAHO Standards, and obedience to all local, state, and feder-
         al laws, rules, and regulations governing Medicare or other fed-
         erally funded health care programs, and

*KH* / *5-7-98* neither the Standards of Conduct nor this Form:
(initial) (date)  - create a contract for employment,
         - alter my status as an at-will employee, or
         - create a policy of progressive discipline.

*Kathleen Hodson LPN*                 *5-7-98*
    (Employee signature)                    (Date)

EXHIBIT

"U"

## EMPLOYEE
### CORPORATE COMPLIANCE
*ACKNOWLEDGMENT*

I, _Kathleen Hodson_                              _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_
    **(PRINT** employee name)                    (Social Security number)

as an employee to the Company, acknowledge that:

_KH 11-18-01_ I have received, and have read, the Standards of Conduct, and
(initial) (date)

_KH 11-18-01_ my continued employment with the Company depends on my full
(initial) (date)       Compliance with all Company rules and policies, and JCAHO Standards,
                       and obedience to all local, state, and federal laws, rules, and regulations
                       governing Medicare or other federally-funded health care programs, and

_KH 11-18-01_ neither the Standards of Conduct nor this Form:
(initial) (date)       -create a contract for employment,
                       -alter my status as an at-will employee, or
                       -create a policy of progressive discipline.


_Kathleen Hodson_                    _1-18-07_
(Employee-signature)                 (Date)

*90%*

# COMPLIANCE 2001
## Post Test

**Name :** *Kathleen Hodson*          **Date:** *1-18-02*

1.  Which is (are) the primary reason(s) that IHS has implemented a Compliance Program?

    a.  To define the policies, rules and standards to be followed by all employees.
    b.  To inform you of your obligation to report violations of policies, standards and laws.
    c.  To inform you of resources and communication tools available to you to express your concerns, including the IHS Compliance Hotline.
    d.  All of the above.

2.  When reviewing the therapy billing logs prior to Triple Check you noticed that the PRN therapist who treated Mrs. Blue last week did not document the number of units or minutes of physical therapy she provided on October 25th. You know she was with the resident for at least an hour that day. What should you do?

    a.  Document 4 units on the Billing Log because you are sure she at least provided that amount of therapy.
    b.  Call the therapist and request that she come back to the facility and document the services she provided.
    c.  Do nothing.
    d.  Call the therapist and tell her to add the units of therapy she provided on October 25th to the next time she treats the resident.

3.  It is your responsibility to call the Compliance Hot Line if:
    a.  You suspect fraud in the facility.
    b.  You feel uncomfortable discussing your concerns with your supervisor or Administrator.
    c.  You have brought the issues and concerns to the attention of the appropriate staff and you believe the issue has not been addressed or resolved.
    d.  All of the above.

4.  IHS cooperates fully with all government investigations. Should government investigators arrive at an IHS facility, you should:
    a.  Immediately notify your supervisor. If your supervisor is not on the premises, you should immediately contact the Corporate Legal/Compliance Department.
    b.  Be respectful and courteous.
    c.  Request identification of all government officials.
    d.  Request that the government officials identify the purpose of their visit to the facility.
    e.  All of the above.

5.  The False Claims Act prohibits billing for services not medically necessary.            **True**          **False**

6.  During an internal audit, services are identified as non-covered. As a result, all payments received for these services are considered overpayments and must be refunded to the payor.            **True**          **False**

7.  IHS' policy prohibits retaliation against anyone reporting suspected violations of laws, regulations or IHS policies.            **True**          **False**

8.  A provider can be fined up to $11,000 per claim and up
    to treble damages for submitting a false claim to a federal
    health care program.

 True    False

9.  The Anti-Kickback Statute prohibits you from accepting or offering gifts
    from or to anyone who refers Medicare or Medicaid business to IHS
    in return for referral of patients.

 True    False

10. A Physician Certification for Skilled Care is required to be signed
    and dated by the physician for Medicare Part A residents.

 True    False