**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| KATHLEEN HODSON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil No. 03-374 E |
| ALPINE MANOR, INC. d/b/a/ | ) |
| INTEGRATED HEALTH SERVICES | ) |
| OF ERIE AT BAYSIDE, | ) |
| | ) |
| Defendant. | ) |

## OPINION

Plaintiff Kathleen Hodson, pro se, brings this suit alleging numerous civil rights

violations under Title VII and the ADA arising out of her employment as a licensed practical

nurse at a skilled nursing facility. Presently before the Court is defendant's motion for summary

judgment. For the reasons stated herein, we will grant the motion.

## I. Background

The basic facts of this case are not in dispute, unless otherwise noted. Plaintiff Kathleen

Hodson is a licensed practical nurse. She was employed by defendant, Alpine Manor, Inc., d/b/a

Integrated Health Services of Erie at Bayside ("IHS"), a skilled nursing facility in Erie,

Pennsylvania, from May 15, 1997 through May 17, 2002. Hodson claims she was fired due to

her religion, Evangelical Christian, and harassed on the basis of her religion, in violation of Title

1

VII. She also claims that: 1) she was discriminated against by management during her employment because of her disability; 2) she was harassed during her employment, either on a theory of sexual harassment or harassment due to her disability; and 3) she was terminated in retaliation for having been injured on the job.

Hodson's job required her to assess patients, pass out medications, perform treatments and document patient charges. She was supervised by a combination of the director of nursing, an assistant director of nursing and other registered nurse supervisors.

## A. Hodson's Back Injury

Hodson suffered a back injury on the job on March 30, 2001, which initially caused her to miss ten days of work; thereafter, she returned to light duty status. She was released by the IHS doctor to full duty roughly 90 days after the injury occurred. At her request, IHS arranged for her to see another doctor for a second opinion. That physician opined that she should return to light duty status. IHS made the necessary arrangements and she was on light duty status (a 20 - 30 pound lifting restriction) from July 6, 2001 through the end of 2001. She also periodically took time off work due to back pain.

Hodson's chiropractor, Michael Ang, D.C., evaluated her condition on December 18, 2001, and filled out a Functional Capacity Evaluation. He stated she could occasionally lift up to 20 pounds and could frequently lift up to ten pounds. He stated that as for positional tolerances, she could only occasionally (0-33% of the time) walk, squat and bend at the trunk; she was unable to kneel. Dr. Ang excused her from work from January 31 through February 28, 2002, when she would be re-evaluated by him. Hodson then went on a medical leave of absence for nearly two months in early 2002, as per her family doctor's recommendations. She did not

2

receive worker's compensation or disability pay during this time.

In the meantime, in a letter dated February 4, 2002, IHS advised Hodson that she was being placed on unpaid medical leave, based upon the excuse from Dr. Ang. IHS also advised her in the letter that in order for her to be approved for any type of paid leave through worker's compensation, she would have to see John J. Euliano, M.D., the treating orthopaedic whose opinion IHS's insurance carrier recognized as necessary to relieve her of work duties. Hodson saw Dr. Euliano, who released her back to work at light duty status with a 20 pound lifting restriction, beginning February 11, 2002.

Dr. Ang's previous opinion continued to release Hodson from work until February 28, 2002. On March 5, 2002, Hodson obtained another release from work from Dr. Euliano for an additional two weeks, which Dr. Euliano opined would facilitate her scheduling of spinal injections. Dr. Euliano stated that he "gave her the benefit of the doubt" and opined that "her complaints are out of proportion to the MRI findings that we have been able to ascertain up until this point in time." After this release expired, Hodson obtained another doctor release from Mary Ann Wendel, D.O., excusing her from work on February 14 through February 17 due to "back strain."

When she returned to work on March 29, 2002, Hodson returned to her prior position. IHS records indicate that her return to work was conditioned upon the most recent work restriction provided by any doctor: the weight lifting restriction of 20 pounds imposed by Dr. Euliano on February 11, 2002. Her schedule clearly states in writing: "Kathy, We can start you on days for a week to get back in the swing of things. Remember your 20# restriction... Have CNA/supervisor's/nurses push your carts ½ down the hall. No repositioning or turning

3

residents."

IHS coordinated this light duty status through IHS administrator Carl Kovski. He had sent her a letter dated February 19, 2002, advising her of the availability of light duty work and setting forth what her job duties would be within the restrictions given by Drs. Euliano and Ang. In the letter Hodson was asked to review the job description with her doctor and have him notify IHS if there were areas within the job duty restrictions she could not perform. Neither Hodson nor Dr. Ang ever provided any supplemental information or restrictions. Hodson has never claimed she was asked to lift something over 20 pounds.

After she returned to work on March 29, 2002, IHS made numerous accommodations, including having other employees push the medication cart, helping her open and close drawers and lift heavy equipment, as well as allowing her to go home early. There were also times when other IHS nurses treated her patients if she was unable to do so. At her written request, Kovski permitted her to go to the physical therapy room and put hot packs on her back and lie down on the therapy mats during breaks.

According to IHS employees, including her direct supervisor Dave Dinges, IHS did not perceive or believe she was disabled because she never claimed to be disabled; rather, she was on light duty status with a twenty pound weight limitation. Hodson believes that when she returned to work, she was not on "light duty" status because IHS assigned her other tasks besides filling out paperwork. She believed that performing any work on the patient halls was not light-duty work. Although she complained she did not want to perform certain tasks, those tasks were within the light duty restrictions set forth by her doctor: a 20 pound weight lifting limit. Nurses' aides were assigned to every hall at the facility and were available to assist Hodson should the

4

need arise.

In his affidavit, Dave Dinges states:

> Ms. Hodson often was over dramatic about her physical limitations and it was my impression that she did not want to work and would do just about anything to get out of performing an assigned task. There were times when she would wheel herself around in an office chair with wheels around the nurses station and other moments where she would have no trouble pushing a medication cart down the hall. She would ask other nurses to carry a patient chart for her that weighed no more than 1 or 2 pounds. She would complain that there was no one around to help her, but there were always nurses aids assigned to every hall and all she had to do was ask. There were times I would see her bending down to pick something up off the floor with no difficulty. She complained she did not want to perform certain tasks, even though those tasks were within her light duty restrictions. Ms. Hodson had a problem with me because I held her to her job requirements and I would not let her neglect her work.

Dinges Aff. ¶ 7.

Hodson further alleges that she applied for a position in patient assessment/medical billing documentation position, and that had IHS hired her, this would have been a way for IHS to accommodate her alleged disability. She notes that the job was offered to someone with less seniority. According to Dinges, he interviewed Hodson for the position but chose to hire the other applicant because she was more qualified. Dinges explains that such positions are not filled based on seniority, but rather, qualifications. Acccording to Dinges, Hodson's assessment and documentation skills were lacking and not adequate for the job requirements.

### B. Alleged Religious Discrimination and Harassment

It was no secret at IHS that Hodson held strong religious beliefs; she openly discussed God in her life and claims employees would ask her to pray for them. According to Hodson, at some point before her work related injury (and at thus, at least one year prior to her last day of employment) co-worker Dave Dinges put a folded note addressed to her on the bulletin board.

The note concerned an incident wherein Hodson forgot to put her initials on a treatment record. According to Hodson, Dinges wrote something along the lines of "What an amazing thing you have performed" or "Did you lay hands on them and heal them?" Hodson claims she gave the note to Sharon DiLoreto, who was then the Director of Nursing, but Hodson herself admits that DiLoreto has no recollection of the note.

Dinges admits that he placed a note for Hodson on the pin-up board, as he did for all staff, but the notes were always folded in half or placed in an envelope so other staff could not read the note's contents. Dinges denies that the note on the board disparaged Hodson's religious beliefs; rather, he has stated that in his note he questioned why she did not perform a treatment as ordered by a physician. Dinges admits, however, that he may have made a comment at one time to another employee questioning how Hodson treated patients. According to Dinges, Hodson would boast that if it were not for her, patients would have died and that she had saved them. He believes he asked her whether she had actually performed CPR as she had claimed, and said, "What did Kathy do, put her hands on them and heal them?" IHS characterizes this as an isolated comment made in jest. There is no dispute that Hodson never complained to Dinges about the comment and as far as he was aware, she never filed a written complaint about it. Hodson admits that this is the only incident-- whether it be in the written or verbal form -- she has to support her claim for religious discrimination.

Hodson also complains that she was reprimanded by Dinges for not properly signing off on narcotics. Hodson believes that another nurse who made the same mistake was not reprimanded; according to Dinges, the other nurse was reprimanded.

Hodson alleges that after her injury, she was targeted by her co-worker, IHS employee

6

Roger Watkins, Assistant Director of Nursing. According to Hodson, Watkins, an openly gay Roman Catholic, made sexual innuendos in front of her because she is a Christian. IHS employees have stated in affidavits that Hodson had a problem with Watkins' sexual preference, and thus, the two had personality conflicts at work. According to IHS, Hodson was heard making derogatory comments while working at the nurses station, calling Watkins a "faggot" and stating that "God does not approve of homosexuality." IHS personnel also claim that Hodson said to Watkins, "Your people are wrong" and "All his people should be put on an island." Watkins has stated in his affidavit that when she made such comments he would roll his eyes and walk away without saying anything back to her. According to Hodson, Watkins' sexual preference did not bother her and she does not have a religious stance on this issue.

Hodson was repeatedly asked in her deposition if there were any other specific instances to support her claim of religious discrimination or harassment and she could not articulate any other incident.

### C. Alleged Sexual Harassment

Ms. Hodson alleges that at some point Watkins threw a small box of lancets at her, saying "If that's not too heavy for you, could you take it."[1] Registered nurse Donna Marcelli, who was not Hodson's supervisor, witnessed this and Hodson said, "How long do I have to continue to take this treatment?" According to Hodson, Marcelli shrugged her shoulders and said she did not want to get involved. Hodson admits that she never complained to anyone else other than Marcelli about this incident. Marcelli has no memory of this incident.

---

[1] Hodson relies on this evidence in support of her claim for harassment based on her disability as well.

7

Hodson also alleges that at one point Watkins put medications and files in front of her and asked her to send them back and make a record of them. She claims he threatened to write her up if she did this wrong; Hodson admits that Watkins never wrote her up for any misconduct. Watkins alleges this never happened; he never threatened her, nor did he ever write her up for any misconduct.

According to Hodson, Hodson overheard Watkins making sexual comments to Carmen Callicott, another LPN. Hodson claims that Watkins boasted that he could not put adult diapers on himself due to his physical endowments. In another alleged incident, Watkins stated he wanted to give patients "flu shots in the butt" because he wanted to see his male patients naked. He also stated he wanted to "do it with a priest," according to Hodson. These comments, not directed at Hodson, were stated in Hodson's presence and witnessed by Callicott. At some point Callicott complained to Hodson that Watkins had pinched Callicott's nipples, although Hodson did not witness this and admits she never complained about this incident to anyone at IHS.

Hodson cannot recall if she complained to management about these incidents, although she claims she told Rist _ and Kovski about Watkins' behavior. When asked in her deposition if there were other incidents of harassment or discrimination, she stated "Oh, I can't specifically remember right now, but, I mean, there was a lot more other harassment."

### D. May 17, 2002 –Hodson's Last Day of Work

On May 17, 2002, Hodson punched in, looked at the hall assignments, and became upset when she realized that she was scheduled to work on Northwest Hall, an area she did not normally work in. IHS was understaffed that day and it was necessary to adjust staff assignments

8

to cover care for all patients.. She claims that Carl Kovski, then Administrator of IHS, had previously stated she was only to be assigned to Ambassador Hall. Kovski denies that he ever said this. Dinges denied ever being told that Hodson was to be assigned soleley to Ambassador Hall. In fact, IHS employees maintain that there is no valid reason why she could not have worked on any of the other halls within her restrictions. IHS supervisory employees have stated in their affidavits that they would have considered her documented work restrictions regardless of which hall she was assigned to.

Hodson, unhappy with the assignment, told the nurse whom she was supposed to relieve that she could not take over for her and went to find Kovski. Kovski was unavailable, and instead, Hodson spoke to her supervisor, Dave Dinges, Director of Nursing. Their conversation was witnessed by Kathy Mannion, Assistant Director of Nursing, and Sheila Rist, Human Resources Manager. During the conversation, Hodson told Dinges she would not work in Northwest Hall. He replied that if she left her shift, she would be abandoning her job. Hodson did not discuss what accommodations she believed IHS should have made in order for her to work there; instead, she simply refused to do work in that hall. Hodson now claims she should not have been assigned to work on any hall because such work was not light duty. She told Dinges that she had heard another nurse state that Northwest Hall "was a bear" and was very demanding, and was concerned that the medicine cart was organized differently and required frequent bending. Hodson admits that she was aware that there was about the same number of patients on Northwest Hall and Ambassador Hall on that particular day. According to Dinges, Hodson had the support staff she needed to perform her job in the Northwest Hall and her job responsibilities would have been no different than those on the Ambassador Hall.

9

Dinges denied her request to work elsewhere, urged her to remain at work, and warned her of the consequences of refusing the assignment. Hodson refused, punched out and walked off the job. This was in violation of IHS policy because she abandoned her patients without adequate notice or without finding a replacement. IHS records indicate that Hodson punched in that day at 2:49 p.m. and punched out at 3:22 p.m. Dinges filled out a disciplinary action form documenting what had occurred.

Hodson went home and called Ray Martinez, the Vice President of Human Resources. This was her first call to corporate headquarters to file a complaint. During the phone call she did not complain of harassment or discrimination based on religion or disability. It appears that Martinez was initially confused as to whether or not Dinges had terminated Hodson or whether she had a legitimate claim for worker's compensation. Despite the fact that Martinez told her she was not terminated, Hodson never returned to work.

The next day, Hodson called Kovski in an attempt to return to work and was told that she had abandoned her patients and was terminated. In meantime, however, Martinez processed her worker's compensation claim and Hodson began collecting receiving worker's compensation. She was paid $404.09 per week in worker's compensation benefits, pursuant to a Notice of Compensation payable issued on July 10, 2002. She was paid this amount weekly for nearly 49 weeks before commutation of her claim was reached. On April 30, 2003, pursuant to a compromise and release agreement, she was awarded the sum of $57,500.00 for the time period after her last day of work. In the end, IHS documentation clearly states that Hodson was terminated effective May 20, 2002, because she refused to work on the Northwest Hall and had abandoned her patients. See IHS "Termination Form" attached to Pl.'s Br. In Support of Opp. To

10

Def.'s M. Summ. J. This "termination form" was dated April 24, 2003. Hodson signed a
resignation letter, resigning her employment from IHS, on April 29, 2003.

### E. Other Information

Hodson's work history at IHS is not blemish-free. IHS records indicate that from August,
1997 through May, 2002, she was reprimanded for: failure to follow proper policy and procedure
in re-capping a lancet, giving the wrong medication to a patient and failure to call a physician and
document the mistake, failure to follow medication administration policy by giving a patient the
wrong medication, failure to follow proper documentation procedure, failure to follow physician
orders with a patient, failure to meet minimum standards of care of patients, failure to remove an
IV from a patient in a timely manner, failure to provide treatment or explain why treatment was
not provided, a verbal warning for improper documentation, a verbal warning for excessive
absenteeism, failure to properly sign in and out for lunch and breaks, failure to properly complete
a narcotic count and document file. According to IHS, she could have been terminated for
several of these infractions.

The IHS Employee Handbook sets forth its grievance policy, which is essentially an
"open door policy." Employees were advised of the grievance procedure upon hiring and at
training sessions. Hodson admits that Kovski told her that she could come to him with any
complaints; she also admits that she felt she could make complaints to Rist at Human Resources.
IHS also provides a hotline number for employees to call and make complaints. This 800
number was posted throughout the IHS facility. Hodson never called the number. Moreover,
Hodson admits that although she was aware that IHS employees could file written complaints
with Ray Martinez, Corporate Director of Human Resources, she never did so. There is no

11

dispute that Hodson signed an acknowledgment of the IHS handbook and policies. IHS also provided a yearly refresher course on discrimination and harassment in the workplace. Hodson admitted in her deposition that she had attended sexual harassment and discrimination training and was aware of how to make a complaint.

Since her termination, Hodson has not attempted to seek other employment. She claims she never recovered from her work-related injury. She claims she cannot walk far and has to rest often. Hodson believes she has a disability in walking. She has a herniated disk, walks with a limp, does not use a leg brace, crutch or cane. She attempted to collect Social Security Disability benefits but her request was denied on the basis that she could work in less physically demanding jobs. It is unclear when her application was filed; she testified at her deposition that her deadline for appealing the decision was February 11, 2005.

## II. Standard of Review

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; Celotex Corp. v. Catrett, 477 U.S. 317 (1986). In reviewing the evidence, facts and inferences must be viewed in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). Summary judgment must be entered in favor of the moving party "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party. . . ." Id. at 586-87 (citations omitted).

On motion for summary judgment, the moving party bears the initial burden of

identifying those portions of the record that it believes demonstrate the absence of genuine

dispute as to any material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat

summary judgment, the non-moving party must respond with facts of record that contradict the

facts identified by the movant and may not rest on mere denials. Id. at 317, quoting Fed. R.

Civ.P. 56(e)); see First Nat'l Bank of Pennsylvania v. Lincoln Nat'l Life Ins. Co., 824 F.2d 277,

282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would

support a jury finding in its favor. See Anderson v. Liberty Lobby, 477 U.S. 242, 248-49

(1986)..

When a moving party has carried his or her burden under Rule 56, the nonmoving party

"must do more than simply show that there is some metaphysical doubt as to the material facts.

. . ." Id. (citations omitted). The nonmoving party "must present affirmative evidence in order to

defeat a properly supported motion for summary judgment," and cannot "simply reassert

factually unsupported allegations contained in [the] pleadings." Williams v. Borough of West

Chester, 891 F.2d 458, 460 (3d Cir.1989) (citation omitted). However, "[i]f the [nonmoving

party's] evidence is merely colorable, or is not significantly probative, summary judgment may be

granted." Anderson, 477 U.S. at 249-50 (citations omitted).

In order to satisfy the standard for summary judgment "the affiant must ordinarily set

forth facts, rather than opinions or conclusions. An affidavit that is 'essentially conclusory' and

lacking in specific facts is inadequate to satisfy the movant [or non-movant]'s burden." See Blair

v. Scott Specialty Gases, 283 F.3d 595, 608 (3d Cir. 2002); Maldonado v. Ramirez, 757 F.2d 48,

51 (3d Cir.1985). In addition, "the mere of existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could

13

reasonably find for the plaintiffs." Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004), quoting Anderson, 477 U.S. at 252.

Kathleen Hodson appears before the court pro se. The Court recognizes its obligation to construe liberally pro se submissions to ensure that rules of pleading, sometimes thorns in the side of the most studied practitioner, do not subvert a litigant's opportunity for judicial remediation of wrongful conduct. See Haines v. Kerner, 404 U.S. 519 (1972). But a forgiving interpretation does not render immune from summary judgment claims that lack factual viability. Where one party is proceeding *pro se,* the court reads the *pro* se party's papers liberally and interprets them to raise the strongest arguments suggested therein. See Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994). Despite this liberal interpretation, however, a "bald assertion," unsupported by evidence, cannot overcome a properly supported motion for summary judgment. Carey v. Crescenzi, 923 F.2d 18, 21 (2d Cir. 1991). With this in mind, the Court turns to defendant's arguments for summary judgment as to the various claims set forth in the Complaint.

## III. Discussion

Title VII of the Civil Rights Act of 1964 "makes it unlawful for an employer 'to discriminate against any individual with respect to his [or her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.' " Kunin v. Sears Roebuck & Co., 175 F.3d 289, 293 (3d Cir.1999), citing 42 U.S.C. § 2000e2(a)(1); Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 259 (1981).

In discrimination and retaliation cases, proof at summary judgment follows a well-established burden-shifting approach first set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). The McDonnell Douglas framework requires a plaintiff alleging a

14

violation of Title VII to first establish a prima facie case of discrimination. The prima facie case,

the elements of which depend upon the kind of claim the plaintiff is alleging, "eliminates the

most common nondiscriminatory reasons for the plaintiff's rejection." Burdine, 450 U.S. at 254;

see also Id. at n. 6. In so doing, "the prima facie case 'raises an inference of discrimination only

because we presume these acts, if otherwise unexplained, are more likely than not based on the

consideration of impermissible factors.'" Id.

　　　　Under this burden-shifting approach, once a plaintiff has established a prima facie case of

discrimination or retaliation, the defendant must rebut an inference of wrongdoing with evidence

of a legitimate, non-discriminatory or non-retaliatory reason for the action taken. Delli Santi v.

CNA Ins. Cos., 88 F.3d 192, 199 (3d Cir. 1996); Weston v. Commonwealth of Pennsylvania, 251

F.3d 420, 432 (3d Cir. 2001). If a defendant successfully meets its burden in a discrimination or

retaliation case, then in order to avoid summary judgment, the plaintiff must present evidence of

pretext or cover-up, or show that discrimination played a role in the employer's decision making

and had a determinative effect on the outcome. Fuentes v. Perskie, 32 F.3d 759, 764 (3d

Cir.1994); Weston, 251 F.3d at 432. The plaintiff, thus, has the ultimate burden of proving by a

preponderance of the evidence that the legitimate reasons offered by the defendant were not its

true reasons, but were pretext for discrimination. Jones v. School Dist. of Philadelphia, 198 F.3d

403, 410 (3d Cir.1999). The ultimate burden to prove discrimination on the basis of the claimed

protected class – the burden of production – remains with the plaintiff at all times. See Barber v.

CSX Distrib. Servs., 68 F.3d 694, 698 (3d Cir.1995).

　　　　Notwithstanding the moving party's burden, the Third Circuit urges special caution in

granting summary judgment to an employer when its intent is at issue, particularly in

15

discrimination and retaliation cases. Goosby v. Johnson & Johnson Med., Inc., 228 F.3d 313, 321
(3d Cir.2000).

## A. Title VII Discrimination

Because Hodson appears pro se, the legal theories on which she relies are often unclear
and overlapping. To the extent that she is asserting a disparate treatment claim, we note the
following.

To state a claim for discrimination under Title VII, a plaintiff must show by a
preponderance of the evidence that: (1) she was a member of the protected class; (2) she was
qualified for the position for which she applied; (3) she was subject to adverse employment
action despite being qualified; and (4) under circumstances that raise an inference of
discriminatory action, the employer continued to seek out individuals with qualifications similar
to the plaintiff's qualifications to fill the position. McDonnell Douglas, 411 U.S. at 802; Burdine,
450 U.S. at 253; Sarullo v. United States Postal Service, 352 F.3d 789, 797 (3d Cir. 2003). We
assume that Hodson asserts she was subject to adverse employment action when she was
terminated and when IHS failed to hire her for the MDS position.

Hodson relies on a few isolated and stray remarks made by Dinges and Watkins
concerning her religion, some of which were of a sexual nature. However, these remarks were
isolated, remote in time, and have not been shown to have had anything to do with her
termination or separation from employment. We agree with the defendant that her assertions of
discrimination seem to stem from the fact that she did not get along with Dinges and Watkins.
Personality conflicts and questioning of job performance are unavoidable aspects of employment;
plaintiff must show legally sufficient evidence to be entitled to an actionable claim of

16

discrimination. Hakins v. Pepsico, 203 F.3d 274, 282 (4th Cir. 2000). Even if she could be said

to have established a prima facie case (under any of the proffered legal theories), she has not

shown that IHS had anything other than a legitimate, nondiscriminatory, business reason to

terminate her position: Hodson disobeyed a direct order by her supervisor, walked out of the

facility, and abandoned her patients. The same holds true with respect to Hodson's not being

hired for the MDS position: Dave Dinges has explained that a more qualified applicant was hired

and that Hodson was not hired because she had a history of poor assessment and documentation

skills. Certainly the litany of documented reprimands described supra bears this out. The record,

taken as a whole, could not lead the rational trier of fact to find for Hodson on these legal

theories. Hodson has no evidence to show that IHS's reason for her termination is unworthy of

credence or pretextual. She has not presented evidence of such "weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons

for its action," such that a reasonable factfinder could rationally find IHS' reasons unworthy of

credence.      ·

Ms. Hodson also alleges "religious discrimination," a cause of action which does not

seem to apply to her arguments and the factual background of her experiences at IHS.

Nevertheless, we note that to state a *prima facie* case for religious discrimination under Title VII,

she must establish the following: she held a bona fide religious belief that conflicted with an

employment requirement; she informed the employer of this belief; and she was disciplined for

failing to comply with the conflicting employment requirement. Shelton v. Univ. of Med. &

Dentistry of N.J., 223 F.3d 220, 224 (3d Cir. 2000). We find that she has failed to state or show

a prima facie case because she has *failed to inform* her employer that she held a religious belief

17

that conflicted with an *employment requirement*. At most, words which may have been of a

religious nature were exchanged between Hodson and her co-workers which may have offended

Hodson; we have no evidence that she was unlawfully subjected to an *employment requirement*

that conflicted with her beliefs.

## B. Hostile Work Environment

Defendant argues that Plaintiff has failed to produce sufficient factual evidence to support

her hostile work environment claim. The Third Circuit has set forth five elements that a plaintiff

must prove to state a claim for hostile work environment based on her sex: (1) the employee

suffered intentional discrimination because of her gender; (2) the discrimination was pervasive

and regular; (3) the discrimination detrimentally affected the employee; (4) the discrimination

would detrimentally affect a reasonable person; and (5) the existence of *respondeat superior*

liability. Weston, 251 F.3d at 426.

In addition, Hodson appears to have alleged that she was subjected to a hostile work

environment based on her religion. To make out a prima facie case for a religiously hostile work

environment under Title VII, a plaintiff must demonstrate five similar elements: (1) the

employee suffered intentional discrimination because of religion; (2) the discrimination was

pervasive and regular; (3) the discrimination detrimentally affected the plaintiff; (4) the

discrimination would detrimentally affect a reasonable person of the same [religion] in that

position; and (5) the existence of *respondeat superior* liability." Kunin, 175 F.3d at 293, citing

Andrews, 895 F.2d at 1482; Abramson v. William Paterson College of New Jersey, 260 F.3d

265 (3d Cir. 2001).

In determining whether a work environment is hostile, "the totality of the circumstances

18

must be considered, including the frequency of the discriminatory conduct, its severity, whether

it is physically threatening or humiliating or a mere offensive utterance, and whether it

reasonably interferes with an employee's work performance." Harris v. SmithKline Beecham, 27

F.Supp.2d 569, 577 (E.D. Pa.1998); see also Harris v. Forklift Systems Inc., 510 U.S. 17, 23

(1993). A single action may be sufficient to support a hostile work environment claim if the act

is "of such a nature and occurs in such circumstances that it may reasonably be said to

characterize the atmosphere in which a plaintiff must work." Id. at 578. Generally, however, a

plaintiff must show that she was subjected to " 'repeated, if not persistent acts of harassment.' "

Id., quoting Bedford v. Southeastern Pennsylvania Transp. Auth., 867 F. Supp. 288, 297 (E.D.

Pa.1994). "The Third Circuit has defined pervasive harassment as that which occurs regularly or

when incidents are in concert with one another." Andrews v. Philadelphia, 895 F.2d 1469, 1484

(3d Cir.1990).

    As for the last factor required to show hostile work environment, *respondeat superior*

liability, an employer will be liable for the harassing conduct of the alleged victim's coworker if

the employer was "negligent or reckless in failing to train, discipline, fire or take remedial action

upon notice of harassment." Bonenberger v. Plymouth Twp., 132 F.3d 20, 26 (3d Cir. 1997).

An employer is negligent if it "knew or should have known about the harassment, but failed to

take prompt and adequate remedial action." Jensen v. Potter, 435 F.3d 444, 453 (3d Cir. 2006).

Even if the remedial action does not stop the alleged harassment, it is "adequate" if it is

"reasonably calculated" to end the harassment. Id.

    In the event that any of the alleged harassers are considered Ms. Hodson's supervisors,

rather than a co-worker, IHS may establish that it was not vicariously liable by proving that it

took prompt and adequate remedial action and that Hodson failed to take advantage of the
preventative opportunities offered to her. Burlington Industries, Inc. v. Ellerth, 524 U.S. 742,
765 (1998).

Reviewing the evidence in the light most favorable to Plaintiff and resolving all
reasonable inferences in her favor, the Court finds that she has not presented sufficient evidence
to raise a genuine issue of material fact sufficient to support a claim of hostile work environment
based either on her sex or religion.  We find that the behavior and comments of her co-workers,
at most, were offensive utterances, rather than rising to the level creating a legally sufficient
hostile work environment. The alleged discriminatory conduct did not occur with much
frequency or severity, was not physically threatening or humiliating, and was not pervasive
enough or regular enough so as to detrimentally affect *a reasonable person in the same position*
as Ms. Hodson from being able to perform her job.  Dinges' comment about Hodson healing
patients with her hands appears to be nothing more than an isolated comment made in jest
(although we have no doubt that Hodson did not perceive it this way); Hodson admitted in her
deposition that this was the only incident she has to support her claim for religious-based
discrimination.[2]  Hodson admits that the sexual comments she overheard Watkins making were
not directed at Hodson herself; Hodson's vague description of other incidents of harassment is
that "there was a lot more other harassment." Such "evidence" is hardly sufficient to prove a

_____

[2]As for openly-gay Watkins making sexual innuendos in front of her because she is a
Christian, Hodson appears to have withdrawn this as a basis for her claim of hostile work
environment based on religion.  She vehemently denied in her deposition ever being offended by
Watkins' sexual orientation and claims she does not have a religious stance on the issue of sexual
orientation.

claim of hostile work environment sufficient to survive a motion for summary judgment.

Even assuming that Hodson has met her burden and has demonstrated the first four elements of a prima facie case, she has not done so with respect to the final element, *respondeat superior* liability. There is no dispute that Hodson never complained to Dinges about his comment ("What did Kathy do, put her hands on them and heal them?") and never filed a written complaint about the incident. Hodson all but admits that the only evidence she has that she complained about this incident is her own memory that she told Sharon DiLoreto; Hodson admits, however, that DiLoretto has no memory of Hodson reporting the incident. Thus, IHS cannot be held liable because it did not know or could not have known about the harassment. Similarly, she cannot recall if she complained to management about certain incidents involving Watkins. She admits she never reported to anyone the alleged incident in which Watkins pinched Carmen Callicot's nipple.

Accordingly, Defendant's Motion for Summary Judgment on will be granted as to the allegations of hostile work environment based on sex and religion.

### C. The ADA

To establish a prima facie case of employment discrimination under the ADA, "a plaintiff must be able to establish that he or she (1) has a 'disability,' (2) is a 'qualified individual,'[3] and

---

[3] The ADA defines a qualified individual as one "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8) (2002). In evaluating whether Plaintiff is a qualified individual, we must decide whether (1) she "satisfies  the requisite skill, experience, education and other job-related requirements of the position" and (2) she, "with or without reasonable accommodation, can perform the essential functions of the position." Deane, 142 F.3d at 145. Arguably, Ms. Hodson has called into question whether she is qualified to work as an

21

(3) has suffered an adverse employment action because of that disability." Deane v. Pocono Med. Ctr., 142 F.3d 138, 142 (3d Cir.1998) (en banc) (citations omitted). A plaintiff can establish that she has a disability if she has a mental or physical impairment that substantially limits a major life activity, has a record of such an impairment, or is regarded has having such an impairment. 42 U.S.C § 12102(2).

The Third Circuit follows the two-step analysis recommended by the EEOC's interpretive guidelines for determining whether a plaintiff is substantially limited in her ability to perform a major life activity. See Mondzelewski v. Pathmark Stores, Inc., 162 F.3d 778, 783 (citing 29 C.F.R. Pt. 1630, App.§ 1630.2(j)); Reese v. American Food Service, No. CIV.A.99-1741, 2000 WL 1470212, at *5 (E D. Pa. Sept. 29, 2000). A court must first determine whether the plaintiff is significantly limited in a life activity other than working. Mondzelewski, 162 F.3d at 783. Only if the court finds that this is not the case should it move to considering whether plaintiff is substantially limited in the major life activity of *working*. Id.

The ADA does not define "major life activities." Kelly v. Drexel University, 94 F.3d 102 , 105 (3d Cir. 1996). The EEOC regulations, however, provide, that an individual is substantially limited in a major life activity when she is "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner, or duration under which [she] can perform a particular major life activity, as compared to the condition, manner, or duration under which the average person in the general

LPN because she denies being able to perform certain essential functions of the positiondue to her back injury. Thus, under her own theory, it would be doubtful that she is entitled to the protections provided by the ADA.

population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1). The regulations suggest considering the nature and severity of the impairment, the duration or expected duration of the impairment, and the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii). Major life activities include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. § 1630.2(i). If an activity is not enumerated among the EEOC's exemplars of major life activities, the court must evaluate its significance to determine whether it is a major life activity within the meaning of the ADA. Bragdon v. Abbott, 524 U.S. 624, 638, 118 S.Ct. 2196, 141 L.Ed.2d 540 (1998).

At her deposition, Ms. Hodson explained that her alleged disability (resulting from the herniated disc injury at work) was pain, loss of function, difficulty walking and back spasms. Hodson Dep. at 70, attached to Def.'s M. Summ. J. as Ex. "B." She admitted that she walks with a limp, but she does not use a brace, crutch, cane or walker. She testified that at times she has difficulty walking and must lie down or put a hot pack on due to the pain. As of the date of her deposition she hadn't seen her doctor for six months, and was taking Darvocet and Flexeril. Id. at 43, 72. Hodson admits that she attends church on a weekly basis. Id. at 47. She further testified that she can no longer garden and that she cannot drive her car very far. Some two years prior to the deposition she had adopted her 13 year old granddaughter, whose father, Hodson's son, an amputee; Hodson collects social security benefits on behalf of the granddaughter.

IHS cites to three cases in which persons who had limitations similar to Hodson's were not found to be person substantially limited in a major life activity, including: being limited in

23

the number of hours they could walk or stand, being limited in the distance they could walk,

walking with a limp, having weight limitations in lifting objects, and who were in pain.

Marinelli v. City of Erie, 216 F.3d 354 (3d Cir. 2000); Taylor v. Pathmark Stores, Inc., 177 F.3d

180 (3d Cir. 1999); and Kelly v. Drexel University, 94 F.3d 102 (3d Cir. 1996). We agree that

under the case law, Hodson's claims of back pain and weight lifting restriction of 20 pounds,

which make it difficult for Hodson to walk, has not been held by the courts to be "substantially

limiting" in a major life activity.

In Kelly, an employee who was a buyer in a university's purchasing department who

suffered hip fracture, causing him to limp, alleged, inter alia, that his termination violated the

ADA. The district court entered summary judgment in favor of the university, on the grounds

that he was not substantially limited in the major life activity of walking; the United States Court

of Appeals for the Third Circuit affirmed. Kelly, 94 F.3d at 106. The court noted that "Kelly,

however, presented no evidence that he required any special devices like a cane or crutches to aid

him in walking. . . . Kelly's trouble climbing stairs, which requires him to hold the handrail,

does not substantially limit his ability to walk." Id. The Kelly court noted that "both the

regulations and the [EEOC Compliance M]anual make clear that comparatively moderate

restrictions on the ability to walk are not disabilities." Id.

We also note that like the plaintiff in Kelly, Ms. Hodson appears to suggest that IHS may

have terminated her because she was perceived as being disabled. The evidence is clear,

however, that IHS employees did not perceive Hodson as disabled, and further, "the mere fact

that an employer is aware of an employee's impairment is insufficient to demonstrate either that

the employer regarded the employee as disabled or that that perception *caused* the adverse

24

employment action.' Id. at 109 (emphasis added).

In Taylor v. Pathmark Stores, Inc., 177 F.3d 180 (3d Cir. 1999), a supermarket cashier who had undergone arthroscopic surgery for an ankle problem and walked with crutches brought an ADA claim against his employer. Taylor indicated that he could walk or stand for fifty minutes without rest. Id. at 186. Finding that Taylor was no different than an average person with respect to walking or standing during this fifty minute stretch, and thus, could carry out most regular activities that require standing and walking, the court held Taylor was not disabled within the purview of the ADA. Id.

In Marinelli, plaintiff, an employee of the City of Erie, was driving a snow plow on the streets of Erie when a pick-up truck collided with his vehicle, suffering injuries to his shoulder, arm and hand and residual pain in his arm.   216 F.3d 354. He sued the city under the ADA alleging failure to reasonably accommodate his physical impairment. The United States Court of Appeals for the Third Circuit held, inter alia[4], that Marinelli's inability to lift more than ten pounds did not constitute a "substantial limitation" on the major life activity of lifting, and further, that the lifting restrictions which his physician had placed on his work were insufficient to establish that he was substantially limited in his ability to work. The Court noted that recent case law indicated that the courts "have rejected claims of disability based on an inability to lift

---

[4] We also note that the court rejected Marinelli's attempt to equate his successful attempt to receive worker's compensation benefits with being disabled pursuant to the ADA. 216 F.3d at 366, n. 8. "In Pennsylvania, worker's compensation benefits are only paid to those who have lost earning capacity. . . . . Because an ADA plaintiff must establish that he or she can perform the essential functions of the job he seeks, it would appear that a finding of worker's compensation benefits would *contradict* – not *support* – a claim of disability under the ADA." Id. (emphasis in original).

similar weights to those with which Marinelli alleges to experience difficulty." Id. at 364-65, citing Williams v. Channel Master Satellite Sys., Inc., 101 F.3d 346 (4th Cir. 1996); Ray v. Glidden Co., 85 F.3d 227, 229 (5th Cir. 1996); Aucutt v. Six Flags Over Mid-America, Inc., 85 F.3d 1311, 1319 (8th Cir. 1996); and Thompson v. Holy Family Hosp., 121 F.3d 537 (9th Cir. 1997). The court further held that his physical impairment did not significantly limit his ability to work, noting that the EEOC "has stipulated that in order for one to be properly characterized as substantially limited from working as required by the ADA, an individual must be unable to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." 216 F.3d at 365, citing 29 C.F.R. §§ 1630.2(I); 1630.2(I)(3) (1999). Marinelli argued that the restrictions placed upon his work by his doctor (medium range of exertion) did not adequately indicate a *class of jobs* from which he is disqualified as a result of his impairment. Id.

We find that under the case law and regulations, Hodson's back pain, back injury, and weight lifting restriction do not constitute a disability under the ADA. We do not doubt that she suffers some level of impairment; however, these types of impairments have not been found to be legally sufficient because they are not substantially limiting in a major life activity. Hodson's injury occurred in March of 2001 and she continued to work in a light duty capacity, after treatment, for well over a year. She is able to attend church on a weekly basis. She was able to attend her deposition without taking medication on that day. She does not need any assistive devices in order to walk.

Hodson argues that her physical impairment significantly limits her ability to work, which classifies as a major life activity. 29 C.F.R. §§ 1630.2(I). To be substantially limited in the

26

major life activity of working, "one must be precluded from more than one type of job, a specialized job or a particular job of choice." Sutton, 527 U.S. at 492, 119 S.Ct. 2139. EEOC regulations specify that the inability to perform a single, particular job does not constitute a substantial limitation on working. 29 C.F.R. § 1630.2(j)(3)(i). Furthermore, in an ADA case, the plaintiff bears the burden of establishing that due to her impairment, she is limited in her ability to perform either a class of jobs or a broad range of jobs in various classes "as compared to the average person having comparable training, skills and abilities." Mondzelewski, 162 F.3d at 784. Thus, a court must consider an individual's training, skills and abilities in order to evaluate whether their particular ailment constitutes, for that particular person, a significant limitation on employment. Id. We find that Hodson has failed to meet her burden in this regard. She has not shown that she is unable to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The Supreme Court of the United States has stated that, "[i]f jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs. Similarly, if a host of different types of jobs are available, one is not precluded from a broad range of jobs." Sutton, 527 U.S. at 492. The factors to consider in determining whether an individual is substantially limited in the major life activity of working include: the geographical area; the number and types of jobs utilizing similar training, knowledge, skills or abilities, from which the individual is also disqualified." Id., citing, 29 C.F.R. §§ 1630.2(j)(3)(ii)(A), (B). In this case, Hodson does not discuss, argue, or mention in any fashion her preclusion from a substantial class of jobs. This is fatal to her claim.

An employer commits unlawful discrimination under the ADA when it does "not mak[e]

27

reasonable accommodations to the known physical or mental limitations of an otherwise
qualified individual with a disability who is an applicant or employee, unless [the employer] can
demonstrate that the accommodation would impose an undue hardship on the business [of the
employer]." 42 U.S.C. § 12112(b)(5)(A) (2002). The ADA requires that employers and
employees engage in an interactive process to identify the employee's limitations resulting from a
disability and the kinds of accommodation which would be both appropriate and feasible. 29
C.F.R. § 1630.2( o)(3). The Third Circuit has placed the responsibility on both parties to engage
in the interactive process in good faith, and indicated that our duty is to isolate the cause of any
breakdown and assign responsibility for it. Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 312
(3d Cir.1999).

　　　The employee bears the responsibility of initiating the interactive process by providing
notice of her disability and requesting accommodation for it. Id. at 313. The employee's request
need not be written, nor need it include the "magic words 'reasonable accommodation,' [but] the
notice must nonetheless make clear that the employee wants assistance for his or her disability."
Id. Once the employer knows of the disability and the desire for the accommodation, it has the
burden of requesting any additional information that it needs, and to engage in the interactive
process of designing a reasonable accommodation-the employer may not "in the face of a request
for accommodation, simply sit back passively, offer nothing, and then, in post-termination
litigation, try to knock down every specific accommodation as too burdensome." Id. at 316.

　　　Even assuming that Hodson's alleged back pain and physical limitations would meet the
minimum requirements for disability under the ADA, the record is clear that IHS did not know or
perceive that Hodson was "disabled." She has not shown that she bore the responsibility of

initiating the interactive process by providing notice of her alleged disability and requesting accommodation for it. Rather, IHS was led to believe that she was released to continue work on light duty status. This is legally different from being disabled under the ADA. Thus, if IHS did not know she had an alleged "disability," then it could not have fired her due to her disability. Moreover, there is no evidence that IHS's articulated business reason for Hodson's termination (job abandonment) was pretextual given the fact that IHS clearly permitted Hodson to work on light duty status for over a year and provided accommodations to her within her restrictions. Therefore, because Hodson has not established a genuine issue of material fact sufficient to support her prima facie case under the ADA, we will grant summary judgment in favor of IHS as to this claim.

### D. Retaliation

Hodson initially alleged unlawful retaliation without specifying the exact cause of action she was alleging. Thus, to cover all its bases, in Defendant's Brief in Support of Motion for Summary Judgment, defendant argues that Hodson cannot prove a cause of action under any of the following three different theories retaliation under Title VII, the ADA, or a claim for wrongful discharge under Pennsylvania law. Defendant's Brief in Support of Motion for Summary Judgment [doc. 51] at 32-33. However, in "Plaintiffs' Reply to Defendants' Reply Brief in Support of Motion for Summary Judgment" she states that she relies on all three theories enunciated by the defendant. Doc. 49 at pp.8-10.    She appears to be alleging that she suffered retaliation as a result of her complaints concerning alleged religious and sexual harassment, as well as as a result of filing her claim for worker's compensation.

29

In order to prevail on the claim for retaliation under Title VII, an employee must prove that (1) she engaged in a protected employment activity, (2) her employer took an adverse employment action after or contemporaneous with the protected activity, and (3) a "causal link" exists between the adverse action and the protected activity. Weston v. Pennsylvania, 251 F.3d 420, 430 (3d Cir. 2001). Ms. Hodson argues that she was subject to adverse employment action in the form of denial of the opportunity to work in the MDS position, which presumably would have placed her away from her alleged harassers, and also her termination. She also argues in her response to defendant's motion for summary judgment (but did not allege in her complaint) that: 1) she was retaliated against for her work related injury when supervisors Robin Otis and Jen Heiser tried to force her to work overtime, to make up time she missed from work to take a health related test; and 2) Lorie Gurdak, Director of Nursing, and Sheila Rist allegedly tried to make her work a full-duty assignment against her doctor's orders. Hodson has recently produced a new document which indicates that Ray Martinez rescinded the termination and changed it to a leave of absence based on worker's compensation pending a commutation of her worker's compensation claim. Exhibit "1" to Plaintiff's Brief in Support of Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment (Doc. 46) at 12. That document, dated and signed on May 24, 2007, entitled "Data Change Form" indicates that effective May 20, 2002, Martinez designated Hodson as being on a leave of absence based on worker's compensation.

We find that Ms. Hodson has failed to establish that any of the alleged adverse actions were causally connected to the protected employment activities which she engaged. Title VII provides that:

> It shall be an unlawful employment practice for an employer to discriminate

30

>  against any of his employees . . . because he has opposed any practice made an
>  unlawful employment practice by this subchapter, or because he has made a
>  charge, testified, assisted, or participated in any matter in an investigation,
>  proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "Opposition" to discrimination "can take the form of 'informal protests

of discriminatory employment practices, including making complaints to management.'" Moore

v. City of Philadelphia, 461 F.3d 331, 343 (3d Cir. 2006).. Thus, a plaintiff had to demonstrate

that the adverse action affected the terms and conditions of his or her employment. Id. However,

the United States Supreme Court rejected the notion that the anti-retaliation provision of Title

VII was limited to discriminatory actions affecting the terms and conditions of employment

finding that its protections also extended to employment actions that are not employment related

or actions taken outside the workplace. Burlington Northern & Santa Fe Railway Co. v. White,

--- U.S. ----, ----, 126 S.Ct. 2405, 2412, 2414, 165 L.Ed.2d 345 (2006) (" Burlington Northern").

Finding that Title VII's retaliation provision should be interpreted broadly, the Court specifically

held that a plaintiff must show only that "a reasonable employee would have found the

challenged action materially adverse" and that, in the context of a retaliation claim, a materially

adverse action means one that "might well have dissuaded a reasonable worker from making or

supporting a charge of discrimination."Id. at ----, 126 S.Ct. at 2414 (Internal quotations and

citations omitted). The Court emphasized that the adversity must be material so as to distinguish

between harms that are significant and those that are trivial and that the standard is an objective

one, i.e., how a reasonable employee would react. Id.

       Hodson alleges that she engaged in activity protected by Title VII by complaining to her

supervisors about Watkin's and Dingess's harassing behavior and that she was generally,

31

harassed by her co-workers as a result of complaining about their behavior. She does not appear to allege that she was in any way dissuaded from filing her charge with the EEOC or from moving forward with her worker's compensation claim. After reviewing the evidence as a whole and viewing it in the light most favorable to Hodson, we conclude that a reasonable juror could not conclude, or infer, that management's alleged adverse action were causally connected to Hodson's alleged protected employment activities. There simply is insufficient evidence to connect these events, nor is their timing, standing alone suggestive. We find that the time period between Hodson's informal complaint and the first alleged adverse action is, without additional evidence, insufficient to raise an inference of causation. Andreoli v. Gates, 2007 WL 1029690 (3d Cir. April 6, 2007). In order to establish a prima facie case of retaliation with respect to her termination, Hodson must show a causal connection between her protected activity and her termination. Cardenas v. Massey, 269 F.3d 251, 263 (3d Cir. 2001). Hodson has not shown that she complained of religious or sexual discrimination or harassment during her employment, and even if a fact-finder believed her self-serving statements, there is no evidence that she was retaliated against for making such complaints. Rather, she was terminated after she voluntarily made a choice to refuse her job assignment to Northwest Hall and walked out on her shift. No issues of discrimination or harassment were even remotely involved in her termination. The same holds true with respect to a statutory discrimination claim under the ADA; she has not shown any causal connection between any alleged protected activity and her termination.

As to retaliation for filing a worker's compensation claim, first we note that it is generally the rule that no common-law cause of action for the wrongful discharge of an at-will employee exists under Pennsylvania law. Borse v. Piece Goods Shop, 963 F.2d 611, 614 (3d Cir.1992).

32

Rather, an employer "may discharge an employee with or without cause, at pleasure, unless restrained by some contract." Id.; Shick v. Shirey, 552 Pa. 590, 716 A.2d 1231, 1233 (1998). There is an exception to this rule, however, as explained by the Court in Shick: "the employer's privilege to dismiss an employee with or without cause is not absolute ... and may be qualified by the dictates of public policy." 716 A.2d at 1233; see also, Clark v. Modern Group Ltd., 9 F.3d 321, 327-28 (3d Cir.1993) (stating that an at-will employee may have a cause of action for wrongful discharge if the termination was in violation of a significant, clearly mandated public policy); accord, McLaughlin v. Gastrointestinal Specialists, 561 Pa. 307, 750 A.2d 283, 287 (2000). However, public policy exceptions apply where no statutory remedies are available. Novosel v. Nationwide Insurance Co., 721 F.2d 894 (3d Cir. 1983). Thus, as to her allegations of unlawful retaliation as a result of sexual or religious harassment, within the Title VII framework Hodson had other remedies available to her to seek redress and thus, any wrongful discharge theories are inadequate as to those particular claims.

Yet in McLaughlin, supra, the Pennsylvania Supreme Court held:

[I]n order to set forth a claim for wrongful discharge, a plaintiff must do more than show a possible violation of a federal statute that implicates her own interest. The plaintiff in some way must allege that some public policy of this Commonwealth is implicated, undermined, or violated because of the employer's termination of the employee. Public policy of the Commonwealth must be just that, the policy of this Commonwealth.

750 A.2d at 289. "[A] recognized facet of public policy may be violated by terminating an employee in retribution for exercising a right protected by a Pennsylvania statute, which, by its plain language, fosters a state public policy." Nazar v. Clark Distribution Systems, 2000 WL 1616785, *37 (Pa.Com.Pl., May 5, 2000). Indeed, in Shick, supra, the Supreme Court of

33

Pennsylvania held that a public policy exception to the at-will doctrine applied where an

employee discharged an employee in retaliation for filing a workmen's compensation claim. 716

A.2d at 1237-38. In McLaughlin, the Pennsylvania Supreme Court explained:

> In cases like Shick, there is no question that the public interest and policy of this
> Commonwealth were at stake, for if we allowed an employer to discharge an
> employee for filing a complaint with a Commonwealth agency such as the
> Workers' Compensation Appeal Board, we impact the rights of that employee and
> the public by undermining the very purposes of a statute of this Commonwealth.

750 A.2d at 289. Hodson's Complaint fails to allege wrongful discharge base on her filing a

claim for worker's compensation, nor does it specifically allege the public policy exception

should apply to her case. Regardless, she has no put forth no credible evidence to suggest that the

reason for her termination – regardless of the effective date of the termination – was based on her

filing for worker's compensation benefits.  She worked for IHS for more than a year after she

filed for worker's compensation (March 2001) and the evidence is clear that she was fired for a

legitimate, non-discriminatory reason.    Regarding her most recent allegation that IHS attempted

her to work overtime and once forced her to work full-duty against her doctor's orders, Hodson

has failed to explain or prove when these alleged events (involving Otis and Gurdak) occurred in

relation to her termination, and how, if at all, they had any connection to the processing of her

worker's compensation claims.  Hodson's own personal opinion, without proof, that she should

not have to work on patient halls and claiming that any work on patient halls was full duty, is not

enough to sustain her burden, especially in light of the fact that the work restriction from a

physician only provided for a 20 pound weight limitation.

34

## IV. Conclusion

For the foregoing reasons, we will enter judgment in favor of defendant and against the plaintiff. An appropriate order will be entered.

Date: _May 17, 2007_

_Maurice B. Cohill, Jr._

Maurice B. Cohill, Jr.
Senior United States District Court Judge

35